No. 25-3128

---

# In the United States Court of Appeals for the Sixth Circuit

---

**U.S. DEPARTMENT OF LABOR,**
*Appellee-Plaintiff,*

**v.**

**AMERICARE HEALTHCARE SERVICES, INC; DILLI ADHIKARI,**
*Defendants-Appellants.*

---

On Appeal from the United States District Court for the
Southern District of Ohio, Eastern Division, 2:21-cv-5076

---

## OPENING BRIEF OF APPELLANTS
---

Bruce C. Fox
Daniel McArdle Booker
OBERMAYER REBMANN
MAXWELL & HIPPEL LLP
525 William Penn Place,
Suite 1710
Pittsburgh, PA 15219
(412) 566-1500
bruce.fox@obermayer.com

Jonathan Berry
Michael Buschbacher
James R. Conde
  *Counsel of Record*
Andrew Smith
BOYDEN GRAY PLLC
800 Connecticut Avenue NW
Suite 900
Washington, DC 20006
(202) 955-0620
jconde@boydengray.com

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and 6th Circuit Rule 26.1, Americare Home Healthcare Services, Inc., hereby makes the following disclosure:

Americare Home Healthcare Services, Inc., has no parent corporation, and no publicly held corporation owns its stock. No publicly held corporation that is not a party to this proceeding has a financial interest in this proceeding's outcome.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................... v

STATEMENT IN SUPPORT OF ORAL ARGUMENT .......................... xii

JURISDICTIONAL STATEMENT ......................................................... 1

INTRODUCTION .................................................................................. 2

STATEMENT OF THE ISSUES............................................................. 6

STATEMENT OF THE CASE ................................................................ 7

    I.    Legal Background .................................................... 7

        A.    Congress Extends the FLSA to (Some) Domestic Service Employees ...................................... 7

        B.    The Department Contemporaneously Interprets the 1974 Exemptions........................................... 10

        C.    The Supreme Court Upholds the Department's Longstanding Reading .................................. 12

        D.    The Department Promulgates a "Pen-and-Phone" Reversal.................................................... 15

    II.    Factual Background............................................. 21

    III.    Procedural History ............................................. 22

STANDARD OF REVIEW..................................................................... 24

SUMMARY OF THE ARGUMENT ...................................................... 25

ARGUMENT ........................................................................................ 28

    I.    The Department's Rule Excluding Third-Party Employers From the Live-In Exemption Is Unlawful ........................... 28

A. The Department's Reversal Conflicts With the Best Reading of the Live-In Exemption ................................ 28

B. The District Court Resurrected *Chevron* ..................... 37

II. The Department's Rule Excluding Third-Party Employers From the Companionship-Services Exemption Is Unlawful ................................................................. 48

III. On Remand Defendants May Challenge the Department's Rule Excluding Care From "Companionship Services" and the Rule Is Unlawful ............................................... 55

A. Defendants Have Standing ........................................ 56

B. The Rule Excluding Care From "Companionship Services" Is Unlawful and Unreasonable ................... 57

CONCLUSION ........................................................................ 59

ADDENDUM ............................................................................ i

# TABLE OF AUTHORITIES

PAGE(S)

**CASES**

*Allegheny Def. Project v. FERC,*
964 F.3d 1 (D.C. Cir. 2020) ................................................. 53

*Am. Petroleum Inst. v. EPA,*
862 F.3d 50 (D.C. Cir. 2017) ............................................... 48

*Bartenwerfer v. Buckley,*
598 U.S. 69 (2023) ............................................................... 30

*Carter v. Welles-Bowen Realty, Inc.,*
736 F.3d 722 (6th Cir. 2013) .............................................. 53

*CFTC v. Schor,*
478 U.S. 833 (1986) ............................................................. 33

*Chamber of Com. v. DOL,*
885 F.3d 360 (5th Cir. 2018) .............................................. 54

*City of Arlington v. FCC,*
569 U.S. 290 (2013) ............................................................. 46

*Dayton Power & Light Co. v. FERC,*
126 F.4th 1107 (6th Cir. 2025) .......................................... 47

*E.M.D. Sales, Inc. v. Carrera,*
604 U.S. 45 (2025) ............................................................ 7, 9

*Encino Motorcars, LLC v. Navarro,*
584 U.S. 79 (2018) ............................................ 18, 29, 36, 49

*Energy Mich., Inc. v. Mich. Pub. Serv. Comm'n,*
126 F.4th 476 (6th Cir. 2025) ....................................... 56, 57

*Epic Sys. Corp. v. Lewis,*
584 U.S. 497 (2018) ............................................................. 34

*Food Mktg. Inst. v. Argus Leader Media,*
588 U.S. 427 (2019) ................................................................ 29, 34

*Gun Owners of Am., Inc. v. Garland,*
19 F.4th 890 (6th Cir. 2021) .................................................. 43, 44

*Henson v. Santander Consumer USA Inc.,*
582 U.S. 79 (2017) ........................................................................ 34

*Herr v. U.S. Forest Serv.,*
803 F.3d 809 (6th Cir. 2015) ........................................................ 40

*Home Care Ass'n of Am. v. Weil,*
76 F. Supp. 3d 138 (D.D.C. 2014) (*Home Care I*) ....... 11, 12, 21, 32, 50

*Home Care Ass'n of Am. v. Weil,*
78 F. Supp. 3d 123 (D.D.C. 2015) (*Home Care II*) .............................. 59

*Home Care Ass'n of Am. v. Weil,*
799 F.3d 1084 (D.C. Circ. 2015) (*Home Care III*) ........................ 21, 35

*Kennedy v. Bremerton Sch. Dist.,*
597 U.S. 507 (2022) ...................................................................... 38

*Long Island Care at Home, Ltd. v. Coke,*
551 U.S. 158 (2007) .............................. 2, 12, 13, 14, 15, 17, 36, 38, 41

*Loper Bright Enterprises v. Raimondo,*
603 U.S. 369 (2024) ..... i, 3, 4, 5, 6, 25, 31, 32, 38, 40, 42, 43, 44, 51, 52

*Mackey v. Lanier Collection Agency & Serv., Inc.,*
486 U.S. 825 (1988) ...................................................................... 45

*Maryland v. Wirtz,*
392 U.S. 183 (1968) ........................................................................ 8

*Mayfield v. DOL,*
117 F.4th 611 (5th Cir. 2024) ................................................ 51, 52, 57

*In re MCP No. 185,*
124 F.4th 993 (6th Cir. 2025) ..................................... 4, 26, 32, 39, 40

*In re MCP No. 185*,
No. 24-7000, 2024 WL 3650468 (6th Cir. Aug. 1, 2024) .................. 47

*Me. Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.*,
70 F.4th 582 (D.C. Cir. 2023)...................................................... 34, 37

*Moctezuma-Reyes v. Garland*,
124 F.4th 416 (6th Cir. 2024) ................................................ 4, 42, 43

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife*,
551 U.S. 644 (2007)....................................................................... 30

*Nat'l Credit Union Admin. v. First Nat'l Bank & Tr. Co.*,
522 U.S. 479 (1998)....................................................................... 29

*Penobscot Nation v. Frey*,
3 F.4th 484 (1st Cir. 2021)............................................................ 30

*Rest. L. Ctr. v. DOL*,
120 F.4th 163 (5th Cir. 2024) .................................................. 43, 53

*Russello v. United States*,
464 U.S. 16 (1983)......................................................................... 41

*Skidmore v. Swift & Co.*,
323 U.S. 134 (1944)....................................................................... 46

*Tennessee v. Becerra*,
No. 24-5220, 2025 WL 751585 (6th Cir. Mar. 10, 2025) .............. 39

*United States v. Darby*,
312 U.S. 100 (1941)......................................................................... 7

*United States v. Granderson*,
511 U.S. 39 (1994)......................................................................... 32

*United States v. Mead Corp.*,
533 U.S. 218 (2001)....................................................................... 43

*United States v. Sabhnani*,
599 F.3d 215 (2d Cir. 2010) .......................................................... 30

*Util. Air Regul. Grp. v. EPA,*
573 U.S. 302 (2014) ............................................................ 31

*Welding v. Bios Corp.,*
353 F.3d 1214 (10th Cir. 2004) ...................................... 55

*West Virginia v. EPA,*
597 U.S. 697 (2022) ............................................................ 16

**STATUTES**

5 U.S.C. § 706 ............................................................... 6, 25

5 U.S.C. § 706(2)(A) ........................................................ 25

28 U.S.C. § 1291 ................................................................ 1

28 U.S.C. § 1331 ................................................................ 1

28 U.S.C. § 1345 ................................................................ 1

29 U.S.C. § 203(r) ............................................................. 8

29 U.S.C. § 203(s) ............................................................. 8

29 U.S.C. § 206(a) ............................................................. 7

29 U.S.C. § 206(f) ................................................... 7, 13, 35

29 U.S.C. § 207(a)(1) .......................................................... 7

29 U.S.C. § 207(*l*) ............................................. 7, 8, 13, 29, 35

29 U.S.C. § 213(a)(15) ............. 2, 6, 9, 10, 19, 27, 28, 41, 49, 50, 53, 55, 58

29 U.S.C. § 213(b)(3) ........................................................ 31

29 U.S.C. § 213(b)(21) ................................... 2, 29, 35, 53

29 U.S.C. § 216(a) ............................................................. 7

29 U.S.C. § 216(c) .......................................................... 1, 7

29 U.S.C. § 216(e)(2) ........................................................ 7

29 U.S.C. § 217 ............................................................... 1

42 U.S.C. § 1396n(c) ................................................... 11

42 U.S.C. § 1396n(i)–(k) ........................................... 11

42 U.S.C. § 7601(a)(1)................................................ 46

47 U.S.C. § 201(b) ...................................................... 45

Pub. L. No. 75-718, 52 Stat. 1060 (1938) ................ 7

Pub. L. No. 87-30, 75 Stat. 65 (1961) ...................... 8

Pub. L. No. 93-259, 88 Stat. 55 (1974) .................... 8

Pub. L. No. 93-259, 88 Stat. 76 (1974) .................... 9

**OTHER AUTHORITIES**

29 C.F.R. § 552.3 ........................................... 9, 29, 50

29 C.F.R. § 552.6 ........................................... 6, 22, 27

29 C.F.R. § 552.6(a) ...................................... 19

29 C.F.R. § 552.6(b) ...................................... 19, 56

29 C.F.R. § 552.109 ....................................... 22

29 C.F.R. § 552.109(a) .................................. 52

29 C.F.R. § 552.109(c) .................................. 31, 52

42 C.F.R. § 440.180(b) .................................. 11

42 C.F.R. § 440.181(b) .................................. 11

42 C.F.R. § 440.182(c)................................... 11

40 Fed. Reg. 7,404 (Feb. 20, 1975) ............. 10, 19, 32

78 Fed. Reg. 60,454 (Oct. 1, 2023)........... 17, 18, 19, 20, 33, 36, 55, 56, 57

89 Fed. Reg. 45,404 (May 22, 2024) ........................................ 46

Admin. Conf. of the U.S., Recommendation,
*Severability in Agency Rulemaking* (2018) ........................................ 48

*The American Heritage Dictionary* (1969) ........................................ 57, 58

Antonin Scalia & Bryan A. Garner,
*Reading Law: The Interpretation of Legal Texts* (2012) .............. 29, 34

Black's Law Dictionary (12th ed. 2024) ........................................ 58

Bryan A. Garner,
*Modern English Usage* (4th ed. 2016) ........................................ 30

Fed. R. App. P. 4(a)(1)(B) ........................................ 1

*Final Report of the Attorney General's Committee on
Administrative Procedure* (1941), *available at*
https://perma.cc/GUD8-SHQ4 ........................................ 44

H.R. Rep. No. 93-232 (1973) ........................................ 8

H.R. Rep. No. 93-913 (1974) ........................................ 33, 35

Matt Compton, *Ensuring Fair Pay for Homecare Workers*,
The White House (Dec. 15, 2011), https://perma.cc/F9F6-
2P7U ........................................ 16

The Obama White House, *President Obama on Ensuring
Fair Pay for In-Home Care Workers*, YouTube, at 4:40,
6:08 (Dec. 15, 2011), https://www.youtube.com/watch?v=
96mmOuNeWj4 ........................................ 16

S. Rep. No. 93-300 (1973) ........................................ 8

Thomas W. Merrill & Kathryn Tongue Watts, *Agency Rules
with the Force of Law: The Original Convention*, 116
Harv. L. Rev. 467 (2002) ........................................ 44

U.S. Gov't Accountability Off., GAO-21-72, *Observations on the Effects of the Home Care Rule* (2020), https://www.gao.gov/products/gao-21-72 ............................................. 20

Wage and Hour Advisory Mem. No. 2005-1 (Dec. 1, 2005) .............. 11, 49

The White House, Press Release, *We Can't Wait: President Obama Will Announce Administrative Action to Provide Minimum Wage and Overtime Protections for Nearly 2 Million In-Home Care Workers* (Dec. 15, 2011), https://perma.cc/H8EM-H3QS. ......................................................... 16

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Oral argument is warranted because, apart from raising important questions of statutory interpretation, this appeal raises an important question of administrative law in the aftermath of *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024). Namely, whether, despite the Supreme Court's decision overruling *Chevron*, a generic grant of general rulemaking authority is the kind of "express delegation" that suffices to confer binding effect on an agency's interpretation of a statute in the courts, thereby rendering *Loper Bright* a nullity with no real effect and reinstating *Chevron*.

# JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction over the Department of Labor's civil action because the action arises under the laws of the United States and because it was brought by an officer of the United States expressly authorized to sue by Act of Congress. 28 U.S.C. §§ 1331, 1345; *see also* 29 U.S.C. §§ 216(c), 217. This Court has appellate jurisdiction because the district court granted summary judgment to the Department of Labor and resolved all pending claims, entering a final decision. 28 U.S.C. § 1291; J., R.127. The district court entered final judgment on March 3, 2025, J., R.127, and Defendants immediately appealed the same day, Notice of Appeal, R.128, so the appeal is timely, Fed. R. App. P. 4(a)(1)(B).

## INTRODUCTION

The Fair Labor Standards Act (FLSA) generally requires paying overtime to employees in domestic service. This appeal is about two exemptions from that requirement: the exemption for "companionship services," 29 U.S.C. § 213(a)(15), and the exemption for live-in "domestic service," *id.* § 213(b)(21). When the exemptions were enacted, and for nearly forty years thereafter, the Department of Labor maintained that the best reading of these exemptions is that they apply to employees of so-called "third-party employers": employers who do not reside in the home of the person receiving the services. Under this best reading, providers of home care thrived—and in the process, saved taxpayers money by keeping the elderly and disabled in their homes. The Department's rule embodying that contemporaneous and longstanding reading of the exemptions was upheld as "valid and binding" in *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 162 (2007), a case implicating the exemption for "companionship services."

In 2013, however, the Department of Labor abruptly changed course. After trying and failing to secure legislation revoking these exemptions for the home-care industry, the President candidly explained

that "we can't wait for Congress to act." The Department of Labor then published a rule to carve out home-care agencies from the exemptions, claiming that purported statutory "gaps" in the exemptions could be exploited to that end, while ignoring the best reading of the statute. That was aggressive, even during the giddy agency days of *Chevron* maximalism.

Those days are over. *Loper Bright* "places a tombstone on *Chevron* no one can miss." 603 U.S. at 417 (Gorsuch, J., concurring).

Remarkably, however, the district court whistled past the grave. Applying *Chevron* in all but name, the district court held that the Department's re-write of the exemptions was valid and entitled to deference even after *Loper Bright*. In so holding, the district court legally erred in two respects, and particularly so for the live-in exemption, which is central here.

First, the district court treated the *Chevron*-based *reasoning* of the Supreme Court's decision in *Coke* about the companionship-services exemption as still binding and even *extended* it to a different statutory provision (the live-in exemption), misapplying the Supreme Court's gin-clear instructions about *stare decisis* in *Loper Bright*. Under *Loper Bright*,

lower courts must follow only Supreme Court "holdings" that "*specific agency actions* are lawful"; in every other situation, lower courts must otherwise follow *Loper Bright* and thus the best reading of the statute, not abrogated reasoning based upon *Chevron*. *Id.* at 412 (majority op.) (emphasis added). Doing otherwise defies *Loper Bright*, as this Court recently explained in binding precedent. *See In re MCP No. 185*, 124 F.4th 993, 1002 (6th Cir. 2025).

Second, and more troubling still, the district court reasoned that even under *Loper Bright*, a generic grant of general rulemaking authority (a prerequisite for deference under *Chevron*) still impliedly commands judicial deference to an agency's view about purported "gaps" in statutory text. This return to "implied delegation" derived from a general grant of rulemaking authority is precisely the legal fiction that *Loper Bright* rejected. By holding otherwise, the district court resurrected *Chevron* in all but name. "That can't be right. The case that declared '*Chevron* is overruled' didn't quietly reinstitute it." *Moctezuma-Reyes v. Garland*, 124 F.4th 416, 420 (6th Cir. 2024). As *Loper Bright* recognized, "implied" delegation to "fill in the gaps" is different from "express" delegations that may legitimately confer interpretive discretion to agencies. But a generic

housekeeping grant of rulemaking authority, which is common to virtually all statutes (including in the statutes considered in *Chevron* and *Loper Bright*), is not one of the kinds of express delegations that the Court had in mind. *Loper Bright*, 603 U.S. at 394–95.

\* \* \*

The district court misunderstood *Loper Bright*, failed to exercise independent judgment as the Administrative Procedure Act requires, and failed to follow the best reading of the statute, deferring to the views of the executive agency bringing the lawsuit on questions of law. This Court should vacate the judgment of the district court, vacate the disputed regulations, and remand for further proceedings, consistent with the Administrative Procedure Act and this Nation's long tradition of independent judicial review on questions of law.

# STATEMENT OF THE ISSUES

1. Whether the Department's rule excluding third-party employers, 29 C.F.R. § 552.109, conflicts with the best reading of the exemption for live-in domestic service employees, 29 U.S.C. § 213(b)(21), which applies to "any employee" who satisfies the terms of the exemption, regardless of who his employer is, and contains no "express delegation" of interpretative authority. *Loper Bright*, 603 U.S. at 394–95 (cleaned up).

