# ADDENDUM

A. Fair Labor Standards Amendments of 1974, Pub. L. No. 93-259, 88 Stat. 55 (1974)

B. Employment Standards Administration, U.S. Department of Labor, *Minimum Wage and Maximum Hours Standards Under the Fair Labor Standards Act* at 28 (Jan. 19, 1973)

C. Regulations - 29 C.F.R. § 552.109; 29 C.F.R. § 552.6; and 29 C.F.R. § 552.3

D. *Webster's New World Dictionary of the American Language* 370 (2d. ed. 1972) (def. 4) (providing a definition of "define") and 373 (providing a definition of "delimit")

E. Designation of relevant originating court documents pursuant to 6 Cir. R. 28(b)(1)(A)(i)

# ADDENDUM A

PL 93–259, APRIL 8, 1974, 88 Stat 55

UNITED STATES PUBLIC LAWS

93rd Congress - Second Session

Convening January 21, 1974

DATA SUPPLIED BY THE U.S. DEPARTMENT OF JUSTICE. (SEE SCOPE)

Additions and Deletions are not identified in this document.

PL 93–259 (S 2747)

APRIL 8, 1974

TO AMEND THE FAIR LABOR STANDARDS ACT OF 1938 TO INCREASE THE MINIMUM WAGE RATE UNDER THAT ACT, TO EXPAND THE COVERAGE OF THE ACT, AND FOR OTHER PURPOSES.

BE IT ENACTED BY THE SENATE AND HOUSE OF REPRESENTATIVES
OF THE UNITED STATES OF AMERICA IN CONGRESS ASSEMBLED,

SHORT TITLE; REFERENCES TO ACT

SECTION 1. (A) THIS ACT MAY BE CITED AS THE "FAIR LABOR STANDARDS AMENDMENTS OF 1974". //298 USC 203 NOTE.//

 (B) UNLESS OTHERWISE SPECIFIED, WHENEVER IN THIS ACT AN AMENDMENT OR REPEAL IS EXPRESSED IN TERMS OF AN AMENDMENT TO, OR REPEAL OF, A SECTION OR OTHER PROVISION, THE SECTION OR OTHER PROVISION AMENDED OR REPEALED IS A SECTION OR OTHER PROVISION OF THE FAIR LABOR STANDARDS ACT OF 1938 (29 U.S.C. 201—219). //52 STAT. 1060.//

INCREASE IN MINIMUM WAGE RATE FOR EMPLOYEES COVERED BEFORE 1966

SEC. 2. SECTION 6(A) (1) IS AMENDED TO READ AS FOLLOWS: //80 STAT. 838, 29 USC 206.//

 "(1) NOT LESS THAN $2 AN HOUR DURING THE PERIOD ENDING DECENBER 31, 1974, NOT LESS THAN $2.10 AN HOUR DURING THE YEAR BEGINNING JANUARY 1, 1975, AND NOT LESS THAN $2.30 AN HOUR AFTER DECEMBER 31, 1975, EXCEPT AS OTHERWISE PROVIDED IN THIS SECTION;".

INCREASE IN MINUMUM WAGE RATE FOR NONAGRICULTURAL EMPLOYEES COVERED IN 1966 AND 1974

SEC. 3. SECTION 6(B) IS AMENDED (1) BY INSERTING ", TITLE IX OF THE EDUCATION AMENDMENTS OF 1972, OR THE FAIR LABOR STANDARDS AMENDMENTS OF 1974" AFTER "1966", AND (2) BY STRIKING OUT PARAGRAPHS (1) THROUGH (5) AND INSERTING IN LIEU THEREOF THE FOLLOWING: //86 STAT. 373, 20 USC 1681.//

 "(1) NOT LESS THAN $1.90 AN HOUR DURING THE PERIOD ENDING DECEMBER 31, 1974,
 "(2) NOT LESS THAN $2 AN HOUR DUING THE YEAR BEGINNING JANUARY 1, 1975,
 "(3) NOT LESS THAN $2.20 AN HOUR DURING THE YEAR BEGINNING JANUARY 1, 1976, AND
 "(4) NOT LESS THAN $2.30 AN HOUR AFTER DECEMBER 31, 1976."

INCREASE IN MINIMUM WAGE RATE FOR AGRICULTURAL EMPLOYEES

SEC. 4. SECTION 6(A) (5) IS AMENDED TO READ AS FOLLOWS:

"(5) IF SUCH EMPLOYED IN AGRICULTURE, NOT LESS THAN—,
    "(A) $1.60 AN HOUR DURING THE PERIOD ENDING DECEMBER 31, 1974.
    "(B) $1.80 AN HOUR DURING THE YEAR BEGINNING JANUARY 1, 1975.
    "(C) $2 AN HOUR DURING THE YEAR BEGINNING JANUARY 1, 1976,
    "(D) $2.20 AN HOUR DURING THE YEAR BEGINNING JANUARY 1, 1977, AND
    "(E) $2.30 AN HOUR AFTER DECEMBER 31, 1977."

INCREASE IN MINIMUM WAGE RATES FOR EMPLOYEES IN PUERTO RICO AND THE VIRGIN ISLANDS.

SEC. 5. (A) SECTION 5 IS AMENDED BY ADDING AT THE END THEREOF THE FOLLOWING NEW SUBSECTION: //63 STAT. 911, 29 USC 205.//

"(E) THE PROVISIONS OF THIS SECTION, SECTION 6(C), AND SECTION 8 //63 STAT. 915; 75 STAT. 70. 29 USC 208.// SHALL NOT APPLY WITH RESPECT TO THE MINIMUM WAGE RATE OF ANY EMPLOYEE EMPLOYED IN PUERTO RICO OR THE VIRGIN ISLANDS (1) BY THE UNITED STATES OR BY THE GOVERNMENT OF THE VIRGIN ISLANDS, (2) BY AN ESTABLISHMENT WHICH IS A HOTEL, MOTEL, OR RESTAURANT, OR (3) BY ANY OTHER RETAIL OR SERVICE ESTABLISHMENT WHICH EMPLOYS SUCH EMPLOYEE PRIMARILY IN CONNECTION WITH THE PREPARATION OR OFFERING OF FOOD OR BEVERAGES FOR HUMAN CONSUMPTION, EITHER ON THE PREMISES, OR BY SUCH SERVICES AS CATERING, BANQUET, BOX LUNCH, OR CURB OR COUNTER SERVICE, TO THE PUBLIC, TO EMPLOYEES, OR TO MEMBERS OR GUESTS OF MEMBERS OF CLUBS. THE MINIMUM WAGE RATE OF SUCH AN EMPLOYEE SHALL BE DETERMINED UNDER THIS ACT IN THE SAME MANNER AS THE MINIMUM WAGE RATE FOR EMPLOYEES EMPLOYED IN A STATE OF THE UNITED STATES IS DETERMINED UNDER THIS ACT. AS USED IN THE PRECEDING SENTENCE, THE TERM 'STATE' DOES NOT INCLUDE A TERRITORY OR POSSESSION OF THE UNITED STATES.".

(B) EFFECTIVE ON THE DATE OF THE ENACTMENT OF THE FAIR LABOR STANDARDS AMENDMENTS OF 1974, SUBSECTION (C) OF SECTION 6 //80 STAT. 839, 29 USC 206.// IS AMENDED BY STRIKING OUT PARAGRAPHS (2), (3), AND (4) AND INSERTING IN LIEU THEREOF THE FOLLOWING:

"(2) EXCEPT AS PROVIDED IN PARAGRAPHS (4) AND (5), IN THE CASE OF ANY EMPLOYEE WHO IS COVERED BY SUCH A WAGE ORDER ON THE DATE OF ENACTMENT OF THE FAIR LABOR STANDARDS AMENDMENTS OF 1974 AND TO WHOM THE RATE OR RATES PRESCRIBED BY SUBSECTION (A) OR (B) WOULD OTHERWISE APPLY, THE WAGE RATE APPLICABLE TO SUCH EMPLOYEE SHALL BE INCREASED AS FOLLOWS:

"(A) EFFECTIVE ON THE EFFECTIVE DATE OF THE FAIR LABOR STANDARDS AMENDMENTS OF 1974, THE WAGE ORDER RATE APPLICABLE TO SUCH EMPLOYEE ON THE DAY BEFORE SUCH DATE SHALL—
    "(I) IF SUCH RATE IS UNDER $1.40 AN HOUR, BE INCREASED BY $0.12 AN HOUR, AND
    "(II) IF SUCH RATE IS $1.40 OR MORE AN HOUR, BE INCREASED BY $0.15 AN HOUR.

"(B) EFFECTIVE ON THE FIRST DAY OF THE SECOND AND EACH SUBSEQUENT YEAR AFTER SUCH DATE, THE HIGHEST WAGE ORDER RATE APPLICABLE TO SUCH EMPLOYEES ON THE DATE BEFORE SUCH FIST DAY SHALL—
    "(I) IF SUCH RATE IS UNDER $1.40 AN HOUR, BE INCREASED BY $0.12 AN HOUR, AND
    "(II) IF SUCH RATE IS $1.40 OR MORE AN HOUR, BE INCREASED BY $0.15 AN HOUR.

IN THE CASE OF ANY EMPLOYEE EMPLOYED IN AGRICULTURE WHO IS COVERED BY A WAGE ORDER ISSUED BY THE SECRETARY PURSUANT TO THE RECOMMENDATIONS OF A SPECIAL INDUSTRY COMMITTEE APPOINTED PURSUANT TO SECTION 5, //ANTE, P. 56// TO WHOM THE RATE OR RATES PRESCRIBED BY SUBSECTION (A) (5) WOULD OTHERWISE APPLY, AND WHOSE HOURLY WAGE IS INCREASED ABOVE THE WAGE RATE PRESCRIBED BY SUCH WAGE ORDER BY A SUBSIDY (OR INCOME SUPPLEMENT) PAID, IN WHOLE

OR IN PART, BY THE GOVERNMENT OF PUERTO RICO, THE INCREASES PRESCRIBED BY THIS PARAGRAPH SHALL BE APPLIED TO THE SUM OF THE WAGE RATE IN EFFECT UNDER SUCH WAGE ORDER AND THE AMOUNT BY WHICH THE EMPLOYEE'S HOURLY WAGE RATE IS INCREASED BY THE SUBSIDY (OR INCOME SUPPLEMENT) ABOVE THE WAGE RATE IN EFFECT UNDER SUCH WAGE ORDER.

"(3) IN THE CASE OF ANY EMPLOYEE EMPLOYED IN PUERTO RICO OR THE VIRGIN ISLANDS TO WHOM THIS SECTION IS MADE APPLICABLE BY THE AMENDMENTS MADE TO THIS ACT BY THE FAIR LABOR STANDARDS AMENDMENT OF 1974, THE SECRETARY SHALL, AS SOON AS PRACTICABLE AFTER THE DATE OF ENACTMENT OF THE FAIR LABOR STANDARDS AMENDMENTS OF 1974, APPOINT A SPECIAL INDUSTRY COMMITTEE IN ACCORDANCE WITH SECTION 5 TO RECOMMEND THE HIGHEST MINIMUM WAGE RATE OR RATES, WHICH SHALL BE NOT LESS THAN 60 PER CENTUM OF THE OTHERWISE APPLICABLE MINIMUM WAGE RATE IN EFFECT UNDER SUBSECTION (B) OR $1.00 AN HOUR, WHICHEVER IS GREATER, TO BE APPLICABLE TO SUCH EMPLOYEE IN LIEU OF THE RATE OR RATES PRESCRIBED BY SUBSECTION (B). THE RATE RECOMMENDED BY THE SPECIAL INDUSTRY COMMITTEE SHALL (A) BE EFFECTIVE WITH RESPECT TO SUCH EMPLOYEE UPON THE EFFECTIVE DATE OF THE WAGE ORDER ISSUED PURSUANT TO SUCH RECOMMENDATION, BUT NOT BEFORE SIXTY DAYS AFTER THE EFFECTIVE DATE OF THE FAIR LABOR STANDARDS AMENDMENTS OF 1974, AND (B) EXCEPT IN THE CASE OF EMPLOYEES OF THE GOVERNMENT OF PUERTO RICO OR ANY POLITICAL SUBDIVISION THEREOF, BE INCREASED IN ACCORDANCE WITH PARAGRAPH (2) (B).

"(4) (A) NOTWITHSTANDING PARAGRAPH (2) (A) OR (3), THE WAGE RATE OF ANY EMPLOYEE IN PUERTO RICO OR THE VIRGIN ISLANDS WHICH IS SUBJECT TO PARAGRAPH (2) (A) OR (3) OF THIS SUBSECTION, SHALL, ON THE EFFECTIVE DATE OF THE WAGE INCREASE UNDER PARAGRAPH (2)(A) OR OF THE WAGE RATE RECOMMENDED UNDER PARAGRAPH (3), AS THE CASE MAY BE, BE NOT LESS THAN 60 PER CENTUM OF THE OTHERWISE APPLICABLE RATE UNDER SUBSECTION (A) OR (B) OR $1.00, WHICHEVER IS HIGHER. "(B) NOTWITHSTANDING PARAGRAPH (2)(B), THE WAGE RATE OF ANY EMPLOYEE IN PUERTO RICO OR THE VIRGIN ISLANDS WHICH IS SUBJECT TO PARAGRAPH (2)( B), SHALL, ON AND AFTER THE EFFECTIVE DATE OF THE FIRST WAGE INCREASE UNDER PARAGRAPH (2)(B), BE NOT LESS THAN 60 PER CENTUM OF THE OTHERWISE APPLICABLE RATE UNDER SUBSECTION (A) OR (B) OR $1.00, WHICHEVER IS HIGHER.

"(5) IF THE WAGE RATE OF AN EMPLOYEE IS TO BE INCREASED UNDER THIS SUBSECTION TO A WAGE RATE WHICH EQUALS OR IS GREATER THAN THE WAGE RATE UNDER SUBSECTION (A) OR (B) WHICH, BUT FOR PARAGRAPH (1) OF THIS SUBSECTION, WOULD BE APPLICABLE TO SUCH EMPLOYEE, THIS SUBSECTION SHALL BE INAPPLICABLE TO SUCH EMPLOYEE AND THE APPLICABLE RATE UNDER SUCH SUBSECTION SHALL APPLY TO SUCH EMPLOYEE.

"(6) EACH MINIMUM WAGE RATE PRESCRIBED BY OR UNDER PARAGRAPH (2) OR (3) SHALL BE IN EFFECT UNLESS SUCH MINIMUM WAGE RATE HAS BEEN SUPERSEDED BY A WAGE ORDER (ISSUED BY THE SECRETARY PURSUANT TO THE RECOMMENDATION OF A SPECIAL INDUSTRY COMMITTEE CONVENED UNDER SECTION 8) FIXING A HIGHER MINIMUM WAGE RATE."

(C)(1) THE LAST SENTENCE OF SECTION 8(B) //63 STAT. 915; 69 STAT. 711, 29 USC 208.// IS AMENDED BY STRIKING OUT THE PERIOD AT THE END THEREOF AND INSERTING IN LIEU THEREOF A SEMICOLON . AND THE FOLLOWING: "EXCEPT THAT THE COMMITTEE SHALL RECOMMEND TO THE SECRETARY THE MINIMUM WAGE RATE PRESCRIBED IN SECTION 6(A) OR 6(B), //ANTE, P. 55.// WHICH WOULD BE APPLICABLE BUT FOR SECTION 6(C), //ANTE, P. 56.// UNLESS THERE IS SUBSTANTIAL DOCUMENTARY EVIDENCE, INCLUDING PERTINENT UNABRIDGED PROFIT AND LOSS STATEMENTS AND BALANCE SHEETS FOR A REPRESENTATIVE PERIOD OF YEARS OR IN THE CASE OF EMPLOYEES OF PUBLIC AGENCIES OTHER APPROPRIATE INFORMATION, IN THE RECORD WHICH ESTABLISHES THAT THE INDUSTRY, OR A PREDOMINANT PORTION THEREOF, IS UNABLE TO PAY THAT WAGE."

(2) THE THIRD SENTENCE OF SECTION 10(A) //69 STAT. 712F 72 STAT. 948, 29 USC 210.// IS AMENDED BY INSERTING AFTER "MODIFY" THE FOLLOWING: "(INCLUDING PROVISION FOR THE PAYMENT OF AN APPROPRIATE MINIMUM WAGE RATE)".

(D) SECTION 8 //75 STAT. 70.// IS AMENDED (1) BY STRIKING OUR "THE MINIMUM WAGE PRESCRIBED IN PARAGRAPH (1) OF SECTION 6(A) IN EACH SUCH INDUSTRY" IN THE FIRST SENTENCE OF SUBSECTION (A) AND INSERTING IN LIEU THEREOF "THE MINIMUM WAGE RATE WHICH WOULD APPLY IN EACH INDUSTRY UNDER PARAGRAPH (1) OR (5) OF SECTION 6(A) BUT FOR SECTION 6(C)", (2) BY STRIKING OUT "THE MINIMUM WAGE RATE PRESCRIBED IN PARAGRAPH (1) OF SECTION 6(A)" IN THE LAST SENTENCE OF SUBSECTION (A) AND INSERTING IN LIEU THEREOF "THE OTHERWISE APPLICABLE MINIMUM WAGE RATE IN EFFECT UNDER PARAGRAPH (1) OR (5) OF SECTION 6(A)", AND (3) BY STRIKING OUT "PRESCRIBED IN PARAGRAPH (1) OF SECTION 6(A)", IN SUBSECTION (C) AND INSERTING IN LIEU THEREOF "IN EFFECT UNDER PARAGRAPH (1) OR (5) OF SECTION 6(A) (AS THE CASE MAY BE)".

FEDERAL AND STATE EMPLOYEES

SEC. 6. (A) (1) SECTION 3(D) IS AMENDED TO READ AS FOLLOWS: /52 STAT. 1060; 80 STAT. 830, 29 USC 203.//

 "(D) 'EMPLOYER' INCLUDES ANY PERSON ACTING DIRECTLY OR INDIRECTLY IN THE INTEREST OF AN EMPLOYER IN RELATION TO AN EMPLOYEE AND INCLUDES A PUBLIC AGENCY, BUT DOES NOT INCLUDE ANY LABOR ORGANIZATION (OTHER THAN WHEN ACTING AS AN EMPLOYER) OR ANYONE ACTING IN THE CAPACITY OF OFFICER OR AGENT OF SUCH LABOR ORGANIZATION."

 (2) SECTION 3(E) IS AMENDED TO READ AS FOLLOWS:

 "(E)(1) EXCEPT AS PROVIDED IN PARAGRAPHS (2) AND (3), THE TERM 'EMPLOYEE' MEANS ANY INDIVIDUAL EMPLOYED BY AN EMPLOYER.

 "(2) IN THE CASE OF AN INDIVIDUAL EMPLOYED BY A PUBLIC AGENCY, SUCH TERM MEANS—,

 "(A) ANY INDIVIDUAL EMPLOYED BY THE GOVERNMENT OF THE UNITED STATES—,

 "(I) AS A CIVILIAN IN THE MILITARY DEPARTMENTS (AS DEFINED IN SECTION 102 OF TITLE 5, UNITED STATES CODE). //80 STAT. 378.//

 "(II) IN ANY EXECUTIVE AGENCY (AS DEFINED IN SECTION 105 OF SUCH TITLE),

 "(III) IN ANY UNIT OF THE LEGISLATIVE OR JUDICIAL BRANCH OF THE
 GOVERNMENT WHICH HAS POSITIONS IN THE COMPETITIVE SERVICE,

 "(IV) IN A NONAPPROPRIATED FUND INSTRUMENTALITY UNDER THE JURISDICTION OF THE ARMED FORCES, OR

 "(V) IN THE LIBRARY OF CONGRESS;

 "(B) ANY INDIVIDUAL EMPLOYED BY THE UNITED STATES POSTAL SERVICE OR THE POSTAL RATE COMMISSION; AND

 "(C) ANY INDIVIDUAL EMPLOYED BY A STATE, POLITICAL SUBDIVISION OF A STATE, OR AN INTERSTATE GOVERNMENTAL AGENCY, OTHER THAN SUCH AN INDIVIDUAL—,

 "(I) WHO IS NOT SUBJECT TO THE CIVIL SERVICE LAWS OF THE STATE, POLITICAL SUBDIVISION, OR AGENCY WHICH EMPLOYS HIM; AND

 "(II) WHO—,

 "(I) HOLDS A PUBLIC ELECTIVE OFFICE OF THAT STATE, POLITICAL SUBDIVISION, OR AGENCY,

 "(II) IS SELECTED BY THE HOLDER OF SUCH AN OFFICE TO BE A MEMBER OF HIS PERSONAL STAFF,

 "(III) IS APPOINTED BY SUCH AN OFFICEHOLDER TO SERVE ON A POLICYMAKING LEVEL, OR

 "(IV) WHO IS AN IMMEDIATE ADVISER TO SUCH AN OFFICEHOLDER WITH RESPECT TO THE CONSTITUTIONAL OR LEGAL POWERS OF HIS OFFICE.

 "(3) FOR PURPOSES OF SUBSECTION (U), SUCH TERM DOES NOT INCLUDE ANY INDIVIDUAL EMPLOYED BY AN EMPLOYER ENGAGED IN AGRICULTURE IF SUCH INDIVIDUAL IS THE PARENT, SPOUSE, CHILD, OR OTHER MEMBER OF THE EMPLOYER'S IMMEDIATE FAMILY."

 (3) SECTION 3(H) IS AMENDED TO READ AS FOLLOWS: //52 STAT. 1060.// "(H) 'INDUSTRY' MEANS A TRADE, BUSINESS, INDUSTRY, OR OTHER ACTIVITY, OR BRANCH OR GROUP THEREOF, IN WHICH INDIVIDUALS ARE GAINFULLY EMPLOYED.".

(4) SECTION 3(R) //75 STAT. 65; 86 STAT. 375.// IS AMENDED BY INSERTING "OR" AT THE END OF PARAGRAPH (2) AND BY INSERTING AFTER THAT PARAGRAPH THE FOLLOWING NEW PARAGRAPH:

"(3) IN CONNECTION WITH THE ACTIVITIES OF A PUBLIC AGENCY,".

(5) SECTION 3(S) IS AMENDED— //80 STAT. 831; 86 STAT. 375.//

(A) BY STRIKING OUT IN THE MATTER PRECEDING PARAGRAPH (1) "INCLUDING EMPLOYEES HANDLING, SELLING, OR OTHERWISE WORKING ON GOODS" AND INSERTING IN LIEU THEREOF "EMPLOYEES HANDLING, SELLING, OR OTHERWISE WORKING ON GOODS OR MATERIALS",

(B) BY STRIKING OUT "OR" AT THE END OF PARAGRAPH (3), //80 STAT. 831, 26 USC 203.//

(C) BY STRIKING OUT THE PERIOD AT THE END OF PARAGRAPH (4) AND INSERTING IN LIEU THEREOF "; OR",

(D) BY ADDING AFTER PARAGRAPH (4) THE FOLLOWING NEW PARAGRAPH:

(5) IS AN ACTIVITY OF A PUBLIC AGENCY.", AND

(E) BY ADDING AFTER THE LAST SENTENCE THE FOLLOWING NEW SENTENCE: "THE EMPLOYEES OF AN ENTERPRISE WHICH IS A PUBLIC AGENCY SHALL FOR PURPOSES OF THIS SUBSECTION BE DEEMED TO BE EMPLOYEES ENGAGED IN COMMERCE, OR IN THE PRODUCTION OF GOODS FOR COMMERCE, OR EMPLOYEES HANDLING, SELLING, OR OTHERWISE WORKING ON GOODS OR MATERIALS THAT HAVE BEEN MOVED IN OR PRODUCED FOR COMMERCE.".

(6) SECTION 3 IS AMENDED BY ADDING AFTER SUBSECTION (W) THE FOLLOWING: //52 STAT. 1060; 80 STAT. 832.//

"NX) 'PUBLIC AGENCY' MEANS THE GOVERNMENT OF THE UNITED STATES; THE GOVERNMENT OF A STATE OR POLITICAL SUBDIVISION THEREOF; ANY AGENCY OF THE UNITED STATES (INCLUDING THE UNITED STATES POSTAL SERVICE AND POSTAL RATE COMMISSION), A STATE, OR A POLITICAL SUBDIVISION OF A STATE; OR ANY INTERSTATE GOVERNMENTAL AGENCY.".

(B) SECTION 4 //75 STAT. 66, 29 USC 204.// IS AMENDED BY ADDING AT THE END THEREOF THE FOLLOWING NEW SUBSECTION:

"(F) THE SECRETARY IS AUTHORIZED TO ENTER INTO AN AGREEMENT WITH THE LIBRARIAN OF CONGRESS WITH RESPECT TO INDIVIDUALS EMPLOYED IN THE LIBRARY OF CONGRESS TO PROVIDE FOR THE CARRYING OUT OF THE SECRETARY'S FUNCTIONS UNDER THIS ACT WITH RESPECT TO SUCH INDIVIDUALS. NOTWITHSTANDING ANY OTHER PROVISION OF THIS ACT, OR ANY OTHER LAW, THE CIVIL SERVICE COMMISSION IS AUTHORIZED TO ADMINISTER THE PROVISIONS OF THIS ACT WITH RESPECT TO ANY INDIVIDUAL EMPLOYED BY THE UNITED STATES (OTHER THAN AN INDIVIDUAL EMPLOYED IN THE LIBRARY OF CONGRESS, UNITED STATES POSTAL SERVICE, POSTAL RATE COMMISSION, OR THE TENNESSEE VALLEY AUTHORITY). NOTHING IN THIS SUBSECTION SHALL BE CONSTRUED TO AFFECT THE RIGHT OF AN EMPLOYEE TO BRING AN ACTION FOR UNPAID MINIMUM WAGES, OR UNPAID OVERTIME COMPENSATION, AND LIQUIDATED DAMAGES UNDER SECTION 16(B) OF THIS ACT.". //29 USC 216.//

(C)(1)(A) EFFECTIVE JANUARY 1, 1975, SECTION 7 IS AMENDED BY ADDING AT THE END THEREOF THE FOLLOWING NEW SUBSECTION: //52 STAT. 1063; 80 STAT. 842, 29 USC 207.//

"(K) NO PUBLIC AGENCY SHALL BE DEEMED TO HAVE VIOLATED SUBSECTION (A) WITH RESPECT TO THE EMPLOYMENT OF ANY EMPLOYEE IN FIRE PROTECTION ACTIVITIES OR ANY EMPLOYEE IN LAW ENFORCEMENT ACTIVITIES (INCLUDING SECURITY PERSONNEL IN CORRECTIONAL INSTITUTIONS) IF—

"(1) IN A WORK PERIOD OF 28 CONSECUTIVE DAYS THE EMPLOYEE RECEIVES FOR TOURS OF DUTY WHICH IN THE AGGREGATE EXCEED 240 HOURS; OR

"(2) IN THE CASE OF SUCH AN EMPLOYEE TO WHOM A WORK PERIOD OF AT LEAST 7 BUT LESS THAN 28 DAYS APPLIES, IN HIS WORK PERIOD THE EMPLOYEE RECEIVES FOR TOURS OF DUTY WHICH IN THE AGGREGATE EXCEED A NUMBER OF HOURS WHICH BEARS THE SAME RATIO TO THE NUMBER OF CONSECUTIVE DAYS IN HIS WORK PERIOD AS 240 HOURS BEARS TO 28 DAYS,

COMPENSATION AT A RATE NOT LESS THAN ONE AND ONE–HALF TIMES THE REGULAR RATE AT WHICH HE IS EMPLOYED."

(B) EFFECTIVE JANUARY 1, 1976, SECTION 7(K) IS AMENDED BY STRIKING OUT "240 HOURS" EACH PLACE IT OCCURS AND INSERTING IN LIEU THEREOF "232 HOURS".

(C) EFFECTIVE JANUARY 1, 1977, SUCH SECTION IS AMENDED BY STRIKING OUT "232 HOURS" EACH PLACE IT OCCURS AND INSERTING IN LIEU THEREOF "216 HOURS".

(D) EFFECTIVE JANUARY 1, 1978, SUCH SECTION IS AMENDED— //ANTE, P. 60.//

(I) BY STRIKING OUT "EXCEED 216 HOURS" IN PARAGRAPH (1) AND INSERTING IN LIEU THEREOF "EXCEED THE LESSER OF (A) 216 HOURS, OR (B) THE AVERAGE NUMBER OF HOURS (AS DETERMINED BY THE SECRETARY PURSUANT TO SECTION 6(C)(3) OF THE FAIR LABOR STANDARDS AMENDMENTS OF 1974) IN TOURS OF DUTY OF EMPLOYEES ENGAGED IN SUCH ACTIVITIES IN WORK PERIODS OF 28 CONSECUTIVE DAYS IN CALENDAR YEAR 1975"; AND

(II) BY STRIKING OUT "AS 216 HOURS BEARS TO 28 DAYS" IN PARAGRAPH (2) AND INSERTING IN LIEU THEREOF "AS 216 HOURS (OR IF LOWER, THE NUMBER OF HOURS REFERRED TO IN CLAUSE (B) OF PARAGRAPH (1) BEARS TO 28 DAYS".

(2)(A) SECTION 13(B) //75 STAT. 71; 80 STAT. 837. 29 USC 213.// IS AMENDED BY STRIKING OUT THE PERIOD AT THE END OF PARAGRAPH (19) AND INSERTING IN LIEU THEREOF"; OR" AND BY ADDING AFTER THAT PARAGRAPH THE FOLLOWING NEW PARAGRAPH:

L"(20) ANY EMPLOYEE OF A PUBLIC AGENCY WHO IS EMPLOYED IN FIRE PROTECTION OR LAW ENFORCEMENT ACTIVITIES (INCLUDING SECURITY PERSONNEL IN CORRECTIONAL INSTITUTIONS);".

(B) EFFECTIVE JANUARY 1, 1975, SECTION 13(B)(20) IS AMENDED TO READ AS FOLLOWS:

"(20) ANY EMPLOYEE OF A PUBLIC AGENCY WHO IN ANY WORKWEEK IS EMPLOYED IN FIRE PROTECTION ACTIVITIES OR ANY EMPLOYEE OF A PUBLIC AGENCY WHO IN ANY WORKWEEK IS EMPLOYED IN LAW ENFORCEMENT ACTIVITIES (INCLUDING SECURITY PERSONNEL IN CORRECTIONAL INSTITUTIONS), IF THE PUBLIC AGENCY EMPLOYS DURING THE WORKWEEK LESS THAN 5 EMPLOYEES IN FIRE PROTECTION OR LAW ENFORCEMENT ACITVITIES, AS THE CASE MAY BE; OR".

(3) THE SECRETARY OF LABOR SHALL IN THE CALENDAR YEAR BEGINNING JANUARY 1, 1976, CONDUCT (A) A STUDY OF THE AVERAGE NUMBER OF HOURS IN TOURS OF DUTY IN WORK PERIODS IN THE PRECEDING CALENDAR YEAR OF EMPLOYEES (OTHER THAN EMPLOYEES EXEMPT FROM SECTION 7 OF THE FAIR LABOR STANDARDS ACT OF 1938 BY SECTION 13(B)(20) OF SUCH ACT) OF PUBLIC AGENCIES WHO ARE EMPLOYED IN FIRE PROTECTION ACTIVITIES, AND (B) A STUDY OF THE AVERAGE NUMBER OF HOURS IN TOURS OF DUTY IN WORK PERIODS IN THE PRECEDING CALENDAR YEAR OF EMPLOYEES (OTHER THAN EMPLOYEES EXEMPT FROM SECTION 7 OF THE FAIR LABOR STANDARDS ACT OF 1938 BY SECTION 13(B)(20) OF SUCH ACT) OF PUBLIC AGENCIES WHO ARE EMPLOYED IN LAW ENFORCEMENT ACTIVITIES (INCLUDING SECURITY PERSONNEL IN CORRECTIONAL INSTITUTIONS). THE SECRETARY SHALL PUBLISH THE RESULTS OF EACH SUCH STUDY IN THE FEDERAL REGISTER. //29 USC 213 NOTE.//

(D)(1) THE SECOND SENTENCE OF SECTION 16(B) //52 STAT. 1069; 75 STAT. 74, 29 USC 216.// IS AMENDED TO READ AS FOLLOWS: "ACTION TO RECOVER SUCH LIABILITY MAY BE MAINTAINED AGAINST ANY EMPLOYER (INCLUDING A PUBLIC AGENCY) IN ANY FEDERAL OR STATE COURT OF COMPETENT JURISDICTION BY ANY ONE OR MORE EMPLOYEES FOR AND IN BEHALF OF HIMSELF OR THEMSELVES AND OTHER EMPLOYEES SIMILARLY SITUATED.".

(2)(A) SECTION 6 OF THE PORTAL–TO–PORTAL PAY ACT OF 1947 //61 STAT. 87, 29 USC 255.// IS AMENDED BY STRIKING OUT THE PERIOD AT THE END OF PARAGRAPH (C) AND BY INSERTING IN LIEU THEREOF A SEMICOLON AND BY ADDING AFTER SUCH PARAGRAPH THE FOLLOWING:

"(D) WITH RESPECT TO ANY CAUSE OF ACTION BROUGHT UNDER SECTION 16(B) OF THE FAIR LABOR STANDARDS ACT OF 1938 AGAINST A STATE OR A POLITICAL SUBDIVISION OF A STATE IN A DISTRICT COURT OF THE UNITED STATES ON OR BEFORE APRIL 18, 1973, THE RUNNING OF THE STATUTORY PERIODS OF LIMITATION SHALL BE DEEMED SUSPENDED DURING THE PERIOD BEGINNING WITH THE COMMENCEMENT OF ANY SUCH ACTION AND ENDING ONE HUNDRED AND EIGHTY DAYS AFTER THE EFFECTIVE DATE OF THE FAIR LABOR STANDARDS AMENDMENTS OF 1974, EXCEPT THAT SUCH SUSPENSION SHALL NOT BE

APPLICABLE IF IN SUCH ACTION JUDGMENT HAS BEEN ENTERED FOR THE DEFENDANT ON THE GROUNDS OTHER THAN STATE IMMUNITY FROM FEDERAL JURISDICTION.".

(B) SECTION 11 OF SUCH ACT //61 STAT. 89, 29 USC 260.// IS AMENDED BY STRIKING OUT "(B)" AFTER "SECTION 16".

## DOMESTIC SERVICE WORKERS

SEC. 7. (A) SECTION 2(A) //52 STAT. 1060; 63 STAT. 910. 29 USC 202.// IS AMENDED BY INSERTING AT THE END THE FOLLOWING NEW SENTENCE: "THAT CONGRESS FURTHER FINDS THAT THE EMPLOYMENT OF PERSONS IN DOMESTIC SERVICE IN HOUSEHOLDS AFFECTS COMMERCE."