2. Whether the Department's rule excluding third-party employers, 29 C.F.R. § 552.109, exceeds the bounds of the Department's express delegation to "define[] and delimit[]" the terms of the companionship-services exemption, 29 U.S.C. § 213(a)(15), or is otherwise arbitrary and capricious, 5 U.S.C. § 706.

3. Whether (A) Defendants in this enforcement action have standing to challenge the Department's rule excluding care from the companionship-services exemption; and (B) whether the rule exceeds the bounds of the Department's express delegation to define and delimit the terms of the exemption or is otherwise arbitrary and capricious. 29 C.F.R. § 552.6; 5 U.S.C. § 706.

## STATEMENT OF THE CASE

### I.    LEGAL BACKGROUND

#### A.    CONGRESS EXTENDS THE FLSA TO (SOME) DOMESTIC SERVICE EMPLOYEES

"In 1938, Congress passed and President Franklin Roosevelt signed the Fair Labor Standards Act." *E.M.D. Sales, Inc. v. Carrera*, 604 U.S. 45, 47 (2025). The FLSA requires employers to pay covered employees a minimum wage and "not less than one and one-half times the regular rate" for hours worked in excess of forty hours per week, a requirement known as overtime pay. 29 U.S.C. §§ 206(a), (f), 207(a)(1), (*l*). A failure to pay overtime to an employee makes an employer potentially liable for backpay, an equal amount in liquidated damages, civil penalties, criminal fines, and imprisonment "for not more than six months." *Id.* § 216(a), (c), (e)(2).

The FLSA's coverage has expanded over the years. In 1938, the Act applied only to an "employee[] who is engaged in commerce or in the production of goods for commerce," where commerce was defined as "trade" or "transportation, transmission, or communication" across state lines. Pub. L. No. 75-718, §§ 3, 7, 52 Stat. 1060, 1060, 1063 (1938); *see United States v. Darby*, 312 U.S. 100 (1941). In 1961, Congress introduced

"enterprise" coverage. *Maryland v. Wirtz*, 392 U.S. 183, 186 (1968); Pub. L. No. 87-30, §§ 2, 7, 75 Stat. 65, 65–66, 70 (1961) (codified as amended at 29 U.S.C. § 203(r), (s)). The 1961 Act still covered only enterprises that engaged in interstate commerce, but now also covered any employees of those enterprises, regardless of whether the individual employee was connected to interstate commerce. "Thus the effect of the 1961 change was to extend protection to the fellow employees of any employee who would have been protected by the original Act, but not to enlarge the class of *employers* subject to the Act." *Maryland*, 392 U.S. at 188 (emphasis added).

In the 1974 amendments, however, Congress vastly expanded the class of employers covered by the FLSA. Pub. L. No. 93-259, 88 Stat. 55. There, Congress covered "any employee in domestic service in one or more households," regardless of any connection to interstate commerce. 29 U.S.C. § 207(*l*). This regulated approximately "836,000 households" as "employers." S. Rep. No. 93-300, at 115 (1973); *see also* H.R. Rep. No. 93-232, at 95 (1973) ("Do we really want to subject housewives to possible criminal penalties for failure to keep these records accurately?"). The term "domestic service" covers "cooks, waiters, butlers, valets, maids,

housekeepers, nannies, nurses, janitors, laundresses, caretakers, handy-men, gardeners," and more. 29 C.F.R. § 552.3. As is typical of most statutes, the 1974 amendments included a generic grant of rulemaking authority allowing the Secretary of Labor to "prescribe necessary rules, regulations, and orders with regard to the" 1974 amendments. Pub. L. No. 93-259, § 29(b), 88 Stat. at 76 (codified at 29 U.S.C. § 202 (note)).

"But" as usual under the FLSA, "Congress recognized that a minimum wage and overtime pay would be impractical or inappropriate for some" domestic service workers. *E.M.D. Sales, Inc.*, 604 U.S. at 48. Two statutory exemptions added in 1974 are crucial to this appeal.

First, Congress exempted "casual" babysitters and all employees, casual or not, providing "companionship services" to the elderly or infirm. The FLSA "shall not apply" to

> any employee employed in domestic service employment to provide companionship services for individuals who (because of age or infirmity) are unable to care for themselves (as such terms are defined and delimited by regulations of the Secretary)[.]

29 U.S.C. § 213(a)(15). This is the "companionship-services exemption."

Second, Congress exempted from overtime pay

> any employee who is employed in domestic service in a household and who resides in such household[.]

9

*Id.* § 213(b)(21). This is the "live-in" exemption. Notably, unlike the companionship-services exemption, the live-in exemption does not expressly delegate to the Secretary the authority to "define[] and delimit[]" the "terms" of the exemption through regulations.

## B. THE DEPARTMENT CONTEMPORANEOUSLY INTERPRETS THE 1974 EXEMPTIONS

In 1975, following the 1974 amendments, the Department of Labor promulgated a rule interpreting both exemptions. 40 Fed. Reg. 7,404 (Feb. 20, 1975). The Department addressed whether the exemptions should apply to employees who "are employed by an employer or agency other than the family or household using their services." *Id.* at 7,405. After "consideration," the Department "concluded that these exemptions can be available to such third party employers since they apply to 'any employee' engaged 'in' the enumerated services. This interpretation is more consistent with the statutory language and prior practices concerning other similarly worded exemptions." *Id.* The Department thus understood the exemptions to apply to those "who are employed by an employer or agency other than the family or household using their services." *Id.* at 7,407. For the sake of brevity, we refer to these employers as "third-party employers."

For nearly four decades, the Department of Labor adhered to this reading. *See* Wage and Hour Advisory Mem. No. 2005-1 (Dec. 1, 2005) ("The text of the FLSA makes the applicability of the companionship exemption dependent upon the nature of an employee's activities and the place of their performance, without regard to the identity of the employer."). Congress amended § 213 several times but never disturbed the Department's reading of the exemptions. *See Home Care Ass'n of Am. v. Weil*, 76 F. Supp. 3d 138, 147–48 (D.D.C. 2014) (*Home Care I*), *rev'd*, 799 F.3d 1084 (D.C. Cir. 2015) (*Home Care III*).

Third parties relied upon the Department's reading of the exemptions to help provide affordable, continuous assistance and care to the elderly, infirm, and disabled in their homes. Much of this care is paid for through Medicaid waiver programs meant to encourage "home and community-based services" and "self-directed" and "consumer controlled" care at home. *See* 42 U.S.C. § 1396n(c), (i)–(k); *see also* 42 C.F.R. §§ 440.180(b), 440.181(b), 440.182(c) (listing services). Although the methods of delivering home-care services vary by program and state, in general, home-care agencies are third parties that help states and managed-care organizations administer reimbursements on behalf of eligible

consumers, match consumers with home-care aides, and oversee compliance with Medicaid program assurances to prevent waste, fraud, and abuse. By 2011, "approximately 90% of home health aides and personal care aides, which include those providing companionship services," provided services through third-party agencies such as Defendant Americare. *Home Care I*, 76 F. Supp. 3d at 147.

## C. THE SUPREME COURT UPHOLDS THE DEPARTMENT'S LONGSTANDING READING

More than three decades after the 1974 amendments, in *Long Island Care at Home, Ltd. v. Coke*, the Supreme Court entertained a challenge to the Department's 1975 rule in a private dispute concerning the companionship-services exemption, but not the live-in exemption. 551 U.S. 158 (2007). The Solicitor General, participating as an *amicus*, defended the Department of Labor's 1975 reading of the exemption. U.S. *Amicus* Br., *Coke*, 551 U.S. 158 (No. 06-593), https://perma.cc/5MTQ-P355. The United States argued that the 1975 reading was "most consistent with the statutory text and Congress's intent," and argued that "there is no legal or policy justification for treating employees providing companionship services differently under the FLSA based on the identity of the employer." *Id.* at 18, 23.

On the other side, Evelyn Coke, a home-care aide seeking backpay, argued that the 1975 rule was contrary to law, and conflicted with another rule interpreting the term "domestic service employment" in the companionship-services exemption. *Coke*, 551 U.S. at 166. On the statutory question, Ms. Coke argued "that the words 'domestic service employment' [in the companionship-services exemption] limit the provision's scope to those workers employed by persons who themselves receive the services (or are part of that person's household) and exclude those who are employed by 'third parties.'" *Id.* The phrase "domestic service employment," Ms. Coke insisted, was borrowed from the Social Security Act, which covers workers working in "a private home *of the employer*." *Id.* at 167 (quoting 26 U.S.C. § 3510(c)(1)).

But as the Supreme Court noted, applying Ms. Coke's reading of "domestic service" consistently "across the FLSA" would have absurd results. *Coke*, 551 U.S. at 169. For example, applying that reading to the coverage provisions for employees in domestic service, 29 U.S.C. §§ 206(f), 207(*l*), "would place outside the scope of FLSA's wage and hour rules any butlers, chauffeurs, and so forth who are employed by *any* third party" not covered as an enterprise before 1974, which "seems clearly

contrary to Congress' intent in enacting the 1974 Amendment." *Coke*, 551 U.S. at 169. Ms. Coke acknowledged this problem, but tried to thread the needle: Ms. Coke asked the Supreme Court to read the phrase "domestic service *employment*" in the companionship-services exemption narrowly by reference to the Social Security Act, to exclude third parties, while reading "employed in domestic service" in the FLSA's coverage provisions naturally and thus broadly, to include employees of third parties. Br. for Resp., at *5–10, *Coke*, 551 U.S. 158 (Mar. 27, 2007) (No. 06-593) (emphasis added), 2007 WL 930417.

At least one Justice was skeptical of Ms. Coke's attempt to thread the needle:

> JUSTICE SCALIA: [Y]ou're hanging your case upon the proposition that there is a difference between domestic service employment and employed in domestic service …. Wow. You know, I just don't see how there's any difference in those two at all.

Oral Arg. Audio at 36:20, *Coke*, 551 U.S. 158 (No. 06-593), https://www.oyez.org/cases/2006/06-593.

Regrettably, the Supreme Court never settled the best reading of the statute. Instead, the Court applied *Chevron* deference. The Supreme Court's holding was narrow: "The question before us is whether, in light

of the statute's text and history … the Department's regulation is valid and binding. We conclude that it is." *Coke*, 551 U.S. at 162. Applying the deference framework of *Chevron* at the outset, *id.* at 165, 172–74, the Court "d[id] not find [Ms. Coke's] arguments convincing," *id.* at 167. The Court rejected Ms. Coke's arguments about "domestic service employment." The Court explained that unlike in the Social Security Act, the term "domestic service employment" in "the text of the FLSA does not expressly answer the third-party-employment question." *Id.* at 168. The Court then asserted that the FLSA "explicitly leaves gaps, for example, as to the scope and definition of statutory terms such as 'domestic service employment,'" and noted that the companionship-services exemption "expressly instructs the agency to work out the details." *Id.* at 165, 167. From this, the Court inferred "that Congress intended its broad grant of definitional authority to the Department to include the authority to answer" questions about third-party employers under the companionship-services exemption. *Id.* at 168.

### D. THE DEPARTMENT PROMULGATES A "PEN-AND-PHONE" REVERSAL

After campaigning on the issue but failing to obtain favorable legislation extending overtime pay to home-care aides, President Obama

concluded that "we can't wait for Congress to act." The White House, Press Release, *We Can't Wait: President Obama Will Announce Administrative Action to Provide Minimum Wage and Overtime Protections for Nearly 2 Million In-Home Care Workers* (Dec. 15, 2011), https://perma.cc/H8EM-H3QS. During a "We Can't Wait" event, the president lamented the Supreme Court's decision in *Coke* and noted: "I'm sure many of you won't be surprised to know that Congress hasn't acted on this issue so far. Today, I will." The Obama White House, *President Obama on Ensuring Fair Pay for In-Home Care Workers*, YouTube, at 4:40, 6:08 (Dec. 15, 2011), https://www.youtube.com/watch?v=96mmOuNeWj4. The president then endorsed the Department of Labor's proposed "law." Matt Compton, *Ensuring Fair Pay for Homecare Workers*, The White House (Dec. 15, 2011), https://perma.cc/F9F6-2P7U.

Except the new "law" was, of course, no law at all. It was a "pen-and-phone" rule used as a "substitute[] for laws passed by the people's representatives." *West Virginia v. EPA*, 597 U.S. 697, 753 (2022) (Gorsuch, J., concurring). This 2013 rule abandoned the longstanding rule upheld in *Coke* and replaced it with the very opposite rule: Third parties "may not avail themselves" of the companionship-services or the live-in

exemptions unless they are members of the same "family or household" as the individual receiving the services. 78 Fed. Reg. 60,454, 60,557 (Oct. 1, 2023) (codified at 29 C.F.R. § 552.109). According to the Department, this subjected 90% of home health and personal care aides—about two million workers, and more than 10,000 businesses—to the FLSA. *See id.* at 60,458, 60,519–20.

To justify this change, the Department resorted to *Chevron* deference. *Id.* at 60,481. The Department relied upon the *Chevron*-based reasoning of *Coke* to assert that both exemptions were silent or ambiguous at step one. *Id.* The Department then recycled many of the same arguments about statutory purpose and legislative history that the Court rejected as unconvincing in *Coke. Compare Coke*, 551 U.S. at 166–67, *with* 78 Fed. Reg. at 60,481–82. In doing so, the Department elevated legislative history over statutory text. "In the past," the Department explained, it had "erroneously focused on the [statutory] phrase 'any employee,' instead of focusing on the purpose and objective behind the 1974 amendments, which was to expand minimum wage and overtime protections to workers employed in private households that did not otherwise meet the FLSA coverage requirements." 78 Fed. Reg. at 60,482. Based upon a

snippet from a committee report, the Department now claimed that "the legislative history" showed that Congress wanted to expand the FLSA's coverage to all employees "whose 'vocation' was domestic service." *Id.* at 60,481.

The Department also relied upon the (now discredited) "general principle that coverage under the FLSA is broadly construed so as to give effect to its remedial purposes, and exemptions are narrowly interpreted and limited in application to those who clearly are within the terms and spirit of the exemption." *Id.* at 60,482; *but see Encino Motorcars, LLC v. Navarro*, 584 U.S. 79, 88 (2018) *(Encino II)* (rejecting this supposed canon). The snippets of legislative history and the discredited narrow-construction canon, the Department argued, meant that "the exemptions excluding employees from coverage must … be defined narrowly in the regulations to achieve the law's purpose of extending coverage broadly." 78 Fed. Reg. at 60,482.

For good measure, the Department further gutted the companion-ship-services exemption for home care by excluding "care" from the exemption. Since 1975, the Department had interpreted "companionship services" to include "care" provided by low-skilled personnel such as

home-care aides helping with tasks of daily living. *See* 40 Fed. Reg. at 7,405 (codified at 29 C.F.R. § 552.6 (1975)). Henceforth, however, the Department proclaimed that companionship services would be limited to "fellowship" or "protection." 29 C.F.R. § 552.6(a). That includes things such as "watching television together" or "engaging in hobbies." 78 Fed. Reg. at 60,464. It does not include assistance to the infirm or the elderly with tasks of daily living, such as bathing them, dressing them, helping them go to the bathroom, or anything else these individuals desperately need, unless such help is merely incidental (no more than 20% of total time) and employees offset each hour of care with, say, four hours of television—and keep meticulous records. 29 C.F.R. § 552.6(b).

As the Department admitted, most companions routinely help the elderly and disabled with tasks of daily living. 78 Fed. Reg. at 60,521. The Department's reading was therefore nullifying an exemption meant to help those "unable to care for themselves." 29 U.S.C. § 213(a)(15). As the Department explained, under its novel view of "companionship services," a father who enrolls in a Medicaid program to care for an "adult, physically disabled son … would not fall under the companionship

services exemption." 78 Fed. Reg. at 60,488. Entities helping that father get reimbursement would therefore risk FLSA liability for overtime pay.

Commenters warned that the rule would "undermine Medicaid's" programs, "which rely on agencies to assist consumers who are not capable of being solely responsible for managing a direct care worker's employment." *Id.* at 60,481. Because these programs usually reimburse home care based upon a fixed rate that doesn't account for overtime, "the costs of care would far exceed those Medicaid will reimburse." *Id.* at 60,487. States and agencies would respond by capping hours and curtailing care. This wouldn't improve wages, as commenters explained, but it would harm the elderly and infirm. *Id.* at 60,487, 60,543–44; *see also* U.S. Gov't Accountability Off., GAO-21-72, *Observations on the Effects of the Home Care Rule* 13, 17–20 (2020), https://www.gao.gov/products/gao-21-72 (concluding the rule reduced hours of service but did not discernably increase wages for home-care aides).

A trade association of home-care agencies challenged the 2013 rule in the D.C. Circuit. The district court held the rule was unlawful, observing that the Department's "conduct bespeaks an arrogance to not only disregard Congress's intent, but seize unprecedented authority to impose

overtime and minimum wage obligations in defiance of the plain language of Section 213." *Home Care I*, 76 F. Supp. 3d at 147–48. But the court of appeals reversed and upheld the rule, reviewing it "pursuant to the two-step *Chevron* framework." *Home Care III*, 799 F.3d at 1090. The Court rejected the "challenge to the regulations at *Chevron* step one" by relying upon *Coke*, and held that the regulation "passes muster at *Chevron* step two." *Id.* at 1093–94.

## II. FACTUAL BACKGROUND

In 2016, Dilli Adhikari bought Americare, a home-care agency that serves elderly individuals in Ohio. Op., R.121, Page ID #49018; *see also* Defs.' Concise Statement of Undisputed Material Facts (CSUMF), R.113-3, Page ID #48602–03. Americare's clients receive care through Ohio Medicaid programs, principally the PASSPORT program. CSUMF, R.113-3, Page ID #48603; *see also* Ohio Admin. Code R. 5160-1-06.1. PASSPORT reimburses home-care services such as "personal care" based upon a fixed rate that doesn't account for overtime. CSUMF, R.113-3, Page ID #48606; Ohio Admin. Code R. 5160-1-06.1, App'x (rates for "Personal Care: agency"), https://tinyurl.com/mrhm9xv2. Adhikari explained that given the prevailing rates and wages in the home-care sector at the

time, he "could not afford to pay overtime compensation without a rate adjustment." Op., R.121, Page ID #49020. Further, the elderly individuals served by Americare ordinarily choose aides who are close kin and who live in the same household to provide around-the-clock care, so Americare could not unilaterally cut weekly hours below forty. CSUMF, R.113-3, Page ID #48604–05. Americare's family-based business model therefore ultimately collided with the Department's re-write of the 1974 exemptions, leading to the Department's lawsuit.