(B)(1) SECTION 6 //80 STAT. 841. 29 USC 206.// IS AMENDED BY ADDING AFTER SUBSECTION (E) THE FOLLOWING NEW SUBSECTION:

"(F) ANY EMPLOYEE—,

"(1) WHO IN ANY WORKWEEK IS EMPLOYED IN DOMESTIC SERVICE IN A HOUSEHOLD SHALL BE PAID WAGES AT A RATE NOT LESS THAN THE WAGE RATE IN EFFECT UNDER SECTION 6(B) UNLESS SUCH EMPLOYEE'S CONPENSATION FOR SUCH SERVICE WOULD NOT BECAUSE OF SECTION 209(G) OF THE SOCIAL SECURITY ACT CONSTITUTE WAGES FOR THE PURPOSES OF TITLE II OF SUCH ACT, OR //64 STAT. 492; 68 STAT. 1078, 42 USC 409.//

"(2) WHO IN ANY WORKWEEK—,

"(A) IS EMPLOYED IN DOMESTIC SERVICE IN ONE OR MORE HOUSEHOLDS, AND

"(B) IS SO EMPLOYED FOR MORE THAN 8 HOURS IN THE AGGREGATE, SHALL BE PAID WAGES FOR SUCH EMPLOYMENT IN SUCH WORKWEEK AT A RATE NOT LESS THAN THE WAGE RATE IN EFFECT UNDER SECTION 6(B)." //ANTE, P. 55.//

(2) SECTION 7 IS AMENDED BY ADDING AFTER THE SUBSECTION ADDED BY SECTION 6(C) OF THIS ACT THE FOLLOWING NEW SUBSECTION: //ANTE. P. 60.//

"(1) NO EMPLOYER SHALL EMPLOY ANY EMPLOYEE IN DOMESTIC SERVICE IN ONE OR MORE HOUSEHOLDS FOR A WORKWEEK LONGER THAN FORTY HOURS UNLESS SUCH EMPLOYEE RECEIVES COMPENSATION FOR SUCH EMPLOYMENT IN ACCORDANCE WITH SUBSECTION (A)."

(3) SECTION 13(A) //72 STAT. 71; 80 STAT. 838, 29 USC 213.// IS AMENDED BY ADDING AT THE END THE FOLLOWING NEW PARAGRPAPH:

"(15) ANY EMPLOY EMPLOYED ON A CASUAL BASIS IN DOMESTIC SERVICE EMPLOYMENT TO PROVIDE BABYSITTING SERVICES OR ANY EMPLOYEE EMPLOYED IN DOMESTIC SERVICE EMPLOYMENT TO PROVIDE COMPANIONSHIP SERVICES FOR INDIVIDUALS WHO (BECAUSE OF AGE OR INFIRMITY) ARE UNABLE TO CARE FOR THEMSELVES (AS SUCH TERMS ARE DEFINED AND DELIMITED BY REGULATIONS OF THE SECRETARY)."

(4) SECTION 13(B) IS AMENDED BY ADDING AFTER THE PARAGRAPH ADDED BY SECTION 6(C) THE FOLLOWING NEW PARAGRAPH: //ANTE, P. 61.//

"(21) ANY EMPLOYEE WHO IS EMPLOYED IN DOMESTIC SERVICE IN A HOUSEHOLD AND WHO RESIDES IN SUCH HOUSEHOLD; OR".

## RETAIL AND SERVICE ESTABLISHMENTS

SEC. 8. (A) EFFECTIVE JANUARY 1, 1975, SECTION 13(A)(2) //80 STAT. 833.// (RELATING TO EMPLOYEES OF RETAIL AND SERVICE ESTABLISHMENTS) IS AMENDED BY STRIKING OUT "$250,000" AND INSERTING IN LIEU THEREOF "$225,000.

(B) EFFECTIVE JANUARY 1, 1976, SUCH SECTION IS AMENDED BY STRIKING OUT "$225,000" AND INSERTING IN LIEU THEREOF "$200,000".

(C) EFFECTIVE JANUARY 1, 1977, SUCH SECTION IS AMENDED BY STRIKING OUT "OR SUCH ESTABLISHMENT HAS AN ANNUAL DOLLAR VOLUME OF SALES WHICH IS LESS THAN $200,000 (EXCLUSIVE OF EXCISE TAXES AT THE RETAIL LEVEL WHICH ARE SEPARATELY STATED)".

TOBACCO EMPLOYEES

SEC. 9. (A) SECTION 7 IS AMENDED BY ADDING AFTER THE SUBSECTION ADDED BY SECTION ((B)(2) OF THIS ACT THE FOLLOWING:

  "(M) FOR A PERIOD OR PERIODS OF NOT MORE THAN FOURTEEN WORKWEEKS IN THE AGGREGATE IN ANY CALENDAR YEAR, ANY EMPLOYER MAY EMPLOY ANY EMPLOYEE FOR A WORKWEEK IN EXCESS OF THAT SPECIFIED IN SUBSECTION (A) WITHOUT PAYING THE COMPENSATION FOR OVERTIME EMPLOYMENT PRESCRIBED IN SUCH SUBSECTION, IF SUCH EMPLOYEE—,
    "(1) IS EMPLOYED BY SUCH EMPLOYER—,
  "(A) TO PROVIDE SERVICES (INCLUDING STRIPPING AND GRADING) NECESSARY AND INCIDENTAL TO THE SALE AT AUCTION OF GREEN LEAF TOBACCO OF THPE 11, 12, 13, 14, 21, 22, 23, 24, 31, 35, 36, OR 37 (AS SUCH TYPES ARE DIFINED BY THE SECRETARY OF AGRICULTURE), OR IN AUCTION SALE, BUYING, HANDLING, STEMMING, REDRYING, PACKING, AND STORING OF SUCH TOBACCO,
  "(B) IN AUCTION SALE, BUYING, HANDLING, STRIPPING, SORTING, GRADING, SIZING, PACKING, OR STEMMING PRIOR TO PACKING, OF PERISHABLE CIGAR LEAF TOBACCO OF TYPE 41, 42, 43, 44, 45, 46, 51, 52, 53, 54, 55, 61, OR 62 (AS SUCH TYPES ARE DEFINED BY THE SECRETARY OF AGRICULTURE); AND
    "(2) RECEIVES FOR—,
  "(A) SUCH EMPLOYMENT BY SUCH EMPLOYER WHICH IS IN EXCESS OF TEN HOURS IN ANY WORKDAY, AND
  "(B) SUCH EMPLOYMENT BY SUCH EMPLOYER WHICH IS IN EXCESS OF FORTY–EIGHT HOURS IN ANY WORKWEEK, COMPENSATION AT A RATE NOT LESS THAN ONE AND ONE–HALF TIMES THE REGULAR RATE AT WHICH HE IS EMPLOYED.

AN EMPLOYER WHO RECEIVES AN EXEMPTION UNDER THIS SUBSECTION SHALL NOT BE ELIGIBLE FOR ANY OTHER EXEMPTION UNDER THIS SECTION.".
  (B)(1) SECTION 13(A) (14) IS REPEALED. //75 STAT. 71; 80 STAT. 838. 29 USC 213.//
  (2) SECTION 13(B) IS AMENDED BY ADDING AFTER THE PARAGRAPH ADDED BY SECTION 7(B)(4) OF THIS ACT //ANTE. P. 62.// THE FOLLOWING NEW PARAGRAPH:
  "(22) ANY AGRICULTURAL EMPLOYEE EMPLOYED IN THE GROWING AND HARVESTING OF SHADE–GROWN TOBACCO WHO IS ENGAGED IN THE PROCESSING (INCLUDING, BUT NOT LIMITED TO, DRYING, CURING, FERMENTING, BULKING, REBULKING, SORTING, GRADING, AGING, AND BALING) OF SUCH TOBACCO, PRIOR TO THE STEMMING PROCESS, FOR USE AS CIGAR WRAPPER TOBACCO; OR".

TELEGRAPH AGENCY EMPLOYEES

SEC 10. (A) SECTION 13(A)(11) (RELATING TO TELEGRAPH AGENCY EMPLOYEES) IS REPEALED.

  (B)(1) SECTION 13(B) IS AMENDED BY ADDING AFTER THE PARAGRAPH ADDED BY SECTION 9(B)(2) OF THIS ACT THE FOLLOWING NEW PARAGRAPH:
  "(23) ANY EMPLOYEE OR PROPRIETOR IN A RETAIL OR SERVICE ESTABLISHMENT WHICH QUALIFIES AS AN EXEMPT RETAIL OR SERVICE ESTABLISHMENT UNDER PARAGRAPH (2) OF SUBSECTION (A) WITH RESPECT TO WHOM THE PROVISIONS OF SECTIONS 6 AND 7 //ANTE, PP. 55, 90.// WOULD NOT OTHERWISE APPLY, WHO IS ENGAGED IN HANDLING TELEGRAPHIC MESSAGES FOR THE PUBLIC UNDER AN AGNCY OR CONTRACT ARRANGEMENT WITH A TELEGRAPH COMPANY WHERE THE TELEGRAPH MESSAGE REVENUE OF SUCH AGENCY DOES NOT EXCEED $500 A MONTH, AND WHO RECEIVES COMPENSATION FOR EMPLOYMENT IN EXCESS OF FORTY–EIGHT HOURS IN ANY WORKWEEK AT A RATE NOT LESS THAN ONE AND ONE–HALF TIMES THE REGULAR RATE AT WHICH HE IS EMPLOYED; OR".

(2) EFFECTIVE ONE YEAR AFTER THE EFFECTIVE DATE OF THE FAIR LABOR STANDARDS AMENDMENTS OF 1974, SECTION 13(B)(23) IS AMENDED BY STRIKING OUT "FORTY-EIGHT HOURS" AND INSERTING IN LIEU THEREOF "FORTY-FOUR HOURS".

(3) EFFECTIVE TWO YEARS AFTER SUCH DATE, SECTION 13(B)(23) IS REPEALED. // ANTE, P. 63.//

### SEAFOOD CANNING AND PROCESSING EMPLOYEES

SEC. 11. (A) SECTION 13(B)(4) //75 STAT. 71, 29 USC 213.// (RELATING TO FISH AND SEAFOOD PROCESSING EMPLOYEES) IS AMENDED BY INSERTING "WHO IS" AFTER "EMPLOYEE", AND BY INSERTING BEFORE THE SEMICOLON THE FOLLOWING: ", AND WHO RECEIVES COMPENSATION FOR EMPLOYMENT IN EXCESS OF FORTY–EIGHT HOURS IN ANY WORKWEEK AT A RATE NOT LESS THAN ONE AND ONE–HALF TIMES THE REGULAR RATE AT WHICH HE IS EMPLOYED".

(B) EFFECTIVE ONE YEAR AFTER THE EFFECTIVE DATE OF THE FAIR LABOR STANDARDS AMENDMENTS OF 1974, SECTION 13(B)(4) IS AMENDED BY STRIKING OUT "FORTH-EIGHT HOURS" AND INSERTING IN LIEU THEREOF "FORTY-FOUR HOURS".

(C) EFFECTIVE TWO YEARS AFTER SUCH DATE, SECTION 13(B)(4) IS REPEALED.

### NURSING HOME EMPLOYEES

SEC. 12. (A) SECTION 13(B)(8) //80 STAT. 833.// (INSOFAR AS IT RELATED TO NURSING HOME EMPLOYEES) IS AMENDED BY STRIKING OUT "ANY EMPLOYEE WHO (A) IS EMPLOYED BY AN ESTABLISHMENT WHICH IS AN INSTITUTION (OTHER THAN A HOSPITAL) PRIMARILY ENGAGED IN THE CARE OF THE SICK, THE AGED, OR THE MENTALLY ILL OR DEFECTIVE WHO RESIDE ON THE PREMISES" AND THE REMAINDER OF THAT PARAGRAPH.

(B) SECTION 7(J) //80 STAT. 842, 29 USC 207.// IS AMENDED BY INSERTING AFTER "A HOSPITAL" THE FOLLOWING: "OR AN ESTABLISHMENT WHICH IS AN INSTITUTION PRIMARILY ENGAGED IN THE CARE OF THE SICK, THE AGED, OR THE MENTALLY ILL OR DEFECTIVE WHO RESIDE ON THE PREMISES".

### HOTEL, MOTEL, AND RESTAURANT EMPLOYEES AND TIPPED EMPLOYEES

SEC. 139 (A) SECTION 13(B)(8) (INSOFAR AS IT RELATES TO HOTEL, MOTEL, AND RESTAURANT EMPLOYEES) (AS AMENDED BY SECTION 12) IS AMENDED (1) BY STRIKING OUT "ANY EMPLOYEE" AND INSERTING IN LIEU THEREOF "(A) ANY EMPLOYEE (OTHER THAN AN EMPLOYEE OF A HOTEL OR MOTEL WHO PERFORMS MAID OR CUSTODIAL SERVICES) WHO IS", (2) BY INSERTING BEFORE THE SEMICOLON THE FOLLOWING: "AND WHO RECEIVES COMPENSATION FOR EMPLOYMENT IN EXCESS OF FORTY–EIGHT HOURS IN ANY WORKWEEK AT A RATE NOT LESS THAN ONE AND ONE–HALF TIMES THE REGULAR RATE AT WHICH HE IS EMPLOYED", AND (3) BY ADDING AFTER SUCH SECTION THE FOLLOWING:

"(B) ANY EMPLOYEE OF A HOTEL OR MOTEL WHO PERFORMS MAID OR CUSTODIAL SERVICES AND WHO RECEIVES COMPENSATION FOR EMPLOYMENT IN EXCESS OF FORTY–EIGHT HOURS IN ANY WORKWEEK AT A RATE NOT LESS THAN ONE AND ONE–HALF TIMES THE REGULAR RATE AT WHICH HE IS EMPLOYED; OR.

(B) EFFECTIVE ONE YAR AFTERTHE EFFECTIVE DATE OF THE FAIR LABOR STANDARDS AMENDMENTS OF 1974, SUBPARAGRAPHS (A) AND (B) OF SECTION 13( B)(8) ARE EACH AMENDED BY STRIKING OUT "FORTY-EIGHT HOURS" AND INSERTING IN LIEU THEREOF "FORTY-SIX HOURS".

(C) EFFECTIVE TWO YEARS AFTER SUCH DATE, SUBPARAGRAPH (B) OF SECTION 13(B)(8) IS AMENDED BY STRIKING OUT "FORTY-SIX HOURS" AND INSERTING IN LIEU THEREOF "FORTY-FOUR HOURS".

(D) EFFECTIVE THREE YEARS AFTER SUCH DATE, SUBPARAGRAPH (B) OF SECTION 13(B) (8) IS REPEALED AND SUCH SECTION IS AMENDED BY STRIKING OUT "(A)".

(E) THE LAST SENTENCE OF SECTION 3(M) //80 STAT. 830, 29 USC 203.// IS AMENDED TO READ AS FOLLOWS: "IN DETERMINING THE WAGE OF A TIPPED EMPLOYEE, THE AMOUNT PAID SUCH EMPLOYEE BY HIS

EMPLOYER SHALL BE DEEMED TO BE INCREASED ON ACCOUNT OF TIPS BY AN AMOUNT DETERMINED BY THE EMPLOYER, BUT NOT BY AN AMOUNT IN EXCESS OF 50 PER CENTUM OF THE APPLICABLE MINIMUM WAGE RATE, EXCEPT THAT THE AMOUNT OF THE INCREASE ON ACCOUNT OF TIPS DETERMINED BY THE EMPLOYER MAY NOT EXCEED THE VALUE OF TIPS ACTUALLY RECEIVED BY THE EMPLOYEE. THE PREVIOUS SENTENCE SHALL NOT APPLY WITH RESPECT TO ANY TIPPED EMPLOYEE UNLESS (1) SUCH EMPLOYEE HAS BEEN INFORMED BY THE EMPLOYER OF THE PROVISIONS OF THIS SUBSECTION, AND (2) ALL TIPS RECEIVED BY SUCH EMPLOYEE HAVE BEEN RETAINED BY THE EMPLOYEE, EXCEPT THAT THIS SUBSECTION SHALL NOT BE CONSTRUED TO PROHIBIT THE POOLING OF TIPS AMONG EMPLOYEES WHO CUSTOMARILY AND REGULARLY RECEIVE TIPS.".

## SALESMEN, PARTSMEN, AND MECHANICS

SEC. 14. SECTION 13(B)(10) //80 STAT. 836, 29 USC 213.// (RELATING TO SALESMEN, PARTSMEN, AND MECHANICS) IS AMENDED TO READ AS FOLLOWS:

 "(10)(A) ANY SALESMEN, PARTSMAN, OR MECHANIC PRIMARILY ENGAGED IN SELLING OR SERVICING AUTOMOBILES, TRUCKS, OR FARM IMPLEMENTS, IF HE IS EMPLOYED BY A NONMANUFACTURING ESTABLISHMENT PRIMARILY ENGAGED IN THE BUSINESS OF SELLING SUCH VEHICLES OR IMPLEMENTS TO ULTIMATE PURCHASERS; OR
 "(B) ANY SALESMAN PRIMARILY ENGAGED IN SELLING TRAILERS, BOATS, OR AIRCRAFT, IF HE IS EMPLOYED BY A NONMANUFACTURING ESTABLISHMENT PRIMARILY ENGAGED IN THE BUSINESS OF SELLING TRAILERS, BOATS, OR AIRCRAFT TO ULTIMATE PURCHASERS; OR".

## FOOD SERVICE ESTABLISHMENT EMPLOYEES

SEC. 15. (A) SECTION 13(B)(8) (RELATING TO FOOD SERVICE AND CATERING EMPLOYEES) IS AMENDED BY INSERTING IMMEDIATELY BEFORE THE SEMICOLON THE FOLLOWING: "AND WHO RECEIVES COMPENSATION FOR EMPLOYMENT IN EXCESS OF FORTY–EIGHT HOURS IN ANY WORKWEEK AT A RATE NOT LESS THAN ONE AND ONE–HALF TIMES THE REGULAR RATE AT WHICH HE IS EMPLOYED".

 (B) EFFECTIVE ONE YEAR AFTER THE EFFECTIVE DATE OF THE FAIR LABOR STANDARDS AMENDMENTS OF 1974, SUCH SECTION IS AMENDED BY STRIKING OUT "FORTY–EIGHT HOURS" AND INSERTING IN LIEU THEREOF "FORTY-FOUR HOURS".
 (C) EFFECTIVE TWO YEARS AFTER SUCH DATE, SUCH SECTION IS REPEALED.

## BOWLING EMPLOYEES

SEC. 16. (A) EFFECTIVE ONE YEAR AFTER TEH EFFECTIVE DATE OF THE FAIR LABOR STANDARDS AMENDMENTS OF 1974, SECTION 13(B)(19) (RELATING TO EMPLOYEES OF BOWLING ESTABLISHMENTS) IS AMENDED BY STRIKING OUT "FORTY–EIGHT HOURS" AND INSERTING IN LIEU THEREOF "FORTY-FOUR HOURS".

 (B) EFFECTIVE TWO YEARS AFTER SUCH DATE, SUCH SECTION IS REPEALED.

## SUBSTITUTE PARENTS FOR INSTITUTIONALIZED CHILDREN

SEC. 17. SECTION 13(B) //ANTE, P. 63.// IS AMENDED BY INSERTING AFTER THE PARAGRAPH ADDED BY SECTION 10(B)(1) OF THIS ACT THE FOLLOWING NEW PARAGRAPH:

 "(24) ANY EMPLOYEE WHO IS EMPLOYED WITH HIS SPOUSE BY A NON–PROFIT EDUCATIONAL INSTITUTION TO SERVE AS THE PARENTS OF CHILDREN—,
 "(A) WHO ARE ORPHANS OR ONE OF WHOSE NATURAL PARENTS IS DECEASED, OR

"(B) WHO ARE ENROLLED IN SUCH INSTITUTION AND RESIDE IN RESIDENTIAL FACILITIES OF THE INSTITUTION, SHILE SUCH CHILDREN ARE IN RESIDENCE AT SUCH INSTITUTION, IF SUCH EMPLOYEE AND HIS SPOUSE RESIDE IN SUCH FACILITIES, RECEIVE, WITHOUT COST, BOARD AND LODGING FROM SUCH INSTITUTION, AND ARE TOGETHER COMPENSATED, ON A CASH BASIS, AT AN ANNUAL RATE OF NOT LESS THAN $10,000; OR".

### EMPLOYEES OF CONGLOMERATES

SEC. 18. SECTION 13 //52 STAT. 1067; 71 STAT. 514, 29 USC 213.// IS AMENDED BY ADDING AT THE END THEREOF THE FOLLOWING:

"(G) THE EXEMPTION FROM SECTION 6 PROVIDED BY PARAGRAPHS (2) AND (6) OF SUBSECTION (A) OF THIS SECTION //ANTE, P. 55.// SHALL NOT APPLY WITH RESPECT TO ANY EMPLOYEE EMPLOYED BY AN ESTABLISHMENT (1) WHICH CONTROLS, IS CONTROLLED BY, OR IS UNDER COMMON CONTROL WITH, ANOTHER ESTABLISHMENT THE ACTIVITIES OF WHICH ARE NOT RELATED FOR A COMMON BUSINESS PURPOSE TO, BUT MATERIALLY SUPPORT THE ACTIVITIES OF THE ESTABLISHMENT EMPLOYING SUCH EMPLOYEE; AND (2) WHOSE ANNUAL GROSS VOLUME OF SALES MADE OR BUSINESS DONE, WHEN COMBINED WITH THE ANNUAL GROSS VOLUME OF SALES MADE OR BUSINESS DONE BY EACH ESTABLISHMENT WHICH CONTROLS, IS CONTROLLED BY, OR IS UNDER COMMON CONTROL WITH, THE ESTABLISHMENT EMPLOYING SUCH EMPLOYEE, EXCEEDS $10,000,000 (EXCLUSIVE OF EXCISE TAXES AT THE RETAIL LEVEL WHICH ARE SEPARATELY STATED), EXCEPT THAT THE EXEMPTION FROM SECTION 6 PROVIDED BY PARAGRAPH (2) OF SUBSECTION (A) OF THIS SECTION SHALL APPLY WITH RESPECT TO ANY ESTABLISHMENT DESCRIBED IN THIS SUBSECTION WHICH HAS AN ANNUAL DOLLAR VOLUME OF SALES WHICH WOULD PERMIT IT TO QUALIFY FOR THE EXEMPTION PROVIDED IN PARAGRAPH (2) OF SUBSECTION (A) IF IT WERE IN AN ENTERPRISE DESCRIBED IN SECTION 3(S).".

### SEASONAL INDUSTRY EMPLOYEES

SEC. 19. (A) SECTION 7(C) AND 7(D) ARE EACH AMENDED— //80 STAT. 835, 29 USC 207.//

(1) BY STRIKING OUT "TEN WORKWEEKS" AND INSERTING IN LIEU THEREOF "SEVEN WORKWEEKS", AND
(2) BY STRIKING OUT "FOURTEEN WORKWEEKS" AND INSERTING IN LIEU THEREOF "TEN WORKWEEKS".
 (B) SECTION 7(C) IS AMENDED BY STRIKING OUT "FIFTY HOURS" AND INSERTING IN LIEU THEREOF "FORTY-EIGHT HOURS".
 (C) EFFECTIVE JANUARY 1, 1975, SECTIONS 7(C) AND 7(D) ARE EACH AMENDED—,
(1) BY STRIKING OUT "SEVEN WORKWEEKS" AND INSERTING IN LIEU THEREOF "FIVE WORKWEEKS", AND
(2) BY STRIKING OUT "TEN WORKWEEKS" AND INSERTING IN LIEU THEREOF "SEVEN WORKWEEKS".
 (D) EFFECTIVE JANUARY 1, 1976, SECTIONS 7(C) AND 7(D) ARE EACH AMENDED—,
(1) BY STRIKING OUT "FIVE WORKWEEKS" AND INSERTING IN LIEU THEREOF "THREE WORKWEEKS", AND
(2) BY STRIKING OUT "SEVEN WORKWEEKS" AND INSERTING IN LIEU THEREOF "FIVE WORKWEEKS".
 (E) EFFECTIVE DECEMBER 31, 1976, SECTIONS 7(C) AND 7(D) ARE REPEALED.

### COTTON GINNING AND SUGAR PROCESSING EMPLOYEES

SEC. 20. (A) SECTION 13(B)(15) IS AMENDED TO READ AS FOLLOWS: //80 STAT. 835.//

"(15) ANY EMPLOYEE ENGAGED IN THE PROCESSING OF MAPLE SAP INTL SUGAR (OTHER THAN REFINED SUGAR) OR SYRUP; OR".
 (B)(1) SECTION 13(B) //ANTE. P. 65.// IS AMENDED BY ADDING AFTER PARAGRAPH (24) THE FOLLOWING NEW PARAGRAPH:

"(25) ANY EMPLOYEE WHO IS ENGAGED IN GINNING OF COTTON FOR MARKET IN ANY PLACE OF EMPLOYMENT LOCATED IN A COUNTY WHERE COTTON IS GROWN IN COMMERCIAL QUANTITIES AND WHO RECEIVES COMPENSATION FOR EMPLOYMENT IN EXCESS OF—

"(A) SEVENTY–TWO HOURS IN ANY WORKWEEK FOR NOT MORE THAN SIX WORKWEEKS IN A YEAR,

"(B) SIXTY–FOUR HOURS IN ANY WORKWEEK FOR NOT MORE THAN FOUR WORKWEEKS IN THAT YEAR,

=(C) FIFTY–FOUR HOURS IN ANY WORKWEEK FOR NOT MORE THAN TWO WORKWEEKS IN THAT YEAR, AND

"(D) FORTY–EIGHT HOURS IN ANY OTHER WORKWEEK IN THAT YEAR, AT A RATE NOT LESS THAN ONE AND ONE–HALF TIMES THE REGULAR RATE AT WHICH HE IS EMPLOYED; OR".

(2) EFFECTIVE JANUARY 1, 1975, SECTION 13(B)(25) IS AMENDED— //ANTE, P. 66.//

(A) BY STRIKING OUT "SEVENTY-TWO" AND INSERTING IN LIEU THEREOF "SIXTY–SIX";

(B) BY STRIKING OUT "SIXTY-FOUR" AND INSERTING IN LIEU THEROF "SIXTY".

(C) BY STRIKING OUT "FIFTY-FOUR" AND INSERTING IN LIEU THEREOF "FIFTY";

(D) BY STRIKING OUT "AND" AT THE END OF SUBPARAGRAPH (C);

AND

(E) BY STRIKING OUT "FORTY-EIGHT HOURS IN ANY OTHER WORKWEEK IN THAT YEAR," AND INSERTING IN LIEU THEREOF THE FOLLOWING: "FORTY–SIX HOURS IN ANY WORKWEEK FOR NOT MORE THAN TWO WORKWEEKS IN THAT YEAR, AND

(E) FORTY–FOUR HOURS IN ANY OTHER WORKWEEK IN THAT YEAR",

(3) EFFECTIVE JANUARY 1, 1976, SECTION 13(B)(25) IS AMENDED—

(A) BY STRIKING OUT "SIXTY-SIX" IN SUBPARAGRAPH (A) AND INSERTING IN LIEU THEREOF "SIXTY";

(B) BY STRIKING OUT "SIXTY" IN SUBPARAGRAPH (B) AND INSERTING IN LIEU THEREOF "FIFTY-SIX";

(C) BY STRIKING OUT "FIFTY" AND INSERTING IN LIEU THEREOF "FORTY–EIGHT";

(D) BY STRIKING OUT "FORTY-SIX" AND INSERTING IN LIEU THEREOF "FORTY–FOUR"; AND

(E) BY STRIKING OUT "FORTY-FOUR" IN SUBPARAGRAPH (E) AND INSERTING IN LIEU THEREOF "FORTY".

(C)(1) SECTION 13(B) //ANTE. P. 66.// IS AMENDED BY ADDING AFTER PARAGRAPH (25) THE FOLLOWING NEW PARAGRAPH:

"(26) ANY EMPLOYEE WHO IS ENGAGED IN THE PROCESSING OF SUGAR BEETS, SUGAR BEET MOLASSES, OR SUGARCANE INTO SUGAR (OTHER THAN REFINED SUGAR) OR SYRUP AND WHO RECEIVES COMPENSATION FOR EMPLOYMENT IN EXCESS OF—

"(A) SEVENTY–TWO HOURS IN ANY WORKWEEK FOR NOT MORE THAN SIX WORKWEEKS IN A YEAR,

"(B) SIXTY–FOUR HOURS IN ANY WORKWEEK FOR NOT MORE THAN FOUR WORKWEEKS IN THAT YEAR.

"(C) FIFTY–FOUR HOURS IN ANY WORKWEEK FOR NOT MORE THAN TWO WORKWEEKS IN THAT YEAR, AND

(D) FORTY–EIGHT HOURS IN ANY OTHER WORKWEEK IN THAT YEAR. AT A RATE NOT LESS THAN ONE AND ONE–HALF TIMES THE REGULAR RATE AT WHICH HE IS EMPLOYED; OR".

(2) EFFECTIVE JANUARY 1, 1975, SECTION 13(B)(26) IS AMENDED—

(A) BY STRIKING OUT "SEVENTY-TWO" AND INSERTING IN LIEU THEREOF "SIXTY–SIX";

(B) BY STRIKING OUT "SIXTY-FOUR" AND INSERTING IN LIEU THEREOF "SIXTY";

(C) BY STRIKING OUT "FIFTY-FOUR" AND INSERTING IN LIEU THEREOF "FIFTY";

(D) BY STRIKING OUT "AND" AT THE END OF SUBPARAGRAPH (C);

AND

(E) BY STRIKING OUT "FORTY-EIGHT HOURS IN ANY OTHER WORKWEEK IN THAT YEAR," AND INSERTING IN LIEU THEREOF THE FOLLOWING: "FORTY–SIX HOURS IN ANY WORKWEEK FOR NOT MORE THAN TWO WORKWEEKS IN THAT YEAR, AND

"(E) FORTY–FOUR HOURS IN ANY OTHER WORKWEEK IN THAT YEAR",

(3) EFFECTIVE JANUARY 1, 1976, SECTION 13(B)(26) IS AMENDED— //ANTE, P. 67.//

(A) BY STRIKING OUT "SISTY-SIX" IN SUBPARAGRAPH (A) AND INSERTING IN LIEU THEREOF "SIXTY";

(B) BY STRIKING OUT "SIXTY" IN SUBPARAGRAPH (B) AND INSERTING IN LIEU THEREOF "FIFTY-SIX";

(C) BY STRIKING OUT "FIFTY" AND INSERTING IN LIEU THEREOF "FORTY–EIGHT";

(D) BY STRIKING OUT "FORTY-SIX" AND INSERTING IN LIEU THEREOF "FORTY–FOUR"; AND

(E) BY STRIKING OUT "FORTY-FOUR" IN SUBPARAGRAPH (E) AND INSERTING IN LIEU THEREOF "FORTY".

## LOCAL TRANSIT EMPLOYEES

SEC. 21. (A) SECTION 7 //ANTE, P. 62.// IS AMENDED BY ADDING AFTER THE SUBSECTION ADDED BY SECTION 9(A) OF THIS ACT THE FOLLOWING NEW SUBSECTION:

"(N) IN THE CASE OF AN EMPLOYEE OF AN EMPLOYER ENGAGED IN THE BUSINESS OF OPERATING A STREET, SUBURBAN OR INTERURBAN ELECTRIC RAILWAY, OR LOCAL TROLLEY OR MOTORBUS CARRIER (REGARDLESS OF WHETHER OR NOT SUCH RAILWAY OR CARRIER IS PUBLIC OR PRIVATE OR OPERATED FOR PROFIT OR NOT FOR PROFIT), IN DETERMINING THE HOURS OF EMPLOYMENT OF SUCH AN EMPLOYEE TO WHICH THE RATE PRESCRIBED BY SUBSECTION (A) APPLIES THERE SHALL BE EXCLUDED THE HOURS SUCH EMPLOYEE WAS EMPLOYED IN CHARTER ACTICITIES BY SUCH EMPLOYER IF (1) THE EMPLOYEE'S EMPLOYMENT IN SUCH ACTIVITIES WAS PURSUANT TO AN AGREEMENT OR UNDERSTANDING WITH HIS EMPLOYER ARRIVED AT BEFORE ENGAGING IN SUCH EMPLOYMENT, AND (2) IF EMPLOYMENT IN SUCH ACTIVITIES IS NOT PART OF SUCH EMPLOYEE'S REGULAR EMPLOYMENT."

(B)(1) SECTION 13(B)(7) //80 STAT. 836, 29 USC 213.// (RELATING TO EMPLOYEES OF STREET, SUBURBAN OR INTERURBAN ELECTRIC RAILWAYS, OR LOCAL TROLLEY OR MOTORBUS CARRIERS) IS AMENDED BY STRIKING OUT ",IF THE RATES AND SERVICES OF SUCH RAILWAY OR CARRIER ARE SUBJECT TO REGULATION BY A STATE OR LOCAL AGENCY" AND INSERTING IN LIEU THEREOF THE FOLLOWING: "(REGARDLESS OF WHETHER OR NOT SUCH RAILWAY OR CARRIER IS PUBLIC OR PRIVATE OR OPERATED FOR PROFIT OR NOT FOR PROFIT), IF SUCH EMPLOYEE RECEIVED COMPENSATION FOR EMPLOYMENT IN EXCESS OF FORTY–EIGHT HOURS IN ANY WORKWEEK AT A RATE NOT LESS THAN ONE AND ONE–HALF TIMES THE REGULAR RATE AT WHICH HE IS EMPLOYED".

(2) EFFECTIVE ONE YEAR AFTER THE EFFECTIVE DATE OF THE FAIR LABOR STANDARDS AMENDMENTS OF 1974, SUCH SECTION IS AMENDED BY STRIKING OUT "FORTY–EIGHT HOURS" AND INSERTING IN LIEU THEREOF "FORTY-FOUR HOURS".

(3) EFFECTIV TWO YEARS AFTER SUCH DATE, SUCH SECTION IS REPEALED.

## COTTON AND SUGAR SERVICES EMPLOYEES

SEC. 22. SECTION 13 //ANTE, P. 66.// IS AMENDED BY ADDING AFTER THE SUBSECTION ADDED BY SECTION 18 THE FOLLOWING:

"(H) THE PROVISIONS OF SECTION 7 SHALL NOT APPLY FOR A PERIOD OR PERIODS OF NOT MORE THAN FOURTEEN WORKWEEKS IN THE AGGREGATE IN ANY CALENDAR YEAR TO ANY EMPLOYEE WHO—

"(1) IS EMPLOYED BY SUCH EMPLOYER—,

"(A) EXCLUSIVELY TO PROVIDE SERVICES NECESSARY AND INCIDENTAL TO THE GINNING OF COTTON IN AN ESTABLISHMENT PRIMARILY ENGAGED IN THE GINNING OF COTTON;

"(B) EXCLUSIVELY TO PROVIDE SERVICES NECESSARY AND INCIDENTAL TO THE RECEIVING, HANDLING, AND STORING OF RAW COTTON AND THE COMPRESSING OF RAW COTTON WHEN PERFORMED AT A COTTON WAREHOUSE OR COMPRESS–WAREHOUSE FACILITY, OTHER THAN ONE OPERATED IN CONJUNCTION WITH A COTTON MILL, PRIMARILY ENGAGED IN STORING AND COMPRESSING;

"(C) EXCLUSIVELY TO PROVIDE SERVICES NECESSARY AND INCIDENTAL TO THE RECEIVING, HANDLING, STORING, AND PROCESSING OF COTTONSEED IN AN ESTABLISHMENT PRIMARILY ENGAGED IN THE RECEIVING, HANDLING, STORING, AND PROCESSING OF COTTONSEED; OR

"(D) EXCLUSIVELY TO PROVIDE SERVICES NECESSARY AND INCIDENTAL TO THE PROCESSING OF SUGAR CANE OR SUGAR BEETS IN AN ESTABLISHMENT PRIMARILY ENGAGED IN THE PROCESSING OF SUGAR CANE OR SUGAR BEETS; AND

   "(2) RCEIVES FOR—,

"(A) SUCH EMPLOYMENT BY SUCH EMPLOYER WHICH IS IN EXCESS OF TEN HOURS IN ANY WORKDAY, AND

 (B) SUCH EMPLOYMENT BY SUCH EMPLOYER WHICH IS IN EXCESS OF FORTY–EIGHT HOURS IN ANY WORKWEEK, COMPENSATION AT A RATE NOT LESS THAN ONE AND ONE–HALF TIMES THE REGULAR RATE AT WHICH HE IS EMPLOYED.