## III. PROCEDURAL HISTORY

The Department of Labor sued Defendants in October 2021, seeking back wages, liquidated damages, and injunctive relief. Op., R.121, Page ID #49022. Following discovery, the Department sought summary judgment for alleged willful violations of the FLSA's overtime-pay requirement from October 2018 through April 2024. *Id.* Defendants opposed summary judgment and sought partial summary judgment setting aside the 2013 rule excluding third-party employers from the companionship-service and live-in exemptions, 29 C.F.R. § 552.109, and the rule defining "companionship services" to exclude "care," *id.* § 552.6. *See* Op., R.121, Page ID #49030.

The district court granted summary judgment to the Secretary and denied partial summary judgment to Defendants. Op., R.121, Page ID #49017. In its opinion, the district court first held that Defendants qualified as employers of the aides under the "economic reality test." Op., R.121, Page ID #49025–29. The district court then held that the Department's regulations "preclude third-party employers like Defendants from claiming the companionship or live-in exemptions." Op., R.121, Page ID #49030.

The district court upheld the validity of the Department's rules even after *Loper Bright*. Op., R.121, Page ID #49030–34. The district court reasoned that "the *Loper Bright* decision does not impact the outcome here" because "*both*" the general grant of rulemaking authority in section 29(b) of the 1974 amendments and the delegation of definitional authority in the companionship-services exemption "unambiguously delegate authority to [the Department] to prescribe the rules and regulations to shape the parameters of the exemptions to the FLSA." Op., R.121, Page ID #49033 (emphasis added). In other words, a general grant of rulemaking authority is alone enough to ignore the best reading of a statute.

Addressing the live-in exemption specifically, the district court extended the reasoning of *Coke* to the live-in exemption, following the reasoning of a D.C. Circuit decision based upon step two of *Chevron*. Op., R.121, Page ID #49035. Like the D.C. Circuit, the district court also denied that *Coke* "was based on" the express delegation of definitional authority referenced several times in *Coke* and insisted that the decision rested upon the FLSA's generic grant of rulemaking authority alone. Op., R.121, Page ID #49036. This grant, the district court concluded, gave the Department latitude to fill alleged "gaps" in the live-in exemption, and thus to deny the exemption to Defendants. *Id.*

After denying Defendants an opportunity to claim the exemptions, the district court found the underlying FLSA violations willful, assessed $7,478,820.79 in liability for back wages, and imposed an equal amount in liquidated damages, totaling $14,957,641.58, through April 2024. Op., R.121, Page ID #49057. The district court later entered a final judgment. Final Order, R.126. Page ID # 49067; J., R.127.

## STANDARD OF REVIEW

Under the Administrative Procedure Act (APA), courts "shall decide all relevant questions of law, interpret constitutional and statutory

provisions, and determine the meaning or applicability of the terms of an agency action." 5 U.S.C. § 706. "Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires." *Loper Bright*, 603 U.S. at 412. Courts must also "set aside" an agency rule that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

## SUMMARY OF THE ARGUMENT

### I. Live-in exemption.

I.A. The Department was right in 1975: the live-in exemption covers *any* employee in domestic service that resides where the employee works; *who* the employer is does not matter. That's not just the best reading of the statute, it's the only one that makes sense of the text, structure, and history of this provision. The district court's holding that 29 C.F.R. § 552.109 validly prevents Defendants as third-party employers from relying upon the live-in exemption thus conflicts with the best reading of the statute. The judgment of the district court must therefore be vacated, and so must 29 C.F.R. § 552.109.

I.B. The district court didn't follow the best reading of the statute. Instead, the district court reasoned that a generic grant of rulemaking authority allowed the agency to fill purported "gaps" that the district court never identified. The district court legally erred in two ways in reaching that conclusion. First, *stare decisis* doesn't require courts to extend reasoning from *Coke* abrogated by *Loper Bright* to different statutory provisions, here the live-in exemption, and the district court's holding to the contrary conflicts with binding precedent from this Court applying *Loper Bright*. *See In re MCP No. 185*, 124 F.4th at 1002. Second, and more importantly, a routine grant of general rulemaking authority is not the kind of "express" delegation that allows agencies discretion to answer questions of law with binding force in the courts. Otherwise, *Loper Bright* would be a nullity, and *Chevron* would still be the law in all but name. Because 29 C.F.R. § 552.109 conflicts with the best reading of the live-in exemption, the Court should vacate the Department's unlawful regulation, vacate the judgment of the district court, and remand for further proceedings.

## II. Companionship-services exemption.

The 2013 rule on third-party employers is doubly unlawful because it also exceeds the Department's delegation of authority to "define[] and delimit[]" the terms of the exemption for companionship services "by regulations." 29 U.S.C. § 213(a)(15). The Department's rule preventing third-party employers from invoking the exemption does not even purport to define or delimit a statutory term, so it is not a proper use of that delegated authority. The rule also draws an arbitrary line between family members and other third-party employers that yields paradoxical results: the same employee is exempt, and not exempt, at the same time, for one joint employer but not another. Disfavoring some employers, and not others, without any sound basis in the text, is impermissible. The rule is therefore an abuse of discretion.

II.A. Because it mistakenly held that 29 C.F.R. § 552.109 was valid after *Loper Bright*, the district court concluded that Defendants lacked standing to challenge a separate rule excluding virtually all care from "companionship services." 29 C.F.R. § 552.6. The district court's premise was wrong, and Defendants obviously have standing to challenge a rule

that narrows an exemption they are eligible to claim. The Court should remand.

II.B. If the Court decides to address the validity of 29 C.F.R. § 552.109 in the first instance, however, then the Court should hold that the rule exceeds the Department's delegated authority. Whatever the scope of the Department's authority to define the terms of the exemption, the Department cannot exercise that authority to virtually wipe out "care" from an exemption meant to aid "individuals who (because of age or infirmity) are unable to care for themselves." 29 U.S.C. § 213(a)(15). That is an abuse of discretion.

## ARGUMENT

## I. THE DEPARTMENT'S RULE EXCLUDING THIRD-PARTY EMPLOYERS FROM THE LIVE-IN EXEMPTION IS UNLAWFUL

The district court held that 29 C.F.R. § 552.109 prevents Defendants from availing themselves of the live-in exemption. That rule contradicts statutory text, and after *Loper Bright*, there is no sound legal basis for deferring to the Department.

### A. THE DEPARTMENT'S REVERSAL CONFLICTS WITH THE BEST READING OF THE LIVE-IN EXEMPTION

"In statutory interpretation disputes, a court's proper starting point lies in a careful examination of the ordinary meaning and structure of

the law itself." *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 436 (2019). Under the FLSA, the overtime-pay requirement "shall not apply" to "any employee who is employed in domestic service in a household and who resides in such household." 29 U.S.C. § 213(b)(21). The word "any" has an expansive meaning, so "the entire exemption bespeaks breadth." *Encino II*, 584 U.S. at 88. The live-in exemption thus covers *every* employee who is (1) "employed in domestic service," (2) "in a household," and (3) "resides in such household." 29 U.S.C. § 213(b)(21). Home-care aides satisfy these terms as long as they reside where they provide care, even if they are employed, jointly or solely, by a third party.

First, "home health aides" are employed in "domestic service," as the Department defines the term. 29 C.F.R. § 552.3. The Department agrees that for purposes of the coverage provision, 29 U.S.C. § 207(*l*), "domestic service" includes home-care aides employed by third-party agencies, and identical terms are usually "accorded a consistent meaning," *Nat'l Credit Union Admin. v. First Nat'l Bank & Tr. Co.*, 522 U.S. 479, 501 (1998); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 170 (2012) ("A word or phrase is presumed to bear the same meaning throughout [the] text."). Second, home-care

aides employed by third parties are employed "*in* a household"—that is, they work in or about a private home. *See Penobscot Nation v. Frey*, 3 F.4th 484, 492 (1st Cir. 2021) (preposition "in" supplies a location). Last, to qualify, the aides must "reside[]" in the household, meaning they must "dwell permanently or for a considerable time" there. *See United States v. Sabhnani*, 599 F.3d 215, 256 (2d Cir. 2010) (quoting *Oxford English Dictionary* (2d ed. 1989)) (construing the live-in exemption).

Nothing depends upon the employer; so, the Department "does not have the discretion to deny" the exemption to some employers, but not others. *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 661 (2007). Underscoring the employer's irrelevance, the exemption is written in the passive voice—"employed in." This "pulls the [employer] off the stage," emphasizing the employer's irrelevance and the "natural breadth" of the exemption. *Bartenwerfer v. Buckley*, 598 U.S. 69, 75–77 (2023); *see also* Bryan A. Garner, *Modern English Usage* 676 (4th ed. 2016) (the passive voice shows that "the actor is unimportant"). The live-in exemption therefore does not depend upon the employer, but upon the activities and residence of the employee.

Limiting the live-in exemption to employers who live in the same household or are family therefore isn't "the best reading." *Loper Bright*, 603 U.S. at 400. Indeed, it re-writes the statute. Under the Department's rewrite, the exemption would read, in effect: "any employee who is employed in domestic service ~~in~~ **by** a household **or family member** and who resides in such household." *See* 29 C.F.R. § 552.109(c). It is a "core administrative-law principle that an agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014).

Surrounding provisions further undermine the Department's rewrite. When Congress wanted an FLSA exemption to turn on the nature and activities of the employer, it said so, using the prepositions "by" or "of" to refer to an agent, instead of "in," to refer to a service or location.[1] Courts generally presume the mention of employers in one place and

---

[1] *See, e.g.*, 29 U.S.C. § 213(b)(3) ("employee of a carrier by air"), (9) ("employee employed … by a radio or television"), (10)(A)–(B) (employee "employed by a nonmanufacturing establishment"), (13) (employee employed "by a farmer"), (17) ("any driver employed by an employer engaged in the business of operating taxicabs"), (20) ("any employee of a public agency"), (24) (employee employed "by a nonprofit educational institution"); (27) ("any employee employed by an establishment which is a motion picture").

their omission in another is intentional, and this presumption is stronger when, as here, the differences appear in "the same section." *United States v. Granderson*, 511 U.S. 39, 63 (1994) (Kennedy, J., concurring in the judgment). The other exemptions are thus particularly probative, as they include text similar to the one the Department now seeks to insert into the live-in exemption.

"History supports this reading." *In re MCP No. 185*, 124 F.4th at 1011. The Department's "contemporaneous" reading of the exemptions—which "'may be especially useful in determining the statute's meaning,'" *id.* (quoting *Loper Bright*, 603 U.S. at 394)—confirms the best reading. Soon after the 1974 amendments, the Department followed the "natural reading of the statute" in the 1975 rule. *See Home Care I*, 76 F. Supp. 3d at 145 & n.10; 40 Fed. Reg. at 7,405. The Department's interpretation remained "consistent over time" for almost forty years, thus making it worthy of judicial "respect." *Loper Bright*, 603 U.S. at 386.

Congress revisited Section 213 several times during those forty years but never disturbed the Department's reading. *Home Care I*, 76 F. Supp. 3d at 147. "It is well established that when Congress revisits a statute giving rise to a longstanding administrative interpretation

without pertinent change, the congressional failure to revise or repeal the agency's interpretation is persuasive evidence that the interpretation is the one intended by Congress." *CFTC v. Schor*, 478 U.S. 833, 846 (1986) (quotation marks omitted). Ordinary meaning, context, and history therefore resolve any doubt about the scope of the live-in exemption against the Department.

The Department has no answer to any of this. The Department has never explained how its new rule is consistent with the best reading of the text. Instead, the Department runs away from the words on the page and invokes "purpose." "In the past," the agency now claims, it "erroneously focused" on the statutory text "instead of focusing on the purpose and objective behind the 1974 amendments." 78 Fed. Reg. at 60,482. In particular, the Department relies upon a sentence from committee reports noting that the "committee[s]" wanted to "include within the coverage of the Act all employees whose 'vocation' is domestic service." *Id.* at 60,457 (quoting S. Rep. No. 93-690, at 20 (1974); H.R. Rep. No. 93-913, at 36 (1974)); *see, e.g.*, H.R. Rep. No. 93-913, at 36, *reprinted in* 1974 U.S.C.C.A.N. 2811, 2845 ("It is the intent of *the committee* to include

within the coverage of the Act all employees whose vocation is domestic service." (emphasis added)).

The Department's new elevation of legislative purpose over text "is a relic from a bygone era of statutory construction." *Food Mktg. Inst.*, 588 U.S. at 437 (quotation marks omitted). "Indeed, it is quite mistaken to assume … that whatever might appear to further the statute's primary objective must be the law." *Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 89 (2017) (cleaned up). And the "legislative history" the agency relies upon in support "is not the law." *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 523 (2018); *see also* Scalia & Garner, *supra*, at 369–90 (rejecting "[t]he false notion that committee reports and floor speeches are worthwhile aids in statutory construction"). "The reason is obvious; as any high school Civics student should know, legislators vote on and the president signs bills, not their legislative history." *Me. Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.*, 70 F.4th 582, 598 (D.C. Cir. 2023). The Department's new focus on legislative history over text is not just wrong; "it was egregiously wrong." *Id.*

Regardless, the Department's arguments about legislative history are unpersuasive even on their own terms. The Department "points to no

legislative materials concerning the live-in exemption in particular." *Home Care III*, 799 F.3d at 1094. And the quoted snippet is about the "coverage" provisions, Sections 206(f) and 207(*l*), not about the exemptions. H.R. Rep. No. 93-913, at 36 ("It is the intent of the committee to include *within the coverage* of the Act all employees whose vocation is domestic service." (emphasis added)). Indeed, live-in employees in domestic service are covered by the FLSA regardless of how the live-in exemption is read: the live-in exemption is limited to overtime pay—"section 207" of the FLSA, and does not exempt workers from Section 206, the minimum wage. 29 U.S.C. § 213(b)(21). So exempt employees are still generally covered by the FLSA and must be paid at or above the minimum wage.

It is also plainly wrong to claim that the live-in exemption doesn't apply to employees whose vocation is domestic service. The exemption covers "any employee who is employed in domestic service"—from maids, to butlers, and yes, home-care aides—even if their job is a full-time gig. Carol Brady, for example, wouldn't go to jail if she failed to pay her live-in maid, Alice, overtime—even though being a maid was Alice's "vocation." *See The Brady Bunch* (ABC television broadcast 1969–1974). Nor

would Bruce Wayne be liable if Alfred, his devoted butler, wasn't paid overtime for working night shifts. *See Batman* (ABC television broadcast 1966–68). It is little wonder the Supreme Court did not "find these arguments convincing" in *Coke*. 551 U.S. at 167. They are even less convincing as to the live-in exemption, which manifestly covers employees whose vocation is domestic service. Congress, as the text shows, does not pursue a purpose at all costs. Lawmaking is an exercise in *balancing* costs and benefits.

Last, the Department relied upon the curious notion that the FLSA's exemptions must be narrowly construed against employers. 78 Fed. Reg. at 60,482. The Supreme Court has "reject[ed] this principle as a useful guidepost for interpreting the FLSA." *Encino II*, 584 U.S. at 88. The Department has "no license to give the exemption anything but a fair reading." *Id.* at 89. The Department gave the exemptions a fair reading in 1975, but later turned its back on the law at the president's request. This Court should follow the best reading and set aside 29 C.F.R. § 552.109.

## B.  THE DISTRICT COURT RESURRECTED *CHEVRON*

Without deciding the best reading of the live-in exemption, the district court concluded that some reasoning in *Coke* and the FLSA's generic grant of rulemaking authority required it to follow the agency's view of purported "gaps" in the exemption. Op., R.121, Page ID #49034–36. "In effect, the district court deferred to the [Department's] interpretation under *Chevron*, without saying so." *Me. Lobstermen's Ass'n*, 70 F.4th at 597. Worse, by inferring statutory "gaps" automatically, without exhausting any tools of interpretation, the district court applied an "aggressive reading of *Chevron*" that had "more or less fallen into desuetude" even before *Loper Bright. Id.*

In particular, the district court legally erred in two respects that warrant reversal. First, the district court mistakenly gave broad *stare decisis* effect to *Coke*'s *Chevron* reasoning after *Loper Bright*. Second, and more importantly, the district court legally erred by reasoning that a generic grant of general rulemaking authority is the kind of delegation that allows the agency discretion on questions of law ordinarily reserved to the courts. That conclusion cannot be reconciled with *Loper Bright.*

### 1. *Stare decisis* does not help the Department's flip-flop

The district court misunderstood how *stare decisis* applies to cases decided applying *Chevron* after *Loper Bright*. Under *Loper Bright*, for prior decisions applying *Chevron* and finding the statute ambiguous, only holdings that "*specific* agency actions are lawful … are still subject to statutory *stare decisis* despite the Court's change in interpretive methodology." *Loper Bright*, 603 U.S. at 376 (emphasis added). So, *Coke*'s core holding survives: "the Department's [1975] regulation [was] valid and binding." *Coke*, 551 U.S. at 162.

But this case involves the opposite rule, so *Coke*'s holding doesn't help the Department. The specific agency action held "valid and binding" in *Coke* was the 1975 rule, which says the opposite of what the Department's rule now says. And *Coke*'s *Chevron*-based reasoning about "gaps," as opposed to its core holding, has been abrogated by *Loper Bright* just as much as every other *Chevron*-based decision. This Court is therefore no longer bound by the reasoning in *Coke*, and the district court erred by following it. Once the Supreme Court "abandon[s]" a "test," lower courts "err[]" by following reasoning applying that test. *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 534–36 (2022).