ANY EMPLOYER WHO RECEIVES AN EXEMPTION UNDER THIS SUBSECTION SHALL NOT BE ELIGIBLE FOR ANY OTHER EXEMPTION UNDER THIS SECTION OR SECTION 7.". //ANTE, P. 68.//

OTHER EXEMPTIONS

SEC. 23. (A)(9) (RELATING TO MOTION PICTURE THEATER EMPLOYEES) IS REPEALED. // 80 STAT. 836, 29 USC 213.//

 (2) SECTION 13(B) IS AMENDED BY ADDING PARAGRAPH (26) THE FOLLOWING NEW PARAGRAPH: //ANTE, P. 67.//

 "(27) ANY EMPLOYEE EMPLOYED BY AN ESTABLISHMENT WHICH IS A MOTION PICTURE THEATER; OR".

  (B)(1) SECTION 13(A)(13) (RELATING TO SMALL LOGGING CREWS) IS REPEALED. //75 STAT. 71; 80 STAT. 838.//

 (2) SECTION 13(B) IS AMENDED BY ADDING AFTER PARAGRAPH (27) THE FOLLOWING NEW PARAGRAPH:

 "(28) ANY EMPLOYEE EMPLOYED IN PLANTING OR TENDING TREES, CRUISING, SURVEYING, OR FELLING TIMBER, OR IN PREPARING OR TRANSPORTING LOGS OR OTHER FORESTRY PRODUCTS TO THE MILL, PROCESSING PLANT, RAILROAD, OR OTHER TRANSPORTATION TERMINAL, IF THE NUMBER OF EMPLOYEES EMPLOYED BY HIS EMPLOYER IN SUCH FORESTRY OR LUMBERING OPERATIONS DOES NOT EXCEED EIGHT.".

  (C) SECTION 13(B)(2) (INSOFAR AS IT RELATES TO PIPELINE EMPLOYEES) IS AMENDED BY INSERTING AFTER "EMPLOYER" THE FOLLOWING: "ENGAGED IN THE OPERATION OF A COMMON CARRIER BY RAIL AND".

EMPLOYMENT OF STUDENTS

SEC. 24. (A) SECTION 14 //80 STAT. 842, 29 USC 214.// IS AMENDED BY STRIKING OUT SUBSECTIONS (A), (B), AND (C) AND INSERTING IN LIEU THEREOF THE FOLLOWING:

 "SEC. 14. (A) THE SECRETARY, TO THE EXTENT NECESSARY IN ORDER TO PREVENT CURTAILMENT OF OPPORTUNITIES FOR EMPLOYMENT, SHALL BY REGULATIONS OR BY ORDERS PROVIDE FOR THE EMPLOYMENT OF LEARNERS, OF APPRENTICES, AND OF MESSENGERSH EMPLOYED PRIMARILY IN DELIVERING LETTERS AND MESSAGES, UNDER SPECIAL CERTIFICATES ISSUED PURSUANT TO REGULATIONS OF THE SECRETARY, AT SUCH WAGES LOWER THAN THE MINIMUM WAGE APPLICABLE UNDER SECTION 6 //ANTE, P. 55.// AND SUBJECT TO SUCH LIMITATIONS AS TO TIME, NUMBER PROPORTION, AND LENGTH OF SERVICE AS THE SECRETARY SHALL PRESCRIBE.

 "(B)(1)(A) THE SECRETARY, TO THE EXTENT NECESSARY IN ORDER TO PREVENT CURTAILMENT OF OPPORTUNITIES FOR EMPLOYMENT, SHALL BY SPECIAL CERTIFICATE ISSUED UNDER A REGULATION OR ORDER PROVIDE, IN ACCORDANCE WITH SUBPARAGRAPH (B), FOR THE EMPLOYMENT, AT A WAGE RATE NOT LESS THAN 85 PER CENTUM OF THE OTHERWISE APPLICABLE WAGE RATE IN EFFECT UNDER SECTION 6 OR NOT LESS THAN $1.60 AN HOUR, WHICHEVER IS THE HIGHER (OR IN THE CASE OF EMPLOYMENT IN PUERTO RICO OR THE VIRGIN ISLANDS NOT DESCRIBED IN SECTION 5(E), ANTE, P. 56.// AT A WAGE RATE NOT LESS THAN 85 PER CENTUM OF THE OTHERWISE APPLICABLE WAGE RATE IN EFFECT UNDER SECTION

6(C)), //80 STAT. 839, 29 USC 206.// OF FULL–TIME STUDENTS (REGARDLESS OF AGE BUT IN COMPLIANCE WITH APPLICABLE CHILD LABOR LAWS) IN RETAIL OR SERVICE ESTABLISHMENTS.

"(B) EXCEPT AS PROVIDED IN PARAGRAPH (4)(B), DURING ANY MONTH IN WHICH FULL–TIME STUDENTS ARE TO BE EMPLOYED IN ANY RETAIL OR SERVICE ESTABLISHMENT UNDER CERTIFICATES ISSUED UNDER THIS SUBSECTION THE PROPORTION OF STUDENT HOURS OF EMPLOYMENT TO THE TOTAL HOURS OF EMPLOYMENT OF ALL EMPLOYEES IN SUCH ESTABLISHMENT MAY NOT EXCEED—

"(I) IN THE CASE OF A RETAIL OR SERVICE ESTABLISHMENT WHOSE EMPLOYEES (OTHER THAN EMPLOYEES ENGAGED IN COMMERCE OR IN THE PRODUCTION OF GOODS FOR COMMERCE) WERE COVERED BY THIS ACT BEFORE THE EFFECTIVE DATE OF THE FAIR LABOR STANDARDS AMENDMENTS OF 1974—,

"(I) THE PROPORTION OF STUDENT HOURS OF EMPLOYMENT TO THE TOTAL HOURS OF EMPLOYMENT OF ALL EMPLOYEES IN SUCH ESTABLISHMENT FOR THE CORRESPONDING MONTH OF THE IMMEDIATELY PRECEDING TWELVE–MONTH PERIOD,

"(II) THE MAXIMUM PROPORTION FOR ANY CORRESPONDING MONTH OF STUDENT HOURS OF EMPLOYMENT TO THE TOTAL HOURS OF EMPLOYMENT OF ALL EMPLOYEES IN SUCH ESTABLISHMENT APPLICABLE TO THE ISSUANCE OF CERTIFICATES UNDER THIS SECTION AT ANY TIME BEFORE THE EFFECTIVE DATE OF THE FAIR LABOR STANDARDS AMENDMENTS OF 1974 FOR THE EMPLOYMENT OF STUDENTS BY SUCH EMPLOYER, OR

"(III) A PROPORTION EQUAL TO ONE–TENTH OF THE TOTAL HOURS OF EMPLOYMENT OF ALL EMPLOYEES IN SUCH ESTABLISHMENT, WHICHEVER IS GREATER;

"(II) IN THE CASE OF RETAIL OR SERVICE ESTABLISHMENT WHOSE EMPLOYEES (OTHER THAN EMPLOYEES ENGAGED IN COMMERCE OR IN THE PRODUCTION OF GOODS FOR COMMERCE) ARE COVERED FOR THE FIRST TIME ON OR AFTER THE EFFECTIVE DATE OF THE FAIR LABOR STANDARDS AMENDMENTS OF 1974—,

"(I) THE PROPORTION OF HOURS OF EMPLOYMENT OF STUDENTS IN SUCH ESTABLISHMENT TO THE TOTAL HOURS OF EMPLOYMENT OF ALL EMPLOYEES IN SUCH ESTABLISHMENT FOR THE CORRESPONDING MONTH OF THE TWELVE–MONTH PERIOD IMMEDIATELY PRIOR TO THE EFFECTIVE DATE OF SUCH AMENDMENTS,

"(II) THE PROPORTION OF STUDENT HOURS OF EMPLOYMENT TO THE TOTAL HOURS OF EMPLOYMENT OF ALL EMPLOYEES IN SUCH ESTABLISHMENT FOR THE CORRESPONDING MONTH OF THE IMMEDIATELY PRECEDING TWELVE–MONTH PERIOD, OR

"(III) A PROPORTION EQUAL TO ONE–TENTH OF THE TOTAL HOURS OF EMPLOYMENT OF ALL EMPLOYEES IN SUCH ESTABLISHMENT, WHICHEVER IS GREATER; OR

(III) IN THE CASE OF A RETAIL OR SERVICE ESTABLISHMENT FOR WHICH RECORDS OF STUDENT HOURS WORKED ARE NOT AVAILABLE, THE PROPORTION OF STUDENT HOURS OF EMPLOYMENT TO THE TOTAL HOURS OF EMPLOYMENT OF ALL EMPLOYEES BASED ON THE PRACTICE DURING THE IMMEDIATELY PRECEDING TWELVE–MONTH PERIOD IN (I) SIMILAR ESTABLISHMENTS OF THE SAME EMPLOYER IN THE SAME GENERAL METROPOLITAN AREA IN WHICH SUCH ESTABLISHMENT IS LOCATED, (II) SIMILAR ESTABLISHMENTS OF THE SAME OR NEARBY COMMUNITIES IF SUCH ESTABLISHMENT IS NOT IN A METROPOLITAN AREA, OR (III) OTHER ESTABLISHMENTS OF THE SAME GENERAL CHARACTER OPERATING IN THE COMMUNITY OR THE NEAREST COMPARABLE COMMUNITY.

FOR PURPOSE OF CLAUSES (I), AND (III) OF THIS SUBPARAGRAPH, THE TERM 'STUDENT HOURS OF EMPLOYMENT' MEANS HOURS DURING WHICH STUDENTS ARE EMPLOYED IN A RETAIL OR SERVICE ESTABLISHMENT UNDER CERTIFICATES ISSUED UNDER THIS SUBSECTION.

"(2) THE SECRETARY, TO THE EXTENT NECESSARY IN ORDER TO PREVENT CURTAILMENT OF OPPORTUNITIES FOR EMPLOYMENT, SHALL BY SPECIAL CERTIFICATE ISSUED UNDER A REGULATION OR ORDER PROVIDE FOR THE EMPLOYMENT, AT A WAGE RATE NOT LESS THAN 85 PER CENTUM OF THE WAGE RATE IN EFFECT UNDER SECTION 6(A)(5) //ANTE, P. 56.// OR NOT LESS THAN $1.30 AN HOUR WHICHEVER IS

THE HIGHER (OR IN THE CASE OF EMPLOYMENT IN PUERTO RICO OR THE VIRGIN ISLANDS NOT DESCRIBED IN SECTION 5(E), AT A WAGE RATE NOT LESS THAN 85 PER CENTUM OF THE WAGE RATE IN EFFECT UNDER SECTION 6(C)), //80 STAT. 839, 29 USC 206.// OF FULL–TIME STUDENTS (REGARDLESS OF AGE BUT IN COMPLIANCE WITH APPLICABLE CHILD LABOR LAWS) IN ANY OCCUPATION IN AGRICULTURE.

"(3) THE SECRETARY, TO THE EXTENT NECESSARY IN ORDER TO PREVENT CURTAILMENT OF OPPORTUNITIES FOR EMPLOYMENT, SHALL BY SPECIAL CERTIFICATE ISSUED UNDER A REGULATION OR ORDER PROVIDE FOR THE EMPLOYMENT BY AN INSTITUTION OF HIGHER EDUCATION, AT A WAGE RATE NOT LESS THAN 85 PER CENTUM OF THE OTHERWISE APPLICABLE WAGE RATE IN EFFECT UNDER SECTION 6 OR NOT LESS THAN $1.60 AN HOUR, WHICHEVER IS THE HIGHER (OR IN THE CASE OF EMPLOYMENT IN PUERTO RICO OR THE VIRGIN ISLANDS NOT DESCRIBED IN SECTION 5(E), AT A WAGE RATE NOT LESS THAN 85 PER CENTUM OF THE WAGE RATE IN EFFECT UNDER SECTION 6(C)), OF FULL–TIME STUDENTS (REGARDLESS OF AGE BUT IN COMPLIANCE WITH APPLICABLE CHILD LABOR LAWS) WHO ARE ENROLLED IN SUCH INSTITUTION. THE SECRETARY SHALL BY REGULATION PRESCRIBE STANDARDS AND REQUIREMENTS TO INSURE THAT THIS PARAGRAPH WILL NOT CREATE A SUBSTANTIAL PROBABILITY OF REDUCING THE FULL–TIME EMPLOYMENT OPPORTUNITIES OF PERSONS OTHER THAN THOSE TO WHOM THE MINIMUM WAGE RATE AUTHORIZED BY THIS PARAGRAPH IS APPLICABLE.

"(4)(A) A SPECIAL CERTIFICATE ISSUED UNDER PARAGRAPH (1), (2), OR (3) SHALL PROVIDE THAT THE STUDENT OR STUDENTS FOR WHOM IT IS ISSUED SHALL, EXCEPT DURING VACATION PERIODS, BE EMPLOYED ON A PART–TIME BASIS AND NOT IN EXCESS OF TWENTY HOURS IN ANY WORKWEEK.

"(B) IF THE ISSUANCE OF A SPECIAL CERTIFICATE UNDER PARAGRAPH (1) OR (2) FOR AN EMPLOYER WILL CAUSE THE NUMBER OF STUDENTS EMPLOYED BY SUCH EMPLOYER UNDER SPECIAL CERTIFICATES ISSUED UNDER THIS SUBSECTION TO EXCEED FOUR, THE SECRETARY MAY NOT ISSUE SUCH A SPECIAL CERTIFICATE FOR THE EMPLOYMENT OF A STUDENT BY SUCH EMPLOYER UNLESS THE SECRETARY FINDS EMPLOYMENT OF SUCH STUDENT WILL NOT CREATE A SUBSTANTIAL PROBABILITY OF REDUCING THE FULL–TIME EMPLOYMENT OPPORTUNITIES OF PERSONS OTHER THAN THOSE EMPLOYED UNDER SPECIAL CERTIFICATES ISSUED UNDER THIS SUBSECTION. IF THE ISSUANCE OF A SPECIAL CERTIFICATE UNDER PARAGRAPH (1) OR (2) FOR AN EMPLOYER WILL NOT CAUSE THE NUMBER OF STUDENTS EMPLOYED BY SUCH EMPLOYER UNDER SPECIAL CERTIFICATES ISSUED UNDER THIS SUBSECTION TO EXCEED FOUR—

"(I) THE SECRETARY MAY ISSUE A SPECIAL CERTIFICATE UNDER PARAGRAPH (1) OR (2) FOR THE EMPLOYMENT OF A STUDENT BY SUCH EMPLOYER IF SUCH EMPLOYER CERTIFIES TO THE SECRETARY THAT THE EMPLOYMENT OF SUCH STUDENT WILL NOT REDUCE THE FULL–TIME EMPLOYMENT OPPORTUNITIES OF PERSONS OTHER THAN THOSE EMPLOYED UNDER SPECIAL CERTIFICATES ISSUED UNDER THIS SUBSECTION, AND

"(II) IN THE CASE OF AN EMPLOYER WHICH IS A RETAIL OR SERVICE ESTABLISHMENT, SUBPARAGRAPH (B) OF PARAGRAPH (1) SHALL NOT APPLY WITH RESPECT TO THE ISSUANCE OF SPECIAL CERTIFICATES FOR SUCH EMPLOYER UNDER SUCH PARAGRAPH.

THE REQUIREMENT OF THIS SUBPARAGRAPH SHALL NOT APPLY IN THE CASE OF THE ISSUANCE OF SPECIAL CERTIFICATES UNDER PARAGRAPH (3) FOR THE EMPLOYMENT OF FULL–TIME STUDENTS BY INSTITUTIONS OF HIGHER EDUCAQTION; EXCEPT THAT IF THE SECRETARY DETERMINES THAT AN INSTITUTION OF HIGHER EDUCATION IS EMPLOYING STUDENTS UNDER CERTIFICATES ISSUED UNDER PARAGRAPH (3) BUT IN VIOLATION OF THE REQUIRMENTS OF THAT PARAGRAPH OR OF REGULATIONS ISSUED THEREUNDER, THE REQUIREMENTS OF THIS SUBPARAGRAPH SHALL APPLY WITH RESPECT TO THE ISSUANCE OF SPECIAL CERTIFICATES UNDER PARAGRAPH (3) FOR THE EMPLOYMENT OF STUDENTS BY SUCH INSTITUTION.

"(C) NO SPECIAL CERTIFICATE MAY BE ISSUED UNDER THIS SUBSECTION UNLESS THE EMPLOYER FOR WHOM THE CERTIFICATE IS TO BE ISSUED PROVIDES EVIDENCE SATISFACTORY TO THE SECRETARY OF THE STUDENT STATUS OF THE EMPLOYEES TO BE EMPLOYED UNDER SUCH SPECIAL CERTIFICATE."

(B) SECTION 14 //ANTE, P. 69.// SHALL NOT APPLY WITH RESPECT TO THE EMPLOYMENT BY ANY ELEMENTARY OR SECONDARY SCHOOL OF ITS STUDENTS IF SUCH EMPLOYMENT CONSTITUTES, AS DETERMINED UNDER REGULATIONS PRESCRIBED BY THE SECRETARY, AN INTEGRAL PART OF

THE REGULAR EDUCATION PROGRAM PROVIDED BY SUCH SCHOOL AND SUCH EMPLOYMENT IS IN ACCORDANCE WITH APPLICABLE CHILD LABOR LAWS."

(C) SECTION 4(D) //52 STAT. 1062; 69 STAT. 711, 29 USC 204.// IS AMENDED BY ADDING AT THE END THEREOF THE FOLLOWING NEW SENTENCES: "SUCH REPORT SHALL ALSO INCLUDE A SUMMARY OF THE SPECIAL CERTIFICATES ISSUED UNDER SECTION 14(B)." // ANTE, P. 69.//

CHILD LABOR

SEC. 25. (A) SECTION 12 //52 STAT. 1067; 63 STAT. 917, 29 USC 212.// (RELATING TO CHILD LABOR) IS AMENDED BY ADDING AT THE END THEREOF THE FOLLOWING NEW SUBSECTION:

"(D) IN ORDER TO CARRY OUT THE OBJECTIVES OF THIS SECTION, THE SECRETARY MAY BY REGULATION REQUIRE EMPLOYERS TO OBTAIN FROM ANY EMPLOYEE PROOF OF AGE."

(B) SECTION 13(C)(1) //80 STAT. 834, 29 USC 213.// (RELATING TO CHILD LABOR IN AGRICULTURE) IS AMENDED TO READ AS FOLLOWS:

"(C)(1) EXCEPT AS PROVIDED IN PARAGRAPH (2), THE PROVISIONS OF SECTION 12 RELATING TO CHILD LABOR SHALL NOT APPLY TO ANY EMPLOYEE EMPLOYED IN AGRICULTURE OUTSIDE OF SCHOOL HOURS FOR THE SCHOOL DISTRICT WHERE SUCH EMPLOYEE IS LIVING WHILE HE IS SO EMPLOYED, IF SUCH EMPLOYEE—,

"(A) IS LESS THAN TWELVE YEARS OF AGE AND (I) IS EMPLOYED BY HIS PARENT, OR BY A PERSON STANDING IN THE PLACE OF HIS PARENT, ON A FARM OWNED OR OPERATED BY SUCH PARENT OR PERSON, OR (II) IS EMPLOYED, WITH THE CONSENT OF HIS PARENT OR PERSON STANDING IN THE PLACE OF HIS PARENT, ON A FARM, NONE OF THE EMPLOYEES OF WHICH ARE (BECAUSE OF SECTION 13(A) (6)(A)) //80 STAT. 833.// REQUIRED TO BE PAID AT THE WAGE RATE PRESCRIBED BY SECTION 6(A)( 5), //ANTE, P. 56.//

"(B) IS TWELVE YEARS OR THIRTEEN YEARS OF AGE AND (I) SUCH EMPLOYMENT IS WITH THE CONSENT OF HIS PARENT OR PERSON STANDING IN THE PLACE OF HIS PARENT, OR (II) HIS PARENT OR SUCH PERSON IS EMPLOYED ON THE SAME FARM AS SUCH EMPLOYEE, OR

"(C) IS FOURTEEN YEARS OF AGE OR OLDER.".

(C) SECTION 16 //52 STAT. 1069; 71 STAT. 514, 29 USC 216.// IS AMENDED BY ADDING AT THE END THEREOF THE FOLLOWING NEW SUBSECTION:

"(E) ANY PERSON WHO VIOLATES THE PROVISIONS OF SECTION 12, RELATING TO CHILD LABOR, OR ANY REGULATION ISSUED UNDER THAT SECTION, SHALL BE SUBJECT TO A CIVIL PENALTY OF NOT TO EXCEED $1,000 FOR EACH SUCH VIOLATION. IN DETERMINING THE AMOUNT OF SUCH PENALTY, THE APPROPRIATENESS OF SUCH PENALTY TO THE SIZE OF THE BUSINESS OF THE PERSON CHARGED AND THE GRAVITY OF THE VIOLATION SHALL BE CONSIDERED. THE AMOUNT OF SUCH PENALTY, WHEN FINALLY DETERMINED, MAY BE—

"(1) DEDUCTED FROM ANY SUMS OWNG BY THE UNITED STATES TO THE PERSON CHARGED;

"(2) RECOVERED IN A CIVIL ACTION BROUGHT BY THE SECRETARY IN ANY COURT OF COMPETENT JURISDICTION, IN WHICH LITIGATION THE SECRETARY SHALL BE REPRESENTED BY THE SOLICITOR OF LABOR; OR

"(3) ORDERED BY THE COURT, IN AN ACTION BROUGHT FOR A VIOLATION OF SECTION 15(A) (4), //52 STAT. 1068, 29 USC 215.// TO BE PAID TO THE SECRETARY.

ANY ADMINISTRATIVE DETERMINATION BY THE SECRETARY OF THE AMOUNT OF SUCH PENALTY SHALL BE FINAL, UNLESS WITHIN FIFTEEN DAYS AFTER RECEIPT OF NOTICE THEREOF BY CERTIFIED MAIL THE PERSON CHARGED WITH THE VIOLATION TAKES EXCEPTION TO THE DETERMINATION THAT THE VIOLATIONS FOR WHICH THE PENALTY IS IMPOSED OCCURRED, IN WHICH EVENT FINAL DETERMINATION OF THE PENALTY SHALL BE MADE IN AN ADMINISTRATIVE PROCEEDING AFTER OPPORTUNITY FOR HEARING IN ACCORDANCE WITH SECTION 554 OF TITLE 5, UNITED STATES CODE, //80 STAT. 384.// AND REGULATIONS TO BE PROMULGATED BY THE SECRETARY, SUMS COLLECTED AS PENALTIES PURSUANT

TO THIS SECTION SHALL BE APPLIED TOWARD REIMBURSEMENT OF THE COSTS OF DETERMINING THE VIOLATIONS AND ASSESSING AND COLLECTING SUCH PENALTIES, IN ACCORDANCE WITH THE PROVISIONS OF SECTION 2 OF AN ACT ENTITLED 'AN ACT TO AUTHORIZE THE DEPARTMENT OF LABOR TO MAKE SPECIAL STATISTICAL STUDIES UPON PAYMENT OF THE COST THEREOF, AND FOR OTHER PURPOSES' (29 U.S.C. 9A)." //48 STAT. 582; 53 STAT. 581.//

SUITS BY SECRETARY FOR BACK WAGES

SEC. 26. THE FIRST THREE SENTENCES OF SECTION 16(C) //63 STAT. 919; 80 STAT. 844, 29 USC 216./ ARE AMENDED TO READ AS FOLLOWS: "THE SECRETARY IS AUTHORIZED TO SUPERVISE THE PAYMENT OF THE UNPAID MINIMUM WAGES OR THE UNPAID OVERTIME COMPENSATION OWING TO ANY EMPLOYEE OR EMPLOYEES UNDER SECTION 6 OR 7 OF THIS ACT, //ANTE, PP. 55, 68.// AND THE AGREEMENT OF ANY EMPLOYEE TO ACCEPT SUCH PAYMENT SHALL UPON PAYMENT IN FULL CONSTITUTE A WAIVER BY SUCH EMPLOYEE OF ANY RIGHT HE MAY HAVE UNDER SUBSECTION (B) OF THIS SECTION TO SUCH UNPAID MINIMUM WAGES OR UNPAID OVERTIME COMPENSATION AND AN ADDITIONAL EQUAL AMOUNT AS LIQUIDATED DAMAGES. THE SECRETARY MAY BRING AN ACTION IN ANY COURT OF COMPETENT JURISDICTION TO RECOVER THE AMOUNT OF THE UNPAID MINIMUM WAGES OR OVERTIME COMPENSATION AND AN EQUAL AMOUNT AS LIQUIDATED DAMAGES. THE RIGHT PROVIDED BY SUBSECTION (B) TO BRING AN ACTION BY OR ON BAHALF OF ANY EMPLOYEE AND OF ANY EMPLOYEE TO BECOME A PARTY PLAINTIFF TO ANY SUCH ACTION SHALL TERMINATE UPON THE FILING OF A COMPLAINT BY THE SECRETARY IN AN ACTION UNDER THIS SUBSECTION IN WHICH A RECOVERY IS SOUGHT OF UNPAID MINIMUM WAGES OR UNPAID OVERTIME COMPENSATION UNDER SECTIONS 6 AND 7 OR LIQUIDATED OR OTHER DAMAGES PROVIDED BY THIS SUBSECTION OWING TO SUCH EMPLOYEE BY AN EMPLOYER LIABLE UNDER THE PROVISIONS OF SUBSECTION (B), UNLESS SUCH ACTION IS DISMISSED WITHOUT PREJUDICE ON MOTION OF THE SECRETARY.

ECONOMIC EFFECTS STUDIES

SEC. 27. SECTION 4(D) IS AMENDED BY— //ANTE, P. 72.//

 (1) INSERTING "(1)" IMMEDIATELY AFTER "(D)",
 (2) INSERTING IN THE SECOND SENTENCE AFTER "MINIMUM WAGES" THE FOLLOWING: "AND OVERTIME COVERAGE"; AND
 (3) BY ADDING AT THE END THEREOF THE FOLLOWING NEW

PARAGRAPHS:

 "(2) THE SECRETARY SHALL CONDUCT STUDIES ON THE JUSTIFICATION OR LACK THEREOF FOR EACH OF THE SPECIAL EXEMPTIONS SET FORTH IN SECTION 13 OF THIS ACT, //ANTE, P. 72.// AND THE EXTENT TO WHICH SUCH EXEMPTIONS APPLY TO EMPLOYEES OF ESTABLISHMENTS DESCRIBED IN SUBSECTION (G) OF SUCH SECTION //ANTE, P. 66.// AND THE ECONOMIC EFFECTS OF THE APPLICATION OF SUCH EXEMPTIONS TO SUCH EMPLOYEES. THE SECRETARY SHALL SUBMIT A REPORT OF HIS FINDINGS AND RECOMMENDATIONS TO THE CONGRESS WITH RESPECT TO THE STUDIES CONDUCTED UNDER THIS PARAGRAPH NOT LATER THAN JANUARY 1, 1976.
 "(3) THE SECRETARY SHALL CONDUCT A CONTINUING STUDY ON MEANS TO PREVENT CURTAILMENT OF EMPLOYMENT OPPORTUNITIES FOR MANPOWER GROUPS WHICH HAVE HAD HISTORICALLY HIGH INCIDENCES OF UNEMPLOYMENT (SUCH AS DISADVANTAGED MINORITIES, YOUTH, ELDERLY, AND SUCH OTHER GROUPS AS THE SECRETARY MAY DESIGNATE). THE FIRST REPORT OF THE RESULTS OF SUCH STUDY SHALL BE TRANSMITTED TO THE CONGRESS NOT LATER THAN ONE YEAR AFTER THE EFFECTIVE DATE OF THE FAIR LABOR STANDARDS AMENDMENTS OF 1974. SUBSEQUENT REPORTS ON SUCH STUDY SHALL BE TRANSMITTED TO THE CONGRESS AT TWO–YEAR INTERVALS AFTER SUCH EFFECTIVE DATE. EACH SUCH

REPORT SHALL INCLUDE SUGGESTIONS RESPECTING THE SECRETARY'S AUTHORITY UNDER SECTION 14 OF THIS ACT." //ANTE, P. 69.//

AGE DISCRIMINATION

SEC. 28(A)(1) THE FIRST SENTENCE OF SECTION 11(B) OF THE AGE DISCRIMINATION IN EMPLOYMENT ACT OF 1967 (29 U.S.C. 630(B) //81 STAT. 605.// IS AMENDED BY STRIKING OUT "TWENTY-FIVE" AND INSERTING IN LIEU THEREOF "TWENTY".

 (2) THE SECOND SENTENCE OF SECTION 11(B) OF SUCH ACT IS AMENDED TO READ AS FOLLOWS: "THE TERM ALSO MEANS (1) ANY AGENT OF SUCH A PERSON, AND (2) A STATE OR POLITICAL SUBDIVISION OF A STATE AND ANY AGENCY OR INSTRUMENTALITY OF A STATE OR A POLITICAL SUBDIVISION OF A STATE, AND INY INTERSTATE AGENCY, BUT SUCH TERM DOES NOT INCLUDE THE UNITED STATES, OR A CORPORATION WHOLLY OWNED BY THE GOVERNMENT OF THE UNITED STATES.".

 (3) SECTION 11(C) OF SUCH ACT IS AMENDED BY STRIKING OUT", OR AN AGENCY OF A STATE OR POLITICAL SUBDIVISION OF A STATE, EXCEPT THAT SUCH TERM SHALL INCLUDE THE UNITED STATES EMPLOYMENT SERVICE AND THE SYSTEM OF STATE AND LOCAL EMPLOYMENT SERVICES RECEIVING FEDERAL ASSISTANCE".

 (4) SECTION 11(F) OF SUCH ACT IS AMENDED TO READ AS FOLLOWS:

 "(F) THE TERM 'EMPLOYEE' MEANS AN INDIVIDUAL EMPLOYED BY ANY EMPLOYER EXCEPT THAT THE TERM 'EMPLOYEE' SHALL NOT INCLUDE ANY PERSON ELECTED TO PUBLIC OFFICE IN ANY STATE OR POLITICAL SUVDIVISION OF ANY STATE BY THE QUALIFIED VOTERS THEREOF, OR ANY PERSON CHOSEN BY SUCH OFFICER TO BE ON SUCH OFFICER'S PERSONAL STAFF, OR AN APPOINTEE ON THE POLICYMAKING LEVEL OR AN IMMEDIATE ADVISER WITH RESPECT TO THE EXERCISE OF THE CONSTITUTIONAL OR LEGAL POWERS OF THE OFFICE. THE EXEMENTION SET FORTH IN THE PRECEDING SECTENCE SHALL NOT INCLUDE EMPLOYEES SUBJECT TO THE CIVIL SERVICE LAWS OF A STATE GOVERNMENT, GOVERNMENTAL AGENCY, OR POLITICAL SUBDIVISION.".

 (5) SECTION 16 OF SUCH ACT //29 USC 634.// IS AMENDED BY STRIKING OUT "$3,000,000" AND INSERTING IN LIEU THEREOF "$5,000,000".

 (B)(1) THE AGE DISCRIMINATION IN EMPLOYMENT ACT OF 1967 IS AMENDED BY REDESIGNATING SECTIONS 15 AND 16, AND ALL REFERENCES THERETO, AS SECTIONS 19 AND 19, RESPECTIVELY.

 (2) THE AGE DISCRIMINATION IN EMPLOYMENT ACT OF 1967 //29 USC 633.// IS FURTHER AMENDED BY ADDING IMMEDIATELY AFTER SECTION 14 THE FOLLOWING NEW SECTION:

 "NONDISCRIMINATION ON ACCOUNT OF AGE IN FEDERAL GOVERNMENT EMPLOYMENT.

SEC. 15.(A) ALL PERSONEL ACTIONS AFFECTING EMPLOYEES OR APPLICANTS FOR EMPLOYMENT (EXCEPT WITH REGARD TO ALIENS EMPLOYED OUTSIDE THE LIMITS OF THE UNITED STATES) IN MILITARY DEPARTMENTS AS DEFINED IN SECTION 102 OF TITLE 5, UNITED STATES CODE, //80 STAT. 378.// IN EXECUTIVE AGENCIES AS DEFINED IN SECTION 105 OF TITLE 5, UNITED STATES CODE (INCLUDING EMPLOYEES AND APPLICANTS FOR EMPLOYMENT WHO ARE PAID FROM NONAPPROPRIATED FUNDS), IN THE UNITED STATES POSTAL SERVICE AND THE POSTAL RATE COMMISSION, IN THOSE UNITS IN THE GOVERNMENT OF THE DISTRICT OF COLUMBIA HAVING POSITIONS IN THE COMPETITIVE SERVICE, AND IN THOSE UNITS OF THE LEGISLATIVE AND JUDICIAL BRANCHES OF THE FEDERAL GOVERNMENT HAVING POSITIONS IN THE COMPETITIVE SERVICE, AND IN THE LIBRARY OF CONGRESS SHALL BE MADE FREE FROM ANY DISCRIMINATION BASED ON AGE. //29 USC 633A.//

 "(B) EXCEPT AS OTHERWISE PROVIDED IN THIS SUBSECTION, THE CIVIL SERVICE COMMISSION IS AUTHORIZED TO ENFORCE THE PROVISIONS OF SUBSECTION (A) THROUGH APPROPRIATE REMEDIES, INCLUDINT REINSTATEMENT OR HIRING OF EMPLOYEES WITH OR WITHOUT BACKPAY, AS WILL EFFECTUATE THE POLICIES OF THIS SECTION. THE CIVIL SERVICE COMMISSION SHALL ISSUE SUCH RULES,

REGULATIONS, ORDERS AND INSTRUCTIONS AS IT DEEMS NECESSARY AND APPROPRIATE TO CARRY OUT ITS RESPONSIBILITIES UNDER THIS SECTION. THE CIVIL SERVICE COMMISSION SHALL—

"(1) BE RESPONSIBLE FOR THE REVIEW AND EVALUATION OF THE OPERATION OF ALL AGENCY PROGRAMS DESIGNED TO CARRY OUT THE POLICY OF THIS SECTION, PERIODICALLY OBTAINING AND PUBLISHING (ON AT LEAST A SEMIANNUAL BASIS) PROGRESS REPORTS FROM EACH DEPARTMENT, AGENCY, OR UNIT REFERRED TO IN SUBSECTION (A);

"(2) CONSULT WITH AND SOLICIT THE RECOMMENDATIONS OF INTERESTED INDIVIDUALS, GROUPS, AND ORGANIZATIONS RELATING TO NONDISCRIMINATION IN EMPLOYMENT ON ACCOUNT OF AGE; AND

"(3) PROVIDE FOR THE ACCEPTANCE AND PROCESSING OF COMPLAINTS OF DISCRIMINATION IN FEDERAL EMPLOYMENT ON ACCOUNT OF AGE.