This Court has already adopted this understanding of *Loper Bright*. In *MCP No. 185*, this Court held that the Supreme Court's *Chevron*-driven decision in *BrandX* applied only to "the FCC's 2002 Internet Over Cable Declaratory Ruling," the specific agency action at issue in *BrandX*. *In re MCP No. 185*, 124 F.4th at 1002. Because *MCP No. 185* was a case about a different agency action—"the FCC's 2024 Safeguarding Order"—this Court was "not bound by *Brand X*'s holding as a matter of statutory *stare decisis*" after *Loper Bright*, nor by its reasoning, even though, as here, this Court was considering a reversal by the same agency interpreting the same statute at issue in a prior Supreme Court case. *Id.* at 1002–03. *MCP No. 185* is thus binding, but the district court failed to follow it.[2]

*Coke*'s reasoning wouldn't be binding as a matter of *stare decisis* anyway. *Coke* involved the companionship-services exemption, not the live-in exemption, and *stare decisis* "does not require courts to extend" precedent to other statutory provisions, particularly when that precedent

---

[2] This Court's decision in *Tennessee v. Becerra* does not govern because there is no binding precedent upholding the Department's new rule. *See Tennessee v. Becerra*, No. 24-5220, 2025 WL 751585, at *8 n.8 (6th Cir. Mar. 10, 2025) ("Unlike in *In re MCP No. 185* … here, HHS's particular construction of § 1008 is the same construction that this court approved in *Ohio*.").

has been undermined or (as here) abrogated by later Supreme Court developments. *Herr v. U.S. Forest Serv.*, 803 F.3d 809, 817 (6th Cir. 2015). By extending the abrogated *Chevron*-based reasoning of *Coke* to a different statutory provision, the district court disregarded the unequivocal rejection of *Chevron* in *Loper Bright*. That turns *stare decisis* on its head. Indeed, instead of following *Loper Bright*, the district court followed a *Chevron*-based opinion from the D.C. Circuit upholding the 2013 rule. But "unlike past challenges that the D.C. Circuit considered under *Chevron*," this Court "no longer afford[s] deference to the [agency's] reading of the statute." *In re MCP No. 185*, 124 F.4th at 997. It was thus error to follow a D.C. Circuit decision that conflicts with recent Supreme Court precedent.

The district court's analogy to the companionship-services exemption also fails on its own terms. The live-in and companionship-services exemptions are different in a key respect, even if they share some textual similarities. Most notably, unlike the companionship-services exemption, the live-in exemption does not "expressly delegate to an agency the authority to give meaning to a particular statutory term." *Loper Bright*, 603 U.S. at 394–95 & n.5 (cleaned up) (citing companionship-services

exemption as an example of an "express delegation"). When Congress wanted to delegate interpretive authority to the Secretary, therefore, it said so in clear terms, as in the companionship-services exemption. 29 U.S.C. § 213(a)(15). It said nothing of the sort for the live-in exemption, fatally undermining the district court's analogy. *See Russello v. United States*, 464 U.S. 16, 23 (1983).

Nor did *Coke* rest solely upon the general grant of rulemaking authority, as the district court claimed. *Contra* Op., R.121, Page ID #49036. Throughout the opinion, and in critical passages, the Supreme Court relied upon the "broad grant of definitional authority" in the companionship-services exemption to "infer" a delegation to the agency. *Coke*, 551 U.S. at 168. By contrast, *Coke* cited the general grant of rulemaking authority only once, as a secondary cite in the paragraph introducing the analysis section. *Id.* at 165. The Supreme Court thus appears to have placed more weight upon the definitional authority in the companionship-services exemption, which the live-in exemption lacks.

### 2. Section 29(b) does not warrant judicial deference

More fundamentally, the district court's reasoning is incompatible with *Loper Bright*. The district court reasoned that section 29(b) of the

1974 amendments is an "unambiguous delegate[ion]" that still invites deference after *Loper Bright*. Op., R.121, Page ID #49033. That conclusion would resurrect *Chevron* in all but name.

In *Loper Bright*, the Supreme Court recognized that the "best reading" may be "that the agency is authorized to exercise a degree of discretion." 603 U.S. at 394–95. But the examples the Court gives are quite narrow and specific, not sweeping. "For example, some statutes 'expressly delegate[]' to an agency the authority to give meaning *to a particular statutory term*." *Id.* at 394 (emphasis added). An example the Court gives is the delegation in the companionship-services exemption, which the live-in exemption lacks. *Id.* at 395 n.5. Another example the Court gives is a broad and non-self-executing delegation from Congress to regulate air pollutants from coal plants if the agency finds it "appropriate" to do so. *Id.* at 395 & n.6 (citing 42 U.S.C. § 7412(n)(1)(A)). "This sort of express language conferring discretion on the agency is critical," and the live-in exemption does not have any similar text. *Moctezuma-Reyes*, 124 F.4th at 420. Thus, after *Loper Bright*, even when "[the Department of Labor] is authorized to promulgate rules interpreting and clarifying the

FLSA," courts must interpret the law independently, as the APA requires. *Rest. L. Ctr. v. DOL*, 120 F.4th 163, 166, 170–71 (5th Cir. 2024).

If a generic grant of general rulemaking authority such as section 29(b) and "less than precise words" sufficed for deference, courts would "quietly reinstitute" *Chevron. Moctezuma-Reyes*, 124 F.4th at 420. "That can't be right. The case that declared '*Chevron* is overruled' didn't quietly reinstitute it." *Id.* After all, generic grants of rulemaking authority are common to "most statutes." *Gun Owners of Am., Inc. v. Garland*, 19 F.4th 890, 918–19 (6th Cir. 2021) (en banc) (Murphy, J., dissenting) (equally divided court). A general grant of rulemaking authority was a *prerequisite* for *Chevron* even to apply to a rule interpreting a statute. "*Chevron* applie[d] only 'when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law.'" *Loper Bright*, 603 U.S. at 404; *see also United States v. Mead Corp.*, 533 U.S. 218, 226–27 (2001). It was the "grant of general rulemaking authority" to an agency that courts relied upon to establish *Chevron*'s fiction of "Congress's *implied* delegation to an agency to resolve ambiguities." *Gun Owners of Am., Inc.*, 19 F.4th at 918–19 (Murphy, J., dissenting). A

general rulemaking authority therefore doesn't distinguish this case from *Chevron*.

Before *Chevron*, the governing convention was that generic grants of rulemaking authority authorized only housekeeping rules, such as non-binding guidance to the public and directives to employees, not "substantive" rules with controlling weight upon independent judges. *Id.* at 917–18 (discussing "past practice" before *Chevron*); *see also Final Report of the Attorney General's Committee on Administrative Procedure* 27 (1941), *available at* https://perma.cc/GUD8-SHQ4; Thomas W. Merrill & Kathryn Tongue Watts, *Agency Rules with the Force of Law: The Original Convention*, 116 Harv. L. Rev. 467, 549–70 (2002) (discussing the background convention regarding general rulemaking grants). *Chevron* departed from this convention by presuming that a general grant of rulemaking authority impliedly delegated binding interpretive authority across entire statutes whenever Congress "is silent or ambiguous with respect to the specific issue." *Loper Bright*, 603 U.S. at 379. That fiction clashed with the APA's text and a long tradition of independent judicial review on questions of law, and so "*Chevron* is overruled." *Id.* at 412.

Indeed, the *Chevron*-based fiction directly clashes with the statute here. According to the district court, "both" section 29(b) and the express delegation of definitional authority in the companionship-services exemption "unambiguously delegate" binding interpretive authority "to shape the parameters of the exemptions to the FLSA." Op., R.121, Page ID #49033. That makes the express delegation of definitional authority in the companionship-services exemption "superfluous." *Mackey v. Lanier Collection Agency & Serv., Inc.*, 486 U.S. 825, 837 (1988). The Court should be "hesitant to adopt an interpretation of a congressional enactment which renders superfluous another portion of that same law." *Id.*

Because the Department got the law wrong, the district court had no way of distinguishing *MCP No. 185*. In a footnote, the district court asserts that section 29(b) somehow "distinguishes this case from" *MCP No. 185*. Op., R.121, Page ID #49034 n.8. It does not. The Communications Act at issue in *MCP No. 185* includes a similar grant of general rulemaking authority relied upon by the FCC to promulgate the contested regulations.[3] An equally general provision was at issue in *Chevron*

---

[3] *See* 47 U.S.C. § 201(b) ("The Commission may prescribe such rules and regulations as may be necessary in the public interest to carry out the

(*footnote continued on next page*)

itself, decided under the Clean Air Act. *See* 42 U.S.C. § 7601(a)(1) ("The Administrator is authorized to prescribe such regulations as are necessary to carry out his functions under this chapter."). The same is true of *Loper Bright*, where the Solicitor General cited similar rules in support of deference.[4] If the district court were right, then the Supreme Court should have affirmed *Loper Bright* and re-affirmed *Chevron*, and this Court should have deferred to the FCC's rule in *MCP No. 185*. Of course, that did not happen, because the district court is wrong about what *Loper Bright* and *MCP No. 185* mean.

The Department may, belatedly, ask for *Skidmore* "deference," as is the new fashion for agencies. It should get none. "[U]nder [the FLSA]," *Skidmore* held, courts give "weight" to the Department's reading when the agency's interpretive "judgment" is consistent, well-reasoned, and thorough, and thus has the power to persuade. *Skidmore v. Swift & Co.*,

---

provisions of this chapter."); 89 Fed. Reg. 45,404, 45,458 (May 22, 2024) (relying upon that provision); *see also City of Arlington v. FCC*, 569 U.S. 290, 306 (2013) (noting the FCC's "general conferral of rulemaking authority" allowed *Chevron* deference).

[4] Br. for Resps. at 2–3, *Loper Bright*, 603 U.S. 369 (Sept. 15, 2023) (No. 22-451) (citing 16 U.S.C. §§ 1854(a)(3), (b)(3); 1855(d) (authorizing "such regulations … as may be necessary" to carry out a plan or "any other provision" of the Act)), http://tinyurl.com/rnm44d98.

323 U.S. 134, 139–40 (1944). *Skidmore* is a truism, a form of "respect" for a coordinate branch, not really deference: under *Skidmore*, "an agency's view is persuasive if it's persuasive. And it's not if it's not." *Dayton Power & Light Co. v. FERC*, 126 F.4th 1107, 1135 (6th Cir. 2025) (Nalbandian, J., concurring).

The Department's new view is not persuasive. In its reversal, the Department offered no interpretive judgment, let alone a well-reasoned one, and the new rule is a reversal from the longstanding and contemporaneous interpretation the Department followed consistently for nearly forty years. Thus "the *Skidmore* factors … all favor the [Department's] first interpretation, not its recent one." *In re MCP No. 185*, No. 24-7000, 2024 WL 3650468, at *6 (6th Cir. Aug. 1, 2024) (Sutton, C.J., concurring). The Department's view of the live-in exemption therefore has no power to persuade.

*** 

The district court's legal error prevented Defendants from claiming the live-in exemption, so the district court's judgment must be vacated. The Department's rule, 29 C.F.R. § 552.109, must also be set aside—that

is, vacated—because it conflicts with the best reading of the live-in exemption.

No portions of 29 C.F.R. § 552.109 should be spared. The Department's rule doesn't include a severability clause, so the agency didn't express any intent that it should survive piecemeal. "If a court holds portions of a rule unlawful, and the agency has been silent about severability, then the default remedy is to vacate the entire rule, including those portions that the court did not hold unlawful." Admin. Conf. of the U.S., Recommendation, *Severability in Agency Rulemaking* (2018); *see also Am. Petroleum Inst. v. EPA*, 862 F.3d 50, 71 (D.C. Cir. 2017) (court will "sever and affirm a portion of an administrative regulation only when [it] can say without any substantial doubt that the agency would have adopted the severed portion on its own" (cleaned up)). The Court should apply that default rule here and vacate 29 C.F.R. § 552.109.

## II. THE DEPARTMENT'S RULE EXCLUDING THIRD-PARTY EMPLOYERS FROM THE COMPANIONSHIP-SERVICES EXEMPTION IS UNLAWFUL

One statutory violation should be enough to vacate 29 C.F.R. § 552.109. If the Court agrees with Part I and vacates 29 C.F.R. § 552.109, then the Court doesn't need to decide whether the rule also conflicts with the exemption for companionship services. But regardless,

the Department's rule is unlawful because it exceeds the Department's delegated interpretative authority under the companionship-services exemption.

"The text of the FLSA makes the applicability of the companionship exemption dependent upon the nature of an employee's activities and the place of their performance, without regard to the identity of the employer." *See* Wage and Hour Advisory Mem. No. 2005-1, *supra*. Thus, as the Solicitor General told the Supreme Court, "there is no legal or policy justification for treating employees providing companionship services differently under the FLSA based on the identity of the employer." U.S. *Amicus* Br., *Coke*, *supra*, at 23.

The exemption is clear. The FLSA "shall not apply" to "any employee employed in domestic service employment to provide companionship services for individuals who (because of age or infirmity) are unable to care for themselves (as such terms are defined and delimited by regulations of the Secretary)." 29 U.S.C. § 213(a)(15). Again, the word "any" has an expansive meaning, so "the entire exemption bespeaks breadth." *Encino II*, 584 U.S. at 88. To be exempt, the employee must (1) be "employed in domestic service employment"; (2) must "provide

companionship services"; (3) and must serve elderly or infirm individuals who are unable to care for themselves. 29 U.S.C. § 213(a)(15). Nothing in the statute turns on the employer.

Ms. Coke argued that the term "domestic service employment" should be read by analogy to the Social Security Act, to limit exempt employees to those who work solely for the household receiving the services. *See supra* Statement of the Case, Part I.C. But to this day, the Department has not defined the term that way. Instead, the Department defines "domestic service employment," the only term disputed in *Coke*, to mean "services of a household nature performed by an employee *in* or about a private home (permanent or temporary)." 29 C.F.R. § 552.3 (emphasis added). Thus, under the Department's interpretation of the term, "domestic service employment" turns on the location and type of work, not the employer. As Judge Leon put it, once the Department of Labor defined "domestic service employment" this way, "the statutory loop was closed." *Home Care I*, 76 F. Supp. 3d at 145. That was the only "gap" plausibly at issue in *Coke*, and it has been filled.

To claim otherwise, the district court applied the same reasoning it applied to the live-in exemption: Section 29(b) and *Coke*. Section 29(b),

the district court reasoned, is "not limited to defining domestic service employment," and thus that delegation allows the Department to shape the scope of the employers who may claim the exemption. Op., R.121, Page ID #49039. And *Coke*'s *Chevron*-inspired reasoning about a "gap" in the statute survives. *Id.* That is wrong for the reasons explained in Part I.B.

To be sure, under *Loper Bright*, the best reading of the companionship-services exemption is "that the agency is authorized to exercise a degree of discretion." *Loper Bright*, 603 U.S. at 394; *see also Mayfield v. DOL*, 117 F.4th 611, 617–18 (5th Cir. 2024) (same type of FLSA express delegation). But "a degree of discretion" does not authorize the Department to amend text at will. The Court must still independently police the boundaries of the Department's delegated authority. *Loper Bright*, 603 U.S. at 395. When "there is an uncontroverted, explicit delegation of authority" to define and delimit terms, "the question is whether the Rule is within the outer boundaries of that delegation." *Mayfield*, 117 F.4th at 617. The court must answer *that* question independently, without deference to the agency. *Id.*

Here, the Department never explained how the rule is within the bounds of its delegated authority. Unlike in *Mayfield*, the Department's rule doesn't define a term by "explain[ing] what a word (or expression) means," nor does it delimit a term by setting an outer boundary on its meaning. *Id.* at 618. The Department is simply re-writing an exemption to carve out a disfavored class of employers. That is not how the delegation operates.

The Department chose this atextual path for a reason. Reading domestic service employment to exclude employees of third parties would have made family members who did not live in the same household liable for overtime, so long as they qualified as joint employers under the FLSA's broad definition of "employer." That would be unpopular. So instead of defining or delimiting the words on page, the Department drew an arbitrary line divorced from text. *Loper Bright*, 603 U.S. at 395. Under the Department's rule, third parties who are joint employers "may not avail themselves" of the exemptions. 29 C.F.R. § 552.109(a), (c). But "the individual or member of the family or household, even if considered a joint employer, is still entitled to assert" the exemptions as to the same employee. *Id.*

The Department's rule therefore creates a paradox. The statutory exemption applies to the "employee," not to the employer. 29 U.S.C. §§ 213(a)(15), (b)(21). Under the Department's rule, however, an employee can paradoxically be exempt and not exempt at the same time. Nothing in the exemption, however, contemplates treating the same employee as "akin to Schrödinger's cat: both [exempt] and [not exempt] at the same time," for some employers but not others. *Allegheny Def. Project v. FERC*, 964 F.3d 1, 10 (D.C. Cir. 2020) (en banc). As in *Restaurant Law Center*, the rule thus "creates a paradox that is not obviously capable of resolution." 120 F.4th at 173. "[A] statute is not a chameleon. Its meaning does not change from case to case" depending upon the defendant. *Carter v. Welles-Bowen Realty, Inc.*, 736 F.3d 722, 730 (6th Cir. 2013) (Sutton, J., concurring).

Of course, the Department gerrymandered the exemption to avoid an unpopular consequence: subjecting relatives who are joint employers to liability. That is understandable and would be a fine choice for Congress to make. But the Department cannot avoid that result by fiat. It can only avoid that result by reading the law reasonably. And a rule that creates a Schrödinger's cat paradox and rests upon administrative fiat

divorced from text is, by definition, not a reasonable interpretation. *See Chamber of Com. v. DOL*, 885 F.3d 360, 382 (5th Cir. 2018) ("Illogic and internal inconsistency are characteristic of arbitrary and unreasonable agency action.").

The Department has to make a choice. It can either extend the exemption to all employees of third parties, as the text would indicate. Or, if the Department has discretion, it may be authorized to define and delimit "domestic service employment" to exclude all third-party employers, be they family members or not. What cannot be right, however, is the Department's third way: exempting and not exempting the same employee at the same time, for some employers and not others, as the Department sees fit according to its latest policy views. Therefore, 29 C.F.R. § 552.109 must be vacated, as it relies upon a paradox that cannot be reconciled with the statutory text.

*** 

The district court's legal error prevented Defendants from relying upon the companionship-services exemption, so the district court's judgment must be vacated. The Department's rule, 29 C.F.R. § 552.109, must also be set aside—that is, vacated—because it exceeds the Department's

delegated authority to define and delimit the terms of the companion-ship-services exemption.