THE HEAD OF EACH SUCH DEPARTMENT, AGENCY, OR UNIT SHALL COMPLY WITH SUCH RULES, REGULATIONS, ORDERS, AND INSTRUCTIONS OF THE CIVIL SERVICE COMMISSION WHICH SHALL INCLUDE A PROVISION THAT AN EMPLOYEE OR APPLICANT FOR EMPLOYMENT SHALL BE NOTIFIED OF ANY FINAL ACTION TAKEN ON ANY COMPLAINT OF DISCRIMINATION FILED BY HIM THEREUNDER. REASONABLE EXEMPTIONS TO THE PROVISIONS OF THIS SECTION MAY BE ESTABLISHED BY THE COMMISSION BUT ONLY WHEN THE COMMISSION HAS ESTABLISHED A MAXIMUM AGE REQUIREMENT ON THE BASIS OF A DETERMINATION THAT AGE IS A BONA FIDE OCCUPATIONAL QUALIFICATION NECESSARY TO THE PERFORMANCE OF THE DUTIES OF THE POSITION. WITH RESPECT TO EMPLOYMENT IN THE LIBRARY OF CONGRESS, AUTHORITIES GRANTED IN THIS SUBSECTION TO THE CIVIL SERVICE COMMISSION SHALL BE EXERCISED BY THE LIBRARIAN OF CONGRESS.

"(C) ANY PERSON AGGRIEVED MAY BRING A CIVIL ACTION IN ANY FEDERAL DISTRICT COURT OF COMPETENT JURISDICTION FOR SUCH LEGAL OR EQUITABLE RELIEF AS WILL EFFECTUATE THE PURPOSES OF THIS ACT.

"(D) WHEN THE INDIVIDUAL HAS NOT FILED A COMPLAINT CONCERNING AGE DISCRIMINATION WITH THE COMMISSION, NO CIVIL ACTION MAY BE COMMENCED BY ANY INDIVIDUAL UNDER THIS SECTION UNTIL THE INDIVIDUAL HAS GIVEN THE COMMISSION NOT LESS THAN THIRTY DAYS' NOTICE OF AN INTENT TO FILE SUCH ACTION. SUCH NOTICE SHALL BE FILED WITHIN ONE HUNDRED AND EIGHTY DAYS AFTER THE ALLEGED UNLAWFUL PRACTICE OCCURRED. UPON RECEIVING A NOTICE OF INTENT TO SUE, THE COMMISSION SHALL PROMPTLY NOTIFY ALL PERSONS NAMED THEREIN AS PROSPECTIVE DEFENDANTS IN THE ACTION AND TAKE ANY APPROPRIATE ACTION TO ASSURE THE ELIMINATION OF ANY UNLAWFUL PRACTICE.

"(E) NOTHING CONTAINED IN THIS SECTION SHALL RELIEVE ANY GOVERNMENT AGENCY OR OFFICIAL OF THE RESPONSIBILITY TO ASSURE NONDISCRIMINATION ON ACCOUT OF AGE IN EMPLOYMENT AS REQUIRED UNDER ANY PROVISION OF FEDERAL LAW."

<div align="center">EFFECTIVE</div>

SEC. 29(A) EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED, THE AMENDMENTS MADE BY THIS ACT SHALL TAKE EFFECT ON MAY 1, 1974.

(B) NOTWITHSTANDING SUBSECTION (A), ON AND AFTER THE DATE OF THE ENACTMENT OF THIS ACT THE SECRETARY OF LABOR IS AUTHORIZED TO PRESCRIBE NECESSARY RULES, REGULATIONS, AND ORDERS WITH REGARD TO THE AMENDMENTS MADE BY THIS ACT.

<div align="center">LEGISLATIVE HISTORY:</div>

HOUSE REPORTS: N/. 93—913 ACCOMPANYING H.R. 12435 (COMM. ON EDUCATION AND LABOR) AND NO. 93—953 (COMM. OF CONFERENCE).

<div align="center">SENATE REPORT NO. 93—690 (COMM. ON LABOR AND PUBLIC WELFARE).</div>

CONGRESSIONAL RECORD, VOL 120 (1974):

FEB. 28, MAR. 5, 7, CONSIDERED AND PASSED SENATE.

MAR. 20, CONSIDERED AND PASSED HOUSE, AMENDED, IN LIEU OF H.R. 12435.

MAR. 28, CONSIDERED AND PASSED HOUSE, AMENDED, IN LIEU OF H.R. 12435.

MAR. 28, SENATE AND HOUSE AGREED TO CONFERENCE REPORT.

WEEKLY COMPILATION OF PRESIDENTIAL DOCUMENTS, VOL. 10, NO. 15:

APR. 8, PRESIDENTIAL STATEMENT.

Approved April 8, 1974.

PL 93–259, 1974 S 2747

---

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

# ADDENDUM B

# Minimum Wage and Maximum Hours Standards Under the Fair Labor Standards Act

**U. S. Department of Labor**
Employment Standards Administration
Economic Effects Study
Submitted to Congress 1973



January 19, 1973

THE HONORABLE THE PRESIDENT OF THE SENATE
THE HONORABLE THE SPEAKER OF THE HOUSE OF REPRESENTATIVES

Sirs:

I have the honor to present herewith the January 1973
report pertaining to fair labor standards in employments
in and affecting interstate commerce, as required by
Section 4(d) of the Fair Labor Standards Act of 1938,
as amended.

Respectfully,

Secretary of Labor

Report to the
Ninety-Third Congress
by the
Secretary of Labor

## Contents

| | Page |
|---|---|
| STATEMENT OF THE SECRETARY--------------------------------------------- | 1 |
| | |
| CONGRESSIONAL ACTIVITIES TO AMEND THE FAIR LABOR STANDARDS ACT----------- | 3 |
| Legislation Enacted--------------------------------------------------- | 3 |
| Legislation Considered------------------------------------------------ | 3 |
| | |
| EQUAL PAY UNDER THE FAIR LABOR STANDARDS ACT----------------------------- | 7 |
| Administration and Enforcement---------------------------------------- | 7 |
| Education Admendments of 1972 - Title IX------------------------------ | 8 |
| | |
| ADMINISTRATION AND ENFORCEMENT OF THE FAIR LABOR STANDARDS ACT----------- | 11 |
| Achieving Voluntary Compliance by Informational Program | |
| and Conciliation----------------------------------------------------- | 11 |
| Investigation Program - New Approach, Less Paperwork------------------ | 12 |
| Litigation----------------------------------------------------------- | 14 |
| | |
| SPECIAL STUDIES-------------------------------------------------------- | 15 |
| Wages and Hours of Work of Nonsupervisory Employees in | |
| Selected Nonagricultural Industries---------------------------------- | 15 |
| Survey of Private Household Workers - Summary of Preliminary | |
| Findings------------------------------------------------------------- | 27 |
| | |
| RECENT STUDIES OF THE FAIR LABOR STANDARDS ACT--------------------------- | 55 |
| Impact on Agricultural Workers---------------------------------------- | 56 |
| Impact on Youth------------------------------------------------------- | 57 |
| Impact of the Overtime Premium---------------------------------------- | 62 |
| Impact on the Domestic Service Industry------------------------------- | 62 |
| General Issues-------------------------------------------------------- | 64 |
| | |
| FUTURE STUDIES--------------------------------------------------------- | 69 |
| Studies in Process---------------------------------------------------- | 69 |
| Studies Currently Being Considered for Fiscal Years 1973-1974-------- | 70 |
| | |
| COVERAGE UNDER THE FAIR LABOR STANDARDS ACT------------------------------ | 73 |
| Minimum Wage---------------------------------------------------------- | 73 |
| Overtime------------------------------------------------------------- | 73 |
| Exemptions from Minimum Wage and Overtime----------------------------- | 74 |

# LIST OF TABLES

Table                                                                    Page

1.  Straight-time average hourly earnings of nonsuper-
    visory employees in selected manufacturing industries,
    United States, May 1971------------------------------------  21

2.  Straight-time average hourly earnings of nonsuper-
    visory employees in retail trade, excluding eating
    and drinking places, by coverage status under the
    Fair Labor Standards Act, United States and regions,
    May 1971--------------------------------------------------  22

3.  Straight-time average hourly earnings of nonsuper-
    visory employees in selected service industries by
    coverage status under the Fair Labor Standards Act,
    United States, May 1971------------------------------------  23

4.  Percent distribution of nonsupervisory employees in
    selected nonfarm industries by number of hours worked
    in survey week, and by overtime coverage status under
    the Fair Labor Standards Act, United States, May 1971----  24

5.  Numerical and percent distribution of private household
    workers by occupational group, region and area, May
    1971------------------------------------------------------  33

6.  Numerical and percent distribution of private household
    workers (except babysitters with no housekeeping duties)
    by race, sex, household status and age, United States,
    South and non-South, May 1971-----------------------------  34

7.  Numerical and percent distribution of babysitters with
    no housekeeping duties by race, sex, household status
    and age, United States, South and non-South, May 1971----  36

8.  Average hourly earnings of private household workers by
    occupational group, race, sex, household status and
    age, United States, South and non-South, May 1971--------  38

9.  Percent of private household workers (except baby-
    sitters with no housekeeping duties) paid less than
    specified hourly rates by race, sex and age, United
    States, South and non-South, May 1971--------------------  40

# LIST OF TABLES

Table                                                                      Page

10.  Percent of female private household workers
     (except babysitters with no housekeeping duties)
     paid less than specified hourly rates by household
     status and race, United States, South and non-
     South, May 1971------------------------------------    43

11.  Percent of babysitters with no housekeeping duties
     paid less than specified hourly rates by race and
     age, United States, May 1971-------------------------    45

12.  Percent increase in the weekly wage bill required to
     raise the wages of private household workers paid
     less than specified minimum hourly wage rates to
     those rates, by occupational group, United States,
     South and non-South, May 1971------------------------    46

13.  Percent distribution of private household workers
     (except babysitters with no housekeeping duties) by
     weekly hours of work, by race, sex and age, United
     States, South and non-South, May 1971----------------    47

14.  Percent distribution of female private household workers
     (except babysitters with no housekeeping duties) by
     weekly hours of work by household status, United States,
     South and non-South, May 1971------------------------    50

15.  Percent distribution of babysitters with no house-
     keeping duties by weekly hours of work, by race and age,
     United States, May 1971------------------------------    53

16.  Estimated number of employed wage and salary workers
     in the civilian labor force classified by their status
     under the minimum wage provisions of the Fair Labor
     Standards Act, by industry division, United States,
     September 1972---------------------------------------    75

# LIST OF TABLES

Table                                                                    Page

17.  Estimated number of employed wage and salary workers
     in the civilian labor force classified by their
     status under the minimum wage provisions of the
     Fair Labor Standards Act, by Region and State,
     September 1972----------------------------------------        77

18.  Estimated number of nonsupervisory employees subject
     to the minimum wage provisions of the Fair Labor
     Standards Act, by sex and race, September 1972--------        81

19.  Estimated number of employed wage and salary workers
     in the civilian labor force classified by their status
     under the overtime compensation provisions of the
     Fair Labor Standards Act, by industry division, United
     States, September 1972--------------------------------        82

20.  Estimated number of employed wage and salary workers
     in the civilian labor force classified by their status
     under the overtime compensation provisions of the Fair
     Labor Standards Act, by Region and State, September
     1972--------------------------------------------------        84

21.  Estimated number of nonsupervisory employees exempt
     from the minimum wage provisions or overtime pro-
     visions of the Fair Labor Standards Act by industry
     division, September 1972------------------------------        88

Report to the
Ninety-Third Congress
by the
Secretary of Labor

Section 4(d) of the Fair Labor Standards Act requires the Secretary of Labor to present a report on his activities for the preceding year and an appraisal and evaluation of the minimum wages established by the Act.

During 1972 there were no increases in the level of the minimum wage and only small increases in the coverage of minimum wage provisions; however, the equal pay provisions of the FLSA were extended to some 15 million executive, administrative, professional and outside sales employees on July 1, 1972. Vigorous enforcement of the equal pay, child labor, overtime and minimum wage provisions of the Act was continued in 1972.

As authorized by the Act several special studies were made in 1972 which will provide basic data and aid in the determination of the future of the Act. The studies surveyed wages and hours worked in selected low wage industries as well as for private household workers, including babysitters. In addition, for the first time a chapter has been added which summarizes the studies completed by independent researchers outside of Government during 1971 and 1972. Some of the data used in these studies were originally generated by surveys initiated under Section 4(d) provisions of the FLSA.

The studies taken as a whole point out the great complexity involved in analyzing the various possible effects of the Act. Departmental studies are continuing on the characteristics of low wage workers in the clothing, retail trade, private household as well as other industries.

In 1972 an estimated 47 million nonsupervisory employees, three quarters of the employed nonsupervisory labor force, were covered by the minimum wage provisions of the Fair Labor Standards Act. The remaining noncovered workers are mainly employed in the public sector, small retail and service firms, and private households.

CONGRESSIONAL ACTIVITIES TO AMEND THE FAIR LABOR STANDARDS ACT

## Legislation Enacted

In an action independent of legislative recommendations from the Administration and of the labor subcommittees having jurisdiction in the House and Senate, the 92nd Congress passed and the President approved two changes in the application of the Fair Labor Standards Act. Title IX of the omnibus Education Amendments of 1972 approved by the President on June 23, 1972, and effective on July 1, contained a number of provisions establishing expanded prohibitions against sex discrimination, primarily in education, but in other segments of the economy as well.

One of the changes extended the minimum wage, overtime pay, and equal pay standards of the Fair Labor Standards Act to an estimated 150,000 nonsupervisory employees of preschool centers, public and private, profit and nonprofit.

One other provision made a very substantial change in the coverage of the equal pay standards of the Act by making the exemption for executive, administrative and professional personnel, outside salesmen, and school teachers inapplicable to the equal pay requirements of the Act.

## Legislation Considered

The Administration in the Spring of 1971 proposed amendments to the Fair Labor Standards Act. The proposals made by the Secretary of Labor in congressional testimony included two 20-cent increases in the nonfarm worker minimum wage to $2.00 an hour by 1974 and two 15-cent increases in the farmworker minimum wage on the same schedule with proportionate increases in Puerto Rico and the Virgin Islands.

A major feature of the recommendation was an overhaul of the application of the Act to teenagers. Instead of the certification program authorizing the employment of full-time students in retail and service establishments at 85 percent of the applicable minimum wage, an across-the-board rate of the greater of $1.60 an hour or 80 percent of the minimum would have applied to all youths under 18, full-time students under 20, and all 18 and 19-year olds during the first six months of their first job.

## House Action

In the House of Representatives, the major alternative to the Administration bill was H.R. 7130 introduced by Chairman Dent of the General Subcommittee on Labor. On September 17, 1971, the General Subcommittee on Labor approved a modified version of H.R. 7130. The

3

full Committee on Education and Labor reported a bill on November 17, 1971, which was similar to the subcommittee bill in most respects. On May 9, 1972, the House Committee on Rules reported the resolution making it the order of business of the House to take up the reported version of H.R. 7130. In addition, the Committee on Rules made it in order to consider H.R. 14104 as introduced by Congressmen Erlenborn, Fuqua, and Quie as a substitute to the committee bill. The House of Representatives began consideration of H.R. 7130 as reported by the Committee on Education and Labor on May 10, 1972.

The Committee bill provided minimum wage increases to $2.00 an hour for workers covered prior to the 1966 amendments and covered Federal workers, on January 1, 1972; to $1.80 an hour on January 1, 1972, and to $2.00 an hour one year later for nonfarm workers covered as a result of the 1966 amendments and the provisions of H.R. 7130; and to $1.50 and $1.70 an hour for farmworkers with the same timing as for newly covered nonfarm workers. There would have been proportionate increases in Puerto Rico and the Virgin Islands and mainland rate protection for employees of hotels, motels, and restaurants, food service workers, Federal employees and employees of the Virgin Islands government and employees of conglomerates.

Some expansion of coverage, primarily domestics and noncovered public employees, would have occurred and several of the overtime exemptions would have been repealed or modified. Among the other provisions of the bill was a title intended to deal with the problem of competition from foreign imports.

As provided in the resolution making the minimum wage the order of business of the House of Representatives, Congressman Erlenborn on May 11, 1972, offered H.R. 14104 as an amendment in the nature of a substitute for H.R. 7130. Several amendments to the H.R. 14104 substitute were adopted including a stretch-out of the minimum wage levels, modification of wage order procedures in Puerto Rico and the Virgin Islands, and retention of the $1.60 an hour rate in the Canal Zone. The House then voted to substitute H.R. 14104 for the committee bill by a vote of 217 to 191 and passed the Fair Labor Standards Act amendments by a vote of 330 to 78 on May 11, 1972.

The bill passed by the House of Representatives established the following new minimum wage rates in the Fair Labor Standards Act: A minimum wage of $1.80 an hour on the effective date and $2.00 an hour a year later for workers covered prior to the 1966 amendments and for covered Federal workers; a rate of $1.70 an hour on the effective date, $1.80 an hour a year later, and $2.00 an hour two years later for nonfarm workers covered as a result of the 1966 amendments; and a minimum wage of $1.50 an hour on the effective date and $1.70 an hour a year later for covered farmworkers.

4

In Puerto Rico and the Virgin Islands the wage order rates increased to at least 60 percent of the mainland rates, with the further exception that the mainland rates applied to employees of hotels, motels, and restaurants, food service workers in retail stores, and to employees of the Federal and Virgin Island governments. The $1.60 minimum wage remained unchanged in the Canal Zone.

Similar to the Administration's proposal, the bill provided a special youth rate of $1.60 an hour ($1.30 in agriculture) or 80 percent of the applicable minimum wage whichever is greater for workers under 18 years of age and full-time students under 21.

The House-passed bill provided no new coverage, but added three exemptions affecting workers involved in delivering shopping news materials, certain house-parents in orphanages, and certain seasonal personnel in retail and service establishments.

### Senate Action

The major alternative to the Administration bill in the Senate was S. 1861 introduced by Senator Williams. On April 19, 1972, the Senate Subcommittee on Labor reported an amended version of S. 1861 to the full Committee on Labor and Public Welfare. The full committee reported a revised version of the subcommittee bill on June 8, 1972. The Senate began consideration of the committee bill on July 17, 1972. As reported to the floor, S. 1861 provided substantial increases in the minimum wage and expansion of coverage under the Act.

As was the case in the House of Representatives, an amendment in the nature of a substitute to the committee bill was offered on the floor of the Senate. Proposed by Senators Dominick and Taft, the substitute amendment provided the same basic farm and nonfarm minimum wage rates approved by the House of Representatives, automatic increases in the wage order rates in Puerto Rico and the Virgin Islands, no change in the $1.60 rate in the Canal Zone, the major features of the Administration's youth rate proposal, no expansion of coverage of the Act, and some additions to the exemptions from the Act's requirements.

By a vote of 47 nays to 46 yeas the Senate defeated the Taft-Dominick substitute. After approving several modifications in the committee bill the Senate approved the minimum wage amendments by a vote of 65 yeas to 27 nays on July 20, 1972.

As passed by the Senate, the bill established increased minimums of $2.00 an hour on the effective date (60 days after enactment) and $2.20 an hour two years later for workers covered prior to the 1966 amendments. Minimum wages of $1.80 an hour on the effective date, $2.00 a year later, and $2.20 two years later applied to nonfarm workers covered by the 1966 amendments and workers covered by the bill.

5

The farmworker minimum would have increased to $1.60 an hour on the effective date, $1.80, $2.00, and $2.20 an hour each succeeding year.

The bill also established minimum wages of at least $1.00 an hour in Puerto Rico and the Virgin Islands with automatic annual increases of 20 cents an hour in wage order rates until the applicable mainland rates were reached. The mainland rates were applied to employees of hotels, motels, and restaurants, food service workers in other retail and service establishments, and public employees in Puerto Rico and the Virgin Islands. The current $1.60 an hour minimum was retained for one year in the Canal Zone after which the rate would have increased to $1.70. The special minimum wage rates for full-time students were extended to employees of educational institutions.

In addition to expanding the coverage to most public employees not already subject to the Act and to most domestic workers, the bill contained provisions to repeal or modify many of the exemptions from coverage under the Act. With respect to the minimum wage and overtime pay standards, the bill deleted exemptions for most chain store establishments and for farmworkers engaged in shade-grown tobacco processing operations. The bill also repealed the minimum wage exemptions but retained the overtime exemptions for small logging operations and for local seasonal hand harvest farmworkers. Several other exemptions would have been repealed or modified. Two new exemptions, very narrow in scope, were added.

## Efforts to Resolve House-Senate Differences

Once the Senate had approved the bill, it was up to the House to either concur in amendments made by the Senate or to request a conference with the Senate to resolve the differences between the bills. Two times, on August 1, 1972, by a vote of 198 nays to 190 yeas, and on October 3, 1972, by a vote of 196 nays to 188 yeas, the House refused to go to conference.

The basis for voting against a conference was the expectation that a majority of the House conferees would have been Congressmen who had voted against the Erlenborn substitute amendment--H.R. 14104-- when it was approved by the House. Thus, supporters of the substitute bill believed that the House conferees would not arrive at a compromise close enough to the House bill. Efforts to establish a satisfactory compromise informally bogged down on the question of the youth wage rate provision. The Congress adjourned on October 18, 1972, without enacting the amendments.

6

In June 1963, the Equal Pay Act was enacted as an amendment to
the Fair Labor Standards Act. With its enactment the long fought for
principle of equal pay for equal work, regardless of the sex of the
worker, became a requirement of law. And, while its protection from
discrimination in wages because of sex applies to both men and women,
it is the latter for whom its protection is most meaningful since
women far more often than men are the victims of such discrimination.
The elimination of sex-based wage discrimination through vigorous
enforcement of the Equal Pay Act is a priority goal of the Employment
Standards Administration.

## Administration and Enforcement

Because the Equal Pay Act was enacted as an amendment to the
minimum wage provisions of the Fair Labor Standards Act, its admin-
istration and enforcement benefited from the strong enforcement
provisions of that law and the experience of the Wage and Hour Division,
the agency within the Department responsible for its enforcement.
Since the generally effective date of the equal pay provisions in
June 1964 through the end of fiscal year 1972, investigations made by
the Division's staff have disclosed underpayments resulting from illegal
sex-based wage discrimination of almost $48 million owed to 112,979
employees. Of these totals over $14 million in underpayments to
29,022 employees were for fiscal year 1972, a level of violations similar
to that disclosed by investigations during the previous year. In terms
of both amount of underpayments and number of employees, the total of
fiscal years 1971 and 1972 findings was greater than that for the
previous six years of the law's enforcement. This reflects the
increasing effectiveness of the enforcement staff in this vital program
area.

In most instances employers correct violations disclosed by
investigations conducted by Wage and Hour Compliance Officers without
court action being necessary. In part, this is attributable to the
widespread recognition of the fact that administrative efforts to
secure voluntary compliance are supported by a vigorous litigation
program. Even so, it is necessary in some instances to initiate court
action in order to secure correction of violative pay practices. In
addition, with regard specifically to the enforcement of the equal pay
standard, there was initially and continues to be the need to establish
legal precedent for interpretative positions as to how the law applies.

During fiscal year 1972, the Department filed 156 suits in the
courts for enforcement of the equal pay standard. A measure of the
momentum attained in this critical phase of enforcement is apparent
from the fact that this number constitutes 35 percent of the total

number (443) of equal pay suits filed since the effective date of the law. Thus, a significant start has been made in building a body of law which will enable the protection of the equal pay standard to be applied uniformly and even more extensively. There is a continuing need, however, for appellate decisions to firmly establish both the basic principles applicable to the standard of equal pay for equal work and the application of these principles across the entire spectrum of covered occupations and industries. The investigative development of cases for these purposes and their prosecution through the courts can be extremely time consuming. The continued expenditure of resources for these ends at this time is essential, however, in order to establish a firm foundation upon which ultimate achievement of the objectives of this program may be based.

## Education Amendments of 1972 - Title IX

Although the enactment of the Equal Pay Act as an amendment to the minimum wage provisions of the Fair Labor Standards Act had the advantage of making strong enforcement remedies available, it had the disadvantage of exempting from the equal pay standard all those employees who were exempt from the Act's minimum wage provisions. Among these were an estimated 15 million executive, administrative, professional, and outside sales employees of whom about 4½ million are women.

An amendment to the Fair Labor Standards Act extending its equal pay provisions to these executive, administrative, professional, and outside sales employees was contained in the Education Amendments of 1972. It was signed into law by the President on June 23, 1972, and became effective on July 1, 1972. Because widespread publicity had not been given to the amendment during the legislative process, and because of the brief period following enactment until the effective date, it was recognized that the initial thrust of enforcement should be to inform those affected of their rights and responsibilities. Accordingly, a series of briefing conferences was conducted early in fiscal year 1973 in all major cities throughout the country. These briefings were open to the general public and the cooperation of all the media was utilized so that their subject and purpose would have the widest possible dissemination. In addition, invitations were individually addressed to business firms, trade and industry associations, labor organizations, women's groups, and others in each area who are directly affected by the law. Concurrent with the initiation of this broad scale information program, work was begun on the revision of publications and other materials containing interpretations and guidance for employers and labor organizations upon whom rests the obligations for compliance.

Through these information and educational activities every effort has and is being made to secure the widest possible degree of voluntary

8

compliance. These will not, however, replace the need for direct enforcement by means of investigation and litigation. Moreover, these direct enforcement actions will undoubtedly be even more time consuming and costly than has been the case to date with the equal pay standard. Enforcement of legislation in new areas is initially almost always relatively more costly due to the lack of precedent and the need to develop guidelines and assure uniformity of application. These factors are compounded in the application of the equal pay standard to jobs in the executive, administrative and professional categories. For example, it will be necessary to determine during investigations whether or not the statutory requirement that jobs must be substantially equal in terms of skill, effort, and responsibility is met when the essential characteristics of the jobs of the men and women being compared comprise such elements as degree of initiative, areas of substantive discretion, and levels of judgment exercised. Further, since employees at these levels often tend to have individualized duties and responsibilities, it will frequently be necessary to make detailed job analyses of numerous jobs in order to apply the law. For example, a situation in which a single woman engineer works with nine male engineers could require a detailed complex investigation of all ten jobs.

Since it was recognized that enforcement of the extended law would require increased sophistication and skill on the part of Compliance Officers in order to deal efficiently with the inherent complexities involved, plans were developed and initiated to provide advanced training to the entire enforcement staff during fiscal year 1973. In addition to policies and procedures relating to equal pay enforcement, the training also includes familiarization with other Federal EEO programs so that the Wage and Hour Division's continuing efforts to coordinate EEO enforcement at the site of employment might be strengthened.

## Achieving Voluntary Compliance by Informational Program and Conciliation

The Employment Standards Administration reorganized and strengthened its services in 1972 to improve the conditions of employment for some 47,000,000 employees working in some 2,000,000 establishments covered by the Fair Labor Standards Act. In response to a clearly indicated need to provide increased services to the public with limited resources, alternative methods other than full-scale investigations were devised and employed where appropriate in an attempt to achieve maximum compliance with the minimum wage, overtime, equal pay and child labor provisions of the Fair Labor Standards Act. The policy of servicing all complaints on a priority basis was continued. However, experience demonstrated that many complaints of violation could be handled quickly and effectively with correction of violations and payment of back wages without the need for time consuming, fact-finding investigations. The employment of conciliation techniques in informal conferences with employers, wherever appropriate, in resolving complaints involving only one or a small group of employees resulted in improved service to the complainant and more effective utilization of scarce resources. This is demonstrated by the fact that the backlog of complaints remaining unserviced at the end of fiscal year 1972 was 28 percent lower than that which existed at the end of fiscal year 1971. This despite the receipt of 38,913 complaints, an increase of approximately 3 percent over the number received the previous year. Complaint situations indicative of general violative practices or not satisfactorily resolved by conciliation techniques continued to be handled by fact-finding investigative procedures.

To assure that every covered worker enjoys the full protection of the Fair Labor Standards Act, the intensive educational and informational program to acquaint employees with their rights and employers with their responsibilities that was instituted several years ago continued in fiscal year 1972. Increased utilization of the CUE (Compliance Utilizing Education) program whereby grass roots efforts are made to acquaint businessmen with their obligations under the Act was promoted. This included speeches, seminars and training sessions with industry officials. Under this program, employers were encouraged to review their operations, under (our) general guidance and assistance, to correct any practices that were not in compliance, including payment of any back wages found due, and to report the results of such activities. Many employers participated in varying degrees in this voluntary compliance program. In addition, the Employment Standards Administration participated in over 38,000 contacts with employers, employment agencies, labor organizations and others which, on the basis of the information and advice provided, resulted in changes in employment practices to achieve compliance. Also in 1972, over one million inquiries and requests for information from the public (both employers and employees) about these laws were answered.

At the close of the fiscal year, the Fair Labor Standards Act was amended to extend equal pay protection to 15 million executive, administrative, professional, and academic administrative personnel or teachers in elementary or secondary schools, and outside sales employees. At the same time, preschool facilities were brought under the minimum wage, overtime, equal pay and child labor provisions of the Act. A massive informational and educational program was initiated to inform those affected by these changes of their respective rights and responsibilities.

## Investigation Program - New Approach, Less Paperwork

In implementing the policy of greater decentralization, the Employment Standards Administration established a policy for delegating to the regional offices and field staff as much program planning, decision-making and action-taking responsibility as feasible in order to concentrate its resources on the more serious noncompliance problems. This decentralized program planning was designed to better identify those industries and areas where violations of the Fair Labor Standards Act affecting the greatest number of employees were most likely to be occurring, and to focus on top priorities, such as (1) the elimination of wage discrimination on the basis of sex, (2) the development of new job opportunities by enforcement of the overtime provisions in industries where the potential for encouraging employers to hire new workers in lieu of paying overtime was greatest, and (3) the improvement and protection of the earnings of low-wage workers. The activities of the field staff were focused on these areas so that the greatest number of people most in need of assistance were helped by our enforcement efforts. Compliance and enforcement procedures were modified to meet enforcement needs. The use of "flexible" investigation procedures--doing only what is essential to identify and resolve a violative situation with fewer hard and fast procedural steps to be followed--became standard. Many situations which in the past would have prompted full-scale investigations were handled by this short cut procedure, informal conciliation-type actions or by other compliance activity tailored to meet local or individual enforcement needs. These changes were designed not only to make operations more efficient but also to reduce the burden on employers.

Investigations and conciliation-type actions in fiscal year 1972 disclosed almost $98 million in wages illegally withheld under the Fair Labor Standards Act from more than 500,000 employees. Included in this total were wage adjustments represented by the correction of minimum wage violations involving 231,100 employees; overtime violations involving 270,075 employees; and equal pay violations involving 29,022 employees. Conciliation-type actions resulted in wage adjustments represented by $2,905,533 in unpaid wages. Low-wage employees, as classified under standards established by the Bureau of Labor Statistics, continued to be helped the most. Thus, workers earning less than the hourly rate equivalent of the total annual budget necessary for the

## Wages and Hours of Work of Nonsupervisory Employees in Selected Nonagricultural Industries

To provide a body of information which will permit a more precise assessment of the economic implications of legislation to amend the Fair Labor Standards Act and a limited appraisal of the effects of the last phase of the 1966 amendments, the Bureau of Labor Statistics, at the request of the Employment Standards Administration, conducted a Nationwide survey of selected nonfarm industries for payroll periods in May 1971 and April 1972. This study will yield comparable two-period data on employment related standards affecting nonsupervisory employees and separate tabulations for youths for the April 1972 payroll period.

Since broad industry data frequently obscure the effect that a change in the minimum wage level may have on individual employee earnings, the survey focuses on industries where the anticipated impact of an increase in the minimum wage level would be higher than the average for all covered establishments. Consequently, the sample was selected to adequately represent industries with concentrations of lower wage workers including manufacturing industries in which hourly earnings were significantly lower than average as well as individual retail trade and service industries, the two economic sectors most directly affected by recent changes in the Federal wage standard (Appendix A).

A short summary of the data currently available is presented below. A full report, containing detailed statistical tables for both survey periods (May 1971, April 1972), will be published later in the year.

### Level of Earnings

Manufacturing - Average straight-time hourly earnings in the nine manufacturing industry groups surveyed in May 1971 ranged from $2.13 to $3.04, appreciably lower than the average straight-time earnings for all manufacturing for the same period, $3.43 an hour (Table 1 ). The marked difference in the proportions of nonsupervisory employees whose hourly earnings approximated the $1.60 minimum wage level in these industries compared with the proportion in all manufacturing1/ one year earlier illustrates how critical the Federal wage standard is to workers in certain industries. In May 1970, a fraction of one percent of the nonsupervisory employees in manufacturing

1/ Wages and Hours of Work of Nonsupervisory Employees in All Private Nonfarm Industries by Coverage Status Under the Fair Labor Standards Act, U.S. Department of Labor, Employment Standards Administration, 1972.

were at the $1.60 minimum wage interval. By comparison, minimum wage workers comprised not less than 2 percent of the work force in any one of the nine manufacturing industries included in the May 1971 survey and as high as 20 percent of the workers in men's, youths', and boys' furnishings, and allied garments industry.

Any increase in the minimum wage will be of particular significance in the apparel industry (SIC 23) where 12 percent of the 1.3 million workers were paid less than $1.65 an hour in May 1971. Establishments in the South employed six out of every seven apparel workers whose hourly earnings appear to be closely related to the current Federal minimum wage standard.

Retail Trade, excluding eating and drinking places - This industry group provides the clearest perspective of the effect of differences in coverage under the Act on wage structures in establishments with common characteristics. The exclusion of eating and drinking places eliminates to a large extent the wage distortion that may have been caused by the inclusion of tipped employees whose hourly wage may legally be adjusted to reflect an allowance of up to 50 percent of the minimum wage for tips actually received.

In general, earnings in retail trade paralleled the pattern evident in most other industries, with the South and smaller communities accounting for the highest proportion of low-wage workers (Table 2 ). However, the $1.60 wage standard was an important wage determinant in each region, and most minimum wage workers were employed in the larger communities.

Nationwide, the proportion of workers clustered at the $1.60 minimum wage interval in establishments first covered by the Federal wage standard in 1966--15 percent--was almost double that in establishments subject to the Act since 1961--8 percent. In noncovered establishments--those with gross annual sales below $250,000--almost a third of the work force were paid less than the minimum applicable to covered retail trade employees.