## III. ON REMAND DEFENDANTS MAY CHALLENGE THE DEPARTMENT'S RULE EXCLUDING CARE FROM "COMPANIONSHIP SERVICES" AND THE RULE IS UNLAWFUL

The exemption for companionship services was enacted to help "individuals who (because of age or infirmity) are unable to care for themselves." 29 U.S.C. § 213(a)(15). As courts have recognized, and as the text demonstrates, "Congress created the 'companionship services' exemption to enable guardians of the elderly and disabled to financially afford to have their wards cared for in their own private homes as opposed to institutionalizing them." *Welding v. Bios Corp.*, 353 F.3d 1214, 1217 (10th Cir. 2004).

In the Department's view, however, the exemption covers only "fellowship" and "protection," such as "watching television together; visiting with friends and neighbors; taking walks; playing cards, or engaging in hobbies." 78 Fed. Reg. at 60,464. It does not include the activities of daily living, such "dressing, grooming, feeding, bathing, toileting, and transferring," unless these activities are incidental to fellowship and protection (no more than one-fifth of the working time), and the employers

prove it by keeping meticulous records of all their activities. 29 C.F.R. § 552.6(b). Under the rule, a father who cares for an "adult, physically disabled son" full time "would not fall under the companionship services exemption." 78 Fed. Reg. at 60,488.

## A.  DEFENDANTS HAVE STANDING

Although Defendants challenged the rule excluding care, the district court never addressed the merits. Instead, the district court held that Defendants lack standing because, in the district court's view, 29 C.F.R. § 552.109 prevents Defendants as third-party employers from claiming the companionship-services exemption anyway. Op., R.121, Page ID #49043.

That premise is wrong, because the rule is invalid. *Supra* Parts I & II. Defendants, as directly regulated parties subject to the risk of a money judgment, may thus challenge the Department's rule excluding care from "companionship services."

This Court is "a court of review, not first view," and the district court never addressed the validity of this rule on the merits. *Energy Mich., Inc. v. Mich. Pub. Serv. Comm'n*, 126 F.4th 476, 501 (6th Cir. 2025). This Court may therefore remand and instruct the district court

to "resolve this narrow question in the first instance." *Id.* If this Court does exercise its discretion to address this question for the sake of efficiency, however, then it should vacate the rule, as discussed next.

### B. THE RULE EXCLUDING CARE FROM "COMPANIONSHIP SERVICES" IS UNLAWFUL AND UNREASONABLE

To demote "care" in favor of "television" and "cards," the Department relies upon a single dictionary definition of "companion," as a "person who associates with or accompanies another or others; associate; comrade." 78 Fed. Reg. at 60,464 (quoting *Webster's New World Dictionary* 288 (2d College ed. 1972)). At least here, the Department is claiming to define a term in the exemption. *Mayfield*, 117 F.4th at 617–18. But the Department's definition of "companionship" is unreasonably narrow, as it effectively repeals the exemption by wiping the word "care" out of the statute.

Start with text. The Department quoted a single dictionary definition defining a "companion" as an "associate," but that proves nothing about the meaning of "companionship services" in context. *See The American Heritage Dictionary* 270 (1969). The contextually relevant definition of "companion," omitted by the Department, describes the *job* of a "companion" as "[a] person employed to assist, live with, or travel with

another." *Id.* Aides hired to help the elderly and infirm with activities of daily living fit this definition to a T: they "assist" them.

The Department also ignores that the statute does not use the word "companion," but the term "companionship services," which describes an occupation, not simply a form of camaraderie. A friend coming over to watch the game may be a companion, but it would be unidiomatic to say that he is providing "companionship services." The occupation of "companionship services" means "[a]ssistance provided to someone who needs help with personal matters such as bathing and dressing." *Companionship Services*, Black's Law Dictionary (12th ed. 2024). In other words, home care. Eliminating "dressing, grooming, feeding, bathing, toileting, and transferring" from the exemption thus exceeds the bounds of the delegation.

The Department's interpretation also collides with the manifest purpose of the exemption: helping the elderly and infirm who cannot care for themselves. Why else would Congress have a carve-out designed to benefit only those "who (because of age or infirmity) are unable to care for themselves"? 29 U.S.C. § 213(a)(15). The Department's new notion, that Congress merely wanted to exempt "elder sitters" who play

backgammon and watch TV, and not those who help care for the old and infirm, does not make sense of text or purpose. Erasing "care" from "companionship services" and limiting it to fellowship and protection "defies logic, and Congressional intent." *Home Care Ass'n of Am. v. Weil*, 78 F. Supp. 3d 123, 128 (D.D.C. 2015) (*Home Care II*), *rev'd on other grounds*, *Home Care III*, 799 F.3d 1084. Judge Leon adjudicated 29 C.F.R. § 552.6 on the merits, and he ordered the rule "VACATED." *Home Care II*, 78 F. Supp. 3d at 130. If the Court reaches the question, then it should do the same.

## CONCLUSION

This Court should vacate 29 C.F.R. § 552.109, vacate the district court's judgment, and remand for further proceedings. The Court should also vacate 29 C.F.R. § 552.6, or instruct the district court to address the validity of that rule on remand.

Dated: March 24, 2025

Respectfully submitted,

Bruce C. Fox
Daniel McArdle Booker
OBERMAYER REBMANN
MAXWELL & HIPPEL LLP
525 William Penn Place,
Suite 1710
Pittsburgh, PA 15219
(412) 566-1500
bruce.fox@obermayer.com

/s/ James R. Conde
Jonathan Berry
Michael Buschbacher
James R. Conde
  *Counsel of Record*
Andrew Smith
BOYDEN GRAY PLLC
800 Connecticut Avenue NW
Suite 900
Washington, DC 20006
(202) 955-0620
jconde@boydengray.com

# CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), the undersigned certifies that this brief:

(i)     complies with the type-volume limitation in Federal Rule of Appellate Procedure 32(a)(7) because it contains 11,386 words; and

(ii)    complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this motion has been prepared in a proportionally spaced typeface using Microsoft Office Word in 14-point Century Schoolbook.

Dated: March 24, 2025       /s/ James R. Conde
                            James R. Conde
                            *Counsel of Record*

**CERTIFICATE OF SERVICE**

I hereby certify that on March 21, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by using the CM/ECF system. I further certify that all parties in this case are represented by counsel who are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: March 24, 2025

/s/ James R. Conde
James R. Conde
*Counsel of Record*

# ADDENDUM

# TABLE OF CONTENTS

Designation of Relevant District Court Documents ............................ A-1

Pub. L. No. 93-259, § 29 (1974) ........................................... A-2

29 U.S.C. § 213 ........................................................... A-3

20 C.F.R. pt. 552 ......................................................... A-6

40 Fed. Reg. 7404 (1975) .................................................. A-13

# DESIGNATION OF DISTRICT COURT DOCUMENTS

The following record documents are relevant to this appeal:

| Docket Entry No. | Description | Page ID # |
|---|---|---|
| R. 1 | Complaint | 1–6 |
| R. 113 | Defendants' Motion for Partial Summary Judgment | 48566–68 |
| R.113-2 | Defendants' Memorandum in Support of Partial Summary Judgment | 48570–48601 |
| R.113-3 | Defendants' Concise Statement of Material Facts | 48602–08 |
| R.114 | Plaintiffs' Response to Defendants' Motion for Partial Summary Judgment | 48774–48809 |
| R.114-1 | Plaintiffs' Response to Defendants' Concise Statement of Material Facts | 48810–28 |
| R.116 | Defendants' Reply in Support of Defendants' Motion for Partial Summary Judgment | 48863–82 |
| R.116-1 | Defendants' Reply to Response to Concise Statement of Material Facts | 48883–95 |
| R.121 | District Court's Summary Judgment Opinion | 49017–57 |
| R.126 | Final Order | 49067 |
| R.127 | Final Judgment | 49068 |
| R.128 | Notice of Appeal | 49069–70 |

EFFECTIVE DATE

29 USC 202 note.

SEC. 29. (a) Except as otherwise specifically provided, the amendments made by this Act shall take effect on May 1, 1974.

29 USC 202 note.

(b) Notwithstanding subsection (a), on and after the date of the enactment of this Act the Secretary of Labor is authorized to prescribe necessary rules, regulations, and orders with regard to the amendments made by this Act.

Approved April 8, 1974.

Public Law 93-260

April 9, 1974
[S. 2174]

AN ACT

To amend certain provisions of law defining widow and widower under the civil service retirement system, and for other purposes.

Civil Service retirement system.
Survivor annuities.

Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That (a) clauses (1) (A) and (2) (A) of section 8341 (a) of title 5, United States Code, are amended by striking out "2 years" wherever it appears and inserting in lieu thereof "1 year".

(b) The amendments made by subsection (a) of this section shall not apply in the cases of employees, Members, or annuitants who died before the date of enactment of this Act. The rights of such individuals and their survivors shall continue in the same manner and to the same extent as if such amendments had not been enacted.

Annuity computation.

SEC. 2. (a) Section 8339 (f) (2) of title 5, United States Code, is amended—

(1) by deleting "greater" and inserting "greatest" in place thereof;

(2) by deleting the word "or" immediately after the semicolon at the end of clause (A);

(3) by redesignating clause (B) as clause (C); and

(4) by inserting immediately below clause (A) the following new clause (B):

"(B) the average pay of the Member; or".

Effective date.
5 USC 8339 note.

(b) The amendments made by subsection (a) of this section shall apply to annuities paid for months beginning after the date of enactment of this Act.

Approved April 9, 1974.

Public Law 93-261

April 11, 1974
[H. J. Res. 941]

JOINT RESOLUTION

Making an urgent supplemental appropriation for the fiscal year ending June 30, 1974, for the Veterans Administration, and for other purposes.

Veterans Administration.
Supplemental appropriation.

Resolved by the Senate and House of Representatives of the United States of America in Congress assembled, That the following sum is appropriated, out of any money in the Treasury not otherwise appropriated, for the fiscal year ending June 30, 1974, namely:

VETERANS ADMINISTRATION

READJUSTMENT BENEFITS

For an additional amount for "Readjustment benefits", $750,000,000, to remain available until expended.

Approved April 11, 1974.

**(b) Investigations and inspections**

The Secretary of Labor or any of his authorized representatives, shall make all investigations and inspections under section 211(a) of this title with respect to the employment of minors, and, subject to the direction and control of the Attorney General, shall bring all actions under section 217 of this title to enjoin any act or practice which is unlawful by reason of the existence of oppressive child labor, and shall administer all other provisions of this chapter relating to oppressive child labor.

**(c) Oppressive child labor**

No employer shall employ any oppressive child labor in commerce or in the production of goods for commerce or in any enterprise engaged in commerce or in the production of goods for commerce.

**(d) Proof of age**

In order to carry out the objectives of this section, the Secretary may by regulation require employers to obtain from any employee proof of age.

(June 25, 1938, ch. 676, §12, 52 Stat. 1067; 1946 Reorg. Plan No. 2, §1(b), eff. July 16, 1946, 11 F.R. 7873, 60 Stat. 1095; Oct. 26, 1949, ch. 736, §10, 63 Stat. 917; Pub. L. 87–30, §8, May 5, 1961, 75 Stat. 70; Pub. L. 93–259, §25(a), Apr. 8, 1974, 88 Stat. 72.)

#### Editorial Notes

##### Amendments

1974—Subsec. (d). Pub. L. 93–259 added subsec. (d).

1961—Subsec. (c). Pub. L. 87–30 inserted "or in any enterprise engaged in commerce or in the production of goods for commerce".

1949—Subsec. (a). Act Oct. 26, 1949, §10(a), struck out effective date at beginning of subsection and inserted proviso excepting good faith purchaser of goods produced by oppressive child labor.

Subsec. (c). Act Oct. 26, 1949, §10(b), added subsec. (c).

#### Statutory Notes and Related Subsidiaries

##### Effective Date of 1974 Amendment

Amendment by Pub. L. 93–259 effective May 1, 1974, see section 29(a) of Pub. L. 93–259, set out as a note under section 202 of this title.

##### Effective Date of 1961 Amendment

Amendment by Pub. L. 87–30 effective upon expiration of one hundred and twenty days after May 5, 1961, except as otherwise provided, see section 14 of Pub. L. 87–30, set out as a note under section 203 of this title.

##### Effective Date of 1949 Amendment

Amendment by act Oct. 26, 1949, effective ninety days after Oct. 26, 1949, see section 16(a) of act Oct. 26, 1949, set out as a note under section 202 of this title.

#### Executive Documents

##### Transfer of Functions

For transfer of functions of other officers, employees, and agencies of Department of Labor, with certain exceptions, to Secretary of Labor, with power to delegate, see Reorg. Plan No. 6 of 1950, §§1, 2, 15 F.R. 3174, 64 Stat. 1263, set out in the Appendix to Title 5, Government Organization and Employees.

"Secretary of Labor" substituted for "Chief of the Children's Bureau in the Department of Labor" in subsec. (b) by 1946 Reorg. Plan No. 2. See note set out under section 203 of this title.

## § 213. Exemptions

### (a) Minimum wage and maximum hour requirements

The provisions of sections 206 (except subsection (d) in the case of paragraph (1) of this subsection) and 207 of this title shall not apply with respect to—

(1) any employee employed in a bona fide executive, administrative, or professional capacity (including any employee employed in the capacity of academic administrative personnel or teacher in elementary or secondary schools), or in the capacity of outside salesman (as such terms are defined and delimited from time to time by regulations of the Secretary, subject to the provisions of subchapter II of chapter 5 of title 5, except that an employee of a retail or service establishment shall not be excluded from the definition of employee employed in a bona fide executive or administrative capacity because of the number of hours in his workweek which he devotes to activities not directly or closely related to the performance of executive or administrative activities, if less than 40 per centum of his hours worked in the workweek are devoted to such activities); or

(2) Repealed. Pub. L. 101–157, §3(c)(1), Nov. 17, 1989, 103 Stat. 939.

(3) any employee employed by an establishment which is an amusement or recreational establishment, organized camp, or religious or non-profit educational conference center, if (A) it does not operate for more than seven months in any calendar year, or (B) during the preceding calendar year, its average receipts for any six months of such year were not more than 33⅓ per centum of its average receipts for the other six months of such year, except that the exemption from sections 206 and 207 of this title provided by this paragraph does not apply with respect to any employee of a private entity engaged in providing services or facilities (other than, in the case of the exemption from section 206 of this title, a private entity engaged in providing services and facilities directly related to skiing) in a national park or a national forest, or on land in the National Wildlife Refuge System, under a contract with the Secretary of the Interior or the Secretary of Agriculture; or

(4) Repealed. Pub. L. 101–157, §3(c)(1), Nov. 17, 1989, 103 Stat. 939.

(5) any employee employed in the catching, taking, propagating, harvesting, cultivating, or farming of any kind of fish, shellfish, crustacea, sponges, seaweeds, or other aquatic forms of animal and vegetable life, or in the first processing, canning or packing such marine products at sea as an incident to, or in conjunction with, such fishing operations, including the going to and returning from work and loading and unloading when performed by any such employee; or

(6) any employee employed in agriculture (A) if such employee is employed by an employer who did not, during any calendar quarter during the preceding calendar year, use more than five hundred man-days of agricultural labor, (B) if such employee is the parent,

spouse, child, or other member of his employer's immediate family, (C) if such employee (i) is employed as a hand harvest laborer and is paid on a piece rate basis in an operation which has been, and is customarily and generally recognized as having been, paid on a piece rate basis in the region of employment, (ii) commutes daily from his permanent residence to the farm on which he is so employed, and (iii) has been employed in agriculture less than thirteen weeks during the preceding calendar year, (D) if such employee (other than an employee described in clause (C) of this subsection) (i) is sixteen years of age or under and is employed as a hand harvest laborer, is paid on a piece rate basis in an operation which has been, and is customarily and generally recognized as having been, paid on a piece rate basis in the region of employment, (ii) is employed on the same farm as his parent or person standing in the place of his parent, and (iii) is paid at the same piece rate as employees over age sixteen are paid on the same farm, or (E) if such employee is principally engaged in the range production of livestock; or

(7) any employee to the extent that such employee is exempted by regulations, order, or certificate of the Secretary issued under section 214 of this title; or

(8) any employee employed in connection with the publication of any weekly, semiweekly, or daily newspaper with a circulation of less than four thousand the major part of which circulation is within the county where published or counties contiguous thereto; or

(9) Repealed. Pub. L. 93–259, §23(a)(1), Apr. 8, 1974, 88 Stat. 69.

(10) any switchboard operator employed by an independently owned public telephone company which has not more than seven hundred and fifty stations; or

(11) Repealed. Pub. L. 93–259, §10(a), Apr. 8, 1974, 88 Stat. 63.

(12) any employee employed as a seaman on a vessel other than an American vessel; or

(13), (14) Repealed. Pub. L. 93–259, §§9(b)(1), 23(b)(1), Apr. 8, 1974, 88 Stat. 63, 69.

(15) any employee employed on a casual basis in domestic service employment to provide babysitting services or any employee employed in domestic service employment to provide companionship services for individuals who (because of age or infirmity) are unable to care for themselves (as such terms are defined and delimited by regulations of the Secretary); or

(16) a criminal investigator who is paid availability pay under section 5545a of title 5;

(17) any employee who is a computer systems analyst, computer programmer, software engineer, or other similarly skilled worker, whose primary duty is—

(A) the application of systems analysis techniques and procedures, including consulting with users, to determine hardware, software, or system functional specifications;

(B) the design, development, documentation, analysis, creation, testing, or modification of computer systems or programs, including prototypes, based on and related to user or system design specifications;

(C) the design, documentation, testing, creation, or modification of computer programs related to machine operating systems; or

(D) a combination of duties described in subparagraphs (A), (B), and (C) the performance of which requires the same level of skills, and

who, in the case of an employee who is compensated on an hourly basis, is compensated at a rate of not less than $27.63 an hour; or

(18) any employee who is a border patrol agent, as defined in section 5550(a) of title 5; or

(19) any employee employed to play baseball who is compensated pursuant to a contract that provides for a weekly salary for services performed during the league's championship season (but not spring training or the off season) at a rate that is not less than a weekly salary equal to the minimum wage under section 206(a) of this title for a workweek of 40 hours, irrespective of the number of hours the employee devotes to baseball related activities.