Hourly straight-time cash wages in May 1971 averaged $2.68 in retail establishments covered prior to the 1966 amendments, $2.80 in those first covered by the 1966 amendments, and $2.13 in establishments not covered by the Federal standard.

Service-producing industries - Differences in average hourly earnings in the service industries studied partially reflected the large variation in the proportion of employees clustered at the $1.60 minimum wage interval (Table 3 ).

In industries covered since 1966 this proportion ranged from 15 percent in educational institutions to just under one-third in both laundries and cleaning services and covered hotels, motels, and other lodging places. In banks and other credit agencies which have been subject to the minimum wage provisions since 1938, only 3 percent of the nonsupervisory work force were paid less than $1.65 an hour. Thus, the average hourly cash wages of nonsupervisory employees in laundries and covered hotels and motels were roughly equivalent, $2.06 and $2.10 respectively, while hourly earnings averaged $2.65 in educational institutions and $2.82 in banks and other credit agencies.

A similar pattern was evident in the noncovered segment, that is, average hourly earnings were lowest ($1.69) in noncovered hotels and motels where over half the employees were paid less than $1.65 an hour and highest in amusement and recreation services ($2.42) where one-fourth of the workers received equally low wages.

## Wage-Bill Impact of Higher Minimum Rates

The comparatively low wages in effect in many of the covered establishments among the selected nonfarm industries surveyed in May 1971, indicate that the higher minimum wage levels proposed under the different versions of H.R. 7130 passed by the House and Senate would have resulted in direct wage increases for a substantial proportion of their nonsupervisory work force. Wage increases related to a change in the minimum wage level as gauged by the survey, however, would be moderated by increases in the general wage level between the survey date (May 1971) and the effective date of new legislation.

While some low wage workers throughout the Nation would be affected by an upward revision in the Federal wage standard, preliminary data for the May 1971 payroll period disclose that covered establishments in the South consistently accounted for the highest proportion of workers paid at or near the current $1.60 minimum. The relatively greater impact of the Federal minimum on wage structures in the South is influenced to some extent by the fact that (1) unionized establishments which generally have higher average wage levels than nonunion establishments are less prevalent in the South and (2) a higher proportion of nonsupervisory workers in the South are employed in covered establishments in nonmetropolitan areas which in each region are characterized by lower wage levels than establishments located in metropolitan areas.

The wage increases required by proposed minimum wage levels of $1.80, $2.00 and $2.20 in the lower wage manufacturing industries surveyed are affected not only by the significant number of workers clustered at the $1.60 minimum but also the sizeable proportion of

17

workers at each 20-cent wage interval above that level. For example, in the two major manufacturing industry groups surveyed--apparel and related products and leather and leather products--nonsupervisory employees who were paid more than the statutory minimum but less than $2.20 an hour comprised about two-fifths of each industry group's work force.

In covered retail trade establishments, excluding eating and drinking places, successive 20-cent increases in the basic minimum wage rate from $1.60 to $2.20 an hour would require wage increases for an estimated 1.6 million nonsupervisory employees paid less than $2.20 an hour in May 1971. Somewhat more than a third of these 1.6 million workers, or 567,000, were paid at the current $1.60 Federal minimum wage level during the survey week.

The higher minimum wage levels discussed will also have a pronounced effect on the wage structure in educational institutions, laundries and cleaning services as well as in hotels and motels with $250,000 or more in annual receipts. Aside from those workers currently at the bottom of the wage ladder in these three service industries, 10 percent of their nonsupervisory employees were paid within 20-cents of the Federal wage standard. And an equally significant number were grouped in the twenty-cent hourly wage intervals between $1.80, $2.00 and $2.20.

## Hours Worked

Average weekly hours worked by nonsupervisory employees in the selected nonfarm industry groups surveyed in May 1971 varied substantially. In manufacturing industries the average workweek ranged from 35.4 hours in the handbags and personal leather goods industry to 42.2 hours in establishments manufacturing veneer and plywood. In the service industries differences were even more pronounced, with the lowest average workweek reported in motion picture theaters--23.2 hours--and the highest in banks and other credit agencies--36.7 hours. Average weekly hours of nonsupervisory employees in retail establishments covered by the overtime provisions and those working in establishments not covered by the premium pay standard were quite close--32.3 hours and 33.7 hours respectively (Table 4 ).

There were also marked differences between the manufacturing, service, and retail trade sectors in the proportion of nonsupervisory employees who worked full-time, that is 35 or more hours a week, and those who worked part-time, particularly those employed less than 15 hours a week. In each of the manufacturing industry groups over two-thirds of the workers were on full-time schedules and only 4 percent or less worked fewer than 15 hours a week. By contrast, in all but banks and other credit agencies, two-fifths or more of the nonsupervisory

workers in the service industries surveyed worked part-time, that is less than 35 hours a week, and a substantial proportion worked under 15 hours during the May 1971 payroll period. In retail trade, just under one-third of the employees worked more than 15 hours but less than 35 hours a week, and one of every eight worked less than 15 hours a week.

With the exception of educational institutions, a significant proportion of nonsupervisory employees worked more than 40 hours a week in all of the surveyed industries subject to the overtime provisions. In industries which have been subject to a 40-hour standard since 1940, the proportion of nonsupervisory employees working more than 40 hours ranged from one out of every nine workers in banks and other credit agencies to over one-half of the nonsupervisory work force in veneer and plywood establishments. In covered retail trade establishments and laundries and cleaning services, which have been subject to the 40-hour standard since February 1, 1969, one out of every six nonsupervisory employee worked more than 40 hours in the survey week.

## APPENDIX A

| SIC | Industry |
| --- | --- |
| 23 | Apparel and related products |
| 232 | Men's and boys' furnishings |
| 2432 | Veneer and plywood |
| 2441-2442 | Nailed and wired boxes and shook |
| 31 | Leather and leather products |
| 314 | Footwear, except rubber |
| 317 | Handbags and personal leather goods |
| 3674, 3679 | Semiconductors and electronic components, not elsewhere classified |
| 394 | Toys, amusement, sporting, and athletic goods |
| 52-57 and 59 | Retail trade, except eating and drinking places |
| 60-61 | Banks and other credit agencies |
| 70 | Hotels, motels, and other lodging places |
| 721 | Laundries and cleaning services |
| 783 | Motion picture theaters |
| 79 | Amusement and recreation services, except motion pictures |
| 821, 822 | Educational institutions |

Table 1 . Straight-time average hourly earnings of nonsupervisory employees in selected manufacturing industries, United States, May 1971

| SIC | Industry | Number of employees :(in thousands): | Average hourly earnings | Percent of employees paid hourly wages below | | | | | | |
|-----|----------|------------------------|-----------------|:$1.65|:$1.70|:$1.80|:$1.90|:$2.00|:$2.10|:$2.20|
| 23 | Apparel and related products | 1,295.5 | $2.39 | 12 | 15 | 22 | 29 | 35 | 43 | 51 |
| 232 | Men's and boys' furnishings | 364.0 | 2.13 | 20 | 24 | 34 | 42 | 50 | 58 | 66 |
| 2432 | Veneer and plywood | 72.8 | 3.04 | 3 | 4 | 9 | 14 | 17 | 21 | 25 |
| 2441- | | | | | | | | | | |
| 2442 | Nailed and wired boxes and shook | 23.7 | 2.28 | 7 | 11 | 25 | 39 | 47 | 56 | 60 |
| 31 | Leather and leather products | 295.1 | 2.45 | 6 | 9 | 15 | 23 | 30 | 40 | 47 |
| 314 | Footwear, except rubber | 199.7 | 2.42 | 7 | 9 | 16 | 25 | 32 | 40 | 48 |
| 317 | Handbags and personal leather goods | 31.7 | 2.44 | 3 | 5 | 10 | 18 | 26 | 38 | 50 |
| 3674, 3679 | Semiconductors and electronic components, not elsewhere classified | 212.7 | 3.04 | 2 | 2 | 4 | 8 | 11 | 16 | 21 |
| 394 | Toys, amusement, sporting, and athletic goods | 102.5 | 2.52 | 4 | 5 | 8 | 15 | 23 | 33 | 42 |

Source: Survey conducted by the Bureau of Labor Statistics for the Employment Standards Administration.

Table 2. Straight-time average hourly earnings of nonsupervisory employees in retail trade, excluding eating and drinking places, by coverage status under the Fair Labor Standards Act, United States and regions, May 1971

| Coverage classification and region | Number of employees (in thousands) | Average hourly earnings | Percent of employees paid hourly wages below | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | $1.65 | $1.70 | $1.80 | $1.90 | $2.00 | $2.10 | $2.20 |
| Covered prior to 1966 | | | | | | | | | |
| United States | 3,789.0 | $2.68 | 8 | 9 | 16 | 25 | 31 | 38 | 43 |
| Metropolitan | 3,203.1 | 2.74 | 6 | 8 | 14 | 22 | 28 | 35 | 40 |
| Nonmetropolitan | 585.9 | 2.32 | 14 | 17 | 29 | 39 | 46 | 55 | 59 |
| Northeast | 980.6 | 2.57 | 5 | 6 | 11 | 21 | 28 | 36 | 43 |
| South | 1,006.5 | 2.53 | 12 | 15 | 23 | 33 | 38 | 46 | 50 |
| North Central | 1,174.6 | 2.62 | 8 | 9 | 18 | 26 | 32 | 39 | 44 |
| West | 627.3 | 3.21 | 5 | 6 | 11 | 16 | 19 | 25 | 28 |
| Covered by the 1966 amendments | | | | | | | | | |
| United States | 1,768.5 | 2.80 | 15 | 17 | 24 | 30 | 33 | 41 | 44 |
| Metropolitan | 1,123.2 | 2.95 | 11 | 14 | 20 | 24 | 27 | 36 | 40 |
| Nonmetropolitan | 645.3 | 2.54 | 21 | 23 | 32 | 39 | 42 | 50 | 53 |
| Northeast | 411.0 | 3.00 | 7 | 9 | 13 | 20 | 23 | 32 | 36 |
| South | 557.5 | 2.47 | 24 | 26 | 35 | 41 | 45 | 52 | 55 |
| North Central | 518.3 | 2.77 | 14 | 17 | 25 | 31 | 33 | 43 | 47 |
| West | 281.8 | 3.21 | 8 | 11 | 17 | 20 | 22 | 29 | 32 |
| Noncovered | | | | | | | | | |
| United States | 2,030.1 | 2.13 | 31 | 36 | 43 | 51 | 54 | 65 | 67 |
| Metropolitan | 1,266.3 | 2.23 | 25 | 29 | 37 | 45 | 48 | 61 | 64 |
| Nonmetropolitan | 763.9 | 1.96 | 42 | 47 | 53 | 62 | 64 | 72 | 74 |
| Northeast | 462.3 | 2.33 | 13 | 15 | 21 | 36 | 39 | 54 | 57 |
| South | 685.9 | 1.88 | 48 | 52 | 59 | 66 | 69 | 76 | 79 |
| North Central | 522.8 | 2.10 | 35 | 40 | 48 | 53 | 56 | 66 | 67 |
| West | 359.2 | 2.39 | 18 | 26 | 33 | 40 | 44 | 56 | 59 |

Source: Survey conducted by the Bureau of Labor Statistics for the Employment Standards Administration.

Table  3.  Straight-time average hourly earnings of nonsupervisory employees
in selected service industries by coverage status under the
Fair Labor Standards Act, United States, May 1971

| SIC | Minimum wage coverage classification and industry | Number of employees :(in thousands) | :Average : hourly : earnings | Percent of employees paid hourly wages below | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | :$1.65 | :$1.70 | :$1.80 | :$1.90 | :$2.00 | :$2.10 | :$2.20 |
| | Covered prior to 1966 | | | | | | | | | |
| 60-61 | Banks and other credit agencies | 1,170.4 | $2.82 | 3 | 3 | 6 | 9 | 13 | 19 | 26 |
| | Covered by the 1966 amendments | | | | | | | | | |
| 70 | Hotels, motels, and other lodging places | 459.6 | 2.10 | 32 | 38 | 47 | 53 | 57 | 64 | 67 |
| 721 | Laundries and cleaning services | 437.4 | 2.06 | 30 | 35 | 44 | 53 | 59 | 70 | 74 |
| 821, 822 | Educational institutions 1/ | 2,307.2 | 2.65 | 15 | 18 | 24 | 29 | 33 | 39 | 42 |
| | Noncovered | | | | | | | | | |
| 70 | Hotels, motels, and other lodging places | 239.6 | 1.69 | 55 | 61 | 69 | 77 | 80 | 87 | 89 |
| 783 | Motion picture theaters | 150.5 | 1.99 | 44 | 46 | 49 | 55 | 56 | 81 | 82 |
| 79 | Amusement and recreation services, except motion pictures | 299.1 | 2.42 | 23 | 27 | 38 | 44 | 46 | 58 | 60 |

1/  SIC 821, 822 and equivalent parts of 9282 and 9382 (elementary and secondary schools, and colleges and universities; Private, State and local combined).

Source:  Survey conducted by the Bureau of Labor Statistics for the Employment Standards Administration.

Table 4. Percent distribution of nonsupervisory employees in selected nonfarm
industries by number of hours worked in survey week, and by
overtime coverage status under the Fair Labor Standards
Act, United States, May 1971

| SIC | Overtime coverage classification and industry | Average weekly hours | Percent of employees working | | | |
|---|---|---|---|---|---|---|
| | | | Under 15 hours | 15 and under 35 hours | 35 to 40 hours | Over 40 hours |
| | Covered by overtime provisions | | | Manufacturing | | |
| 23 | Apparel and related products | 35.5 | 4 | 28 | 52 | 16 |
| 232 | Men's and boys' furnishings | 37.0 | 2 | 24 | 58 | 16 |
| 2432 | Veneer and plywood | 42.2 | 2 | 10 | 37 | 51 |
| 2441- 2442 | Nailed and wired boxes and shook | 39.1 | 3 | 18 | 42 | 37 |
| 31 | Leather and leather products | 36.1 | 3 | 24 | 52 | 21 |
| 314 | Footwear, except rubber | 36.7 | 3 | 25 | 49 | 23 |
| 317 | Handbags and personal leather goods | 35.4 | 3 | 23 | 61 | 12 |
| 3674, 3679 | Semiconductors and electronic components, not elsewhere classified | 39.3 | 1 | 14 | 65 | 20 |
| 394 | Toys, amusement, sporting, and athletic goods | 38.1 | 2 | 18 | 62 | 19 |

Table 4. Percent distribution of nonsupervisory employees in selected nonfarm industries by number of hours worked in survey week, and by overtime coverage status under the Fair Labor Standards Act, United States, May 1971 (Concluded)

| SIC | Overtime coverage classification and industry | Average weekly hours | Under 15 hours | 15 and under 35 hours | Percent of employees working 35 to 40 hours | Over 40 hours |
|-----|-----------------------------------------------|----------------------|----------------|-----------------------|---------------------------------------------|---------------|
| | Covered by overtime provisions | | | | Services | |
| 60-61 | Banks and other credit agencies | 36.7 | 3 | 13 | 73 | 11 |
| 721 | Laundries and cleaning services | 33.7 | 7 | 33 | 42 | 18 |
| 821, 822 | Educational institutions 1/ | 29.4 | 17 | 30 | 48 | 5 |
| | Not covered by overtime provisions | | | | | |
| 70 | Hotels, motels, and other lodging places | 33.0 | 13 | 31 | 33 | 23 |
| 783 | Motion picture theaters | 23.2 | 27 | 58 | 11 | 4 |
| 79 | Amusement and recreation services, except motion pictures | 27.7 | 27 | 30 | 24 | 19 |
| | | | | | Retail trade, except eating and drinking places | |
| 52-57 and 59 | Establishments covered by overtime provisions | 32.3 | 12 | 32 | 39 | 17 |
| | Establishments not covered by overtime provisions | 33.7 | 12 | 30 | 42 | 16 |

1/ SIC 821, 822 and equivalent parts of 9282 and 9382 (elementary and secondary schools, and colleges and universities; Private, State and local combined).

Note: Because of rounding, sums of individual items may not equal totals.

Source: Survey conducted by the Bureau of Labor Statistics for the Employment Standards Administration.

25

## Survey of Private Household Workers - Summary of Preliminary Findings

At the request of the Employment Standards Administration, the Bureau of the Census conducted a nationwide survey to provide data on wages, weekly hours of work and fringe benefits (including perquisites) for private household workers, one of the larger remaining segments of the private economy excluded from the protection of the Fair Labor Standards Act. These data permit an evaluation of the implications of extending FLSA coverage to household service workers, as proposed by bills introduced in the Ninety-Second Congress.

The survey data were collected by the Bureau of the Census as a part of the May 1971 supplement to the Current Population Survey. For survey purposes, a private household worker was defined as anyone working for wages, including pay-in-kind, in or about a private residence who was employed by (1) a member of the household occupying that residence or (2) a household service business 1/ whose services had been requested by a member of the household occupying that residence. Craftsmen such as plumbers and carpenters, self-employed people such as registered nurses and related household members performing household work were excluded from the survey.

A summarization of the data currently available from the study is contained in the following sections. It should be noted that these data are preliminary and subject to revision. A complete report containing detailed statistical tables will be published later in the year.

### Employment

In May 1971, a total of 2.4 million persons were employed as private household workers (Table 5 ). Excluding babysitters with no housekeeping duties, the work force totaled 1.8 million. (To facilitate description, the category "household workers except babysitters with no housekeeping duties" will be used interchangeably with the term "domestic workers.")

---

1/ Employees of a household service business are presently covered by the FLSA if the business is a part of an enterprise under Section 3(s) of the Act. The exemption for employees of a retail or service establishment is generally inapplicable to such employees.

Nearly three-fifths of the domestic workers and seven-tenths of the babysitters were located in metropolitan areas. Two out of five domestic workers, but only one out of five babysitters, were employed in the South. 1/

The vast majority of the private household workers were employed directly by a member of a household. In both the South and non-South, no more than two percent of the workers within the scope of the survey were in the employ of a household service business.

Workforce Characteristics

Private household workers except babysitters with no housekeeping duties - Nationwide, females comprised three-fourths of the domestic workforce (Table 6 ); the proportion was somewhat larger in the South than in the rest of the country--82 percent compared to 71 percent.

Sixty-three percent of all domestic workers were white; the proportion was only 34 percent in the South as contrasted with 82 percent in the non-South.

Workers under 20 years of age comprised a third of the domestic workforce. Only a fourth of the domestic workers were 20 to 44 years of age, a third were 45 to 64 years old and a tenth were 65 years of age or older. Teen-age workers were more prevalent in the non-South than in the South, accounting for 42 percent and 17 percent of the respective workforces.

Three out of ten domestic workers were heads of households, the bulk of whom were females. A much larger proportion of the females of Negro and other races 2/ than white females were heads of households--

---

1/ The South is comprised of the District of Columbia and the following States: Alabama, Arkansas, Delaware, Florida, Georgia, Kentucky, Louisiana, Maryland, Mississippi, North Carolina, Oklahoma, South Carolina, Tennessee, Texas, Virginia and West Virginia.

2/ For ease of discussion, the classification "Negro and other races," which includes persons of all races other than white, will be referred to as Negro.

28

38 percent compared to 22 percent. Likewise, a larger proportion of Negro than white females were wives of household heads--41 percent compared to 26 percent.

| Race and household status | United States | Percent distribution of female domestics South | Non-South |
|---|---|---|---|
| White | 100 | 100 | 100 |
| Head of household | 22 | 27 | 21 |
| Wife of head | 26 | 33 | 24 |
| Other | 52 | 40 | 55 |
| Negro and other races | 100 | 100 | 100 |
| Head of household | 38 | 38 | 39 |
| Wife of head | 41 | 43 | 36 |
| Other | 21 | 19 | 25 |

Babysitters with no housekeeping duties - The babysitter work-force consisted almost entirely of young white females. Of the 561,000 babysitters, nine-tenths were white females and over four-fifths were under 20 years of age (50 percent under 16 years of age and 33 percent 16 to 19 years of age). Only 15 percent of all babysitters were household heads or wives of household heads (Table 7).

Average Hourly Earnings

Private household workers except babysitters with no housekeeping duties - In May 1971, domestic workers averaged $1.34 an hour in cash wages (Table 8). Workers in the South averaged $1.21 an hour, 21 cents below the average in the rest of the country.

Nationwide, Negro domestics averaged $1.36 an hour in cash wages, 4 cents more than white domestics. Intra-regional differences were more significant. Average earnings of Negro workers exceeded the average for whites by 30 percent in the non-South, but were 5 percent below the average for whites in the South. In both regions, however, Negro females in each of the three "household status" classifications for which data were tabulated had higher average hourly earnings than their white counter-parts.

Babysitters with no housekeeping duties - Cash wages of babysitters averaged $ .72 an hour in May 1971. The average hourly cash wage of white babysitters exceeded that for their Negro counterparts by nine cents.

Distribution of Workers by Straight-time Hourly Earnings

Private household workers except babysitters with no housekeeping duties - Nationwide, 31 percent of the domestic workers were paid cash wages of less than $ .70 an hour; 48 percent were paid less than $1.00 an hour, and 68 percent were paid less than $1.50 an hour (Table 9 ). The concentration of low-wage workers was greater in the South than in the rest of the country.

The nationwide wage structures for white and Negro domestics were roughly similar; the largest variation was at the low-end of the wage scale--under $ .70 an hour--where the concentration of whites (34 percent) exceeded that for Negroes by eight percentage points. Wage structure differences were much more pronounced within geographic areas, particularly in the non-South where, for example, 49 percent of the whites but only 16 percent of the Negro workers earned less than $1.00 an hour.

There was a substantial difference between the earnings distributions of white female domestics and Negro female domestics. Forty-four percent of the white females earned less than $ .70 an hour and 59 percent earned less than $1.00 an hour; in contrast, the proportions of Negro females with such earnings were 28 percent and 47 percent, respectively. At higher wage levels, differences in the concentration narrowed.

A further classification of female workers by household status shows that lower earnings for whites was not characteristic of female heads of households or wives of heads. For both of these categories, a larger proportion of Negroes than whites were clustered at the low-end of the wage scale. In the "other" classification, however, white females were heavily concentrated in the lower earnings intervals--65 percent under $ .70 an hour and 80 percent under $1.00 an hour (Table 10 ). Of the relatively fewer Negro females in the "other" category, the proportion with such wages were 38 percent and 57 percent, respectively.

Low cash wages were more prevalent among teen-age domestic workers than any other age groups. For example, two out of five teenagers earned less than $ .70 an hour, but only one out of four in the age groups 20 to 44, 45 to 64, and 65 and over had such earnings.

Babysitters with no housekeeping duties - Over seven-tenths of the babysitters earned less than $ .70 an hour, and over nine-tenths earned less than $1.00 an hour (Table 11 ). Babysitters 20 years of age and older were only slightly better off, earnings-wise, than their younger counterparts.

## Impact of Various Minimum Wage Rates

Private household workers except babysitters with no housekeeping duties - As indicated by the earnings distributions, the extension of the minimum wage provisions of the FLSA to domestic workers would have a very large impact on wage bill costs. To raise the cash wages of workers paid less than $1.00 an hour in May 1971 to that level would have required an estimated 16 percent increase in the weekly wage bill. Weekly wage bill increases associated with minimum wage levels of $1.30, $1.50 and $2.00 an hour were 30, 41 and 74 percent, respectively. (See Table 12 for wage bill impacts of other intermediate hourly rates.) In the South, where the impact of a minimum wage would be greatest, the estimated weekly wage bill increases for minimum hourly rates between $1.00 to $2.00 ranged from 17 percent to 91 percent.

Since the impact estimates are based solely on cash wages paid in May 1971 and exclude the value of any perquisites (free meals, lodging, transportation, etc.), some of which may be credited toward meeting a minimum wage established under the FLSA, they tend to maximize the wage bill increases associated with various minimum hourly wage rates. Nevertheless, the estimates indicate that the impact on wage bill costs resulting from an extension of minimum wage coverage to domestic workers will be greater than the wage bill impacts associated with previous extensions of FLSA coverage.

Babysitters with no housekeeping duties - Based on the May 1971 survey data, an estimated 62 percent increase in the weekly wage bill would be required to raise the cash wages of babysitters paid less than $1.00 an hour to that level. A minimum wage level of $1.30 an hour would require a doubling and $2.00 an hour a trebling of the weekly wage bill.

## Distribution of Private Household Workers by Weekly Hours of Work

Private household workers except babysitters with no housekeeping duties - For the Nation as a whole, 53 percent of the domestic workers worked short workweeks (less than 15 hours) during the May 1971 survey week, more than a third worked from 15 to 40 hours, and nearly a tenth worked over 40 hours (Table 13 ). A greater proportion of domestic workers in the non-South than in the South worked short workweeks-- 60 percent compared to 43 percent and the proportion working over 40 hours a week was greater in the South (12 percent) than in the rest of the country (7 percent). When teenagers are excluded, however, regional differences in the distribution of workers by hours of work are small.

Weekly hours of work varied significantly among domestic workers classified by selected characteristics such as age, sex and household status. For example, well over four-fifths of the teenagers compared with less than two-fifths of the workers 20 years of age and over

worked less than 15 hours during the survey week. On the other hand, workweeks in excess of 40 hours were more common among workers aged 65 and over than any other age group. The classification of females by household status showed that only 4 percent of the females who were wives of household heads worked in excess of 40 hours while the proportions of females in the "head of household" and "other" classifications working such hours were 12 percent and 16 percent, respectively (Table 14 ); in the latter two classifications, a larger proportion of the white than Negro females worked over 40 hours during the survey week.

Babysitters with no housekeeping duties - More than nine-tenths of the babysitters under 20 years of age worked less than 15 hours a week compared with half of the 20 years and older group (Table 15 ). None of the teenage babysitters and only 15 percent of the 20 years and older group worked over 40 hours during the survey week.

Table 5. Numerical and percent distribution of private household workers by occupational group, region and area, May 1971

(Numbers in thousands)

| Region and area | Private household workers | | | | | |
| | Total | | Except babysitters with no house-keeping duties | | Babysitters with no housekeeping duties | |
| | Number | Percent | Number | Percent | Number | Percent |
|---|---|---|---|---|---|---|
| United States | 2,376 | 100.0 | 1,815 | 100.0 | 561 | 100.0 |
| Metropolitan areas | 1,438 | 60.5 | 1,054 | 58.1 | 385 | 68.6 |
| Nonmetropolitan areas | 938 | 39.5 | 761 | 41.9 | 176 | 31.4 |
| South | 813 | 34.2 | 709 | 39.1 | 104 | 18.5 |
| Metropolitan areas | 395 | 16.6 | 320 | 17.6 | 75 | 13.4 |
| Nonmetropolitan areas | 418 | 17.6 | 389 | 21.4 | 29 | 5.2 |
| Non-South | 1,563 | 65.8 | 1,106 | 60.9 | 458 | 81.6 |
| Metropolitan areas | 1,043 | 43.9 | 733 | 40.4 | 310 | 55.3 |
| Nonmetropolitan areas | 520 | 21.9 | 372 | 20.5 | 147 | 26.2 |

Note: Data are preliminary. Due to rounding, details may not add to totals.

Source: Survey conducted by the Bureau of the Census for the Employment Standards Administration.

33

Table 6. Numerical and percent distribution of private household workers (except babysitters with no housekeeping duties) by race, sex, household status and age, United States, South and non-South, May 1971

(Numbers in thousands)

| Characteristic | United States | | South | | Non-South | |
|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent |
| Total | 1,815 | 100.0 | 709 | 100.0 | 1,106 | 100.0 |
| **Race, sex and household status** | | | | | | |
| White | 1,148 | 63.3 | 239 | 33.7 | 908 | 82.1 |
| Male | 390 | 21.5 | 85 | 12.0 | 305 | 27.6 |
| Head of household | 78 | 4.3 | 23 | 3.2 | 55 | 5.0 |
| Other | 313 | 17.2 | 62 | 8.7 | 250 | 22.6 |
| Female | 757 | 41.7 | 154 | 21.7 | 603 | 54.5 |
| Head of household | 167 | 9.2 | 42 | 5.9 | 124 | 11.2 |
| Wife of head | 197 | 10.9 | 50 | 7.1 | 148 | 13.4 |
| Other | 393 | 21.7 | 62 | 8.7 | 331 | 29.9 |
| Negro and other races | 667 | 36.7 | 470 | 66.3 | 197 | 17.8 |
| Male | 57 | 3.1 | 39 | 5.5 | 18 | 1.6 |
| Head of household | 40 | 2.2 | 24 | 3.4 | 15 | 1.4 |
| Other | 18 | 1.0 | 15 | 2.1 | 3 | .3 |
| Female | 610 | 33.6 | 431 | 60.8 | 179 | 16.2 |
| Head of household | 232 | 12.8 | 162 | 22.8 | 70 | 6.3 |
| Wife of head | 249 | 13.7 | 184 | 26.0 | 65 | 5.9 |
| Other | 129 | 7.1 | 84 | 11.8 | 45 | 4.1 |

34

Table 6. Numerical and percent distribution of private household workers (except babysitters with no housekeeping duties) by race, sex, household status and age, United States, South and non-South, May 1971 (Concluded)

(Numbers in thousands)

| Characteristic | United States | | South | | Non-South | |
|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent |
| **Age** | | | | | | |
| Under 16 years | 295 | 16.3 | 58 | 8.2 | 237 | 21.4 |
| 16-19 years | 296 | 16.3 | 64 | 9.0 | 232 | 21.0 |
| 20 years and over | 1,223 | 67.4 | 587 | 82.8 | 636 | 57.5 |
| 20-44 years | 431 | 23.7 | 200 | 28.2 | 231 | 20.9 |
| 45-64 years | 616 | 33.9 | 315 | 44.4 | 300 | 27.1 |
| 65 years and over | 177 | 9.8 | 72 | 10.2 | 105 | 9.5 |

35

Note: Data are preliminary. Due to rounding, details may not add to totals.

Source: Survey conducted by the Bureau of the Census for the Employment Standards Administration.

Table 7. Numerical and percent distribution of babysitters with no housekeeping duties by race, sex, household status and age, United States, South and non-South, May 1971

(Numbers in thousands)

| Characteristic | United States | | South | | Non-South | |
|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent |
| Total | 561 | 100.0 | 104 | 100.0 | 458 | 100.0 |
| **Race, sex and household status** | | | | | | |
| White | 539 | 96.1 | 96 | 92.3 | 443 | 96.7 |
| Male | 31 | 5.5 | 3 | 2.9 | 28 | 6.1 |
| Head of household | 2 | .4 | - | - | 2 | .4 |
| Other | 29 | 5.2 | 3 | 2.9 | 27 | 5.9 |
| Female | 508 | 90.6 | 93 | 89.4 | 415 | 90.6 |
| Head of household | 26 | 4.6 | 6 | 5.8 | 20 | 4.4 |
| Wife of head | 45 | 8.0 | 6 | 5.8 | 39 | 8.5 |
| Other | 437 | 77.9 | 81 | 77.9 | 356 | 77.7 |
| Negro and other races | 22 | 3.9 | 8 | 7.7 | 15 | 3.3 |
| Male | - | - | - | - | - | - |
| Head of household | - | - | - | - | - | - |
| Other | - | - | - | - | - | - |
| Female | 22 | 3.9 | 8 | 7.7 | 15 | 3.3 |
| Head of household | 9 | 1.6 | 4 | 3.8 | 4 | .9 |
| Wife of head | 4 | .7 | 1 | 1.0 | 2 | .4 |
| Other | 10 | 1.8 | 2 | 1.9 | 8 | 1.7 |

36

Table 7. Numerical and percent distribution of babysitters with no housekeeping duties by race, sex, household status and age, United States, South and non-South, May 1971 (Concluded)

(Numbers in thousands)

| Characteristic | United States | | South | | Non-South | |
|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent |
| **Age** | | | | | | |
| Under 16 years | 278 | 49.6 | | | | |
| 16-19 years | 185 | 33.0 | (Data not available) | | | |
| 20 years and over | 98 | 17.5 | | | | |
| 20-44 years | 57 | 10.2 | | | | |
| 45-64 years | 24 | 4.3 | | | | |
| 65 years and over | 17 | 3.0 | | | | |

37

Note: Data are preliminary. Due to rounding, details may not add to totals.
      Dash (-) indicates no workers reported.

Source: Survey conducted by the Bureau of the Census for the Employment Standards Administration.

Table 8. Average hourly earnings of private household workers by occupational group, race, sex, household status and age, United States, South and non-South, May 1971

| Characteristic | Private household workers | | | |
| | Except babysitters with no housekeeping duties | | | Babysitters with no housekeeping duties |
| | United States | South | Non-South | United States |
|---|---|---|---|---|
| Total | $1.34 | $1.21 | $1.42 | $ .72 |
| **Race, sex and household status** | | | | |
| White | 1.32 | 1.25 | 1.35 | .72 |
| Male | 1.65 | 1.82 | 1.60 | NA |
| Female | 1.16 | .93 | 1.21 | NA |
| Head of household | 1.34 | .99 | 1.46 | NA |
| Wife of head | 1.60 | 1.10 | 1.77 | NA |
| Other | .86 | .76 | .87 | NA |
| Negro and other races | 1.36 | 1.19 | 1.75 | .63 |
| Male | 1.47 | 1.40 | 1.62 | NA |
| Female | 1.35 | 1.17 | 1.77 | NA |
| Head of household | 1.33 | 1.18 | 1.69 | NA |
| Wife of head | 1.43 | 1.17 | 2.16 | NA |
| Other | 1.22 | 1.17 | 1.30 | NA |

38

Table 8. Average hourly earnings of private household workers by occupational group, race, sex, household status and age, United States, South and non-South, May 1971 (Concluded)

| Characteristic | Private household workers | | | |
|---|---|---|---|---|
| | Except babysitters with no housekeeping duties | | | Babysitters with no housekeeping duties |
| | United States | South | Non-South | United States |
| **Age** | | | | |
| Under 16 years | $1.15 | $1.37 | $1.10 | $ .71 |
| 16 years and over | 1.37 | 1.20 | 1.51 | .73 |
| 16-19 years | 1.22 | 1.36 | 1.19 | .76 |
| 20 years and over | 1.41 | 1.18 | 1.62 | .67 |
| 20-44 years | 1.54 | 1.34 | 1.70 | .65 |
| 45-64 years | 1.37 | 1.10 | 1.65 | .56 |
| 65 years and over | 1.22 | 1.03 | 1.35 | .88 |

39

Note: Data are preliminary.

NA - Not available.

Source: Survey conducted by the Bureau of the Census for the Employment Standards Administration.