**(b) Maximum hour requirements**

The provisions of section 207 of this title shall not apply with respect to—

(1) any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of section 31502 of title 49; or

(2) any employee of an employer engaged in the operation of a rail carrier subject to part A of subtitle IV of title 49; or

(3) any employee of a carrier by air subject to the provisions of title II of the Railway Labor Act [45 U.S.C. 181 et seq.]; or

(4) Repealed. Pub. L. 93–259, §11(c), Apr. 8, 1974, 88 Stat. 64.

(5) any individual employed as an outside buyer of poultry, eggs, cream, or milk, in their raw or natural state; or

(6) any employee employed as a seaman; or

(7) Repealed. Pub. L. 93–259, §21(b)(3), Apr. 8, 1974, 88 Stat. 68.

(8) Repealed. Pub. L. 95–151, §14(b), Nov. 1, 1977, 91 Stat. 1252.

(9) any employee employed as an announcer, news editor, or chief engineer by a radio or television station the major studio of which is located (A) in a city or town of one hundred thousand population or less, according to the latest available decennial census figures as compiled by the Bureau of the Census, except where such city or town is part of a standard metropolitan statistical area, as defined and designated by the Office of Management and Budget, which has a total population in excess of one hundred thousand, or (B) in a city or town of twenty-five thousand population or less, which is part of such an area but is at least 40 airline miles from the principal city in such area; or

(10)(A) any salesman, partsman, or mechanic primarily engaged in selling or servicing automobiles, trucks, or farm implements, if he is employed by a nonmanufacturing establishment primarily engaged in the business of selling such vehicles or implements to ultimate purchasers; or

(B) any salesman primarily engaged in selling trailers, boats, or aircraft, if he is employed by a nonmanufacturing establishment primarily engaged in the business of selling trailers, boats, or aircraft to ultimate purchasers; or

(11) any employee employed as a driver or driver's helper making local deliveries, who is compensated for such employment on the basis of trip rates, or other delivery payment plan, if the Secretary shall find that such plan has the general purpose and effect of reducing hours worked by such employees to, or below, the maximum workweek applicable to them under section 207(a) of this title; or

(12) any employee employed in agriculture or in connection with the operation or maintenance of ditches, canals, reservoirs, or waterways, not owned or operated for profit, or operated on a sharecrop basis, and which are used exclusively for supply and storing of water, at least 90 percent of which was ultimately delivered for agricultural purposes during the preceding calendar year; or

(13) any employee with respect to his employment in agriculture by a farmer, notwithstanding other employment of such employee in connection with livestock auction operations in which such farmer is engaged as an adjunct to the raising of livestock, either on his own account or in conjunction with other farmers, if such employee (A) is primarily employed during his workweek in agriculture by such farmer, and (B) is paid for his employment in connection with such livestock auction operations at a wage rate not less than that prescribed by section 206(a)(1) of this title; or

(14) any employee employed within the area of production (as defined by the Secretary) by an establishment commonly recognized as a country elevator, including such an establishment which sells products and services used in the operation of a farm, if no more than five employees are employed in the establishment in such operations; or

(15) any employee engaged in the processing of maple sap into sugar (other than refined sugar) or syrup; or

(16) any employee engaged (A) in the transportation and preparation for transportation of fruits or vegetables, whether or not performed by the farmer, from the farm to a place of first processing or first marketing within the same State, or (B) in transportation, whether or not performed by the farmer, between the farm and any point within the same State of persons employed or to be employed in the harvesting of fruits or vegetables; or

(17) any driver employed by an employer engaged in the business of operating taxicabs; or

(18), (19) Repealed. Pub. L. 93–259, §§ 15(c), 16(b), Apr. 8, 1974, 88 Stat. 65.

(20) any employee of a public agency who in any workweek is employed in fire protection activities or any employee of a public agency who in any workweek is employed in law enforcement activities (including security personnel in correctional institutions), if the public agency employs during the workweek less than 5 employees in fire protection or law enforcement activities, as the case may be; or

(21) any employee who is employed in domestic service in a household and who resides in such household; or

(22) Repealed. Pub. L. 95–151, § 5, Nov. 1, 1977, 91 Stat. 1249.

(23) Repealed. Pub. L. 93–259, § 10(b)(3), Apr. 8, 1974, 88 Stat. 64.

(24) any employee who is employed with his spouse by a nonprofit educational institution to serve as the parents of children—

(A) who are orphans or one of whose natural parents is deceased, or

(B) who are enrolled in such institution and reside in residential facilities of the institution,

while such children are in residence at such institution, if such employee and his spouse reside in such facilities, receive, without cost, board and lodging from such institution, and are together compensated, on a cash basis, at an annual rate of not less than $10,000; or

(25), (26) Repealed. Pub. L. 95–151, §§ 6(a), 7(a), Nov. 1, 1977, 91 Stat. 1249, 1250.

(27) any employee employed by an establishment which is a motion picture theater; or

(28) any employee employed in planting or tending trees, cruising, surveying, or felling timber, or in preparing or transporting logs or other forestry products to the mill, processing plant, railroad, or other transportation terminal, if the number of employees employed by his employer in such forestry or lumbering operations does not exceed eight;

(29) any employee of an amusement or recreational establishment located in a national park or national forest or on land in the National Wildlife Refuge System if such employee (A) is an employee of a private entity engaged in providing services or facilities in a national park or national forest, or on land in the National Wildlife Refuge System, under a contract with the Secretary of the Interior or the Secretary of Agriculture, and (B) receives compensation for employment in excess of fifty-six hours in any workweek at a rate not less than one and one-half times the regular rate at which he is employed; or

(30) a criminal investigator who is paid availability pay under section 5545a of title 5.

**(c) Child labor requirements**

(1) Except as provided in paragraph (2) or (4), the provisions of section 212 of this title relating to child labor shall not apply to any employee employed in agriculture outside of school hours for the school district where such employee is living while he is so employed, if such employee—

(A) is less than twelve years of age and (i) is employed by his parent, or by a person standing in the place of his parent, on a farm owned or operated by such parent or person, or (ii) is employed, with the consent of his parent or person standing in the place of his parent, on a farm, none of the employees of which are (because of subsection (a)(6)(A)) required to be paid at the wage rate prescribed by section 206(a)(5)[1] of this title,

(B) is twelve years or thirteen years of age and (i) such employment is with the consent of

---

[1] See References in Text note below.



process of production; and transportation of goods within a local community or metropolitan area as an integral part of a carriage of such goods from a point outside such community or area to a destination within it, rather than as a part of the activities customarily performed in making local deliveries, as defined in this section, in the same manner as deliveries of goods held locally for local disposition.

(e) *Employee employed as a driver or driver's helper making local deliveries* includes any employee who is employed in any workweek:

(1) To drive a delivery vehicle used in making local deliveries, or

(2) To assist the driver of such a vehicle in making such deliveries, being required to ride on the vehicle to perform such work,

and whose work in making local deliveries, as defined in paragraph (d) of this section, accounts for at least 80 percent of his hours of work in such workweek. In making and applying any finding as provided in this part, no employee shall be considered to be employed as a driver or driver's helper making local deliveries in any workweek when more than 20 percent of his hours of work results from the performance of duties other than those included in making such local deliveries.

(f) A plan of compensation *on the basis of trip rates or other delivery payment plan* means any plan whereby employees employed as drivers or drivers' helpers making local deliveries are compensated for their employment on a basis such that the amount of payment which they receive is governed in substantial part by a system of wage payments based on units of work measurement such as numbers of trips taken, miles driven, stops made, or units of goods delivered (but not including any plan based solely on the number of hours worked) so that there is a substantial inducement to employees to minimize the number of hours worked.

(g) For purposes of determining whether and to what extent a plan of compensation on the basis of trip rates or other delivery payment plan has the effect of reducing the weekly hours worked by employees employed by an employer as drivers or drivers' helpers

making local deliveries pursuant to such plan:

(1) The *most recently completed representative period of one year* (§ 551.2(c)) or *most recent representative annual period* (§ 551.5(b)(3)) shall mean a one-year period within which such employees were so employed on a regular full-time basis by such employer (or, if such employer has not previously used such plan, by another employer using the plan under substantially the same conditions, which period shall include a calendar or fiscal quarter-year ending not more than four months prior to the date as of which the effect of such plan is to be considered, together with the three quarter-year periods immediately preceding such recently completed quarter-year; and

(2) The *average weekly hours* or *average workweek* of the full-time employees so employed during such annual period shall mean the number of hours obtained by the following computation: (i) All the hours worked during such annual period by all the full-time employees regularly employed under the plan shall be totaled; (ii) the number of workweeks worked by each such employee during such annual period under such plan shall be computed, and the totals added together; and (iii) the average weekly hours, taken in the aggregate, of all such employees shall be computed by dividing the sum resulting from computation (i) by the sum resulting from computation (ii).

§ 551.9 Recordkeeping requirements.

The records which must be kept and the computations which must be made with respect to employees for whom the overtime pay exemption under section 13(b)(11) is taken are specified in § 516.15 of this chapter.

[35 FR 17841, Nov. 20, 1970]

PART 552—APPLICATION OF THE FAIR LABOR STANDARDS ACT TO DOMESTIC SERVICE

Subpart A—General Regulations

Sec.
552.1   Terms used in regulations.
552.2   Purpose and scope.
552.3   Domestic service employment.
552.4   Babysitting services.

552.5 Casual basis.
552.6 Companionship services.

**Subpart B—Interpretations**

552.99 Basis for coverage of domestic service employees.
552.100 Application of minimum wage and overtime provisions.
552.101 Domestic service employment.
552.102 Live-in domestic service employees.
552.103 Babysitting services in general.
552.104 Babysitting services performed on a casual basis.
552.105 Individuals performing babysitting services in their own homes.
552.106 Companionship services.
552.107 Yard maintenance workers.
552.108 Child labor provisions.
552.109 Third party employment.
552.110 Recordkeeping requirements.

AUTHORITY: Secs. 13(a)(15) and 13(b)(21) of the Fair Labor Standards Act, as amended (29 U.S.C. 213(a)(15), (b)(21)), 88 Stat. 62; Sec. 29(b) of the Fair Labor Standards Amendments of 1974 (Pub. L. 93–259, 88 Stat. 76), unless otherwise noted.

SOURCE: 40 FR 7405, Feb. 20, 1975, unless otherwise noted.

## Subpart A—General Regulations

### §552.1  Terms used in regulations.

(a) *Administrator* means the Administrator of the Wage and Hour Division, U.S. Department of Labor, or the Administrator's authorized representative.

(b) *Act* means the Fair Labor Standards Act of 1938, as amended.

### §552.2  Purpose and scope.

(a) This part provides necessary rules for the application of the Act to domestic service employment in accordance with the following amendments made by the Fair Labor Standards Amendments of 1974, 88 Stat. 55, *et seq.*

(b) Section 2(a) of the Act finds that the "employment of persons in domestic service in households affects commerce." Section 6(f) extends the minimum wage protection under section 6(b) to employees employed as domestic service employees under either of the following circumstances:

(1) If the employee's compensation for such services from his/her employer would constitute wages under section 209(a)(6) of title II of the Social Security Act, that is, if the cash remuneration during a calendar year is not less

than $1,000 in 1995, or the amount designated for subsequent years pursuant to the adjustment provision in section 3121(x) of the Internal Revenue Code of 1986; or

(2) If the employee was employed in such domestic service work by one or more employers for more than 8 hours in the aggregate in any workweek.

Section 7(l) extends generally the protection of the overtime provisions of section 7(a) to such domestic service employees. Section 13(a)(15) provides both a minimum wage and overtime exemption for "employees employed on a casual basis in domestic service employment to provide babysitting services" and for domestic service employees employed" to provide companionship services for individuals who (because of age or infirmity) are unable to care for themselves." Section 13(b)(21) provides an overtime exemption for domestic service employees who reside in the household in which they are employed.

(c) The definitions required by section 13(a)(15) are contained in §§552.3, 552.4, 552.5 and 552.6.

(Sec. 29(b), 88 Stat. 76; (29 U.S.C. 206(f)); Secretary's Order No. 16–75, dated Nov. 25, 1975 (40 FR 55913), and Employment Standards Order No. 76–2, dated Feb. 23, 1976 (41 FR 9016))

[40 FR 7405, Feb. 20, 1975, as amended at 44 FR 37221, June 26, 1979; 60 FR 46767, 46768, Sept. 8, 1995]

### §552.3  Domestic service employment.

The term *domestic service employment* means services of a household nature performed by an employee in or about a private home (permanent or temporary). The term includes services performed by employees such as companions, babysitters, cooks, waiters, butlers, valets, maids, housekeepers, nannies, nurses, janitors, laundresses, caretakers, handymen, gardeners, home health aides, personal care aides, and chauffeurs of automobiles for family use. This listing is illustrative and not exhaustive.

[78 FR 60557, Oct. 1, 2013]

### §552.4  Babysitting services.

As used in section 13(a)(15) of the Act, the term *babysitting services* shall

mean the custodial care and protection, during any part of the 24-hour day, of infants or children in or about the private home in which the infants or young children reside. The term "babysitting services" does not include services relating to the care and protection of infants or children which are performed by trained personnel, such as registered, vocational, or practical nurses. While such trained personnel do not qualify as babysitters, this fact does not remove them from the category of a covered domestic service employee when employed in or about a private household.

### § 552.5 Casual basis.

As used in section 13(a)(15) of the Act, the term *casual basis*, when applied to babysitting services, shall mean employment which is irregular or intermittent, and which is not performed by an individual whose vocation is babysitting. Casual babysitting services may include the performance of some household work not related to caring for the children: *Provided, however,* That such work is incidental, *i.e.*, does not exceed 20 percent of the total hours worked on the particular babysitting assignment.

### § 552.6 Companionship services.

(a) As used in section 13(a)(15) of the Act, the term *companionship services* means the provision of fellowship and protection for an elderly person or person with an illness, injury, or disability who requires assistance in caring for himself or herself. The provision of *fellowship* means to engage the person in social, physical, and mental activities, such as conversation, reading, games, crafts, or accompanying the person on walks, on errands, to appointments, or to social events. The provision of *protection* means to be present with the person in his or her home or to accompany the person when outside of the home to monitor the person's safety and well-being.

(b) The term *companionship services* also includes the provision of care if the care is provided attendant to and in conjunction with the provision of fellowship and protection and if it does not exceed 20 percent of the total hours worked per person and per workweek.

The provision of *care* means to assist the person with activities of daily living (such as dressing, grooming, feeding, bathing, toileting, and transferring) and instrumental activities of daily living, which are tasks that enable a person to live independently at home (such as meal preparation, driving, light housework, managing finances, assistance with the physical taking of medications, and arranging medical care).

(c) The term *companionship services* does not include domestic services performed primarily for the benefit of other members of the household.

(d) The term *companionship services* does not include the performance of medically related services provided for the person. The determination of whether services are medically related is based on whether the services typically require and are performed by trained personnel, such as registered nurses, licensed practical nurses, or certified nursing assistants; the determination is not based on the actual training or occupational title of the individual performing the services.

[78 FR 60557, Oct. 1, 2013]

## Subpart B—Interpretations

### § 552.99 Basis for coverage of domestic service employees.

Congress in section 2(a) of the Act specifically found that the employment of persons in domestic service in households affects commerce. In the legislative history it was pointed out that employees in domestic service employment handle goods such as soaps, mops, detergents, and vacuum cleaners that have moved in or were produced for interstate commerce and also that they free members of the household to themselves to engage in activities in interstate commerce (S. Rep. 93–690, pp. 21–22). The Senate Committee on Labor and Public Welfare "took note of the expanded use of the interstate commerce clause by the Supreme Court in numerous recent cases (particularly *Katzenbach* v. *McClung*, 379 U.S. 294 (1964))," and concluded "that coverage of domestic employees is a vital step in the direction of ensuring that all workers affecting interstate commerce are

protected by the Fair Labor Standards Act'' (S. Rep. 93–690, pp. 21–22).

### §552.100 Application of minimum wage and overtime provisions.

(a)(1) Domestic service employees must receive for employment in any household a minimum wage of not less than that required by section 6(a) of the Fair Labor Standards Act.

(2) In addition, domestic service employees who work more than 40 hours in any one workweek for the same employer must be paid overtime compensation at a rate not less than one and one-half times the employee's regular rate of pay for such excess hours, unless the employee is one who resides in the employer's household. In the case of employees who reside in the household where they are employed, section 13(b)(21) of the Act provides an overtime, but not a minimum wage, exemption. See §552.102.

(b) In meeting the wage responsibilities imposed by the Act, employers may take appropriate credit for the reasonable cost or fair value, as determined by the Administrator, of food, lodging and other facilities customarily furnished to the employee by the employer such as drugs, cosmetics, drycleaning, etc. See S. Rep. 93–690, p. 19, and section 3(m) of the Act. Credit may be taken for the reasonable cost or fair value of these facilities only when the employee's acceptance of them is voluntary and uncoerced. See regulations, part 531. Where uniforms are required by the employer, the cost of the uniforms and their care may not be included in such credit.

(c) For enforcement purposes, the Administrator will accept a credit taken by the employer of up to 37.5 percent of the statutory minimum hourly wage for a breakfast (if furnished), up to 50 percent of the statutory minimum hourly wage for a lunch (if furnished), and up to 62.5 percent of the statutory minimum hourly wage for a dinner (if furnished), which meal credits when combined do not in total exceed 150 percent of the statutory minimum hourly wage for any day. Nothing herein shall prevent employers from crediting themselves with the actual cost or fair value of furnishing meals, whichever is less, as determined in ac-

cordance with part 531 of this chapter, if such cost or fair value is different from the meal credits specified above: *Provided, however,* that employers keep, maintain and preserve (for a period of 3 years) the records on which they rely to justify such different cost figures.

(d) In the case of lodging furnished to live-in domestic service employees, the Administrator will accept a credit taken by the employer of up to seven and one-half times the statutory minimum hourly wage for each week lodging is furnished. Nothing herein shall prevent employers from crediting themselves with the actual cost or fair value of furnishing lodging, whichever is less, as determined in accordance with part 531 of this chapter, if such cost or fair value is different from the amount specified above, *provided, however,* that employers keep, maintain, and preserve (for a period of 3 years) the records on which they rely to justify such different cost figures. In determining reasonable cost or fair value, the regulations and rulings in 29 CFR part 531 are applicable.