Table 9.  Percent of private household workers (except babysitters with no housekeeping duties) paid less than specified hourly rates by race, sex and age, United States, South and non-South, May 1971

| Characteristic | Percent paid cash wages below [1] | | | | Percent with earnings not reported |
| | $ .70 an hour | $1.00 an hour | $1.50 an hour | $2.00 an hour | |
|---|---|---|---|---|---|
| | United States | | | | |
| Total | 31.1 | 48.2 | 67.7 | 87.3 | 2.1 |
| Race and sex | | | | | |
| White | 33.9 | 50.0 | 67.5 | 85.5 | 1.9 |
| Male | 14.2 | 32.8 | 52.6 | 76.2 | 3.2 |
| Female | 44.1 | 58.9 | 75.2 | 90.2 | 1.1 |
| Negro and other races [2] | 26.2 | 45.1 | 68.0 | 86.6 | 2.5 |
| Female | 27.7 | 46.5 | 69.2 | 87.1 | 2.2 |
| Age | | | | | |
| Under 16 years | 39.5 | 60.5 | 77.0 | 87.5 | 2.9 |
| 16-19 years | 40.7 | 57.6 | 70.9 | 88.5 | 1.6 |
| 20 years and over | 26.7 | 43.0 | 64.7 | 84.8 | 2.0 |
| 20-44 years | 25.9 | 42.1 | 60.9 | 80.5 | 1.7 |
| 45-64 years | 26.9 | 42.5 | 64.7 | 85.6 | 2.8 |
| 65 years and over | 27.7 | 47.0 | 74.1 | 92.7 | - |

See footnotes at end of table.

Table 9. Percent of private household workers (except babysitters with no housekeeping duties) paid less than specified hourly rates by race, sex and age, United States, South and non-South, May 1971 (Continued)

| Characteristic | Percent paid cash wages below [1] | | | | Percent with earnings not reported |
|---|---|---|---|---|---|
| | $ .70 an hour | $1.00 an hour | $1.50 an hour | $2.00 an hour | |
| | | | South | | |
| Total | 31.5 | 55.7 | 77.6 | 89.7 | 2.1 |
| Race and sex | | | | | |
| White [2] | 31.1 | 52.8 | 72.1 | 85.1 | 1.9 |
| Female | 42.7 | 68.7 | 88.4 | 95.2 | 1.0 |
| Negro and other races [2] | 31.7 | 57.3 | 80.4 | 92.1 | 2.2 |
| Female | 34.0 | 59.0 | 81.8 | 92.3 | 2.1 |
| Age [2] | | | | | |
| 20 years and over | 31.6 | 56.2 | 80.4 | 91.9 | 1.8 |
| 20-44 years | 28.3 | 52.5 | 75.8 | 88.2 | 1.5 |
| 45-64 years | 34.0 | 56.9 | 81.7 | 93.3 | 2.4 |

See footnotes at end of table.

Table 9.  Percent of private household workers (except babysitters with no housekeeping duties) paid less than specified hourly ratesby race, sex and age, United States, South and non-South, May 1971 (Concluded)

| Characteristic | Percent paid cash wages below 1/ | | | | Percent with earnings not reported |
|---|---|---|---|---|---|
| | $ .70 an hour | $1.00 an hour | $1.50 an hour | $2.00 an hour | |
| | Non-South | | | | |
| Total | 30.8 | 43.4 | 61.4 | 83.4 | 2.1 |
| Race and sex | | | | | |
| White | 34.6 | 49.3 | 66.3 | 85.5 | 1.8 |
| Male | 15.3 | 35.3 | 55.4 | 78.9 | 3.1 |
| Female | 44.4 | 56.4 | 71.9 | 88.9 | 1.2 |
| Negro and other races 2/ | 13.1 | 16.3 | 38.7 | 73.5 | 3.1 |
| Female | 12.8 | 16.3 | 39.0 | 74.5 | 2.5 |
| Age | | | | | |
| Under 16 years | 42.8 | 63.5 | 80.5 | 90.0 | 2.3 |
| 16-19 years | 42.3 | 57.4 | 72.3 | 90.5 | 1.4 |
| 20 years and over | 22.1 | 30.8 | 50.3 | 78.3 | 2.2 |
| 20-44 years | 23.7 | 33.0 | 48.0 | 73.9 | 1.8 |
| 45-64 years | 19.6 | 27.5 | 46.8 | 77.5 | 3.3 |
| 65 years and over | 25.9 | 35.6 | 65.3 | 90.4 | - |

1/ Employees who were employed during the survey week at varying hourly rates were tabulated on the basis of their lowest rate during the week.
2/ Insufficient data to warrant presentation of greater detail.

Note: Data are preliminary.  Dash (-) indicates no workers.

Source:  Survey conducted by the Bureau of the Census for the Employment Standards Administration.

42

Table 10.  Percent of _female_ private household workers (except babysitters with no housekeeping
duties) paid less than specified hourly rates by household status and race,
United States, South and non-South, May 1971

| Household status and race | Percent paid cash wages below [1] | | | | Percent with earnings not reported |
|---|---|---|---|---|---|
| | $ .70 an hour | $1.00 an hour | $1.50 an hour | $2.00 an hour | |
| | | | United States | | |
| Head of household | 27.8 | 44.8 | 68.2 | 89.1 | 2.3 |
| White | 26.0 | 44.8 | 64.6 | 92.1 | - |
| Negro and other races | 29.1 | 44.8 | 70.8 | 86.9 | 3.9 |
| Wife of head | 19.7 | 36.2 | 60.8 | 82.8 | 1.6 |
| White | 17.9 | 28.3 | 54.2 | 77.2 | 2.9 |
| Negro and other races | 21.0 | 42.5 | 66.0 | 87.2 | .6 |
| Other | 58.2 | 74.6 | 86.0 | 93.7 | 1.1 |
| White | 64.8 | 80.4 | 90.3 | 95.9 | .7 |
| Negro and other races | 38.1 | 57.1 | 72.7 | 87.0 | 2.4 |
| | | | South | | |
| Head of household 2/ | 39.2 | 60.3 | 83.7 | 91.0 | 3.7 |
| Negro and other races | 38.8 | 57.9 | 82.2 | 90.5 | 4.7 |
| Wife of head 2/ | 25.0 | 54.1 | 79.8 | 93.8 | .7 |
| Negro and other races | 26.0 | 55.1 | 79.8 | 94.5 | - |
| Other 2/ | 50.2 | 75.4 | 89.3 | 94.8 | 1.0 |

43

See footnotes at end of table.

Table 10. Percent of _female_ private household workers (except babysitters with no housekeeping duties) paid less than specified hourly rates by household status and race, United States, South and non-South, May 1971
(Concluded)

| Household status and race | Percent paid cash wages below [1] | | | | Percent with earnings not reported |
|---|---|---|---|---|---|
| | $ .70 an hour | $1.00 an hour | $1.50 an hour | $2.00 an hour | |
| | | | Non-South | | |
| Head of household 2/ | 15.8 | 28.5 | 51.8 | 87.1 | 0.8 |
| White | 21.0 | 36.4 | 56.1 | 91.9 | - |
| Wife of head 2/ | 13.8 | 16.6 | 39.9 | 70.6 | 2.7 |
| White | 16.9 | 20.8 | 45.7 | 72.4 | 2.9 |
| Other 2/ | 61.4 | 74.3 | 84.7 | 93.3 | 1.2 |
| White | 65.5 | 79.9 | 89.5 | 95.2 | .8 |

1/ Employees who were employed during the survey week at varying hourly rates were tabulated on the basis of their lowest rate during the week.

2/ Insufficient data to warrant presentation of greater detail.

Note: Data are preliminary. Dash (-) indicates no workers.

Source: Survey conducted by the Bureau of the Census for the Employment Standards Administration.

Table 11. Percent of babysitters with no housekeeping duties paid less than specified hourly rates by race and age, United States, May 1971

| Characteristic | Percent paid cash wages below 1/ | | | | Percent with earnings not reported |
|---|---|---|---|---|---|
| | $.70 an hour | $.80 an hour | $.90 an hour | $1.00 an hour | |
| Total | 71.9 | 77.3 | 77.8 | 91.7 | 1.5 |
| Race 2/ | | | | | |
| White | 72.1 | 77.4 | 78.0 | 91.6 | 1.5 |
| Age | | | | | |
| Under 16 years | 76.2 | 81.7 | 82.2 | 92.5 | 1.3 |
| 16-19 years | 69.5 | 74.9 | 75.8 | 92.6 | 1.8 |
| 20 years and over 2/ | 62.2 | 67.3 | 67.3 | 87.8 | 2.0 |

1/ Employees who were employed during the survey week at varying hourly rates were tabulated on the basis of their lowest rate during the week.

2/ Insufficient data to warrant presentation of greater detail.

Note: Data are preliminary.

Source: Survey conducted by the Bureau of the Census for the Employment Standards Administration.

45

Table 12. Percent increase in the weekly wage bill required to raise the wages of private household workers paid less than specified minimum hourly wage rates to those rates, by occupational group, United States, South and non-South, May 1971

| Specified hourly rate | United States | | | South | | | Non-South | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Private household workers | | | Private household workers | | | Private household workers | |
| | Total | Except baby-sitters with no house-keeping duties | Baby-sitters with no house-keeping duties | Total | Except baby-sitters with no house-keeping duties | Baby-sitters with no house-keeping duties | Total | Except baby-sitters with no house-keeping duties | Baby-sitters with no house-keeping duties |
| $1.00 | 19 | 16 | 62 | 19 | 17 | 52 | 20 | 15 | 65 |
| 1.10 | 24 | 20 | 77 | 24 | 23 | 64 | 25 | 18 | 80 |
| 1.20 | 30 | 25 | 92 | 31 | 29 | 76 | 29 | 22 | 96 |
| 1.30 | 36 | 30 | 107 | 37 | 35 | 89 | 34 | 26 | 111 |
| 1.40 | 42 | 35 | 121 | 45 | 42 | 101 | 40 | 30 | 127 |
| 1.50 | 48 | 41 | 136 | 52 | 50 | 113 | 45 | 35 | 142 |
| 1.60 | 55 | 47 | 152 | 60 | 58 | 127 | 51 | 39 | 158 |
| 1.70 | 62 | 53 | 167 | 69 | 66 | 141 | 58 | 45 | 174 |
| 1.80 | 69 | 60 | 182 | 77 | 74 | 155 | 64 | 50 | 189 |
| 1.90 | 77 | 67 | 198 | 86 | 82 | 169 | 71 | 56 | 205 |
| 2.00 | 84 | 74 | 213 | 94 | 91 | 183 | 78 | 62 | 221 |
| Percent of workers not reported | 3 | 3 | 8 | 2 | 2 | 12 | 3 | 3 | 7 |

Note: Data are preliminary. The percent of wage impact is calculated by dividing the wage increase required to raise the wages of employees paid less than specified rates to those rates by the total wage bill of all employees before the change. For employees who worked in more than one household during the survey week at varying hourly earnings rates, the wage impact was calculated on the basis of the actual number of hours worked at each rate.

Source: Survey conducted by the Bureau of the Census for the Employment Standards Administration.

96

Table 13. Percent distribution of private household workers (except babysitters with no housekeeping duties) by weekly hours of work, by race, sex and age, United States, South and non-South, May 1971

| Characteristic | Percent working weekly hours of- | | | | Percent with hours not reported |
|---|---|---|---|---|---|
| | Under 15 | 15 and under 35 | 35 through 40 | Over 40 | |
| **United States** | | | | | |
| Total | 52.9 | 23.9 | 11.8 | 9.0 | 2.0 |
| Race and sex | | | | | |
| White | 62.2 | 18.7 | 8.2 | 9.3 | 1.4 |
| Male | 86.0 | 8.0 | 2.5 | 2.5 | .8 |
| Female | 49.9 | 24.1 | 11.1 | 13.8 | 1.7 |
| Negro and other races 1/ | 37.0 | 33.0 | 18.1 | 8.4 | 3.1 |
| Female | 34.7 | 34.8 | 18.7 | 8.8 | 2.7 |
| Age | | | | | |
| Under 16 years | 89.8 | 6.6 | 1.0 | .9 | 1.5 |
| 16-19 years | 81.2 | 9.5 | 4.2 | 4.3 | .4 |
| 20 years and over | 37.2 | 31.6 | 16.3 | 12.1 | 2.5 |
| 20-44 years | 38.6 | 29.7 | 18.8 | 12.0 | .6 |
| 45-64 years | 35.4 | 33.5 | 16.3 | 10.5 | 3.9 |
| 65 years and over | 39.9 | 29.6 | 10.2 | 17.5 | 2.4 |

See footnote at end of table.

Table 13. Percent distribution of private household workers (except babysitters with no
housekeeping duties) by weekly hours of work, by race, sex and age,
United States, South and non-South, May 1971 (Continued)

| Characteristic | Percent working weekly hours of- | | | | Percent with hours not reported |
| | Under 15 | 15 and under 35 | 35 through 40 | Over 40 | |
|---|---|---|---|---|---|
| | | | South | | |
| Total | 42.5 | 28.2 | 14.9 | 11.9 | 2.1 |
| Race and sex | | | | | |
| White 1/ | 52.3 | 19.6 | 9.0 | 16.3 | 2.5 |
| Female | 33.7 | 28.7 | 11.9 | 22.5 | 2.8 |
| Negro and other races 1/ | 37.5 | 32.6 | 17.9 | 9.8 | 1.9 |
| Female | 34.8 | 34.9 | 17.9 | 10.2 | 1.8 |
| Age 1/ | | | | | |
| 20 years and over | 34.7 | 33.2 | 17.2 | 12.7 | 1.8 |
| 20-44 years | 34.2 | 37.0 | 16.2 | 12.4 | - |
| 45-64 years | 31.7 | 33.4 | 18.8 | 12.3 | 3.5 |

See footnote at end of table.

48

Table 13. Percent distribution of private household workers (except babysitters with no
housekeeping duties) by weekly hours of work, by race, sex and age,
United States, South and non-South, May 1971 (Concluded)

| Characteristic | Percent working weekly hours of- | | | | Percent with hours not reported |
|---|---|---|---|---|---|
| | Under 15 | 15 and under 35 | 35 through 40 | Over 40 | |
| | | | Non-South | | |
| Total | 59.6 | 21.2 | 9.9 | 7.1 | 1.9 |
| Race and sex | | | | | |
| White | 64.8 | 18.4 | 8.0 | 7.4 | 1.1 |
| Male | 86.0 | 9.3 | 2.1 | 1.8 | .5 |
| Female | 54.1 | 23.0 | 10.9 | 10.3 | 1.4 |
| Negro and other races 1/ | 35.8 | 33.9 | 18.7 | 5.4 | 5.9 |
| Female | 34.4 | 34.6 | 20.6 | 5.2 | 4.9 |
| Age | | | | | |
| Under 16 years | 89.7 | 7.7 | 1.2 | .5 | .6 |
| 16-19 years | 84.1 | 10.5 | 3.4 | 1.9 | - |
| 20 years and over | 39.5 | 30.1 | 15.5 | 11.4 | 3.2 |
| 20-44 years | 42.4 | 23.4 | 21.1 | 12.6 | 1.1 |
| 45-64 years | 39.2 | 33.6 | 13.7 | 8.8 | 4.4 |
| 65 years and over | 33.5 | 35.2 | 8.3 | 18.7 | 4.1 |

1/ Insufficient data to warrant presentation of greater detail.

Note: Data are preliminary. Dash (-) indicates no workers.

Source: Survey conducted by the Bureau of the Census for the Employment Standards Administration.

69

Table 14. Percent distribution of female private household workers (except babysitters with no housekeeping duties) by weekly hours of work, by household status, United States, South and non-South, May 1971

| Household status and race | Percent working weekly hours of - | | | | Percent with hours not reported |
|---|---|---|---|---|---|
| | Under 15 | 15 and under 35 | 35 through 40 | Over 40 | |
| United States | | | | | |
| Head of household | 35.5 | 33.3 | 15.7 | 12.4 | 2.8 |
| White | 34.1 | 34.2 | 11.8 | 17.0 | 2.6 |
| Negro and other races | 36.5 | 32.7 | 18.6 | 9.1 | 3.0 |
| Wife of head | 43.5 | 38.0 | 12.7 | 4.4 | 1.2 |
| White | 50.5 | 36.6 | 9.1 | 2.8 | .7 |
| Negro and other races | 37.9 | 39.1 | 15.6 | 5.6 | 1.5 |
| Other | 48.7 | 17.8 | 15.1 | 15.6 | 2.5 |
| White | 56.3 | 13.6 | 11.9 | 16.0 | 1.8 |
| Negro and other races | 25.5 | 30.5 | 24.9 | 10.3 | 4.6 |

50

Table 14. Percent distribution of _female_ private household workers (except babysitters with no housekeeping duties) by weekly hours of work, by household status, United States, South and non-South, May 1971 (Continued)

| Household status and race | Percent working weekly hours of - | | | | Percent with hours not reported |
| --- | --- | --- | --- | --- | --- |
| | Under 15 | 15 and under 35 | 35 through 40 | Over 40 | |
| South | | | | | |
| Head of household 1/ | 31.7 | 31.8 | 16.9 | 15.3 | 4.0 |
| Negro and other races | 35.4 | 31.1 | 17.7 | 12.1 | 3.3 |
| Wife of head 1/ | 36.1 | 40.7 | 15.7 | 6.8 | .4 |
| Negro and other races | 35.3 | 40.5 | 17.0 | 6.3 | .6 |
| Other 1/ | 36.1 | 23.4 | 16.4 | 21.8 | 2.0 |

See footnote at end of table.

51

Table 14. Percent distribution of <u>female</u> private household workers (except babysitters with no housekeeping duties) by weekly hours of work, by household status, United States, South and non-South, May 1971 (Concluded)

| Household status and race | Percent working weekly hours of - | | | | Percent with hours not reported |
|---|---|---|---|---|---|
| | Under 15 | 15 and under 35 | 35 through 40 | Over 40 | |
| Non-South | | | | | |
| Head of household 1/ | 39.4 | 34.9 | 14.5 | 9.4 | 1.5 |
| White | 39.8 | 34.1 | 11.1 | 13.6 | 1.2 |
| Wife of head 1/ | 51.6 | 35.1 | 9.4 | 1.8 | 2.0 |
| White | 54.5 | 35.0 | 8.4 | .9 | 1.0 |
| Other 1/ | 53.7 | 15.6 | 14.6 | 13.1 | 2.7 |
| White | 59.3 | 13.4 | 12.0 | 13.3 | 1.7 |

1/ Insufficient data to warrant presentation of greater detail.

Note: Data are preliminary.

Source: Survey conducted by the Bureau of the Census for the Employment Standards Administration.

52

Table 15. Percent distribution of babysitters with no housekeeping duties by weekly
hours of work, by race and age, United States, May 1971

| Item | Percent working weekly hours of- | | | | Percent with hours not reported |
|---|---|---|---|---|---|
| | Under 15 | 15 and under 35 | 35 through 40 | Over 40 | |
| Total | 83.9 | 10.9 | 2.2 | 2.5 | 0.3 |
| Race 1/<br>White | 85.0 | 10.2 | 2.2 | 2.4 | .4 |
| Age<br>Under 16 years<br>16-19 years<br>20 years and over 1/ | 90.6<br>93.0<br>48.0 | 8.6<br>5.4<br>28.6 | -<br>1.6<br>10.2 | -<br>-<br>15.3 | .7<br>-<br>- |

1/ Insufficient data to warrant presentation of greater detail.

Note: Data are preliminary. Dash (-) indicates no workers reported.

Source: Survey conducted by the Bureau of the Census for the Employment Standards Administration.

This Chapter reviews several recent attempts to provide
empirical answers to questions raised by government regulation
of hours and wages. Because of the extensive research into
this issue, this Chapter limits itself to those studies
which were published in scholarly sources during 1971 and
1972. 2/ Naturally this excludes many important studies.

The analysis of Federal wage and hour legislation is a multi-
faceted issue involving such questions as whether minimum wage in-
creases raise the income of the poor, whether these increases
reduce employment or retard its growth, whether increases in the
minimum wage create pressures for wage increases among workers
earning higher wages, whether maximum hours standards create new
jobs, and whether minimum wage increases or extensions of coverage
generate upward price movements. Careful empirical analysis is
needed to determine not only whether a particular effect exists but
also how large that effect is. In the following pages, the attempts
of various researchers to obtain answers to some of these issues are
reported. Of course, all the effects--both beneficial and harmful--
of the Fair Labor Standards Act must be studied and measured.

The first section summarizes two studies on the impact of minimum
wage legislation in the agricultural sector. The second summarizes
three studies which attempt to isolate the effect of minimum wage laws
on youth. The third and fourth sections treat in succession the over-
time provision and the implications of extending coverage to the
domestic service industry. The final section reviews some miscellaneous
studies relevant to government regulation of hours and wages.

---

1/ This Chapter provides an abbreviated summary of recent research
in this area. It is not meant to be an endorsement of either the
research methods used or the conclusions reached and no state-
ment in this chapter should be interpreted as representing Depart-
ment of Labor policy.

2/ Two exceptions were made to this rule. The Hashimoto and
Mincer study, which will be published early in 1973, was included
because of its direct relevance to the other two studies on youth.
The Mattila study, although yet unpublished, was included because
it was specially commissioned by the Department of Labor.

## Impact on Agricultural Workers

The 1966 amendments to the Fair Labor Standards Act extended coverage of the minimum wage provision to certain farmworkers. This section reviews two recent studies of the impact of this change on the agricultural economy.

### Lianos

Lianos / 10 / attempted to estimate the demand for agricultural labor over the period 1950 through 1969 and to determine what factors influence that demand. In particular, he tried to learn whether there was a shift in demand in 1966 in anticipation of the agricultural minimum wage. For this purpose, he experimented with three different theories of demand. The statistical analysis was limited to selected southern states because the overwhelming majority of farmworkers affected by the minimum wage lived in that area.

He concluded that the agricultural minimum wage reduced employment on southern farms. These results are statistically significant whether the analysis is conducted in terms of total farm employment or the employment of hired farmworkers.

The difference between total employment and hired workers is the number of family workers. Lianos conducted his analysis in terms of both variables because he believed that the phrasing of the man-day test encourages farmers to substitute the labor of family members for that of hired labor. 1/ Such substitution might remove a farm and all of its workers from FLSA coverage. Moveover, family workers can be paid less than the minimum wage and thus less than hired workers. His results which indicate that the minimum wage affected total employment suggest that this substitution did not ameliorate the employment impact of minimum wage coverage. The author was unable to determine how much substitution occurred in an effort to circumvent the man-day test.

### Gardner

Gardner / 6 / attempted to determine whether extending coverage to agriculture affected the level of employment and wages in agriculture. In addition, he investigated the impact of changes in the nonagricultural minimum wage on employment and earnings in agriculture. Prior to 1967, agriculture was a noncovered sector.

---

1/ For farmworkers to be covered by the FLSA they must work on farms that employed more than 500 man-days of hired labor during any quarter of the preceding calendar year. Neither family workers nor local hand harvest workers paid on a piece rate basis, who were employed in agriculture for less than 13 weeks during the preceding calendar year, are included in computing the number of man-days of employment.

Gardner hypothesized that an increase in the nonagricultural minimum wage would reduce nonagricultural employment, causing the displaced to seek work in agriculture. This could result in lower agricultural wages and higher agricultural employment.

The results indicate that extending coverage to agriculture raised the wage level in agriculture and diminished agricultural employment. An attempt was made to compare the gains and losses. Estimates by Gardner suggest that the percentage increase in wages was less than the percentage decline in employment, that is, the total farm wage income was reduced. There was no statistically significant effect on either agricultural employment or wages from changes in the nonagricultural minimum wage. Gardner interpreted this as an indication that other sectors served to absorb displacement.

## Impact on Youth

There are two reasons for studying the impact of the Fair Labor Standards Act on youth separately from its effects on the total labor force. Youth have special labor force problems which the FLSA could either ease or complicate. These include high unemployment rates, the need to find jobs compatible with school attendance, and the difficulty of establishing a full-time work career upon leaving school. Secondly, some researchers believe that, if minimum wage laws do reduce employment, this effect will be heavily concentrated among teenagers.

### Moore

Moore / 12 / tried to measure how much impact increases in the minimum wage have on teenage unemployment rates. In his study four subgroups of the teenage population were analyzed separately: males 16-19, females 16-19, whites 16-19, and nonwhites 16-19. In all four cases Moore observed that increases in either the level or the coverage of the minimum wage lead to increases in the unemployment rate.

His results also suggest that a higher minimum and increased coverage adversely affect not only the unskilled and inexperienced but also those who suffer from discrimination in the labor market. The percentage point increase in the unemployment rate corresponding to an increase in either the level or the coverage of the minimum wage was higher for nonwhites than for whites and for females than for males.

When the same analysis was applied to males 20-24, it was found that the level of the minimum wage does not seem to have any impact on the unemployment rate while an increase in coverage is associated with a reduction in the unemployment rate for this group.

### Hashimoto and Mincer

Hashimoto and Mincer $\overline{/ \overline{7} /}$ divided the labor force into 10 groups: white teenagers (16-19), nonwhite teenagers (16-19), white males (20-24), nonwhite males (20-24), white males (25-64), nonwhite males (25-64), white males (65 +), nonwhite males (65 +), white females (20 +), nonwhite females (20 +). For each group, they estimate how minimum wage changes affect the ratio of both employment and labor force to the population of that group. Using these estimates, they calculate the impact on the unemployment rate for each group.

The empirical results indicate that a higher minimum wage or expanded coverage lead to reduced labor force participation for both white and nonwhite teenagers. The reduction for nonwhites is greater than that for whites. There are indications of reduced employment for both white and nonwhite teenagers. The impact on nonwhites is larger but only the impact on whites is statistically significant. 1/ The calculated unemployment effect for both groups indicates that an increase in the minimum wage leads to an increase in the unemployment rate.

For males (20-24) the results are similar. Increased minimum wages have a detrimental impact on labor force participation and the employment to population ratio for both whites and nonwhites. Again the impact on nonwhites is greater than on whites. The calculated unemployment rate shows an adverse effect on both groups.

It is somewhat surprising to see that a higher minimum wage results in a lower participation rate for all four groups. Hashimoto and Mincer believe these results to be reasonable on theoretical grounds. They suggest that the added difficulty of finding employment more than offsets the lure of higher wages. As a result of minimum wage increases they believe that teenagers and young men experience greater job finding problems and react to those problems by withdrawing from the market.

For males (25-64) changes in the minimum wage have no statistically significant effect. For white males (65 +) and white females (20 +), higher minimum wages lead to a reduced labor

---

1/ At the 0.05 level.

58

force and lower employment. There are no other statistically
significant results among the remaining groups.

Besides calculating the unemployment rate effect,
Hashimoto and Mincer also tried to observe this effect directly.
Unlike Moore, they were unable to find statistically significant
unemployment rate effects for teenagers. The most striking
difference between their approach and that of Moore is the in-
clusion by Hashimoto and Mincer of a time-trend variable to ex-
plain fluctuations in the unemployment rate. From the late 1950's
the teenage population grew sharply as a result of the post-
World War II baby boom. The time trend variable would adjust to
some extent for the impact of this demographic change on teenage
unemployment experience. Moore experimented with a time trend
variable for the non-white teenager group and noted that its
inclusion would not have altered his results significantly for
that particular group. However, he does not report similar
experimentation in the case of the other groups.

### Kosters and Welch

A different analytical technique was developed in a third
study (Kosters and Welch / 8 /). The previous studies focused on
whether changes in the minimum wage affect the level of employ-
ment or unemployment. In order to make this determination, it
was necessary to identify all the other factors which affect
employment and unemployment and remove their influence. To avoid
this difficulty, Kosters and Welch restrict their attention to how
employment changes are accomplished rather than trying to explain
why the employment changes occur. Their technique is based on the
distinction between the trend growth and cyclical changes in
employment. As the nation's population grows and its economy
expands, employment should increase in a smooth fashion, that is,
at a steady rate. This pattern of constant growth is frequently
interrupted by shifts in business activity and other factors.
Statisticians describe this phenomenon as cyclical fluctuations
around a persistent trend.

Kosters and Welch were interested in learning first,
whether these cyclical fluctuations have a more pronounced impact
on certain groups within the labor force, and secondly, whether this
pattern of impact has been affected by minimum wage legislation.
In their terminology the trend is referred to as normal employment
and the cyclical fluctuations as transitional employment. Ten
groups were studied: adults (20 +), teenagers (16-19), adult white
males, adult white females, adult nonwhite males, adult nonwhite
females, teenage white males, teenage white females, teenage non-
white males, and teenage nonwhite females.

A simple description of this perspective is that firms divide their workers into two categories according to their value to the firm. Those with special skills or extensive work experience will be carefully hoarded because they are difficult to replace. Those with few skills and little experience will be let go whenever demand slackens because they can easily be replaced once business improves.

Kosters and Welch found that teenagers participate in transitional employment out of proportion to their parti- cipation in the labor force and that they are underrepresented in normal employment growth. An identical conclusion holds for any subgroup of teenagers. The opposite results were obtained for all adult subgroups except nonwhite males whose share in transitional employment is larger than their share in normal employment. Kosters and Welch also found that increases in the minimum wage (either a higher level or greater coverage) further reduce the teenage share of normal employment and increase the teenage share of transitional employment. This is true for each race-sex subgroup. The impact on adults is less clear. The adult white male share of both normal employment and transitional employment increases with increases in the minimum wage. The adult white female share of normal employment also increases; but the behavior of that group's share of transitional employment shows no clear change. There were no statistically significant changes in the shares of either adult nonwhite males or adult nonwhite females.

An interesting feature of the Kosters and Welch study is the contrast between the detrimental employment impact on teenagers and the favorable effects experienced by certain adult groups. The favorable impact observed for adult white males and adult white females must be interpreted within the analytical framework used by Kosters and Welch. The emphasis on shifting employment shares assumes a tradeoff, i.e., that there will be both gainers and losers in terms of employment shares. Therefore, it is only natural that the loss suffered in the teenagers' share will be offset by gains in the share of some adult groups. Whether adults are better off in terms of number of jobs held depends also on whether the absolute level of normal employment has increased, remained constant, or decreased. If minimum wage increases reduce the absolute level of employment, it is possible that adults could have fewer "normal employment" jobs even though their share of such jobs has increased.

* * * * *

The results reported above focus on a possible detrimental effect of minimum wage legislation--the reduction of youth employment opportunities. The authors of these three studies were concerned primarily with measuring this impact and therefore did not investigate possible beneficial effects. For example, no attempt was made to determine, as Gardner had done with regard to agriculture, whether the increase in wages would lead to higher youth income despite the decline in employment opportunities.

Unfortunately, it was not possible to review earlier work on these questions. For a listing and brief description of most of the previous research, the reader should consult (1) Chapter II of Youth Unemployment and Minimum Wages / 14 / and (2) Juanita Krep's "Youth Unemployment and Minimum Wages: Some Further Questions" / 9 /. In general, there is less unanimity among the earlier studies.

The Department's own study / 14 /, published in 1970, found mixed results as regards the effects of minimum wage legislation. There was statistically significant evidence that minimum wage increases are associated with higher employment among nonwhite males 18-19, but lower employment for certain classes of white teenagers. The only statistically significant unemployment results were for nonwhite males where the evidence indicated that lower unemployment ratios are associated with minimum wage increases.

## Impact of the Overtime Premium

One objective of Federal maximum hours legislation is to expand
employment opportunities. By increasing the cost of overtime work,
maximum hours legislation may induce employers to hire more workers
and reduce the number of hours in the average workweek. Recent
research by Ehrenberg / 3, 4, 5 / investigates whether the overtime
premium actually has this effect.

### Ehrenberg

Ehrenberg believes that there may be certain incentives
which encourage employers to work their present labor force longer
hours on a regular basis rather than hire new workers. New workers
must be trained and this implies an initial period of low productivity
plus special training costs. Moreover, many labor costs are unrelated
to the number of hours worked. These often include most of the
standard fringe benefits: holidays, paid vacations, insurance plans,
pensions, etc. The extra costs of working several existing employees
overtime may be less than the fixed costs involved in hiring a new
worker.

By analyzing firm behavior within 24 industries, Ehrenberg
tested whether the ratio of fixed-labor-costs relative to the overtime
premium affects employers' decisions regarding overtime and new hires.
In 18 of those industries, there was statistically significant
evidence that as fixed-labor-costs increase relative to premium pay
the average number of overtime hours per man increased.

On the basis of these results Ehrenberg estimated the impact
of changing the premium rate from time-and-a-half to double-time.
Assuming that the reduction in overtime is matched by new employment,
the increase in employment in most industries ranges from 1 to 3
percent. Ehrenberg noted that these estimates were on the high side
because no adjustments were made for the capital-labor substitution
or the decline in product demand which could result from the higher
labor costs. Ehrenberg further qualifies these estimates by noting
that technical constraints, particularly in manufacturing industries,
may cause many firms not to adjust their employment level immediately.

### Impact on the Domestic Service Industry

One of the major areas not covered by the Fair Labor Standards
Act is the domestic service industry. Naturally any extension of
coverage to this sector will require the careful consideration of
many factors. Two of these are the potential effects on employment
and the potential effects on income. A recent study by Mattila
investigated these questions.

## Mattila

Mattila $\boxed{11}$ attempted to quantify the impact on the demand for maids if coverage under the Fair Labor Standards Act is extended to domestic workers. He developed estimates of the demand function for maids using simultaneous regression techniques. These estimates were based on cross-section 1960 data for 40 Standard Metropolitan Statistical Areas (SMSA's). Data for some of the variables utilized were not available for about half of the SMSA's, necessitating the development of estimates.

The demand equation derived indicated that (1) a one percent increase in the wages of maids reduces the number of maids demanded by 2.4 percent, (2) a one percent increase in family income or female labor force participation rates increases demand by a corresponding amount and (3) a one percent increase in the cost of substitutes for maids increases demand by 2.2 percent. The author cautions that these elasticities are based on his own intuitive and theoretical judgments in combination with the information derived from the regressions and are "highly subjective and should be subject to further evaluation."

In order to predict the impact on demand for maids associated with a given minimum wage, it was also necessary to estimate the wage distribution for maids. This was done by adjusting the 1967 wage data for female domestics aged 30-44 obtained in the Longitudinal Labor Market Survey. $\underline{6}/$ (The author concluded that the median hourly wage for maids was approximately $1.40 in 1971.) Using the estimated 1971 wage distribution and the estimated wage elasticity of demand for the South (-1.9), it was predicted that a minimum wage of $1.00 an hour, if put into effect in 1971, would have reduced demand for maids by 7 percent. Minimum wage rates of $1.20, $1.40, $1.60 and $1.80 an hour would have reduced demand by 15, 28, 40, and 55 percent, respectively. With regard to these estimates, the author notes that while the possibility of lay-offs exists "it is more reasonable to suppose that household response to higher costs would lead to a reduction in hours per day and days of work rather than to the more extreme response of firing maids." The predictions were qualified for two reasons. First, the estimates assume that a minimum wage will be compiled with and enforced. Second, the effects of a minimum wage will be eroded over time by inflation, increases in real income, and increased female participation in the labor force.

In summarizing his findings, the author concludes that "if a minimum wage is to be extended to cover domestics, it $\boxed{\text{should}}$ be set initially at relatively low levels and then increased only gradually as in past cases when other low income groups were newly covered."

---

$\underline{1}/$ Center for Human Resource Research, The Ohio State University.

## General Issues

This section will review two unrelated studies. The first attempts to determine whether minimum wage laws have altered the growth rate of employment in nonmetropolitan areas. The second discusses earlier research into the impact of state minimum wage laws.