(Sec. 29(b), 88 Stat. 76; (29 U.S.C. 206(f)); Secretary's Order No. 16–75, dated Nov. 25, 1975 (40 FR 55913), and Employment Standards Order No. 76–2, dated Feb. 23, 1976 (41 FR 9016))

[40 FR 7405, Feb. 20, 1975, as amended at 44 FR 6716, Feb. 2, 1979; 60 FR 46768, Sept. 8, 1995]

### §552.101 Domestic service employment.

(a) The definition of *domestic service employment* contained in §552.3 is derived from the regulations issued under the Social Security Act (20 CFR 404.1057) and from ''the generally accepted meaning'' of the term. Accordingly, the term includes persons who are frequently referred to as ''private household workers.'' See. S. Rep. 93–690, p. 20. The domestic service must be performed in or about a private home whether that home is a fixed place of abode or a temporary dwelling as in the case of an individual or family traveling on vacation. A separate and distinct dwelling maintained by an individual or a family in an apartment house, condominium or hotel may constitute a private home.

273

A-9

(b) Employees employed in dwelling places which are primarily rooming or boarding houses are not considered domestic service employees. The places where they work are not private homes but commercial or business establishments. Likewise, employees employed in connection with a business or professional service which is conducted in a home (such as a real estate, doctor's, dentist's or lawyer's office) are not domestic service employees.

(c) In determining the total hours worked, the employer must include all time the employee is required to be on the premises or on duty and all time the employee is suffered or permitted to work. Special rules for live-in domestic service employees are set forth in § 552.102.

[40 FR 7405, Feb. 20, 1975, as amended at 60 FR 46768, Sept. 8, 1995; 78 FR 60557, Oct. 1, 2013]

### § 552.102 Live-in domestic service employees.

(a) Domestic service employees who reside in the household where they are employed are entitled to the same minimum wage as domestic service employees who work by the day. However, section 13(b)(21) provides an exemption from the Act's overtime requirements for domestic service employees who reside in the household where employed. But this exemption does not excuse the employer from paying the live-in worker at the applicable minimum wage rate for all hours worked. In determining the number of hours worked by a live-in worker, the employee and the employer may exclude, by agreement between themselves, the amount of sleeping time, meal time and other periods of complete freedom from all duties when the employee may either leave the premises or stay on the premises for purely personal pursuits. For periods of free time (other than those relating to meals and sleeping) to be excluded from hours worked, the periods must be of sufficient duration to enable the employee to make effective use of the time. If the sleeping time, meal periods or other periods of free time are interrupted by a call to duty, the interruption must be counted as hours worked. See regulations part 785, § 785.23.

(b) If it is found by the parties that there is a significant deviation from the initial agreement, the parties should reach a new agreement that reflects the actual facts of the hours worked by the employee.

[40 FR 7405, Feb. 20, 1975, as amended at 78 FR 60557, Oct. 1, 2013]

### § 552.103 Babysitting services in general.

The term ''babysitting services'' is defined in § 552.4. Babysitting is a form of domestic service, and babysitters other than those working on a casual basis are entitled to the same benefits under the Act as other domestic service employees.

### § 552.104 Babysitting services performed on a casual basis.

(a) Employees performing babysitting services on a casual basis, as defined in § 552.5 are excluded from the minimum wage and overtime provisions of the Act. The rationale for this exclusion is that such persons are usually not dependent upon the income from rendering such services for their livelihood. Such services are often provided by (1) Teenagers during nonschool hours or for a short period after completing high school but prior to entering other employment as a vocation, or (2) older persons whose main source of livelihood is from other means.

(b) Employment in babysitting services would usually be on a ''casual basis,'' whether performed for one or more employees, if such employment by all such employers does not exceed 20 hours per week in the aggregate. Employment in excess of these hours may still be on a ''casual basis'' if the excessive hours of employment are without regularity or are for irregular or intermittent periods. Employment in babysitting services shall also be deemed to be on a ''casual basis'' (regardless of the number of weekly hours worked by the babysitter) in the case of individuals whose vocations are not domestic service who accompany families for a vacation period to take care of the children if the duration of such employment does not exceed 6 weeks.

(c) If the individual performing babysitting services on a ''casual basis'' devotes more than 20 percent of his or her

time to household work during a baby-sitting assignment, the exemption for "babysitting services on a casual basis" does not apply during that assignment and the individual must be paid in accordance with the Act's minimum wage and overtime requirements. This does not affect the application of the exemption for previous or subsequent babysitting assignments where the 20 percent tolerance is not exceeded.

(d) Individuals who engage in babysitting as a full-time occupation are not employed on a "casual basis."

[40 FR 7405, Feb. 20, 1975, as amended at 60 FR 46768, Sept. 8, 1995]

### §552.105 Individuals performing baby-sitting services in their own homes.

(a) It is clear from the legislative history that the Act's new coverage of domestic service employees is limited to those persons who perform such services in or about the private household of the employer. Accordingly, if such services are performed away from the employer's permanent, or temporary household there is no coverage under sections 6(f) and 7(l) of the Act. A typical example would be an individual who cares for the children of others in her own home. This type of operation, however, could, depending on the particular facts, qualify as a preschool or day care center and thus be covered under section 3(s)(1)(B) of the Act in which case the person providing the service would be required to comply with the applicable provisions of the Act.

(b) An individual in a local neighborhood who takes four or five children into his or her home, which is operated as a day care home, and who does not have more than one employee or whose only employees are members of that individual's immediate family is not covered by the Fair Labor Standards Act.

[40 FR 7405, Feb. 20, 1975, as amended at 60 FR 46768, Sept. 8, 1995]

### §552.106 Companionship services.

The term "companionship services" is defined in §552.6. Persons who provide care and protection for babies and young children who do not have illnesses, injuries, or disabilities are con-sidered babysitters, not companions. The companion must perform the services with respect to the elderly person or person with an illness, injury, or disability and not generally to other persons. The "casual" limitation does not apply to companion services.

[78 FR 60557, Oct. 1, 2013]

### §552.107 Yard maintenance workers.

Persons who mow lawns and perform other yard work in a neighborhood community generally provide their own equipment, set their own work schedule and occasionally hire other individuals. Such persons will be recognized as independent contractors who are not covered by the Act as domestic service employees. On the other hand, gardeners and yardmen employed primarily by one household are not usually independent contractors.

### §552.108 Child labor provisions.

Congress made no change in section 12 as regards domestic service employees. Accordingly, the child labor provisions of the Act do not apply unless the underaged minor (a) is individually engaged in commerce or in the production of goods for commerce, or (b) is employed by an enterprise meeting the coverage tests of sections 3(r) and 3(s)(1) of the Act, or (c) is employed in or about a home where work in the production of goods for commerce is performed.

### §552.109 Third party employment.

(a) Third party employers of employees engaged in companionship services within the meaning of §552.6 may not avail themselves of the minimum wage and overtime exemption provided by section 13(a)(15) of the Act, even if the employee is jointly employed by the individual or member of the family or household using the services. However, the individual or member of the family or household, even if considered a joint employer, is still entitled to assert the exemption, if the employee meets all of the requirements of §552.6.

(b) Employees who are engaged in providing babysitting services and who are employed by an employer or agency other than the family or household using their services are not employed

on a ''casual basis'' for purposes of the section 13(a)(15) exemption. Such employees are engaged in this occupation as a vocation.

(c) Third party employers of employees engaged in live-in domestic service employment within the meaning of § 552.102 may not avail themselves of the overtime exemption provided by section 13(b)(21) of the Act, even if the employee is jointly employed by the individual or member of the family or household using the services. However, the individual or member of the family or household, even if considered a joint employer, is still entitled to assert the exemption.

[40 FR 7405, Feb. 20, 1975, as amended at 78 FR 60557, Oct. 1, 2013]

§ 552.110 Recordkeeping requirements.

(a) The general recordkeeping regulations are found in part 516 of this chapter and they require that every employer having covered domestic service employees shall keep records which show for each such employee: (1) Name in full, (2) social security number, (3) address in full, including zip code, (4) total hours worked each week by the employee for the employer, (5) total cash wages paid each week to the employee by the employer, (6) weekly sums claimed by the employer for board, lodging or other facilities, and (7) extra pay for weekly hours worked in excess of 40 by the employee for the employer. No particular form of records is required, so long as the above information is recorded and the record is maintained and preserved for a period of 3 years.

(b) In the case of an employee who resides on the premises, the employer shall keep a copy of the agreement specified by § 552.102 and make, keep, and preserve a record showing the exact number of hours worked by the live-in domestic service employee. The provisions of § 516.2(c) of this chapter shall not apply to live-in domestic service employees.

(c) With the exception of live-in domestic service employees, where a domestic service employee works on a fixed schedule, the employer may use a schedule of daily and weekly hours that the employee normally works and either the employer or the employee may:

(1) Indicate by check marks, statement or other method that such hours were actually worked; and

(2) When more or less than the scheduled hours are worked, show the exact number of hours worked.

(d) The employer is required to maintain records of hours worked by each covered domestic service employee. However, the employer may require the domestic service employee to record the hours worked and submit such record to the employer.

(e) No records are required for casual babysitters.

[40 FR 7405, Feb. 20, 1975, as amended at 78 FR 60557, Oct. 1, 2013]

# PART 553—APPLICATION OF THE FAIR LABOR STANDARDS ACT TO EMPLOYEES OF STATE AND LOCAL GOVERNMENTS

## Subpart A—General

INTRODUCTION

Sec.
553.1  Definitions.
553.2  Purpose and scope.
553.3  Coverage—general.

SECTION 3(e)(2)(C)—EXCLUSIONS

553.10  General.
553.11  Exclusion for elected officials and their appointees.
553.12  Exclusion for employees of legislative branches.

SECTION 7(o)—COMPENSATORY TIME AND COMPENSATORY TIME OFF

553.20  Introduction.
553.21  Statutory provisions.
553.22  ''FLSA compensatory time'' and ''FLSA compensatory time off''.
553.23  Agreement or understanding prior to performance of work.
553.24  ''Public safety'', ''emergency response'', and ''seasonal'' activities.
553.25  Conditions for use of compensatory time (''reasonable period'', ''unduly disrupt'').
553.26  Cash overtime payments.
553.27  Payments for unused compensatory time.
553.28  Other compensatory time.

OTHER EXEMPTIONS

553.30  Occasional or sporadic employment—section 7(p)(2).
553.31  Substitution—section 7(p)(3).

276

Part 2 is amended in § 2.121 by revising paragraph (p) (7) to read as follows:

**§ 2.121 Redelegations of authority from the Commissioner to other officers of the Administration.**

* * * * *

(p) * * *

(7) The Director, Deputy Director, and Associate Director of the Bureau of Biologics and the Director of the Division of Compliance of that Bureau may authorize, pursuant to section 351(c) of the Public Health Service Act (42 U.S.C. 262 (c)), any officer, agent, or employee to enter and inspect any establishment which is subject to the provisions of section 351 of the act (42 U.S.C. 262).

* * * * *

*Effective date.* This order shall be effective February 20, 1975.

(Sec. 701(a), 52 Stat. 1055; 21 U.S.C. 371(a).)

Dated: February 13, 1975.

SAM D. FINE,
*Associate Commissioner for
Compliance.*

[FR Doc.75–4591 Filed 2–19–75;8:45 am]

**PART 121—FOOD ADDITIVES**

**Subpart C—Food Additives Permitted in Feed and Drinking Water of Animals or for the Treatment of Food-Producing Animals**

**LIGNIN SULFONATE FROM SISAL**

The Commissioner of Food and Drugs has evaluated the data in a petition (MF–3515) filed by the Dexter Corp., 1 Elm St., Windsor Locks, CT 06096, and other relevant material, and concludes that the food additive regulations (21 CFR Part 121) should be amended, as set forth below, to provide for the safe use of lignin sulfonate derived from sisal (*Agave sisalana*) as a permitted ingredient in animal feed.

Therefore, pursuant to provisions of the Federal Food, Drug, and Cosmetic Act (sec. 409(c)(1), 72 Stat. 1786; 21 U.S.C. 348(c)(1)), and under authority delegated to the Commissioner (21 CFR 2.120), § 121.234 is amended in paragraph (a) by adding the words "or of sisal (*Agave sisalana*)" after the words "or of abaca (*Musa textilis*)." As revised, paragraph (a) reads as follows:

**§ 121.234 Lignin sulfonates.**

(a) For the purpose of this section, the food additive is either one, or a combination, of the ammonium, calcium, magnesium, or sodium salts of the extract of spent sulfite liquor derived from the sulfite digestion of wood or of abaca (*Musa textilis*) or of sisal (*Agave sisalana*) in either a liquid form moisture not to exceed 50 percent by weight) or dry form (moisture not to exceed 6 percent by weight).

* * * * *

Any person who will be adversely affected by the foregoing order may at any time on or before March 24, 1975 file with the Hearing Clerk, Food and Drug Administration, Rm. 4–65, 5600 Fishers Lane, Rockville, MD 20852, written objections thereto. Objections shall show wherein the person filing will be adversely affected by the order, specify with particularity the provisions of the order deemed objectionable, and state the grounds for the objections. If a hearing is requested, the objections shall state the issues for the hearing, shall be supported by grounds factually and legally sufficient to justify the relief sought, and shall include a detailed description and analysis of the factual information intended to be presented in support of the objections in the event that a hearing is held. Six copies of all documents shall be filed. Received objections may be seen in the above office during working hours, Monday through Friday.

*Effective date.* This order shall become effective February 20, 1975.

(Sec. 409(c)(1), 72 Stat. 1786; 21 U.S.C. 348(c)(1))

Dated: February 13, 1975.

SAM D. FINE,
*Associate Commissioner for
Compliance.*

[FR Doc.75–4592 Filed 2–19–75;8:45 am]

**Title 29—Labor**

**CHAPTER V—WAGE AND HOUR DIVISION, DEPARTMENT OF LABOR**

**PART 516—RECORDS TO BE KEPT BY EMPLOYERS**

**PART 552—APPLICATION OF THE FAIR LABOR STANDARDS ACT TO DOMESTIC SERVICE**

**Extension to Domestic Service Employees**

The Fair Labor Standards Act of 1938 (52 Stat. 1060, as amended, 29 U.S.C. 201 et seq.), as amended by the Fair Labor Standards Amendments of 1974 (Pub. L. 93–259, 88 Stat. 55), extends with certain exceptions the Act's minimum wage, overtime, equal pay, and recordkeeping provisions to domestic service employees. In order to implement the 1974 Amendments, a proposed change in the recordkeeping requirements of 29 CFR Part 516 and and a new proposed 29 CFR Part 552 concerning domestic service employment were published in the FEDERAL REGISTER on October 1, 1974 (39 FR 35382). Subpart A of 29 CFR Part 552 defined and delimited the terms "domestic service employee," "employee employed on a casual basis in domestic service employment to provide babysitting services," and "employment to provide companionship services for individuals who (because of age or infirmity) are unable to care for themselves." Subpart B set out statements of general policy and interpretation concerning the application of the Fair Labor Standards Act to domestic service employees. Interested persons were invited to submit written comments, suggestions, data or arguments concerning the proposal to the Administrator of the Wage and Hour Division, U.S. Department of

Labor, in Washington, D.C. on or before November 4, 1974.

In response to the October proposal, comments were received from individuals, law firms, social service groups (both public and private), employers of working mothers, the Women's Bureau of the U.S. Department of Labor, the AFL–CIO, public welfare departments of State and local governments, and business firms providing domestic service workers. Most of the comments were from working mothers and their employers who expressed great concern over the impact which the Amendments and the proposed regulations would have upon those working mothers who employ full-time babysitters. The Wage and Hour Division is mindful of the special problems of working mothers, but the text of the statute and the legislative history of the 1974 Amendments do not permit the Secretary of Labor or the Administrator of the Wage and Hour Division to extend the exemption which Congress provided for those who perform babysitting services on a casual basis to individuals who care for children as their regular, full-time employment.

Based upon the other comments, I have made several minor changes in proposed Part 552. These include the addition of "nurses" to the list of employees who fall within the term "domestic service employment" (§ 552.3); removing the examples from the definition of "casual basis" as it applies to babysitting services (§ 552.5) and inserting them in § 552.104; and deleting the 8-hour a week limitation on the amount of nonexempt work which may be performed by individuals engaged in rendering companionship services (§ 552.6). Also, a sentence was added to § 552.100(b) to make it clear that employers cannot credit against wages for the cost of uniforms and their care if they require that the uniforms be worn. The more detailed description in § 552.100(d) for determining the actual cost of furnishing lodging has been omitted and employers are referred instead to the applicable regulations and rulings contained in 29 CFR 531. Section 552.101(b) has been amended to make clear that employees engaged in maintaining businesses conducted in a home are not "domestic service employees." A paragraph (c) has been added to § 552.101 to deal with the method of determining hours of work for non-live-in domestic service employees. The recordkeeping requirements for live-in domestic service employees have been simplified by the addition of paragraph (b) to § 552.102 which permits the employee's hours to be established by an agreement rather than by the maintenance of precise hourly records where there is an agreement between the parties which schedules the employee's hours of work and that agreement is regularly followed. Other clarifying changes were made in § 552.110.

The one major change in Part 552 is in § 552.109 which deals with "third party employment." This section as originally proposed would not have allowed the section 13(a)(15) or the section 13(b)(21)

exemption for employees who, although providing companionship or live-in domestic services, are employed by an employer or agency other than the family or household using their services. On further consideration, I have concluded that these exemptions can be available to such third party employers since they apply to "any employee" engaged "in" the enumerated services. This interpretation is more consistent with the statutory language and prior practices concerning other similarly worded exemptions.

Therefore, with the changes and additions indicated above, the proposed amendments to 29 CFR Part 516, and the new 29 CFR Part 552, are adopted, to become effective February 20, 1975 in their final form which reads as follows:

1. Part 516 is amended by adding the following section:

### § 516.34  Domestic service employees.

(a) With respect to any person employed as a domestic service employee who is not exempt under section 13(a) (15) of the Act, the employer of such person shall maintain and preserve records containing for each such person the following:

(1) Name in full;

(2) Social security number;

(3) Address in full, including zip code;

(4) Total hours worked each week by such employee for the employer;

(5) Total cash wages paid each week to such employee by the employer;

(6) Weekly sums claimed by the employer for board, lodging or other facilities; and

(7) Extra pay for weekly hours worked in excess of 40 by such employee for the employer.