### Tideman

Wages are generally higher in metropolitan areas than in nonmetropolitan areas. Therefore, the impact of an increase in the minimum wage should be greater in nonmetropolitan areas.

Tideman $\underline{/\ 13\ /}$ tried to measure the employment impact on a nonmetropolitan area. The best data available covered the non-metropolitan sections of New Jersey and Pennsylvania. Tideman found that minimum wage increases, either Federal or State, resulted in statistically significant but minor reductions in employment for these areas.

Because Tideman did not perform a similar analysis for the metropolitan areas of New Jersey and Pennsylvania, it is impossible to determine whether the impact of the minimum wage is relatively stronger in nonmetropolitan areas.

### White and Jones

The White and Jones study $\underline{/\ 15\ /}$ addressed the question of whether state minimum wage laws have an impact on state unemployment rates. In 1969 Campbell and Campbell $\underline{/\ 1\ /}$ had observed that, as a group, states with minimum wage laws have higher unemployment rates than states without such laws. 1/ After considering alternate explanations, Campbell and Campbell had concluded that the observed differences are the results of state minimum wage laws. However, they noted that the impact attributable to state laws alone is relatively minor.

White and Jones questioned the Campbell and Campbell findings. Their main criticism involved the data used. Since there is no series of area unemployment rates comparable to the national series, cross-area comparisons must be based on estimates prepared from unemployment insurance data. White and Jones suggest that the estimation technique may systematically bias these estimates in such a manner that states

---

1/ Their analysis was actually based on the unemployment rate for major local labor markets and not on the unemployment rate for the entire state. Bimonthly data from 1950 to 1965 were analyzed.

with state minimum wage laws appear to have higher unemployment rates
when this is not true. White and Jones mention several factors which
might produce this effect but do not attempt to isolate and measure
the possible bias. A twenty city comparison of the area estimates
based on the unemployment insurance data with local unemployment rates
compiled by the Census Bureau for 1967 and 1968 shows that significant
differences can occur. The authors also call attention to the fact
that when Campbell and Campbell confined their analysis to the years
1950 and 1960 and used Census data, the difference between the two
groups of states narrowed. Campbell and Campbell $/\overline{2}/$ acknowledge
the possible data limitations but maintain that the series is still
useful for this purpose.

White and Jones show that states with state minimum wage laws
actually had a higher rate of employment growth than those without
state minimum wage laws in 9 of the 15 years from 1960-65. The
authors note, however, that they have not adjusted for other factors
besides the existence of state minimum wage laws which could account
for this difference.

# BIBLIOGRAPHY

1. Campbell, Colin D. and Campbell, Rosemary G. "State Minimum Wage Laws as a Cause of Unemployment," Southern Economic Journal, XXXV, (April 1969).

2. _____. Reply to White and Jones, Southern Economic Journal, XXXVII, (January 1971).

3. Ehrenberg, Ronald G. Fringe Benefits and Overtime Behavior, D.C. Heath and Co. (Lexington, Mass. 1971).

4. _____. "Heterogeneous Labor, the Internal Labor Market, and the Dynamics of the Employment-Hours Decision," Journal of Economic Theory, III(1), (March 1971).

5. _____. "The Impact of the Overtime Premium on Employment and Hours in U.S. Industry," Western Economic Journal, IX, (June 1971).

6. Gardner, Bruce. "Minimum Wages and the Farm Labor Market," American Journal of Agricultural Economics, (August 1972).

7. Hashimoto, Masanori and Mincer, Jacob. "Employment and Unemployment Effects of Minimum Wages," The NBER Survey of Research into Poverty Labor Markets, National Bureau of Economic Research (New York, forthcoming).

8. Kosters, Marvin and Welch, Finis. "The Effects of Minimum Wages on the Distribution of Changes in Aggregate Employment," American Economic Review, LXII, (June 1972).

9. Kreps, Juanita. "Youth Unemployment and Minimum Wages: Some Further Questions," Nebraska Journal of Economics and Business, X(1), (Winter 1971).

10. Lianos, Theodore P. "Impact of Minimum Wages Upon the Level and the Composition of Agricultural Employment," American Journal of Agricultural Economics, (August 1972).

11. Mattila, J. Peter. The Impact of Extending Minimum Wages to Private Household Workers, Ohio State University Research Foundation Report, (October 1971).

## Studies In Process

Demographic Characteristics of Nonsupervisory Employees in the Work Clothing Industry - This is a pilot study to test the feasibility of collecting employee characteristics data partly from the employer and, with the employer's assistance, from his employees. The survey field-work has been completed and data are currently being tabulated. The study will provide nationwide data on characteristics such as age, sex, race, education, wage earner status, hourly earnings (for a payroll period in March 1972) and annual earnings of nonsupervisory workers in a low-wage industry. Besides providing a picture of the socio-economic position of these workers, this information will be useful in evaluating the significance of the Federal minimum wage and assessing the potential impact of an increase in the minimum wage on the work force of the work clothing industry.

Wages and Hours of Work in Selected Nonagricultural Industries - This study will yield comparable data for payroll periods in May 1971 and April 1972 on minimum wage and maximum hours standards as they affect employees in selected low-wage manufacturing, retail trade, finance, insurance and real estate, and service industries. For both the May 1971 and the April 1972 surveys, data were collected on hourly earnings, weekly hours of work, aggregate hours, existence of union-management agreements, establishment provisions for premium pay for daily overtime, and scheduled hours per day and days per week. Since the provisions of the FLSA are applicable only to hotels and motels and retail trade establishments with gross annual sales of $250,000 or more, the data for these groups will be tabulated separately for establishments which meet this sales test as well as for those which do not. For manufacturing and retail trade, tabulations will be prepared for the United States, four broad regions, and metropolitan and nonmetropolitan areas. For the other industries, the data will be tabulated for the United States and the South, by metropolitan and nonmetropolitan areas. Additionally, the April 1972 survey will provide separate tabulations for youths employed in gasoline service stations and drug stores. The information obtained from these two surveys will permit an assessment of the economic impact of proposed changes in the minimum wage and maximum hours standards under the FLSA. Preliminary findings for the May 1971 payroll period can be found in the Special Studies section of this report.

Private Household Workers - This study will provide information on the economic position of private household workers, one of the larger remaining segments of the private economy excluded from the protection

of the Fair Labor Standards Act. Data on wages, weekly hours of work, and fringe benefits (including perquisites) were collected as a part of the May 1971 supplement to the Current Population Survey. These data will permit assessments of the economic position of household workers and the implications of extending the provisions of the FLSA to them. The study will also provide some of the demographic characteristics of household workers such as age, sex, race and position in family unit. The initial findings of the study are summarized in the Special Studies section of this report.

## Studies Currently Being Considered For Fiscal Years 1973 - 1974

Triennial Employer Survey - This triennial survey is an attempt to gather empirical information on a variety of subjects related to the Employment Standards Administration's program areas and interests. The initial survey, as tentatively planned, will be conducted in two parts. The first part will provide general information on: (1) the prevalence of wage garnishments and wage assignments; (2) overtime premium pay practices; (3) maternity leave policies; (4) involuntary retirement; (5) the demographic characteristics of the private nonagricultural nonsupervisory workforce; and (6) employer attitudes as they relate to premium pay for overtime and a youth minimum wage. The second part of the survey, to be fielded a year later, will provide quantitative data on wages and hours of work for all private nonagricultural nonsupervisory employees by region and by major industrial group.

Sheltered Workshops - Section 14(d) of the FLSA authorizes the Secretary of Labor to issue special certificates for the employment of handicapped workers in sheltered workshops at wages not less than 50 percent of the statutory hourly minimum and which are commensurate with those paid nonhandicapped workers in the industry in the vicinity for essentially the same type, quality, and quantity of work. In addition, rates below the 50 percent floor are permitted for certain handicapped workers. A primary goal of this study is to provide an evaluation of sheltered workshops operating under the provisions of the FLSA in terms of the benefits derived by individual clients. The initial phase of the study, involving the construction of an appropriate questionnaire, is still under consideration by various government agencies. It is expected, however, that data will be obtained on: (1) policies, practices, and programs of sheltered workshops; (2) prevalence of supplementary benefits; (3) wage "floor" criteria currently in effect for handicapped persons in sheltered workshops; (4) wage changes since 1968; (5) the "Work Activities Center" concept established by the 1966 Amendments to the Fair Labor Standards Act; and (6) the total number of sheltered workshops and the total number of clients, by type of disability, served in these workshops.

Overtime Standards - The Fair Labor Standards Act, the Public Contracts Act, and the Contract Work Hours and Safety Standards Act set maximum hours standards and provide for the payment of premium rates for hours worked in excess of these standards. The primary thrust of these

laws is to protect the worker from the detrimental effects of long hours and to provide an incentive for employers to hire more workers rather than to schedule overtime hours. The purpose of this study, if undertaken, is to provide an assessment of the impact of statutory hours standards and premium overtime rates on employer decisions to either hire additional workers or schedule overtime hours.

Wage Garnishment and Wage Assignment - The Federal wage garnishment law restricts the amount of an employee's disposable earnings that can be garnisheed and protects the employee from discharge because of garnishment due to any one indebtedness. The Congress, in passing this law, felt that unrestricted garnishment of a workers earnings would increase bankruptcies, encourage predatory credit policies, and result in possible loss of employment to the debtor. A study will be undertaken to provide information on the prevalence of wage garnishments and wage assignments for the private nonagricultural nonsupervisory work force. Data will also be compiled on the number of employees who were discharged because their wages were garnisheed more than once. Additionally, information is being collected on the extent to which State laws and regulations protect employees from wage garnishment.

Sex Discrimination - In occupations for which a structure of job classifications determines the pay received for specified "skill" levels and the path of advancement within an occupation, it is not uncommon to find women concentrated in the lowest paid classifications. To provide data needed to appraise such differences, an in-depth survey will be undertaken of the particular types of operative jobs which are held by both men and women in one or two specific industries. The study will provide information on whether differences in occupational classifications between men and women within the same occupation can be explained by skill differences, seniority, or other company practices. The study will also attempt to isolate those factors that determine movement to higher classifications within an occupation.

## Minimum Wage

There were a total of 83.3 million employed persons in September 1972. Of these, 7.3 million were self-employed and 1.0 million represented unpaid family workers, leaving a net of 75.0 million employed wage and salary workers. However, because some employees hold down more than one job and because of some slight discrepancies between estimates prepared from household interviews and those prepared from establishment records, the total number of wage and salary workers on establishment payrolls in September 1972 was estimated at 77.3 million.

The estimated 47.0 million nonsupervisory employees covered by the minimum wage provisions of the Fair Labor Standards Act in September 1972 represented nearly three-fourths of the employed nonsupervisory workforce. With the exception of hired farmworkers, the Federal minimum wage standard currently applicable to these workers is $1.60 an hour. For the 485,000 hired farmworkers first covered by the 1966 amendments the minimum wage is $1.30 an hour, the rate that has been in effect since February 1969 (Table 16 ).

Nonsupervisory employees in the public sector accounted for 5.0 million of the 16.9 million nonsupervisory workers not covered by the minimum wage provisions of the Fair Labor Standards Act. Of the 11.9 million noncovered nonsupervisory workers in the private sector, almost three-fifths--6.8 million--were employed in retail and service establishments and a substantial number--2.1 million-- were employed as private household service workers.

The extension of coverage incorporated in the 1966 amendments was relatively more important for women than for men and for Negro workers than for white workers. Prior to the 1966 amendments, less than one-half of all female nonsupervisory workers were covered, compared to almost three-fourths currently covered--only 2 percentage-points below the coverage ratio for men. While the proportion of covered Negro nonsupervisory workers increased substantially as a result of the 1966 amendments--from 41 percent to 60 percent--their ratio of coverage is still much lower than that for Whites (Table 18 ).

## Overtime

Approximately 40.5 million wage and salary workers, or about two-thirds of the employed nonsupervisory workforce are covered by the overtime provisions of the Fair Labor Standards Act, that is, they are required to be paid time and one-half their regular rate of pay for all hours worked beyond 40 a week. While the 1966 amendments increased the number of employees covered by the overtime

provisions, many of the "newly covered" workers were employed in restaurants, hotels and motels, and agriculture, industries specifically exempt from the overtime provisions (Table 19 ).

## Exemptions from Minimum Wage and Overtime

Over 8.4 million nonsupervisory employees were exempt from both the minimum wage and overtime provisions of the Fair Labor Standards Act and an additional 6.5 million were exempt from only its overtime provisions. Nearly half of the employees exempt from both the minimum wage and overtime provisions in the private sector were employed in retail trade and 19 percent in the services and transportation, communication and utilities (Table 21 ).

Table 16. Estimated number of employed wage and salary workers in the civilian labor force classified by their status under the minimum wage provisions of the Fair Labor Standards Act, by industry division, United States, September 1972 (Concluded)

(in thousands)

| Industry division | Number of employed wage and salary workers in the civilian labor force | | | | Number of nonsupervisory employees subject to the minimum wage provisions of the FLSA | | | : Number of non-supervisory employees not subject to the minimum wage provisions of the FLSA |
|---|---|---|---|---|---|---|---|---|
| | : Total : | Exempt under section 13(a)(1) of FLSA[1]/ : Executive, administrative, and professional personnel | : Out-side sales-men | : Non-supervisory : employees : excluding : outside : salesmen | : Total : | : Subject : prior to the : 1966 : amendments[2]/ | : Subject as a : result of the : 1966 : amendments | |
| Services (excluding domestic service)[4]/ | 12,482 | 3,315 | 25 | 9,142 | 6,465 | 2,466 | 3,999 | 2,702 |
| Domestic service | 2,063 | - | - | 2,063 | - | - | - | 2,063 |
| Public sector | 13,553 | 5,070 | - | 8,483 | 3,453 | - | 3,453 | 5,030 |
| Federal government | 2,627 | 294 | - | 2,333 | 636 | - | 636 | 1,697 |
| State and local government[4]/ | 10,926 | 4,776 | - | 6,150 | 2,817 | - | 2,817 | 3,333 |

1/ Section 13(a)(1) exempts from the minimum wage and overtime provisions of the Fair Labor Standards Act "any employee employed in a bona fide executive, administrative, or professional capacity (including any employee employed in the capacity of academic administrative personnel, or teacher in elementary or secondary schools), or in the capacity of outside salesman. . ."

2/ Relates to currently employed workers who would have been subject under criteria in effect prior to the 1966 amendments.

3/ Estimates for agriculture relate to May 1972.

4/ Estimates for educational services relate to October 1972.

Table 17. Estimated number of employed wage and salary workers in the civilian labor force classified by their status under the minimum wage provisions of the Fair Labor Standards Act, by Region and State, September 1972

(in thousands)

| Region and State | Employed wage and salary workers in the civilian labor force | Nonsupervisory employees including outside salesmen 1/ | Number of nonsupervisory employees subject to the minimum wage provisions of the FLSA 1/ | | | Number of nonsupervisory employees not subject to the minimum wage provisions of the FLSA |
|---|---|---|---|---|---|---|
| | | | Total | Subject prior to the 1966 amendments 2/ | Subject as a result of the 1966 amendments | |
| United States | 77,340 | 63,889 | 46,950 | 35,159 | 11,791 | 16,939 |
| Domestic workers | 2,063 | 2,063 | - | - | - | 2,063 |
| ATLANTA | 11,161 | 9,239 | 7,020 | 5,268 | 1,752 | 2,219 |
| Alabama | 1,084 | 890 | 657 | 501 | 156 | 233 |
| Florida | 2,404 | 1,969 | 1,476 | 976 | 500 | 493 |
| Georgia | 1,663 | 1,369 | 1,039 | 801 | 238 | 330 |
| Kentucky | 1,012 | 838 | 626 | 456 | 170 | 212 |
| Mississippi | 674 | 557 | 396 | 293 | 103 | 161 |
| North Carolina | 1,913 | 1,609 | 1,278 | 1,025 | 253 | 331 |
| South Carolina | 936 | 780 | 600 | 477 | 123 | 180 |
| Tennessee | 1,475 | 1,227 | 948 | 739 | 209 | 279 |
| BOSTON | 4,679 | 3,863 | 3,003 | 2,285 | 718 | 860 |
| Connecticut | 1,207 | 1,007 | 810 | 639 | 171 | 197 |
| Maine | 348 | 286 | 219 | 159 | 60 | 67 |
| Massachusetts | 2,313 | 1,903 | 1,466 | 1,106 | 360 | 437 |
| New Hampshire | 289 | 238 | 179 | 136 | 43 | 59 |
| Rhode Island | 359 | 296 | 233 | 179 | 54 | 63 |
| Vermont | 163 | 133 | 96 | 66 | 30 | 37 |

Table 17. Estimated number of employed wage and salary workers in the civilian labor force classified by their status under the minimum wage provisions of the Fair Labor Standards Act, by Region and State, September 1972 (Continued) (in thousands)

| Region and State | Employed wage and salary workers in the civilian labor force | Nonsupervisory employees including outside salesmen[1] | Number of nonsupervisory employees subject to the minimum wage provisions of the FLSA [1] | | | Number of nonsupervisory employees not subject to the minimum wage provisions of the FLSA |
|---|---|---|---|---|---|---|
| | | | Total | Subject prior to the 1966 amendments [2] | Subject as a result of the 1966 amendments | |
| CHICAGO | 16,706 | 13,846 | 10,894 | 8,466 | 2,428 | 2,952 |
| Illinois | 4,469 | 3,704 | 2,935 | 2,307 | 628 | 769 |
| Indiana | 1,956 | 1,634 | 1,310 | 1,034 | 276 | 324 |
| Michigan | 3,158 | 2,614 | 2,081 | 1,610 | 471 | 533 |
| Minnesota | 1,418 | 1,164 | 872 | 641 | 231 | 292 |
| Ohio | 4,047 | 3,362 | 2,660 | 2,098 | 562 | 702 |
| Wisconsin | 1,658 | 1,368 | 1,036 | 776 | 260 | 332 |
| DALLAS | 6,926 | 5,673 | 4,170 | 2,995 | 1,175 | 1,503 |
| Arkansas | 652 | 546 | 371 | 268 | 103 | 175 |
| Louisiana | 1,124 | 919 | 678 | 497 | 181 | 241 |
| New Mexico | 331 | 263 | 182 | 118 | 64 | 81 |
| Oklahoma | 840 | 679 | 496 | 334 | 162 | 183 |
| Texas | 3,979 | 3,266 | 2,443 | 1,778 | 665 | 823 |
| DENVER | 1,975 | 1,588 | 1,094 | 722 | 372 | 494 |
| Colorado | 845 | 684 | 502 | 345 | 157 | 182 |
| Montana | 228 | 185 | 115 | 73 | 42 | 70 |
| North Dakota | 191 | 152 | 93 | 53 | 40 | 59 |
| South Dakota | 191 | 151 | 91 | 55 | 36 | 60 |
| Utah | 392 | 313 | 227 | 152 | 75 | 86 |
| Wyoming | 128 | 103 | 66 | 44 | 22 | 37 |

Table 17.   Estimated number of employed wage and salary workers in the civilian labor force classified by their status under the <u>minimum wage</u> provisions of the Fair Labor Standards Act, by Region and State, September 1972 (Continued)

(in thousands)

| Region and State | Employed wage and salary workers in the civilian labor force | Nonsupervisory employees including outside salesmen [2/] | Number of nonsupervisory employees subject to the minimum wage provisions of the FLSA [1/] | | | Number of nonsupervisory employees not subject to the minimum wage provisions of the FLSA |
|---|---|---|---|---|---|---|
| | | | Total | Subject prior to the 1966 amendments [2/] | Subject as a result of the 1966 amendments | |
| KANSAS CITY | 3,960 | 3,240 | 2,372 | 1,722 | 650 | 868 |
| Iowa | 969 | 795 | 566 | 400 | 166 | 229 |
| Kansas | 728 | 589 | 415 | 289 | 126 | 174 |
| Missouri | 1,721 | 1,415 | 1,078 | 818 | 260 | 337 |
| Nebraska | 542 | 441 | 313 | 215 | 98 | 128 |
| NEW YORK | 9,889 | 8,088 | 6,176 | 4,805 | 1,371 | 1,912 |
| New Jersey | 2,710 | 2,246 | 1,720 | 1,383 | 337 | 526 |
| New York | 7,179 | 5,842 | 4,456 | 3,422 | 1,034 | 1,386 |
| PHILADELPHIA | 8,830 | 7,216 | 5,454 | 4,108 | 1,346 | 1,762 |
| Delaware | 225 | 187 | 146 | 113 | 33 | 41 |
| District of Columbia | 582 | 427 | 237 | 145 | 92 | 190 |
| Maryland | 1,449 | 1,172 | 842 | 611 | 231 | 330 |
| Pennsylvania | 4,363 | 3,620 | 2,861 | 2,242 | 619 | 759 |
| Virginia | 1,664 | 1,356 | 1,017 | 728 | 289 | 339 |
| West Virginia | 547 | 454 | 351 | 269 | 82 | 103 |

Table 17.  Estimated number of employed wage and salary workers in the civilian labor force classified by their status under the <u>minimum wage</u> provisions of the Fair Labor Standards Act, by Region and State, September 1972 (Concluded)

(in thousands)

| Region and State | Employed wage and salary workers in the civilian labor force | Nonsupervisory employees including outside salesmen[1/] | Number of nonsupervisory employees subject to the minimum wage provisions of the FLSA[1/] | | | Number of nonsupervisory employees not subject to the minimum wage provisions of the FLSA |
|---|---|---|---|---|---|---|
| | | | Total | Subject prior to the 1966 amendments[2/] | Subject as a result of the 1966 amendments | |
| SAN FRANCISCO | 8,785 | 7,148 | 5,379 | 3,801 | 1,578 | 1,769 |
| Arizona | 688 | 562 | 410 | 286 | 124 | 152 |
| California | 7,532 | 6,137 | 4,635 | 3,320 | 1,315 | 1,502 |
| Hawaii | 327 | 263 | 201 | 111 | 90 | 62 |
| Nevada | 238 | 186 | 133 | 84 | 49 | 53 |
| SEATTLE | 2,366 | 1,925 | 1,388 | 987 | 401 | 537 |
| Alaska | 106 | 83 | 58 | 39 | 19 | 25 |
| Idaho | 251 | 205 | 138 | 94 | 44 | 67 |
| Oregon | 825 | 677 | 491 | 362 | 129 | 186 |
| Washington | 1,184 | 960 | 701 | 492 | 209 | 259 |

1/  Section 13(a)(1) exempts from the minimum wage and overtime provisions of the Fair Labor Standards Act "any employee employed in a bona fide executive, administrative, or professional capacity, (including any employee employed in the capacity of academic administrative personnel, or teacher in elementary or secondary schools), or in the capacity of outside salesmen. . .

2/  Relates to currently employed workers who would have been subject under criteria in effect prior to the 1966 amendments.

8

Table 18. Estimated number of nonsupervisory employees subject to the minimum wage provisions of the Fair Labor Standards Act, by sex and race, September 1972

(in thousands)

| Sex and race | Total number of nonsupervisory employees 1/ | Number of nonsupervisory employees subject to the minimum wage provisions of the FLSA | | | Number of nonsupervisory employees not subject to the minimum wage provisions of the FLSA |
| --- | --- | --- | --- | --- | --- |
| | | Total | Subject prior to the 1966 amendments 2/ | Subject as a result of the 1966 amendments | |
| Total | 63,889 | 46,950 | 35,159 | 11,791 | 16,939 |
| White | 55,487 | 41,887 | 31,670 | 10,217 | 13,600 |
| Negro and other races | 8,402 | 5,063 | 3,489 | 1,574 | 3,339 |
| Negro | 7,799 | 4,687 | 3,244 | 1,443 | 3,112 |
| Male | 39,248 | 29,134 | 23,679 | 5,455 | 10,114 |
| White | 34,686 | 25,751 | 21,074 | 4,677 | 8,935 |
| Negro and other races | 4,562 | 3,383 | 2,605 | 778 | 1,179 |
| Negro | 4,203 | 3,148 | 2,446 | 702 | 1,055 |
| Female | 24,641 | 17,816 | 11,480 | 6,336 | 6,825 |
| White | 20,801 | 16,136 | 10,596 | 5,540 | 4,665 |
| Negro and other races | 3,840 | 1,680 | 884 | 796 | 2,160 |
| Negro | 3,596 | 1,539 | 798 | 741 | 2,057 |

1/ All employees are included except academic administrative personnel and teachers in elementary and secondary schools and executive, administrative, and professional employees in all other activities.
2/ Relates to currently employed workers who would have been subject under criteria in effect prior to the 1966 amendments.

Table 19. Estimated number of employed wage and salary workers in the civilian labor force classified by their status under the overtime compensation provisions of the Fair Labor Standards Act, by industry division, United States, September 1972

(in thousands)

| Industry division | Number of employed wage and salary workers in the civilian labor force | | | | Number of nonsupervisory employees subject to the overtime compensation provisions of the FLSA | | | Number of non-supervisory employees not subject to the overtime compensation provisions of the FLSA |
|---|---|---|---|---|---|---|---|---|
| | Total | Exempt under section 13(a)(1) of FLSA[1] Executive, administrative, and professional personnel | Out-side sales-men | Non-supervisory employees excluding outside salesmen | Total | Subject prior to the 1966 amendments[2] | Subject as a result of the 1966 amendments | |
| All industries | 77,340 | 13,451 | 2,069 | 61,820 | 40,489 | 32,312 | 8,177 | 23,400 |
| Private sector | 63,787 | 8,381 | 2,069 | 53,337 | 37,181 | 32,312 | 4,869 | 18,225 |
| Agriculture[3] | 1,267 | 68 | - | 1,199 | - | - | - | 1,199 |
| Mining | 613 | 66 | - | 547 | 531 | 531 | - | 16 |
| Contract construction | 3,785 | 304 | 2 | 3,479 | 3,424 | 2,832 | 592 | 57 |
| Manufacturing | 19,298 | 1,942 | 459 | 16,897 | 16,145 | 16,113 | 32 | 1,211 |
| Transportation, communications, utilities | 4,548 | 468 | 9 | 4,071 | 2,398 | 2,362 | 36 | 1,682 |
| Wholesale trade | 3,962 | 575 | 804 | 2,583 | 2,350 | 2,268 | 82 | 1,037 |
| Retail trade | 11,812 | 1,081 | 102 | 10,629 | 4,713 | 3,407 | 1,306 | 6,018 |
| Finance, insurance, real estate | 3,957 | 562 | 668 | 2,727 | 2,576 | 2,487 | 89 | 819 |

See footnotes at end of table.

Table 19. Estimated number of employed wage and salary workers in the civilian labor force classified by their status under the overtime compensation provisions of the Fair Labor Standards Act, by industry division, United States, September 1972 (Concluded)

(in thousands)

| Industry division | Number of employed wage and salary workers in the civilian labor force | | | | Number of nonsupervisory employees subject to the overtime compensation provisions of the FLSA | | | Number of non-supervisory employees not subject to the overtime provisions of the FLSA |
| | Exempt under section 13(a)(1) of FLSA[1] | | | Non-supervisory employees excluding outside salesmen | | | | |
| | Total | Executive, administrative, and professional personnel | Out-side sales-men | | Total | Subject prior to the 1966 amendments[2] | Subject as a result of the 1966 amendments | |
| Services (excluding domestic service)[4] | 12,482 | 3,315 | 25 | 9,142 | 5,044 | 2,312 | 2,732 | 4,123 |
| Domestic service | 2,063 | - | - | 2,063 | - | - | - | 2,063 |
| Public sector | 13,553 | 5,070 | - | 8,483 | 3,308 | - | 3,308 | 5,175 |
| Federal government | 2,627 | 294 | - | 2,333 | 636 | - | 636 | 1,697 [5] |
| State and local government [4] | 10,926 | 4,776 | - | 6,150 | 2,672 | - | 2,672 | 3,478 |

[1] Section 13(a)(1) exempts from the minimum wage and overtime provisions of the Fair Labor Standards Act "any employee employed in a bona fide executive, administrative, or professional capacity (including any employee employed in the capacity of academic administrative personnel, or teacher in elementary or secondary schools), or in the capacity of outside salesman. . ."

[2] Relates to currently employed workers who would have been subject under criteria in effect prior to the 1966 amendments.

[3] Estimates for agriculture relate to May 1972.

[4] Estimates for education relate to October 1972.

[5] Federal employees, not covered by the overtime provisions of the Fair Labor Standards Act, who are under the General Schedule of salary rates are paid 1 1/2 times the employee's regular rate from Grade 1 through the first step of Grade 10.

Table 20.  Estimated number of employed wage and salary workers in the civilian labor force classified by their status under the overtime compensation provisions of the Fair Labor Standards Act, by Region and State, September 1972

(in thousands)

| Region and State | Employed wage and salary workers in the civilian labor force | Nonsupervisory employees including outside salesmen[1] | Number of nonsupervisory employees subject to the overtime compen- sation provisions of the FLSA | | | Number of nonsupervisory employees not subject to the overtime compensation provision of the FLSA |
|---|---|---|---|---|---|---|
| | | | Total | Subject prior to the 1966 amendments | Subject as a result of the 1966 amendments[2] | |
| United States | 77,340 | 63,889 | 40,489 | 32,312 | 8,177 | 23,400 |
| Domestic workers | 2,063 | 2,063 | - | - | - | 2,063 |
| ATLANTA | 11,161 | 9,239 | 6,052 | 4,831 | 1,221 | 3,187 |
| Alabama | 1,084 | 890 | 582 | 466 | 116 | 308 |
| Florida | 2,404 | 1,969 | 1,141 | 852 | 289 | 828 |
| Georgia | 1,663 | 1,369 | 906 | 729 | 177 | 463 |
| Kentucky | 1,012 | 838 | 540 | 415 | 125 | 298 |
| Mississippi | 674 | 557 | 347 | 273 | 74 | 210 |
| North Carolina | 1,913 | 1,609 | 1,152 | 960 | 192 | 457 |
| South Carolina | 936 | 780 | 545 | 450 | 95 | 235 |
| Tennessee | 1,475 | 1,227 | 839 | 686 | 153 | 388 |
| BOSTON | 4,679 | 3,863 | 2,651 | 2,150 | 501 | 1,212 |
| Connecticut | 1,207 | 1,007 | 729 | 609 | 120 | 278 |
| Maine | 348 | 286 | 187 | 143 | 44 | 99 |
| Massachusetts | 2,313 | 1,903 | 1,281 | 1,037 | 244 | 622 |
| New Hampshire | 289 | 238 | 160 | 129 | 31 | 78 |
| Rhode Island | 359 | 296 | 211 | 170 | 41 | 85 |
| Vermont | 163 | 133 | 83 | 62 | 21 | 50 |

84

Table 20. Estimated number of employed wage and salary workers in the civilian labor force classified by their status under the overtime compensation provisions of the Fair Labor Standards Act, by Region and State, September 1972 (Continued)

(in thousands)

| Region and State | Employed wage and salary workers in the civilian labor force | Nonsupervisory employees including outside salesmen[1] | Number of nonsupervisory employees subject to the overtime compensation provisions of the FLSA | | | Number of nonsupervisory employees not subject to the overtime compensation provision of the FLSA |
|---|---|---|---|---|---|---|
| | | | Total | Subject prior to the 1966 amendments | Subject as a result of the 1966 amendments[2] | |
| CHICAGO | 16,706 | 13,846 | 9,536 | 7,835 | 1,701 | 4,310 |
| Illinois | 4,469 | 3,704 | 2,560 | 2,118 | 442 | 1,144 |
| Indiana | 1,956 | 1,634 | 1,162 | 965 | 197 | 472 |
| Michigan | 3,158 | 2,614 | 1,855 | 1,517 | 338 | 759 |
| Minnesota | 1,418 | 1,164 | 729 | 577 | 152 | 435 |
| Ohio | 4,047 | 3,362 | 2,342 | 1,947 | 395 | 1,020 |
| Wisconsin | 1,658 | 1,368 | 888 | 711 | 177 | 480 |
| DALLAS | 6,926 | 5,673 | 3,526 | 2,715 | 811 | 2,147 |
| Arkansas | 652 | 546 | 307 | 242 | 65 | 239 |
| Louisiana | 1,124 | 919 | 574 | 443 | 131 | 345 |
| New Mexico | 331 | 263 | 156 | 107 | 49 | 107 |
| Oklahoma | 840 | 679 | 418 | 303 | 115 | 261 |
| Texas | 3,979 | 3,266 | 2,071 | 1,620 | 451 | 1,195 |
| DENVER | 1,975 | 1,588 | 898 | 633 | 265 | 690 |
| Colorado | 845 | 684 | 418 | 310 | 108 | 266 |
| Montana | 228 | 185 | 89 | 60 | 29 | 96 |
| North Dakota | 191 | 152 | 71 | 44 | 27 | 81 |
| South Dakota | 191 | 151 | 74 | 48 | 26 | 77 |
| Utah | 392 | 313 | 195 | 135 | 60 | 118 |
| Wyoming | 128 | 103 | 51 | 36 | 15 | 52 |

Table 20.  Estimated number of employed wage and salary workers in the civilian labor force classified by their status under the <u>overtime compensation</u> provisions of the Fair Labor Standards Act, by Region and State, September 1972 (Continued)

(in thousands)

| Region and State | Employed wage and salary workers in the civilian labor force | Nonsupervisory employees including outside salesmen [1] | Number of nonsupervisory employees subject to the overtime compensation provisions of the FLSA | | | Number of nonsupervisory employees not subject to the overtime compensation provision of the FLSA |
|---|---|---|---|---|---|---|
| | | | Total | Subject prior to the 1966 amendments | Subject as a result of the 1966 amendments [2] | |
| KANSAS CITY | 3,960 | 3,240 | 1,996 | 1,545 | 451 | 1,244 |
| Iowa | 969 | 795 | 473 | 362 | 111 | 322 |
| Kansas | 728 | 589 | 344 | 255 | 89 | 245 |
| Missouri | 1,721 | 1,415 | 926 | 740 | 186 | 489 |
| Nebraska | 542 | 441 | 253 | 188 | 65 | 188 |
| NEW YORK | 9,889 | 8,088 | 5,465 | 4,470 | 995 | 2,623 |
| New Jersey | 2,710 | 2,246 | 1,532 | 1,287 | 245 | 714 |
| New York | 7,179 | 5,842 | 3,933 | 3,183 | 750 | 1,909 |
| PHILADELPHIA | 8,830 | 7,216 | 4,818 | 3,810 | 1,008 | 2,398 |
| Delaware | 225 | 187 | 129 | 105 | 24 | 58 |
| District of Columbia | 582 | 427 | 207 | 135 | 72 | 220 |
| Maryland | 1,449 | 1,172 | 730 | 558 | 172 | 442 |
| Pennsylvania | 4,363 | 3,620 | 2,557 | 2,106 | 451 | 1,063 |
| Virginia | 1,664 | 1,356 | 883 | 660 | 223 | 473 |
| West Virginia | 547 | 454 | 312 | 246 | 66 | 142 |

Table 20. Estimated number of employed wage and salary workers in the civilian labor force classified by their status under the overtime compensation provisions of the Fair Labor Standards Act, by Region and State, September 1972 (Concluded)

(in thousands)

| Region and State | Employed wage and salary workers in the civilian labor force | Nonsupervisory employees including outside salesmen [1] | Number of nonsupervisory employees subject to the overtime compensation provisions of the FLSA | | | Number of nonsupervisory employees not subject to the overtime compensation provision of the FLSA |
|---|---|---|---|---|---|---|
| | | | Total | Subject prior to the 1966 amendments | Subject as a result of the 1966 amendments [2] | |
| SAN FRANCISCO | 8,785 | 7,148 | 4,405 | 3,458 | 947 | 2,743 |
| Arizona | 688 | 562 | 347 | 264 | 83 | 215 |
| California | 7,532 | 6,137 | 3,821 | 3,021 | 800 | 2,316 |
| Hawaii | 327 | 263 | 138 | 95 | 43 | 125 |
| Nevada | 238 | 186 | 99 | 78 | 21 | 87 |
| SEATTLE | 2,366 | 1,925 | 1,142 | 865 | 277 | 783 |
| Alaska | 106 | 83 | 48 | 32 | 16 | 35 |
| Idaho | 251 | 205 | 101 | 73 | 28 | 104 |
| Oregon | 825 | 677 | 412 | 324 | 88 | 265 |
| Washington | 1,184 | 960 | 581 | 436 | 145 | 379 |

[1] Section 13(a)(1) exempts from the minimum wage and overtime provisions of the Fair Labor Standards Act "any employee employed in a bona fide executive, administrative, or professional capacity, (including any employee employed in the capacity of academic administrative personnel, or teacher in elementary or secondary schools), or in the capacity of outside salesman. . ."