(b) No particular form of records is required, so long as the above information is recorded and the record is maintained and preserved for a period of 3 years.

(c) Where an employee works on a fixed schedule, the employer may maintain the schedule of daily and weekly hours the employee normally works, and (1) indicate by check mark, statement or other method that such hours were actually worked, and (2) when more or less than the scheduled hours are worked, show the exact number of h' worked.

(Sec. 11(c), 52 Stat. 1060, as amended U.S.C. 211 (c)))

2. Part 552 is added. Its title, table of contents and Subparts A and B read as follows.

#### Subpart A—General Regulations

Sec.
552.1    Terms used in regulations.
552.2    Purpose and scope.
552.3    Domestic service employment.
552.4    Babysitting services.
552.5    Casual basis.
552.6    Companionship services for the aged or infirm.
552.7    Petition for amendment of regulations.

#### Subpart B—Interpretations

552.99   Basis for coverage of domestic service employees.

Sec.
552.100   Application of minimum wage and overtime provisions.
552.101   Domestic service employment.
552.102   Live-in domestic service employees.
552.103   Babysitting services in general.
552.104   Babysitting services performed on a casual basis.
552.105   Individuals performing babysitting services in their own home.
552.106   Companionship services for the aged or infirm.
552.107   Yard maintenance workers.
552.108   Child labor provisions.
552.109   Third party employment.
552.110   Recordkeeping requirements.

AUTHORITY: Section 13(a) (15) of the Fair Labor Standards Act, as amended (29 U.S.C. 213(a) (15), 88 Stat. 62; sec. 29(b) of the Fair Labor Standards Amendments of 1974 (Pub. L. 93–259, 88 Stat. 76).

#### Subpart A—General Regulations

### § 552.1  Terms used in regulations.

(a) "Administrator" means the Administrator of the Wage and Hour Division, U.S. Department of Labor, or the Administrator's authorized representative.

(b) "Act" means the Fair Labor Standards Act of 1938, as amended.

### § 552.2  Purpose and scope.

(a) This part provides necessary rules for the application of the Act to domestic service employment in accordance with the following amendments made by the Fair Labor Standards Amendments of 1974, 88 Stat. 55, et seq.

(b) Section 2(a) of the Act finds that the "employment of persons in domestic service in households affects commerce." Section 6(f) extends minimum wage protection under section 6(b) to employees employed as domestic service employees under either of the following circumstances: (1) If the employee's compensation for such services from his employer would constitute wages under section 209 (g) of Title II of the Social Security Act, that is, if the compensation paid in cash during a calendar quarter totale~' '50 or more, or (2) if the employee ..as employed in such domestic service work by one or more employers for more than 8 hours in the aggregate in any workweek. Section 7(1) extends generally the protection of the overtime provisions of section 7(a) to such domestic service employees. Section 13(a) (15) provides both a minimum wage and overtime exemption for "employees employed on a casual basis in domestic service employment to provide babysitting services" and for domestic service employees employed "to provide companionship services for individuals who (because of age or infirmity) are unable to care for themselves." Section 13(b) (21) provides an overtime exemption for domestic service employees who reside in the household in which they are employed.

(c) The definitions required by section 13(a) (15) are contained in §§ 552.3, 552.4, 552.5 and 552.6.

### § 552.3  Domestic service employment.

As used in section 13(a) (15) of the Act, the term "domestic service employment" refers to services of a household nature performed by an employee in or about a private home (permanent or temporary) of the person by whom he or she is employed. The term includes employees such as cooks, waiters, butlers, valets, maids, housekeepers, governesses, nurses, janitors, laundresses, caretakers, handymen, gardeners, footmen, grooms, and chauffeurs of automobiles for family use. It also includes babysitters employed on other than a casual basis. This listing is illustrative and not exhaustive.

### § 552.4  Babysitting services.

As used in section 13(a) (15) of the Act, the term "babysitting services" shall mean the custodial care and protection, during any part of the 24-hour day, of infants or children in or about the private home in which the infants or young children reside. The term "babysitting services" does not include services relating to the care and protection of infants or children which are performed by trained personnel, such as registered, vocational, or practical nurses. While such trained personnel do not qualify as baby sitters, this fact does not remove them from the category of a covered domestic service employee when employed in or about a private household.

### § 552.5  Casual basis.

As used in section 13(a) (15) of the Act, the term "casual basis," when applied to babysitting services, shall mean employment which is irregular or intermittent, and which is not performed by an individual whose vocation is babysitting. Casual babysitting services may include the performance of some household work not related to caring for the children: *Provided, however,* That such work is incidental, i.e., does not exceed 20 percent of the total hours worked on the particular babysitting assignment.

### § 552.6  Companionship services for the aged or infirm.

As used in section 13(a) (15) of the Act, the term "companionship services" shall mean those services which provide fellowship, care, and protection for a person who, because of advanced age or physical or mental infirmity, cannot care for his or her own needs. Such services may include household work related to the care of the aged or infirm person such as meal preparation, bed making, washing of clothes, and other similar services. They may also include the performance of general household work: *Provided however,* That such work is incidental, i.e., does not exceed 20 percent of the total weekly hours worked. The term "companionship services" does not include services relating to the care and protection of the aged or infirm which require and are performed by trained personnel, such as a registered or practical nurse. While such trained personnel do not qualify as companions, this fact does not remove them from the category of covered domestic service employees when employed in or about a private household.

### § 552.7  Petition for amendment of regulations.

Any person wishing a revision of any of the terms of the foregoing regula-

tions may submit in writing to the Administrator a petition setting forth the changes desired, the reasons for proposing the specified changes, and his or her interest in the matter. No particular form of petition is required. If, upon inspection of the petition, the Administrator believes that reasonable cause for amendment of the regulations is set forth, the Administrator will either schedule a hearing with due notice to interested parties, or will make other provision for affording interested parties an opportunity to present their views, either in support of or in opposition to the proposed changes.

### Subpart B—Interpretations

§ 552.99 Basis for coverage of domestic service employees.

Congress in section 2(a) of the Act specifically found that the employment of persons in domestic service in households affects commerce. In the legislative history it was pointed out that employees in domestic service employment handle goods such as soaps, mops, detergents, and vacuum cleaners that have moved in or were produced for interstate commerce and also that they free members of the household to themselves engage in activities in interstate commerce (S. Rep. 93–690, pages 21–22). The Senate Committee on Labor and Public Welfare "took note of the expanded use of the interstate commerce clause by the Supreme Court in numerous recent cases (particularly "Katzenbach v. McClung", 379 U.S. 294 (1964))," and concluded "that coverage of domestic employees is a vital step in the direction of ensuring that all workers affecting interstate commerce are protected by the Fair Labor Standards Act" (S. Rep. 93–690, pp. 21–22).

§ 552.100 Application of minimum wage and overtime provisions.

(a)(1) Domestic service employees must receive for employment in any household a minimum wage of $1.90 an hour effective May 1, 1974, not less than $2.00 an hour during the year beginning January 1, 1975, not less than $2.20 an hour during the year beginning January 1, 1976, and not less than $2.30 an hour after December 31, 1976.

(2) In addition, domestic service employees who work more than 40 hours in any one workweek for the same employer must be paid overtime compensation at a rate not less than one and one-half times the employee's regular rate of pay for such excess hours, unless the employee is one who resides in the employer's household. In the case of employees who reside in the household where they are employed, section 13(b)(21) of the Act provides an overtime, but not a minimum wage, exemption. See § 552.102.

(b) In meeting the wage responsibilities imposed by the Act, employers may take appropriate credit for the reasonable cost or fair value, as determined by the Administrator, of food, lodging and other facilities customarily furnished to the employee by the employer such as drugs, cosmetics, drycleaning, etc. See S. Rep. 93–690, p. 19, and section 3(m) of

the Act. Credit may be taken for the reasonable cost or fair value of these facilities only when the employee's acceptance of them is voluntary and uncoerced. See regulations, Part 531. Where uniforms are required by the employer, the cost of the uniforms and their care may not be included in such credit.

(c) For enforcement purposes, the Administrator will accept a credit taken by the employer of $0.75 for breakfast (if furnished), $1.00 for lunch (if furnished), and $1.25 for dinner (if furnished), which meal credits do not exceed $3.00 a day. Nothing herein shall prevent employers from crediting themselves with the actual cost or fair value of furnishing meals, as determined in accordance with Part 531 of this chapter, if such cost or fair value is different from the meal credits specified above: *Provided, however,* That employers keep, maintain and preserve (for a period of 3 years) the records on which they rely to justify such different cost figures.

(d) In the case of lodging furnished to live-in domestic service employees, the Administrator will accept a credit taken by the employer of $15 a week. Nothing herein shall prevent employers from crediting themselves with the actual cost or fair value of furnishing lodging, as determined in accordance with Part 531 of this chapter, if such cost or fair value is different from the amount specified above, provided however, that employers keep, maintain, and preserve (for a period of 3 years) the records on which they rely to justify such different cost figures. In determining reasonable cost or fair value, the regulations and rulings in 29 CFR 531 are applicable.

§ 552.101 Domestic service employment.

(a) The definition of "domestic service employment" contained in § 552.3 is derived from the regulations issued under the Social Security Act (20 CFR 404.–1027(j)) and from "the generally accepted meaning" of the term. Accordingly, the term includes persons who are frequently referred to as "private household workers." See S. Rep. 93–690, p. 20. The domestic service must be performed in or about the private home of the employer whether that home is a fixed place of abode or a temporary dwelling as in the case of an individual or family traveling on vacation. A separate and distinct dwelling maintained by an individual or a family in an apartment house, condominium or hotel may constitute a private home.

(b) Employees employed in dwelling places which are primarily rooming or boarding houses are not considered domestic service employees. The places where they work are not private homes but commercial or business establishments. Likewise, employees employed in connection with a business or professional service which is conducted in a home (such as a real estate, doctor's, dentist's or lawyer's office) are not domestic service employees.

(c) In determining the total hours worked, the employer must include all time the employee is required to be on

the premises or on duty, and all time the employee is suffered or permitted to work. Special rules for live-in domestic service employees are set forth in § 552.102.

§ 552.102 Live-in domestic service employees.

(a) Domestic service employees who reside in the household where they are employed are entitled to the same minimum wage as domestic service employees who work by the day. However, section 13(b)(21) provides an exemption from the Act's overtime requirements for domestic service employees who reside in the household where employed. But this exemption does not excuse the employer from paying the live-in worker at the applicable minimum wage rate for all hours worked. In determining the number of hours worked by a live-in worker, the employee and the employer may exclude, by agreement between themselves, the amount of sleeping time, meal time and other periods of complete freedom from all duties when the employee may either leave the premises or stay on the premises for purely personal pursuits. For periods of free time (other than those relating to meals and sleeping) to be excluded from hours worked, the periods must be of sufficient duration to enable the employee to make effective use of the time. If the sleeping time, meal periods or other periods of free time are interrupted by a call to duty, the interruption must be counted as hours worked. See regulations Part 785, § 785.23.

(b) Where there is a reasonable agreement, as indicated in (a) above, it may be used to establish the employee's hours of work in lieu of maintaining precise records of the hours actually worked. The employer shall keep a copy of the agreement and indicate that the employee's work time generally coincides with the agreement. If it is found by the parties that there is a significant deviation from the initial agreement, a separate record should be kept for that period or a new agreement should be reached that reflects the actual facts.

§ 552.103 Babysitting services in general.

The term "babysitting services" is defined in § 552.4. Babysitting is a form of domestic service, and babysitters other than those working on a casual basis are entitled to the same benefits under the Act as other domestic service employees.

§ 552.104 Babysitting services performed on a casual basis.

(a) Employees performing babysitting services on a casual basis, as defined in § 552.5 are excluded from the minimum wage and overtime provisions of the Act. The rationale for this exclusion is that such persons are usually not dependent upon the income from rendering such services for their livelihood. Such services are often provided by (1) teenagers during non-school hours or for a short period after completing high school but prior to entering other employment as a vocation, or (2) older persons whose

main source of livelihood is from other means.

(b) Employment in babysitting services would usually be on a "casual basis," whether performed for one or more employees, if such employment by all such employers does not exceed 20 hours per week in the aggregate. Employment in excess of these hours may still be on a "casual basis" if the excessive hours of employment are without regularity or are for irregular or intermittent periods. Employment in babysitting services shall also be deemed to be on a "casual basis" (regardless of the number of weekly hours worked by the babysitter) in the case of individuals whose vocations are not domestic service who accompany families for a vacation period to take care of the children if the duration of such employment does not exceed 6 weeks.

(c) If the individual performing babysitting services on a "casual" basis devotes more than 20 percent of his or her time to household work during a babysitting assignment, the exemption for "babysitting services on a casual basis" does not apply during that assignment and the individual must be paid in accordance with the Act's minimum wage and overtime requirements. This does not affect the application of the exemption for previous or subsequent babysitting assignments where the 20 percent tolerance is not exceeded.

(d) Individuals who engage in babysitting as a full-time occupation are not employed on a "casual basis."

§ 552.105 Individuals performing babysitting services in their own homes.

(a) It is clear from the legislative history that the Act's new coverage of domestic service employees is limited to those persons who perform such services in or about the private household of the employer. Accordingly, if such services are performed away from the employer's permanent or temporary household, there is no coverage under sections 6(f) and 7(l) of the Act. A typical example would be an individual who cares for the children of others in her own home. This type of operation, however, could, depending on the particular facts, qualify as a preschool or day care center and thus be covered under section 3(s)(4) of the Act in which case the person providing the service would be required to comply with the applicable provisions of the Act.

(b) An individual in a local neighborhood who takes four or five children into his or her home, which is operated as a day care home, and who does not have more than 1 employee or whose only employees are members of that individual's immediate family is not covered by the Fair Labor Standards Act.

§ 552.106 Companionship services for the aged or infirm.

The term "companionship services for the aged or infirm" is defined in § 552.6. Persons who provide care and protection for babies and young children, who are not physically or mentally infirm, are considered babysitters, not companions. The companion must perform the services with respect to the aged or infirm persons and not generally to other persons. The "casual" limitation does not apply to companion services.

§ 552.107 Yard maintenance workers.

Persons who mow lawns and perform other yard work in a neighborhood or community generally provide their own equipment, set their own work schedule and occasionally hire other individuals. Such persons will be recognized as independent contractors who are not covered by the Act as domestic service employees. On the other hand, gardeners and yardmen employed primarily by one household are not usually independent contractors.

§ 552.108 Child labor provisions.

Congress made no change in section 12 as regards domestic service employees. Accordingly, the child labor provisions of the Act do not apply unless the underaged minor (a) is individually engaged in commerce or in the production of goods for commerce, or (b) is employed by an enterprise meeting the coverage tests of sections 3(r) and 3(s)(1) of the Act, or (3) is employed in or about a home where work in the production of goods for commerce is performed.

§ 552.109 Third party employment.

(a) Employees who are engaged in providing companionship services, as defined in § 552.6, and who are employed by an employer or agency other than the family or household using their services, are exempt from the Act's minimum wage and overtime pay requirements by virtue of section 13(a)(15). Assigning such an employee to more than one household or family in the same workweek would not defeat the exemption for that workweek, provided that the services rendered during each assignment come within the definition of companionship services.

(b) Employees who are engaged in providing babysitting services and who are employed by an employer or agency other than the family or household using their services are not employed on a "casual basis" for purposes of the section 13(a)(15) exemption. Such employees are engaged in this occupation as a vocation.

(c) Live-in domestic service employees who are employed by an employer or agency other than the family or household using their services are exempt from the Act's overtime requirements by virtue of section 13(b)(21). This exemption, however, will not apply where the employee works only temporarily for any one family or household, since that employee would not be "residing" on the premises of such family or household.

§ 552.110 Recordkeeping requirements.

(a) The general recordkeeping regulations are found in Part 516 of this chapter and they require that every employer having covered domestic service employees shall keep records which show for each such employee (1) name in full, (2) social security number, (3) address in full, including zip code, (4) total hours worked each week by the employee for the employer, (5) total cash wages paid each week to the employee by the employer, (6) weekly sums claimed by the employer for board, lodging or other facilities, and (7) extra pay for weekly hours worked in excess of 40 by the employee for the employer. No particular form of records is required, so long as the above information is recorded and the record is maintained and preserved for a period of 3 years.

(b) In the case of an employee who resides on the premises, records of the actual hours worked are not required. Instead, the employer may maintain a copy of the agreement referred to in § 552.102. The more limited recordkeeping requirement provided by this subsection does not apply to third party employers. No records are required for casual babysitters.

(c) Where a domestic service employee works on a fixed schedule, the employer may use a schedule of daily and weekly hours that the employee normally works, and either the employer or the employee may (1) indicate by check marks, statement or other method that such hours were actually worked, and (2) when more or less than the scheduled hours are worked, show the exact number of hours worked.

(d) The employer may require the domestic service employee to record the hours worked and submit such record to the employer.

Signed at Washington, D.C., this 12th day of February, 1975.

BETTY SOUTHARD MURPHY,
*Administrator, Wage and Hour Division, U.S. Department of Labor.*

[FR Doc.75-4472 Filed 2-19-75;8:45 am]

---

## Title 32—National Defense

## CHAPTER VII—DEPARTMENT OF THE AIR FORCE

### SUBCHAPTER B—SALES AND SERVICES

### PART 812—USER CHARGES

#### Cost Determination Factors

These amendments expand and revise the factors used in determining costs for services and change the criteria for determining charges for lease or sale of Federally-owned resources or property.

Part 812, Subchapter B of Chapter VII of title 32 of the Code of Federal Regulations is amended as follows:

1. Section 812.3 is amended by revising paragraph (b)(1) and adding (b)(10) and (11) to read as follows:

§ 812.3 Establishing fees and determining costs for special services.

\* \* \* \* \*

(b) \* \* \*

(1) Gross civilian salaries. (Include an amount to cover annual leave, sick leave and holiday entitlements, and the Air Force contributions for life insurance,