[2] Relates to currently employed workers who would have been subject under criteria in effect prior to the 1966 amendments.

Table 21. Estimated number of nonsupervisory employees exempt from
the minimum wage provisions or the overtime provisions of
the Fair Labor Standards Act by industry division,
September 1972

(in thousands)

| Industry division | Estimated number of nonsupervisory employees in categories in which minimum wage exemptions apply | Estimated number of nonsupervisory employees in categories in which only overtime exemptions apply |
|---|---|---|
| All industries | 8,412 | 6,461 |
| Private sector | 8,412 | 6,316 |
| Agriculture | 714 | 485 |
| Mining | - | 11 |
| Contract construction | 19 | 38 |
| Manufacturing | 517 | 643 |
| Transportation, communications, utilities | 10 | 1,593 |
| Wholesale trade | 804 | 226 |
| Retail trade | 4,120 | 1,898 |
| Finance, insurance, real estate | 668 | 1 |
| Services, (excluding domestic service) | 1,561 | 1,421 |
| Public sector | - | 145 |
| Federal government | - | - |
| State and local government | - | 145 |

Note: Details may not add to totals due to rounding.

GPO 860-154

# ADDENDUM C

Code of Federal Regulations
Title 29. Labor
Subtitle B. Regulations Relating to Labor
Chapter V. Wage and Hour Division, Department of Labor
Subchapter A. Regulations
Part 552. Application of the Fair Labor Standards Act to Domestic Service (Refs & Annos)
Subpart B. Interpretations

29 C.F.R. § 552.109

# § 552.109 Third party employment.

Currentness

(a) Third party employers of employees engaged in companionship services within the meaning of § 552.6 may not avail themselves of the minimum wage and overtime exemption provided by section 13(a)(15) of the Act, even if the employee is jointly employed by the individual or member of the family or household using the services. However, the individual or member of the family or household, even if considered a joint employer, is still entitled to assert the exemption, if the employee meets all of the requirements of § 552.6.

(b) Employees who are engaged in providing babysitting services and who are employed by an employer or agency other than the family or household using their services are not employed on a "casual basis" for purposes of the section 13(a)(15) exemption. Such employees are engaged in this occupation as a vocation.

(c) Third party employers of employees engaged in live-in domestic service employment within the meaning of § 552.102 may not avail themselves of the overtime exemption provided by section 13(b)(21) of the Act, even if the employee is jointly employed by the individual or member of the family or household using the services. However, the individual or member of the family or household, even if considered a joint employer, is still entitled to assert the exemption.

**Credits**

[78 FR 60557, Oct. 1, 2013]

SOURCE: 40 FR 7405, Feb. 20, 1975; 60 FR 46767, Sept. 8, 1995, unless otherwise noted.

AUTHORITY: Secs. 13(a)(15) and 13(b)(21) of the Fair Labor Standards Act, as amended (29 U.S.C. 213(a)(15), (b)(21)), 88 Stat. 62; Sec. 29(b) of the Fair Labor Standards Amendments of 1974 (Pub.L. 93–259, 88 Stat. 76), unless otherwise noted.

Notes of Decisions (14)

Current through May 22, 2025, 90 FR 21870. Some sections may be more current. See credits for details.

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
  Title 29. Labor
    Subtitle B. Regulations Relating to Labor
      Chapter V. Wage and Hour Division, Department of Labor
        Subchapter A. Regulations
          Part 552. Application of the Fair Labor Standards Act to Domestic Service (Refs & Annos)
            Subpart A. General Regulations

29 C.F.R. § 552.6

§ 552.6 Companionship services.

Currentness

(a) As used in section 13(a)(15) of the Act, the term companionship services means the provision of fellowship and protection for an elderly person or person with an illness, injury, or disability who requires assistance in caring for himself or herself. The provision of fellowship means to engage the person in social, physical, and mental activities, such as conversation, reading, games, crafts, or accompanying the person on walks, on errands, to appointments, or to social events. The provision of protection means to be present with the person in his or her home or to accompany the person when outside of the home to monitor the person's safety and well-being.

(b) The term companionship services also includes the provision of care if the care is provided attendant to and in conjunction with the provision of fellowship and protection and if it does not exceed 20 percent of the total hours worked per person and per workweek. The provision of care means to assist the person with activities of daily living (such as dressing, grooming, feeding, bathing, toileting, and transferring) and instrumental activities of daily living, which are tasks that enable a person to live independently at home (such as meal preparation, driving, light housework, managing finances, assistance with the physical taking of medications, and arranging medical care).

(c) The term companionship services does not include domestic services performed primarily for the benefit of other members of the household.

(d) The term companionship services does not include the performance of medically related services provided for the person. The determination of whether services are medically related is based on whether the services typically require and are performed by trained personnel, such as registered nurses, licensed practical nurses, or certified nursing assistants; the determination is not based on the actual training or occupational title of the individual performing the services.

**Credits**

[78 FR 60557, Oct. 1, 2013]

SOURCE: 40 FR 7405, Feb. 20, 1975; 60 FR 46767, Sept. 8, 1995, unless otherwise noted.

AUTHORITY: Secs. 13(a)(15) and 13(b)(21) of the Fair Labor Standards Act, as amended (29 U.S.C. 213(a)(15), (b)(21)), 88 Stat. 62; Sec. 29(b) of the Fair Labor Standards Amendments of 1974 (Pub.L. 93–259, 88 Stat. 76), unless otherwise noted.

Notes of Decisions (12)

Current through May 22, 2025, 90 FR 21870. Some sections may be more current. See credits for details.

---

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
   Title 29. Labor
      Subtitle B. Regulations Relating to Labor
         Chapter V. Wage and Hour Division, Department of Labor
            Subchapter A. Regulations
               Part 552. Application of the Fair Labor Standards Act to Domestic Service (Refs & Annos)
                  Subpart A. General Regulations

29 C.F.R. § 552.3

## § 552.3 Domestic service employment.

Currentness

The term domestic service employment means services of a household nature performed by an employee in or about a private home (permanent or temporary). The term includes services performed by employees such as companions, babysitters, cooks, waiters, butlers, valets, maids, housekeepers, nannies, nurses, janitors, laundresses, caretakers, handymen, gardeners, home health aides, personal care aides, and chauffeurs of automobiles for family use. This listing is illustrative and not exhaustive.

**Credits**

[78 FR 60557, Oct. 1, 2013]

SOURCE: 40 FR 7405, Feb. 20, 1975; 60 FR 46767, Sept. 8, 1995, unless otherwise noted.

AUTHORITY: Secs. 13(a)(15) and 13(b)(21) of the Fair Labor Standards Act, as amended (29 U.S.C. 213(a)(15), (b)(21)), 88 Stat. 62; Sec. 29(b) of the Fair Labor Standards Amendments of 1974 (Pub.L. 93–259, 88 Stat. 76), unless otherwise noted.

Current through May 22, 2025, 90 FR 21870. Some sections may be more current. See credits for details.

End of Document                                                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# ADDENDUM D

SECOND COLLEGE EDITION

# WEBSTER'S
# NEW WORLD
# DICTIONARY

*of the*

*American Language*

David B. Guralnik, *Editor in Chief*

THE WORLD PUBLISHING COMPANY

*New York and Cleveland*

Webster's New World Dictionary, Second College Edition

Copyright © 1972 and 1970 by

THE   WORLD   PUBLISHING   COMPANY

Copyright under the Universal Copyright Convention; the
International Copyright Union; Pan-American Conventions
of Montevideo, Mexico, Rio de Janeiro,
Buenos Aires and Havana

Previous edition Copyright © 1953, 1954, 1955, 1956, 1957,
1958, 1959, 1960, 1962, 1964, 1966, 1968 by

THE   WORLD   PUBLISHING   COMPANY

Library of Congress Catalog Card Number: 71-182408

PRINTED IN THE UNITED STATES OF AMERICA

*fenestra*, window + -TION] a tossing out through a window

**de·fense** (di fens', dē'fens) *n.* [ME. < OFr. < L. *defensa* < fem. of L. *defensus*, pp. of *defendere*] 1. the act or power of defending, or guarding against attack, harm, or danger 2. the fact or state of being defended 3. *a)* something that defends; means of or resources for protection *b)* a plan or system for defending 4. justification or support by speech or writing; vindication 5. self-protection, as by boxing 6. the side that is defending in any contest 7. *a)* the arguments of the defendant or his lawyer in contesting a case *b)* the defendant and his lawyer or lawyers, collectively —*vt.* -**fensed'**, -**fens'ing** [Colloq.] to plan a defense against (an offensive maneuver) in a game or sport

**de·fense·less** (-lis) *adj.* lacking defense; unable to defend oneself; open to attack; helpless; unprotected —**de·fense'-less·ly** *adv.* —**de·fense'less·ness** *n.*

**defense mechanism** 1. any self-protective physiological reaction of an organism 2. *Psychiatry* any behavior or thought process unconsciously brought into use by an individual to protect himself against painful or anxiety-provoking feelings, impulses, perceptions, etc.

**de·fen·si·ble** (di fen'sə b'l) *adj.* [ME. & OFr. *defensable* < L. *defensabilis* < *defensare*, intens. < *defendere*: see DEFEND] that can be defended, protected, or justified —**de·fen'si·bil'i·ty** *n.* —**de·fen'si·bly** *adv.*

**de·fen·sive** (-siv) *adj.* [ME. & OFr. *defensif* < ML. *defensivus* < L. *defensus*: see DEFENSE] 1. defending 2. of or for defense 3. *Psychol.* constantly feeling under attack and hence quick to justify one's actions —*n.* 1. orig., something that defends 2. a position of defense: chiefly in the phrase **on the defensive**, in a position that makes defense necessary —**de·fen'sive·ly** *adv.* —**de·fen'sive·ness** *n.*

**de·fer**[1] (di fur') *vt.*, *vi.* -**ferred'**, -**fer'ring** [ME. *differen* < OFr. *differer* < L. *differre*: see DIFFER] 1. to put off to a future time; postpone; delay 2. to postpone the induction of (a person) into the armed forces —**de·fer'rer** *n.*

**de·fer**[2] (di fur') *vi.* -**ferred'**, -**fer'ring** [ME. *deferen* < OFr. *deferer*, to yield, pay deference to < L. *deferre*, to bring down < *de-*, down + *ferre*, to BEAR] to give in to the wish or judgment of another, as in showing respect; yield with courtesy (*to*) —*SYN.* see YIELD

**def·er·ence** (def'ər əns) *n.* [Fr. *déférence* < L. *deferens*, prp. of prec.] 1. a yielding in opinion, judgment, wishes, etc. 2. courteous regard or respect —*SYN.* see HONOR —**in deference to** out of regard or respect for (a person, his wishes, etc.]

**def·er·ent**[1] (-ənt) *adj. same as* DEFERENTIAL

**def·er·ent**[2] (-ənt) *adj.* [Fr. *déférent* < L. *deferens*, prp. of *deferre*: see DEFER[1]] 1. carrying down or out 2. *Anat.* of or relating to the vas deferens

**def·er·en·tial** (def'ə ren'shəl) *adj.* showing deference; very respectful —**def'er·en'tial·ly** *adv.*

**de·fer·ment** (di fur'mənt) *n.* [see DEFER[1]] a deferring or being deferred; postponement: also **de·fer'ral**

**de·ferred** (di furd') *adj.* [pp. of DEFER[1]] 1. postponed 2. having the rights, interest, etc. withheld until a certain date [a *deferred* annuity]

**de·fer·ves·cence** (dē'fər ves'ns, def'ər-) *n.* [G. *defervescens* (first used by K. A. Wunderlich, 1815-1877, Ger. physician) < L. *defervescens*, prp. of *defervescere*, to cool off, orig. stop boiling < *de-*, down, off + *fervescere*, to grow hot: see EFFERVESCE] the abating or disappearance of a fever

**de·fi·ance** (di fī'əns) *n.* [ME. *defiaunce* < OFr. *defiance* < *defier*, DEFY] 1. the act of defying; open, bold resistance to authority or opposition 2. a challenge —**in defiance to** to defy —**in defiance of** 1. defying 2. in spite of

**de·fi·ant** (-ənt) *adj.* [Fr. *défiant*, prp. of *défier*] full of defiance; openly and boldly resisting —**de·fi'ant·ly** *adv.*

**de·fib·ril·late** (dī fib'rə lāt', -fī'brə-) *vt.* -**lat'ed**, -**lat'ing** to stop fibrillation of the heart, as by the use of electric current —**de·fib'ril·la'tion** *n.* —**de·fib'ril·la'tor** *n.*

**de·fi·cien·cy** (di fish'ən sē) *n.*, *pl.* -**cies** [ME. < LL. *deficientia* < L. *deficiens*, prp. of *deficere*, to lack, fail < *de-*, from + *facere*, to DO] 1. the quality or state of being deficient; absence of something essential; incompleteness 2. a) -**cies** *a)* a shortage *b)* the amount of shortage; deficit

**deficiency disease** a disease, as rickets or pellagra, caused by a lack of vitamins, minerals, etc. in the diet

**deficiency judgment** *Law* a judgment in favor of a mortgagee for the remainder of a debt not completely covered by foreclosure and sale of the mortgaged property

**de·fi·cient** (di fish'ənt) *adj.* [L. *deficiens*: see DEFICIENCY] 1. lacking in some essential; incomplete; defective 2. inadequate in amount, quality, degree, etc.; not sufficient —*n.* a deficient person or thing —**de·fi'cient·ly** *adv.*

**def·i·cit** (def'ə sit) *n.* [L., there is lacking, 3d pers. sing., pres. indic. of *deficere* (see DEFICIENCY): from use as first word in inventory clauses] the amount by which a sum of money is less than the required amount; specif., an excess of liabilities over assets, of losses over profits, or of expenditure over income

**deficit financing** *Econ.* the theory or practice of seeking to increase a nation's productivity and consumption by governmental expenditures financed by borrowing (**deficit spending**)

‡**de·fi·de** (di fā'dā) [L.] *R.C.Ch.* of faith: used to designate doctrines held to be revealed by God and so requiring the unconditional assent of faith by all

**de·fi·er** (di fī'ər) *n.* a person who defies

**def·i·lade** (def'ə lād', def'ə lād') *vt.*, *vi.* -**lad'ed**, -**lad'ing** [< Fr. *défilade*, a filing off, succession < *défiler*: see DEFILE[2]] to arrange (troops and fortifications) so that the terrain will protect them, esp. from gunfire against either flank —*n.* 1. the act of defilading 2. the protection afforded by defilading

**de·file**[1] (di fīl') *vt.* -**filed'**, -**fil'ing** [ME. *defilen*, altered (after *filen*, to make foul < OE. *fylan* < *ful*, FOUL) < *defoulen* < OFr. *defouler*, to tread underfoot, insult < *de-*, intens. + *fouler* < VL. **fullare*, to tread, FULL] 1. to make filthy or dirty; pollute 2. to make ceremonially unclean 3. to corrupt 4. to profane or sully, as a person's name 5. [Archaic] to violate the chastity of; deflower —*SYN.* see CONTAMINATE —**de·file'ment** *n.* —**de·fil'er** *n.*

**de·file**[2] (di fīl', dēfīl) *vi.* -**filed'**, -**fil'ing** [Fr. *défiler*, to file off, unravel < *dé-* (L. *de-*), from + *filer*, to form a line < *fil*, thread: see FILE[1]] to march in single file or by files —*n.* [Fr. *défilé* < the *v.*] 1. a narrow passage through which troops must defile 2. any narrow valley or mountain pass 3. a march in single file or by files

**de·fine** (di fīn') *vt.* -**fined'**, -**fin'ing** [ME. *diffinen* < OFr. *definer* & ML. *diffinire*, both < L. *definire*, to limit, define < *de-*, from + *finire*, to set a limit to, bound < *finis*, boundary] 1. *a)* to determine or set down the boundaries of *b)* to trace the precise outlines of; delineate 2. to determine or state the extent and nature of; describe exactly [*define* your duties] 3. *a)* to give the distinguishing characteristics of *b)* to constitute the distinction of; differentiate [reason *defines* man] 4. to state the meaning or meanings of (a word, etc.) —*vi.* to prepare definitions, as of words —**de·fin'a·ble** *adj.* —**de·fin'er** *n.*

**def·i·nite** (def'ə nit) *adj.* [L. *definitus*, pp. of *definire*: see prec.] 1. having exact limits 2. precise and clear in meaning; explicit 3. certain; positive [it's *definite* that he'll go] 4. *Gram.* limiting or specifying ["the" is the *definite* article] 5. *Bot.* having a constant number of stamens, etc., less than 20 but always a multiple of the number of petals —*SYN.* see EXPLICIT —**def'i·nite·ly** *adv.* —**def'i·nite·ness** *n.*

**definite integral** *Math.* an integral in which the range of integration is specified

**def·i·ni·tion** (def'ə nish'ən) *n.* [ME. *diffinicioun* < OFr. *definicion* & ML. *diffinitio*, both < L. *definitio*] 1. a defining or being defined 2. a statement of what a thing is 3. a statement of the meaning of a word, phrase, etc. 4. *a)* a putting or being in clear, sharp outline *b)* a making or being definite, explicit, clear, etc. 5. the power of a lens to show (an object) in clear, sharp outline 6. the degree of distinctness of a photograph, etc. 7. the clearness with which recorded or broadcast sounds or televised images are reproduced; absence of fuzziness —**def'i·ni'tion·al** *adj.*

**de·fin·i·tive** (di fin'ə tiv) *adj.* [ME. *diffinitif* < OFr. *definitif* < L. *definitivus* < pp. of *definire*, DEFINE] 1. that decides or settles in a final way; decisive; conclusive [a *definitive* answer] 2. most nearly complete and accurate [a *definitive* biography] 3. serving to define; limiting or distinguishing precisely [*definitive* details] 4. *Biol.* fully developed, as a structure or part —**de·fin'i·tive·ly** *adv.* —**de·fin'i·tive·ness** *n.*

**definitive host** the organism on or in which a parasite lives in the adult stage

**de·fin·i·tude** (di fin'ə tood', -tyood) *n.* [< L. *definitus* (see DEFINITE), after FINITUDE] the quality of being definite; precision

**def·la·grate** (def'lə grāt') *vt.*, *vi.* -**grat'ed**, -**grat'ing** [< L. *deflagratus*, pp. of *deflagrare*, to burn, consume < *de-*, intens. + *flagrare*, to burn] to burn rapidly, with intense heat and dazzling light —**def'la·gra'tion** *n.*

**de·flate** (di flāt') *vt.*, *vi.* -**flat'ed**, -**flat'ing** [DE- + (IN)FLATE] 1. to collapse by letting out air or gas [to *deflate* a tire] 2. to make smaller or less important 3. to cause deflation of (currency, prices, etc.) Opposed to INFLATE —*SYN.* see CONTRACT —**de·fla'tor** *n.*

**de·fla·tion** (di flā'shən) *n.* 1. a deflating or being deflated 2. a lessening of the amount of money in circulation, resulting in a relatively sharp and sudden rise in its value and fall in prices 3. *Geol.* erosion by the wind See INFLATION —**de·fla'tion·ar'y** *adj.*

**de·flect** (di flekt') *vt.*, *vi.* [L. *deflectere* < *de-*, from + *flectere*, to bend] to turn or make go to one side; bend; swerve —**de·flec'tive** *adj.* —**de·flec'tor** *n.*

**de·flec·tion** (di flek'shən) *n.* [LL. *deflexio* < L. *deflexus*, pp. of prec.] 1. a) a deflecting or being deflected; a turning aside, bending, or deviation *b)* the amount of this 2. the deviation from the zero mark of the needle or pointer of a measuring instrument

**de·flexed** (di flekst') *adj.* [earlier *deflex* (< L. *deflexus*, pp. of *deflectere*, DEFLECT) + -ED] bent downward, as branches, leaves, or hairs

**de·flex·ion** (di flek'shən) *n. Brit. sp. of* DEFLECTION

**def·lo·ra·tion** (def'lə rā'shən) *n.* [ME. *defloracioun* < OFr. *desfloracion* < LL.] the act of deflowering

**de·flow·er** (di flou'ər) *vt.* [ME. *deflouren* < OFr. *desflorer* < L. *deflorare* < *de-*, from + *flos* (gen. *floris*), FLOWER] 1. to make (a woman) no longer a virgin 2. to ravage or spoil 3. to remove flowers from (a plant)

**De·foe** (di fō'), **Daniel** 1660?-1731; Eng. writer

**de·fo·li·ant** (dē fō'lē ənt) *n.* a chemical spray that strips growing plants of their leaves

**de·fo·li·ate** (-āt') *vt.* -**at'ed**, -**at'ing** [< LL. *defoliatus*, pp.

to send or appoint as a representative or deputy   **2.** to entrust (authority, power, etc.) to a person acting as one's agent or representative

**del·e·ga·tion** (del'ə gā'shən) *n.* [L. *delegatio*] **1.** a delegating or being delegated   **2.** a body of delegates

**de·lete** (di lēt') *vt.* -let'ed, -let'ing [< L. *deletus*, pp. of *delere*, to blot out, destroy < *de-*, from + base of *linere*, to daub, rub over (writing on a wax tablet with the blunt end of the style) < IE. base *\*lei-*, viscous, smooth (whence LIME)] to take out (a printed or written letter, word, etc.); cross out —**SYN.** see ERASE

**del·e·te·ri·ous** (del'ə tir'ē əs) *adj.* [Gr. *dēlētērios* < *dēleisthai*, to injure] harmful to health, well-being; etc.; injurious —**SYN.** see PERNICIOUS —**del'e·te'ri·ous·ly** *adv.* —**del'e·te'ri·ous·ness** *n.*

**de·le·tion** (di lē'shən) *n.* [L. *deletio*] **1.** a deleting or being deleted   **2.** a deleted word, passage, etc.   **3.** *Genetics* the absence of some normal portion of a chromosome

**Delft** (delft) city in W. Netherlands: pop. 77,000

**delft·ware** (delft'wer') *n.* **1.** glazed earthenware, usually blue and white, which originated in Delft   **2.** any similar ware  Also **delft**, **delft** (delf)

**Del·hi** (del'ē) **1.** territory in N India: 573 sq. mi.; pop. 2,659,000   **2.** city in this territory, on the Jumna River: pop. 2,062,000; also called **Old Delhi**: see also NEW DELHI

**De·li·a** (dēl'yə) [L., fem. of *Delius*, of Delos] a feminine name

**De·li·an** (dē'lē ən) *adj.* of or having to do with Delos —*n.* a native or inhabitant of Delos

**de·lib·er·ate** (di lib'ər it; *for v.*, -āt') *adj.* [ME. < L. *deliberatus*, pp. of *deliberare*, to consider, weigh well < *de-*, intens. + *librare*, to weigh < *libra*, a scales] **1.** carefully thought out and formed, or done on purpose; premeditated **2.** careful in considering, judging, or deciding; not rash or hasty   **3.** unhurried and methodical [take *deliberate* aim] —*vi.* -at'ed, -at'ing to think or consider carefully and fully; esp., to consider reasons for and against a thing in order to make up one's mind [a jury *deliberates*] —*vt.* to consider carefully —**SYN.** see THINK[1], VOLUNTARY —**de·lib'er·ate·ly** *adv.* —**de·lib'er·ate·ness** *n.* —**de·lib'er·a'tor** *n.*

**de·lib·er·a·tion** (di lib'ə rā'shən) *n.* [ME. *deliberacioun* < OFr. *deliberation* < L. *deliberatio*] **1.** a deliberating, or considering carefully   **2.** [*often pl.*] consideration and discussion of alternatives before reaching a decision [the *deliberations* of statesmen]   **3.** the quality of being deliberate; carefulness; slowness

**de·lib·er·a·tive** (di lib'ə rāt'iv, -ər ə tiv) *adj.* [L. *deliberativus*] **1.** of or for deliberating [a *deliberative* assembly] **2.** characterized by or resulting from deliberation —**de·lib'er·a'tive·ly** *adv.*

**De·libes** (də lēb'), **(Clément Philibert) Lé·o** (lā ō') 1836-91; Fr. composer

**del·i·ca·cy** (del'i kə sē) *n., pl.* **-cies** [ME. *delicacie* < ML. *delicacia* < L. *delicatus*: see DELICATE] **1.** the quality of being delicate in taste, odor, texture, etc.   **2.** fragile beauty or graceful shapeliness, softness, etc.; fineness [the *delicacy* of a petal, of spun glass, or of a child's face]   **3.** weakness of constitution or health; frailty   **4.** the quality or condition of needing careful and deft handling [negotiations of great *delicacy*]   **5.** fineness of feeling, observation, or appreciation [*delicacy* of musical taste]   **6.** sensitiveness of response [the *delicacy* of a compass]   **7.** fineness of touch, skill, etc.   **8.** a fine regard for the feelings of others **9.** a sensitive, or sometimes, finical distaste for what is considered improper or offensive   **10.** a choice food [caviar and other *delicacies*]   **11.** [Obs.] luxuriousness or voluptuousness

**del·i·cate** (del'i kit) *adj.* [ME. *delicat* < L. *delicatus*, giving pleasure, delightful < *\*delicare*, for OL. *delicere*, to allure, entice < *de-*, intens. + *lacere*: see DELIGHT] **1.** pleasing in its lightness, mildness, subtlety, etc. [a *delicate* flavor, color, color, etc.]   **2.** beautifully fine in texture, quality, workmanship, etc. [*delicate* linen, *delicate* skin]   **3.** slight and subtle [a *delicate* difference]   **4.** easily damaged, spoiled, disordered, etc. [a *delicate* vase, a *delicate* stomach]   **5.** frail in health [a *delicate* child]   **6.** *a)* needing careful handling, tact, etc. [a *delicate* situation] *b)* showing tact, consideration, etc.   **7.** finely sensitive in feeling, understanding, discriminating, or responding [a *delicate* ear for music, a *delicate* gauge]   **8.** finely skilled   **9.** having or showing a sensitive or, sometimes, finical distaste for what is considered offensive or improper —*n.* [Archaic or Poet.] a delicacy; dainty —**del'i·cate·ly** *adv.* —**del'i·cate·ness** *n.* **SYN.**—**delicate** and **dainty** are both used to describe things that are pleasing to highly refined tastes or sensibilities, **delicate** implying fragility, subtlety, or fineness, and **dainty**, smallness, fastidiousness, or gracefulness; **exquisite** is applied to something so delicately wrought or subtly refined as to be appreciated by only the most keenly discriminating or fastidious —**ANT.** gross, crude, coarse

☆**del·i·ca·tes·sen** (del'i kə tes''n) *n.* [G. *delikatessen*, derived by folk etym. < *deikat* < Fr. *délicat*) + essen, food, but actually *pl.* of *delikatesse* < Fr. *délicatesse*, delicacy (< *délicat*: see prec.) after It. *delicatezza*, ult. (< same origin] **1.** prepared cooked meats, smoked fish, cheeses,

salads, relishes, etc., collectively   **2.** a shop where such foods are sold

**de·li·cious** (di lish'əs) *adj.* [ME. < OFr. *delicius* < L. *deliciosus* < *deliciae*, delight < *delicere*: see DELICATE] **1.** very enjoyable; delightful [a *delicious* bit of gossip] **2.** very pleasing, esp. to taste or smell —☆*n.* [D.] a variety of sweet, red winter apple —**de·li'cious·ly** *adv.* —**de·li'cious·ness** *n.*

**de·lict** (di likt') *n.* [L. *delictum*, a fault < pp. of *delinquere*, to leave undone: see DELINQUENCY] *Law* an offense; wrong

**de·light** (di līt') *vt.* [ME. *deliten* < OFr. *delitier* < L. *delectare*, to delight, freq. of *delicere* < *de-*, from + *lacere*, to entice, lit., to ensnare < IE. base *\*lek-*, twig, snare, whence OE. *lāl*, whip; sp. infl. by LIGHT[1]] to give great joy or pleasure to —*vi.* **1.** to give great joy or pleasure **2.** to be highly pleased; rejoice (usually with *in* or an infinitive) —*n.* [ME. & OFr. *delit* < the *v.*] **1.** great joy or pleasure   **2.** something giving great joy or pleasure **3.** [Poet.] the power of pleasing greatly —**SYN.** see PLEASURE

**de·light·ed** (-id) *adj.* **1.** highly pleased; happy   **2.** [Obs.] delightful —**de·light'ed·ly** *adv.*

**de·light·ful** (-fəl) *adj.* giving delight; very pleasing; charming: also [Archaic] **de·light'some** (-səm) —**de·light'ful·ly** *adv.* —**de·light'ful·ness** *n.*

**De·li·lah** (di lī'lə) [Heb. *delīlāh*, lit., delicate] *Bible* the mistress of Samson, who betrayed him to the Philistines: Judg. 16 —*n.* a seductive, treacherous woman; temptress

**de·lim·it** (di lim'it) *vt.* [Fr. *délimiter* < L. *delimitare* < *de-*, from + *limitare*) to fix the limits of; mark the boundaries of: also **de·lim'i·tate**' (-ə tāt') —**de·lim'i·ta'tion** *n.* —**de·lim'i·ta'tive** *adj.*

**de·lin·e·ate** (di lin'ē āt') *vt.* -at'ed, -at'ing [< L. *delineatus*, pp. of *delineare*, to sketch out < *de-*, from + *linea*, LINE[1]] **1.** to trace the outline of; sketch out **2.** to draw; depict   **3.** to depict in words; describe —**de·lin'e·a'tion** *n.* —**de·lin'e·a'tive** *adj.* —**de·lin'e·a'tor** *n.*

**de·lin·quen·cy** (di lin'kwən sē) *n., pl.* **-cies** [LL. *delinquentia* < L. *delinquens*, prp. of *delinquere*, to leave undone. commit a fault < *de-*, from + *linquere*, to leave < IE. base *\*leikw-*, to leave, whence Gr. *leipein*, to leave, OE. *lān*, LOAN] **1.** failure or neglect to do what duty or law requires ☆**2.** an overdue debt, tax, etc.   **3.** a fault; misdeed ☆**4.** behavior, esp. by the young, that is antisocial or in violation of the law: see JUVENILE DELINQUENCY

**de·lin·quent** (-kwənt) *adj.* [L. *delinquens*: see prec.] **1.** failing or neglecting to do what duty or law requires ☆**2.** past the time for payment; overdue [*delinquent* taxes] —*n.* a delinquent person; esp., a juvenile delinquent —**de·lin'quent·ly** *adv.*

**del·i·quesce** (del'ə kwes') *vi.* -quesced', -quesc'ing [L. *deliquescere* < *de-*, from + *liquescere*, to melt: see LIQUID] **1.** to melt away   **2.** *Biol. a)* to melt away in the course of growth or decay, as parts of certain fungi *b)* to branch into many fine divisions, as leaf veins **3.** *Chem.* to become liquid by absorbing moisture from the air —**del'i·ques'cence** *n.* —**del'i·ques'cent** *adj.*

**de·lir·i·a·tion** (del'ə rā'shən) *n.* [see DELIRIUM] [Rare] mental aberration; delirium; madness

**de·lir·i·ous** (di lir'ē əs) *adj.* [L. *delirious*: see fl. & -OUS] **1.** in a state of delirium; raving incoherently   **2.** of, characteristic of, or caused by delirium   **3.** wildly excited [*delirious* with joy] —**de·lir'i·ous·ly** *adv.* —**de·lir'i·ous·ness** *n.*

**de·lir·i·um** (-ē əm) *n., pl.* **-i·ums, -i·a** (-ə) [L., madness < *delirus*, crazy, lit., to turn the furrow awry in plowing < *de-*, from + *lira*, a line, furrow] **1.** a temporary state of extreme mental excitement, marked by restlessness, confused speech, and hallucinations: it is sometimes occurs during a fever, in some forms of insanity, etc.   **2.** uncontrollably wild excitement or emotion [a *delirium* of joy] —**SYN.** see MANIA

**delirium tre·mens** (trē'mənz) [ModL. (1813), lit., trembling delirium] a violent delirium resulting chiefly from excessive drinking of alcoholic liquor, and characterized by sweating, trembling, anxiety, and frightening hallucinations

**del·i·tes·cent** (del'ə tes''nt) *adj.* [L. *delitescens*, prp. of *delitescere*, to hide away < *de-*, from + *latescere*, to hide oneself < *latere*, to lurk: see LATENT] [Rare] lying hidden; latent or inactive —**del'i·tes'cence** *n.*

**De·li·us** (dē'lē əs, dēl'yəs), **Frederick** 1862-1934; Eng. composer

**de·liv·er** (di liv'ər) *vt.* [ME. *deliveren* < OFr. *délivrer* < VL. *deliberare*, to liberate < L. *de-*, from + *liberare*, to set free < *liber*, free] **1.** to set free or save from evil, danger, etc. [*delivered* from bondage]   **2.** to assist (a female) at the birth of (offspring) *(to deliver* a woman of a child, to deliver a baby)*   **3.** to give forth, or express, in words; make (a speech, pronouncement, etc.); utter   **4.** to give or hand over; transfer   **5.** to carry to and leave at the proper place or places; distribute [*deliver* the mail]   **6.** to give or send forth; discharge; emit [the vli well *delivered* 20 barrels a day]   **7.** to strike (a blow)   **8.** to throw or toss [the

# ADDENDUM E

**Designation of relevant originating court documents pursuant to 6 Cir. R. 28(b)(1)(A)(i)**

1. Complaint, Docket 1, Page ID# 1
2. Amended Complaint, Docket 8, Page ID# 29
3. Defendants' Answer, Docket 42, Page ID# 244
4. Plaintiff's Memorandum in Support of Motion for Summary Judgment, Docket 112-1, Page ID## 48517-18
5. Defendants' Statement of Undisputed Material Facts, Docket 113-3, Page ID# 48602-06