# In the United States Court of Appeals for the Sixth Circuit

**U.S. DEPARTMENT OF LABOR,**
*Appellee-Plaintiff,*

**v.**

**AMERICARE HEALTHCARE SERVICES, INC; DILLI ADHIKARI,**
*Defendants-Appellants.*

On Appeal from the United States District Court for the Southern District of Ohio, Eastern Division, 2:21-cv-5076

## PETITION FOR PANEL REHEARING AND REHEARING EN BANC

Bruce C. Fox
Daniel McArdle Booker
OBERMAYER REBMANN
MAXWELL & HIPPEL LLP
525 William Penn Place,
Suite 1710
Pittsburgh, PA 15219
(412) 566-1500
bruce.fox@obermayer.com

Michael Buschbacher
James R. Conde
 *Counsel of Record*
Nicholas Cordova
Walker Fortenberry
BOYDEN GRAY PLLC
800 Connecticut Avenue NW
Suite 900
Washington, DC 20006
(202) 955-0620
jconde@boydengray.com

# TABLE OF CONTENTS

INTRODUCTION AND RULE 40(B) STATEMENT ..............................1

BACKGROUND..............................................................................5

    I.    Legal Background...................................................5

        A.    The Exemptions...........................................5

        B.    *Long Island Care v. Coke*................................7

        C.    The 2013 Rule...............................................7

    II.    Factual and Procedural Background......................9

REASONS FOR GRANTING THE PETITION......................................10

    I.    The Panel Decision Conflicts With *Loper Bright*'s Presumption of Independent Review....................................10

    II.    The Panel Departs from *Chenery* and Party Presentation...15

    III.    The Panel Decision Flips *Stare Decisis* On Its Head By Extending *Chevron* Precedent................................................17

    IV.    The Panel Egregiously Misapplies Its Interpretation..........20

CONCLUSION....................................................................................21

# TABLE OF AUTHORITIES

**PAGE(S)**

**CASES**

*Becerra v. Empire Health Found.,*
597 U.S. 424 (2022) ..................................................................15

*Chevron USA Inc. v. NRDC,*
467 U.S. 837 (1984) ..................................................................19

*In re Chrysler Pacifica Fire Recall Prods. Liab. Litig.,*
143 F.4th 718 (6th Cir. 2025) ..................................................16

*Citizens Coal Council v. EPA,*
447 F.3d 879 (6th Cir. 2006) ...................................................17

*Hallstrom v. Tillamook County,*
493 U.S. 20 (1989) ...................................................................13

*Herr v. U.S. Forest Serv.,*
803 F.3d 809 (6th Cir. 2015) ...................................................18

*Home Care Ass'n of Am. v. Weil,*
76 F. Supp. 3d 138 (D.D.C. 2014) .........................................6, 8

*Home Care Ass'n of Am. v. Weil,*
799 F.3d 1084 (D.C. Cir. 2015) ............................................7, 8, 9

*Long Island Care at Home, Ltd. v. Coke,*
551 U.S. 158 (2007) .........................3, 7, 14, 16, 17, 18, 19

*Loper Bright Enters. v. Raimondo,*
603 U.S. 369 (2024) .........................1, 4, 11, 17, 19

*In re MCP No. 185,*
124 F.4th 993 (6th Cir. 2025) ..............................................4, 17

*Michigan v. EPA,*
   576 U.S. 743 (2015) ..................................................................15

*Moctezuma-Reyes v. Garland,*
   124 F.4th 416 (6th Cir. 2024) ...................................1, 4, 10, 11, 13, 15

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife,*
   551 U.S. 644 (2007) ..................................................................11

*Pickens v. Hamilton-Ryker IT Sols., LLC,*
   133 F.4th 575 (6th Cir. 2025) ...........................................2, 4, 10

*Return Mail, Inc. v. USPS,*
   587 U.S. 618 (2019) ..................................................................15

*SEC v. Chenery Corporation,*
   318 U.S. 80 (1943) ................................................................4, 15

*Tennessee v. Becerra,*
   131 F.4th 350 (6th Cir. 2025) ...............................................19

*Tennessee v. Kennedy,*
   No. 25-162, 2026 WL 135717 (U.S. Jan. 20, 2026)...........................19

*United States v. Sineneng-Smith,*
   590 U.S. 371 (2020) ..............................................................4, 15

*United States v. Trumbull,*
   114 F.4th 1114 (9th Cir. 2024) ...............................................17

**STATUTES**

29 U.S.C. § 202................................................................................2

29 U.S.C. § 206(a) ...........................................................................5

29 U.S.C. § 206(f) ........................................................................5, 14

29 U.S.C. § 207(a)(1) ........................................................................5

29 U.S.C. § 207(*l*) .....................................................................1, 5, 14

29 U.S.C. § 213(a)(1) ..........................................................................11

29 U.S.C. § 213(a)(15) ...............................................................6, 11, 13

29 U.S.C. § 213(b)(14) .........................................................................11

29 U.S.C. § 213(b)(21) .............................................................1, 6, 10, 11

29 U.S.C. § 216(a) ................................................................................5

29 U.S.C. § 216(c) ................................................................................5

29 U.S.C. § 216(e)(2) ............................................................................5

Pub. L. No. 93-259..............................................................................2

**REGULATIONS**

29 C.F.R. § 552.3.................................................................................13

29 C.F.R. § 552.6.................................................................................20

29 C.F.R. § 552.6(b).........................................................................4, 20

29 C.F.R. § 552.109(c) ..................................................................2, 13, 15

40 Fed. Reg. 7,404 (Feb. 20, 1975).......................................................6

78 Fed. Reg. 60,454 (Oct. 1, 2013) ...............................................1, 8, 16

90 Fed. Reg. 28,976 (July 2, 2025).......................................................5, 9

**OTHER AUTHORITIES**

Question Presented, No. 06-593,
    https://www.supremecourt.gov/qp/06-00593qp.pdf.......................7, 18

The White House, Press Release, *We Can't Wait* (Dec. 15,
    2011), https://perma.cc/H8EM-H3QS.............................................8

## INTRODUCTION AND RULE 40(B) STATEMENT

The final rule at issue here differs from the "best reading" of the statute followed by an agency for nearly 40 years. 78 Fed. Reg. 60,454, 60,482 (Oct. 1, 2013). After *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), this should have been a straightforward case. But the panel had other ideas. The panel's departures from text, precedent, and party presentation call for rehearing.

The Fair Labor Standards Act (FLSA), as amended in 1974, generally requires employers to pay overtime to employees "in domestic service." 29 U.S.C. § 207(*l*). But the law exempts live-in domestic workers: the overtime requirement "shall not apply with respect to … any employee who is employed in domestic service in a household and who resides in such household." *Id.* § 213(b)(21). All agree the exemption applies to the employees here. Op.5 ("All of Americare's home care workers are live-in workers …."). The exemption is mandatory ("shall not apply"), so "eligibility isn't up to the 'judgment' or 'opinion' of the" agency. *Moctezuma-Reyes v. Garland*, 124 F.4th 416, 421 (6th Cir. 2024). Accordingly, after *Loper Bright*, the Court's "responsibility" is "to honor the statute's 'single, best meaning,' 'fixed at the time of enactment,' whether the

1

agency has the same view or not." *Pickens v. Hamilton-Ryker IT Sols., LLC*, 133 F.4th 575, 588 (6th Cir. 2025) (citation omitted). And under the single "best meaning," as followed by the Department of Labor (DOL) when the law was enacted and for nearly forty years, that exemption ends this case.

The panel instead defers to DOL's atextual proclamation that so-called "third-party employers" outside the household, such as defendants, "may not avail themselves of the" live-in exemption. 29 C.F.R. § 552.109(c). That's a "rewrite." Op.23 (Bush, J., concurring.). To defend that rewrite, DOL relied upon *Chevron* and its general rulemaking authority. Pub. L. No. 93-259, § 29(b); 29 U.S.C. § 202 (note). This argument conflicts with a "faithful reading of *Loper Bright*," so rejecting it should have been "easy." Op.27 (Bush, J., concurring).

Instead of charting the "easy" (lawful) course, however, the panel improvises novel theories to defer. The panel relies upon a delegation tucked into a parenthetical of a different FLSA exemption in a different subsection to claim that the agency had the express and clear delegation that *Loper Bright* requires. But as can happen with legal theories never tested through the adversarial process or advanced by the agency in the

administrative record, the panel opinions suffer from crippling flaws. The majority rewrites the live-in exemption based upon a theory that DOL disclaimed and that bears no resemblance to the rule. It then misapplies its novel interpretation to the facts, reaching the wrong conclusion. The concurring opinion rests upon a different interpretation that DOL also never advanced and that would gut the 1974 amendments. Both opinions pay only lip service to *Loper Bright*'s requirement of a clear express delegation, and trample basic principles of party presentation and the *Chenery* doctrine.

The panel then compounds the error by concluding that DOL's putative delegation includes the power to "rewrite … the exemption." Op.23 (Bush, J., concurring). The basis for this rewrite is *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158 (2007), a *Chevron* case about a different FLSA exemption upholding the *opposite* interpretation. The panel concludes that *Coke* greenlights "flipping back and forth in its regulation of an industry," Op.27 (Bush, J., concurring), even after *Loper Bright*. Extending reasoning based upon *Chevron* and *Brand X* rather than following *Loper Bright* stands *stare decisis* on its head.

En banc rehearing is warranted three times over. The panel's decision conflicts with *Loper Bright,* 603 U.S. 369, *Moctezuma-Reyes*, 124 F.4th 416, and *Pickens*, 133 F.4th 575. The panel's departures from the administrative record and party presentation conflict with *SEC v. Chenery Corporation,* 318 U.S. 80 (1943), and *United States v. Sineneng-Smith*, 590 U.S. 371 (2020). And the panel's misunderstanding of *stare decisis* conflicts with *Loper Bright* and *In re MCP No. 185*, 124 F.4th 993 (6th Cir. 2025). The decision is extraordinary because it threatens to subject persons in this circuit to "an eternal fog of uncertainty." *Loper Bright,* 603 U.S. at 411.

Panel rehearing is also warranted. The panel fails to grasp that under its interpretation, correctly applied, defendants are still exempt. The panel affords DOL rewriting authority "*only insofar as* it regulates companionship workers," which it says "includes all the workers employed by Americare." Op.10–11. But according to DOL's rule, Americare's workers don't provide companionship services: they provide mostly care. 29 C.F.R. § 552.6(b). If the panel is going to improvise a new interpretation, then it should apply it correctly and reverse.

Finally, DOL last year proposed to repeal the rule relied upon by the panel because it is not the best reading. 90 Fed. Reg. 28,976 (July 2, 2025). The Court should at least hold this petition pending this rulemaking change.

## BACKGROUND

### I. LEGAL BACKGROUND

#### A. THE EXEMPTIONS

The FLSA requires employers to pay covered employees a minimum wage and overtime. 29 U.S.C. §§ 206(a), (f), 207(a)(1), (*l*). Failure to comply makes an employer potentially liable for backpay, an equal amount in liquidated damages, and penalties, fines, and imprisonment. *Id.* § 216(a), (c), (e)(2).

In 1974, Congress expanded the FLSA's coverage to employees in "domestic service." *Id.* §§ 206(f), 207(*l*). But Congress included two exemptions.

First, Congress exempted all employees providing "companionship services" to the elderly or infirm from the minimum wage and overtime. The FLSA "shall not apply with respect to"

> any employee employed in domestic service employment to provide companionship services for individuals who (because

of age or infirmity) are unable to care for themselves (*as such terms are defined and delimited by regulations of the Secretary*)[.]

29 U.S.C. § 213(a)(15) (emphasis added).

Second, the FLSA's overtime requirement "shall not apply with respect to—

any employee who is employed in domestic service in a household and who resides in such household[.]

*Id.* § 213(b)(21).

In 1975, DOL promulgated a contemporaneous rule interpreting both exemptions. 40 Fed. Reg. 7,404 (Feb. 20, 1975). DOL considered whether the exemptions should apply to employees who "are employed by an employer or agency other than the family or household using their services." *Id.* at 7,405. After "consideration," DOL "concluded that these exemptions can be available to such third party employers since they apply to 'any employee' engaged 'in' the enumerated services. This interpretation is more consistent with the statutory language and prior practices concerning other similarly worded exemptions." *Id.* DOL codified this best reading. *Id.* at 7,407. For nearly four decades, DOL followed this reading. *See Home Care Ass'n of Am. v. Weil,* 76 F. Supp. 3d 138, 141, 147

6

(D.D.C. 2014) (*Home Care I*), *rev'd*, 799 F.3d 1084 (D.C. Cir. 2015) (*Home Care III*).

**B.** ***LONG ISLAND CARE V. COKE***

In *Long Island Care at Home, Ltd. v. Coke*, the Supreme Court addressed a challenge to the 1975 rule in a private dispute about the companionship-services exemption. 551 U.S. 158. The question presented was "[w]hether the Second Circuit erred in refusing to give deference under *Chevron*" to the 1975 rule. Question Presented, No. 06-593, https://www.supremecourt.gov/qp/06-00593qp.pdf. The Court answered yes. The holding was narrow: "The question before us is whether, in light of the statute's text and history … the Department's regulation is valid and binding. We conclude that it is." *Coke*, 551 U.S. at 162 (citing *Chevron USA Inc. v. NRDC*, 467 U.S. 837 (1984)). Applying the deference framework of *Chevron*, *id.* at 165, 172–74, the Court explained that "the text of the FLSA does not expressly answer the third-party-employment question." *Id.* at 168.

**C.** **THE 2013 RULE**

In 2011, after failing to obtain legislation extending overtime pay to home-care providers, the President concluded that "we can't wait for

Congress to act." The White House, Press Release, *We Can't Wait* (Dec. 15, 2011), https://perma.cc/H8EM-H3QS.

Following this directive, DOL promulgated the 2013 rule. DOL asserted that third parties "may not avail themselves" of the companionship-services or live-in exemptions, unless they are members of the same "family" as the recipient. 78 Fed. Reg. at 60,454, 60,557 . This subjected home-care providers—over 10,000 businesses—to the FLSA. *See id.* at 60,519–20; *Home Care I*, 76 F. Supp. 3d at 147. To justify this change, DOL resorted to *Chevron* deference. 78 Fed. Reg. at 60,481.

For good measure, DOL gutted the companionship-services exemption by excluding "care"—except at most one-fifth of the hours worked— from the definition of companionship services: henceforth, companionship services would be limited to "fellowship" or "protection." *Id.* at 60,557.

An association of home-care agencies challenged the 2013 rule. The district court held the rule unlawful, *Home Care I*, 76 F. Supp. 3d at 147– 48, but the court of appeals reversed, reviewing the rule "pursuant to the two-step *Chevron* framework." *Home Care III*, 799 F.3d at 1090. The court rejected the "challenge to the regulations at *Chevron* step one" by

relying upon *Coke*, and held that the regulation "passes muster at *Chevron* step two." *Id.* at 1093–94.[1]

## II. FACTUAL AND PROCEDURAL BACKGROUND

Dilli Adhikari owns Americare (collectively, "Americare"), a home-care agency. "All of Americare's home care workers are live-in workers." Op.5. DOL nevertheless brought suit, alleging that Americare was covered by the 1974 amendments because Americare "employ[s] persons … in domestic service." Stipulated Am. Compl., R.8, Page ID #30. Americare explained that its employees are exempt. The district court held Americare could not assert the exemptions and found the underlying FLSA violations willful, entered injunctive relief, and assessed damages totaling nearly $15 million. Op., R.121, Page ID #49057.

The panel affirmed. The majority never addressed "the parties' arguments," which focused on whether § 29(b) authorized the 2013 rule for the live-in exemption. Op.11 n.2. Instead, the panel concluded that the delegation to delimit terms *in the companionship-services exemption*

---

[1] Last July DOL proposed to restore the 1975 rule. DOL noted that "the 1975 regulations better comport with the statute and Congress's intent to exempt home care employees from FLSA coverage." 90 Fed. Reg. at 28,978.

somehow "extends" to the live-in exemption "insofar as they overlap in their regulatory coverage." Op.10. The panel then deferred to DOL's proclamation that employers such as Americare cannot claim either exemption. The panel claimed that it was bound to defer because "*Coke* controls this case." Op.13. The panel last concluded that *a fortiori* Americare lacked standing to challenge DOL's definition of "companionship services." Op.16–17.

<u>**REASONS FOR GRANTING THE PETITION**</u>

**I.  THE PANEL DECISION CONFLICTS WITH *LOPER BRIGHT*'S PRESUMPTION OF INDEPENDENT REVIEW**

Under the Administrative Procedure Act (APA), there is a strong presumption of independent judicial review of questions of law unless an agency can point to specific vesting language that "expressly delegates discretionary authority" to the agency. *Pickens*, 133 F.4th at 588. "The actual delegation of the authority must be clear." *Moctezuma-Reyes*, 124 F.4th at 421.

The live-in exemption contains no delegation to the agency, let alone a clear one. Far from allowing discretion, the live-in exemption is mandatory: Overtime pay "shall not apply with respect to … any employee" that satisfies the criteria. 29 U.S.C. § 213(b)(21). This text

"indicates a command that admits of no discretion on the part of the person instructed to carry out the directive." *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 661 (2007). Canons of interpretation reinforce this conclusion. Congress delegated DOL discretion to delimit the terms of the companionship-services and other exemptions, but not the live-in exemption. *Moctezuma-Reyes*, 124 F.4th at 421; *compare* 29 U.S.C. § 213(b)(21), *with id.* § 213(a)(1), (15), (b)(14). Courts "presume that Congress acts intentionally when it uses different [delegation] language across similar provisions." *Moctezuma-Reyes*, 124 F.4th at 421.

That deliberate difference in treatment makes sense in context. The companionship-services exemption raises several line-drawing questions agencies are good at resolving. For example, companionship services usually include some household work ordinarily performed by a maid. But how much household work is too much? Congress authorized DOL to draw the line. By contrast, the live-in exemption is straightforward: does the domestic worker reside where he or she works? Implementing this exemption requires no administrative skill, just legal interpretation and adjudicative fact. That has been the "field" of Article III courts "for at least 221 years." *Loper Bright*, 603 U.S. at 412.

To find a delegation, the panel majority advances a "counterintuitive" reading of the live-in exemption. Op.3. The majority notes that there is "overlap" in the 1974 exemptions because (1) companionship services are domestic services, and (2) some companionship-services workers may live where they work. Op.9. The majority then asserts that, given this overlap, if DOL promulgated "a regulation limiting the scope of the Companionship Services Exemption only, that regulation would have no practical effect on overtime payment for the substantial portion of companionship workers who are also live-in workers, because their employers could simply claim the Live-In Exemption instead." Op.10. Apparently finding that "practical effect" undesirable, the majority concludes that the delegation to define and delimit terms in the companionship-services exemption therefore "extends" to the live-in exemption "insofar as they overlap in their regulatory coverage." *Id.*

Americare is "hard pressed to see how the text of these exemptions supports the majority's interpretation." Op.18 (Bush, J., concurring). The majority re-writes the live-in exemption to say: "any employee who is employed in domestic service in a household and who resides in such

household**, except employees providing companionship services under 29 U.S.C. § 213(a)(15)**." Courts "are not at liberty to create an exception where Congress has declined to do so." *Hallstrom v. Tillamook County*, 493 U.S. 20, 27 (1989). Regardless, this convoluted reading is no way for Congress to communicate a "clear" delegation. *Moctezuma-Reyes*, 124 F.4th at 421.

Judge Bush improvises a different theory:

> Congress gave the Department the authority to define and delimit the phrase "domestic service employment ...." 29 U.S.C. § 213(a)(15). The Department exercised its authority and defined this term, and, at least under *Coke*, could delimit the term to exclude third-party employers. We then apply that definition and its delimitations to the rest of the statute, including the live-in exemption ... So now the live-in exemption, after taking on the Department-supplied definition of domestic service employment, includes a third-party exclusion.

Op.19.

Every premise of this theory is flawed. First, DOL didn't "exercise[] its authority" to define domestic service when excluding third-party employers. All agree that DOL defines "domestic service employment" to include "personal care aides" such as the employees here, 29 C.F.R. § 552.3, and the rule excluding third-party employers only applies *if* the employees are "engaged in live-in *domestic service employment*." 29 C.F.R. § 552.109(c) (emphasis added). Indeed, Judge Bush recognizes that

DOL's rule doesn't "purport to define or delimit any terms." Op.21. How can DOL exercise its power to define a term if it didn't even "purport to" do so?

Second, DOL never argued that such a (non-existent) definition of domestic service should apply "to the rest of the statute." Op.19. DOL agrees that under the FLSA's coverage provision, 29 U.S.C. § 207(*l*), Americare employs workers in "domestic service." *See, e.g.*, Stipulated Am. Compl., R.8, at Page ID #30. Contending otherwise would be ludicrous. As the Supreme Court noted in *Coke*, reading "domestic service" "across the FLSA" to exclude third-party employers would gut the 1974 amendments. *Coke*, 551 U.S. at 169. For example, applying that reading to the coverage provisions for "domestic service," 29 U.S.C. §§ 206(f), 207(*l*), "would place outside the scope of FLSA's wage and hour rules any butlers, chauffeurs, and so forth who are employed by *any* third party" not covered before 1974, which "seems clearly contrary to Congress' intent in enacting the 1974 Amendment." *Coke*, 551 U.S. at 169.

A delegation tucked into a parenthetical of a single exception cannot bear this weight. "If Congress does not alter the fundamentals of a statutory scheme in vague terms or ancillary provisions, then it

14

ordinarily does not do so in parentheticals either." *Becerra v. Empire Health Found.*, 597 U.S. 424, 440 (2022) (cleaned up). The presumption of consistent usage that Judge Bush cites "readily yields to context," *Return Mail, Inc. v. USPS*, 587 U.S. 618, 629 (2019), and here, context makes it implausible to think that Congress impliedly delegated to DOL the power to end coverage for vast swaths of employees in a single parenthetical of a single exemption. Such an implausible assumption is no basis to find "clear" vesting language. *Moctezuma-Reyes*, 124 F.4th at 421.

## II. THE PANEL DEPARTS FROM *CHENERY* AND PARTY PRESENTATION

The panel decision also conflicts with *SEC v. Chenery Corp.*, 318 U.S. 80 (1943), which establishes the "foundational principle of administrative law that a court may uphold agency action only on the grounds that the agency invoked when it took the action," *Michigan v. EPA*, 576 U.S. 743, 758 (2015). And it conflicts with "the principle of party presentation." *Sineneng-Smith*, 590 U.S. at 375.

The majority's "overlap" interpretation has no basis in DOL's *actual* rule, which excludes *all* third-party employers from the live-in exemption, not just employers of companionship-service workers. 29

15

C.F.R. § 552.109(c). DOL also never advanced the majority's "overlap" interpretation. Indeed, DOL twice *rejected* the interpretation during argument:

> Court: Do you think the "define and delimit" delegation that is there in the companionship exemption is limited with respect to the live-in exemption to those instances where the live-in employee is also doing companionship services, so to speak?
>
> DOL: No, Your honor.

Oral Arg. 23:07–23:26; *see also* 23:12–24:28 (same).

By overruling DOL's lawyers and advancing a theory with no basis in the rule, the panel assumes the roles of Secretary and Solicitor of Labor. *Chenery* and our adversarial system don't permit that.

Nor did DOL ever embrace Judge Bush's alternative reading, as that would blow a vast hole in the 1974 amendments. DOL's rule was seeking to "expand coverage," not contract it. 78 Fed. Reg. at 60,455. If DOL really meant to advance a theory that "seems clearly contrary to Congress' intent in enacting the 1974 Amendment," *Coke*, 551 U.S. at 169, then it must say so, in a rule.

In short, the panel blatantly ignores *Chenery* and fail to "rely on the parties to frame the issues for decision." *In re Chrysler Pacifica Fire Recall Prods. Liab. Litig.*, 143 F.4th 718, 725 (6th Cir. 2025). This alone

merits rehearing. *See Citizens Coal Council v. EPA*, 447 F.3d 879, 905 (6th Cir. 2006) (en banc) ("[T]he panel majority erred in ruling on grounds not raised by the parties …. We granted en banc review … to vacate the panel majority's *sua sponte* determination of those unbriefed issues").

## III. THE PANEL DECISION FLIPS *STARE DECISIS* ON ITS HEAD BY EXTENDING *CHEVRON* PRECEDENT

The panel majority also contravenes *Loper Bright* and *In re MCP* by giving broad *stare decisis* effect to the reasoning, as opposed to only the specific holding, of a *Chevron*-based decision, *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158 (2007).

*Loper Bright* abrogates the reasoning of prior decisions applying *Chevron* deference. The only part of those decisions "still subject to statutory *stare decisis*" are their holdings that "*specific* agency actions are lawful." *Loper Bright*, 603 U.S. at 376 (emphasis added); *see also In re MCP No. 185*, 124 F.4th at 1002–03; *United States v. Trumbull*, 114 F.4th 1114, 1125–26 (9th Cir. 2024) (Bea, J., concurring in the judgment).

Because *Coke* reasoned "that courts should defer to the Department's rule" under *Chevron, see* 551 U.S. at 174, only its core holding survives: "the Department's [1975] regulation [was] valid and

17

binding." *Id.* at 162. But this case involves the 2013 rule, a different and opposite "specific agency action," so the surviving holding doesn't apply. Moreover, the live-in exemption was not at issue in *Coke*, and *stare decisis* "does not require courts to extend" reasoning to other statutory provisions. *Herr v. U.S. Forest Serv.*, 803 F.3d 809, 817 (6th Cir. 2015).

The panel majority nevertheless claims that reasoning or dicta in "*Coke* controls this case" because *Coke* "is not a *Chevron* case." Op.14. This is untenable. The question presented in *Coke* was "[w]hether the Second Circuit erred in refusing to give deference under *Chevron*" to the 1975 rule interpreting the companionship-services exemption. Question Presented, No. 06-593, https://www.supremecourt.gov/qp/06-00593qp. pdf. And that is the question the Court resolved, holding that the challenged regulation "is entitled to *Chevron* deference." *Coke*, 551 U.S. at 169.

*Coke* starts by citing *Chevron* and discussing DOL's definitional and rulemaking authorities as sufficient delegations at step zero, citing *United States v. Mead Corp.*, 533 U.S. 218 (2001), another *Chevron* case. *Coke*, 551 U.S. at 165. *Coke* then cursorily asserts that "the text of the FLSA does not expressly answer the third-party-employment question."

18

*Id.* at 165, 168. In other words, "Congress has not directly addressed the precise question at issue." *Chevron*, 467 U.S. at 843, *overruled by Loper Bright*, 603 U.S. 369. The word "gap," *Chevron*-speak for an implied delegation, appears eight times in *Coke*. 551 U.S. at 165–74. *Coke* ends by explaining that DOL's 1975 rule binds under *Chevron* because DOL had gone through "notice-and-comment procedures," citing *Mead*. *Id.* at 173–74. All told, *Coke* cites *Chevron* and *Mead* seven times.

*Coke*, in short, "was a *Chevron* case down to its bones." *Tennessee v. Becerra*, 131 F.4th 350, 372 (6th Cir. 2025) (Kethledge, J., dissenting in part and concurring in the judgment in part), *vacated as moot by Tennessee v. Kennedy*, No. 25-162, 2026 WL 135717 (U.S. Jan. 20, 2026). As Judge Bush explains, moreover, *Coke* cannot be reconciled with a proper reading of the term "delimit" under the framework of *Loper Bright* and *Pickens*. Op.21–24. That is unsurprising, because the *Coke* Court was applying *Chevron*, not *Loper Bright*.

The panel's holding is consequential. "*Chevron* was cited in more than 18,000 federal-court decisions." *Loper Bright*, 603 U.S. at 474 (Kagan, J., dissenting). As a result, the *stare decisis* effect of *Chevron*-deference cases after *Loper Bright* will be a constantly recurring issue.

## IV. THE PANEL EGREGIOUSLY MISAPPLIES ITS INTERPRETATION

Rehearing is also warranted because the panel misapplies its own novel rule. The majority *assumes* that Americare's workers provide companionship services. Op.10 ("Still, both exemptions apply to live-in companionship workers, which includes all the workers employed by Americare."). But under DOL's definition of "companionship services," 29 C.F.R. § 552.6, Americare's home-care providers *don't* provide companionship services: they mostly provide care, not "fellowship and protection," *id.* § 552.6(b). That's why Americare challenged the definition. The panel holds that Americare *doesn't even have standing* to challenge DOL's definition because Americare is categorically ineligible to claim the companionship-services exemption, Op.16–17, so the definition stands. Accordingly, if DOL has discretion to rewrite the live-in exemption "*only insofar*" as an employee provides companionship services, Op.11, then it follows that it lacks discretion over Americare's workers. Americare's workers either provide companionship services or they don't. The only apparent logic in the majority's contrary holding is heads DOL wins, tails Americare loses.

Thus, if the Court maintains its theory, it should apply it correctly, clarify that Americare's workers don't provide companionship services under DOL's definition, declare that Americare is eligible to claim the live-in exemption, and reverse.

## <u>CONCLUSION</u>

This Court should grant rehearing en banc or panel rehearing.

Dated: May 18, 2026

Respectfully submitted,

Bruce C. Fox
Daniel McArdle Booker
OBERMAYER REBMANN
MAXWELL & HIPPEL LLP
525 William Penn Place,
Suite 1710
Pittsburgh, PA 15219
(412) 566-1500
bruce.fox@obermayer.com

/s/ James R. Conde
Michael Buschbacher
James R. Conde
  *Counsel of Record*
Nicholas Cordova
Walker Fortenberry
BOYDEN GRAY PLLC
800 Connecticut Avenue NW
Suite 900
Washington, DC 20006
(202) 955-0620
jconde@boydengray.com

# CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), the under-signed certifies that this petition:

(i)     complies with the type-volume limitation in Federal Rule of Appellate Procedure 40(d)(3)(A) because it contains 3,868 words; and

(ii)    complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and 32(a)(6) because this petition has been prepared in a proportionally spaced typeface using Microsoft Office Word in 14-point Century Schoolbook.


Dated: May 18, 2026                         /s/ James R. Conde
                                             James R. Conde
                                             *Counsel of Record*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 18, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by using the CM/ECF system. I further certify that all parties in this case are represented by counsel who are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: May 18, 2026

/s/ James R. Conde
James R. Conde
*Counsel of Record*

# ADDENDUM

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 26a0099p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

————————————

UNITED STATES DEPARTMENT OF LABOR,

*Plaintiff-Appellee*,

*v.*

AMERICARE HEALTHCARE SERVICES, INC.; DILLI
ADHIKARI,

*Defendants-Appellants*.

No. 25-3128

————————————

Appeal from the United States District Court for the Southern District of Ohio at Columbus.
No. 2:21-cv-05076—Edmund A. Sargus Jr., District Judge.

Argued:  December 16, 2025

Decided and Filed:  April 1, 2026

Before:  STRANCH, BUSH, and DAVIS, Circuit Judges.

————————————

## COUNSEL

**ARGUED:**  James R. Conde, BOYDEN GRAY PLLC, Washington, D.C., for Appellants. Lindsey Rothfeder, UNITED STATES DEPARTMENT OF LABOR, Washington, D.C., for Appellee.  **ON BRIEF:**  James R. Conde, BOYDEN GRAY PLLC, Washington, D.C., Daniel McArdle Booker, MAXWELL & HIPPEL LLP, Pittsburgh, Pennsylvania, for Appellants. Lindsey Rothfeder, Amelia Bell Bryson, Rachel Goldberg, UNITED STATES DEPARTMENT OF LABOR, Washington, D.C., for Appellee.

STRANCH, J., delivered the opinion of the court in which DAVIS, J., joined in full, and BUSH, J., joined in part and in the judgment.  BUSH, J. (pp. 18–28), delivered a separate opinion concurring in the judgment and joining all but Section III.A. of the majority opinion.

---

**OPINION**

---

JANE B. STRANCH, Circuit Judge.   This is an enforcement proceeding against Americare Healthcare Services, Inc., a third-party provider of home care services, and its owner, Mr. Dilli Adhikari, for failing to compensate their employees in accordance with the Fair Labor Standards Act (FLSA) for overtime hours worked between October 2018 and October 2021. Under a regulation promulgated by the Department of Labor in 2013, third-party employers of home care workers are not permitted to claim either the "Companionship Services Exemption" or the "Live-In Exemption" to the FLSA's overtime requirements.   Americare and Adhikari contend the regulation is invalid under the Administrative Procedure Act and, thus, that the FLSA's overtime requirements are not enforceable against them because they are entitled to avail themselves of either statutory exemption.   The district court disagreed and granted summary judgment to the Department.   Americare and Adhikari also seek to challenge a regulation that narrowed the definition of "companionship services" under the FLSA, but the district court found they lacked standing.   Because we find the third-party regulation is a valid exercise of the Secretary of Labor's expressly delegated authority as to both exemptions, and that Americare and Adhikari lack standing to challenge the "companionship services" definition, we **AFFIRM**.

## I.  BACKGROUND

### A.        The FLSA and the Department's Regulation of the Home Care Industry

"The Fair Labor Standards Act, like many regulatory statutes, starts with a general rule and adds a list of exceptions after it.   Here is [one] general rule:   An employer must pay his employees overtime if they work more than 40 hours in a week." *Pickens v. Hamilton-Ryker IT Sols., LLC*, 133 F.4th 575, 579 (6th Cir. 2025) (citing 29 U.S.C. § 207).   Another general rule is that an employer must pay employees a minimum wage. *See* 29 U.S.C. § 206.   Despite the simplicity of these rules, the way the statute works in practice can be somewhat counterintuitive. The "list of exceptions" in the statute, *Pickens*, 133 F.4th at 579, comes in the form of a long

"Exemptions" section, 29 U.S.C. § 213.  The exemptions in Section 13[1] are many and varied, but they all operate as exceptions to requirements the FLSA places on *employers*, meaning that they provide scenarios in which employers do not have to, say, pay minimum wage or overtime.

The exemptions at issue in this case were originally enacted as part of the Fair Labor Standards Amendments of 1974.  The "Companionship Services Exemption" provides that the FLSA's minimum wage and overtime requirements do not apply to "any employee employed in domestic service employment to provide companionship services for individuals who (because of age or infirmity) are unable to care for themselves (as such terms are defined and delimited by regulations of the Secretary)."  29 U.S.C. § 213(a)(15).  The Department defines "domestic service employment" as "services of a household nature performed by an employee in or about a private home (permanent or temporary)," which may "include[] services performed by employees such as companions, babysitters, cooks, waiters, butlers," and the like (this list is "illustrative and not exhaustive").  29 C.F.R. § 552.3.  Likewise, "the term companionship services" has been defined to mean "the provision of fellowship and protection for an elderly person or person with an illness, injury, or disability who requires assistance in caring for himself or herself," which may include "the provision of care . . . to assist the person with activities of daily living."  *Id.* § 552.6.  The "Live-In Exemption" provides that the FLSA's overtime requirements do not apply to "any employee who is employed in domestic service in a household and who resides in such household."  29 U.S.C. § 213(b)(21).  The Department defines "live-in" domestic service workers as those "who reside in the household where they are employed."  29 C.F.R. § 552.102.  The 1974 Amendments also included a general grant of rulemaking authority providing that "the Secretary of Labor is authorized to prescribe necessary rules, regulations, and orders with regard to the amendments made by this act."  Pub. L. No. 93-259, § 29(b), 88 Stat. 76.

The Department adopted a set of implementing regulations in 1975, two of which are relevant here (together, the "1975 Third-Party Regulation").  One provided that both the

---

[1]While the United States Code citation is § 213, the Department tends to drop the hundreds digit, "2," in its regulations.  For instance, it refers to the Companionship Services Exemption as Section 13(a)(15), even though its citation is 29 U.S.C. § 213(a)(15).  *See* 29 C.F.R. § 552.109.  We adopt the same style.

Companionship Services Exemption and the Live-In Exemption applied to third-party employees, those "who [were] employed by an employer or agency other than the family or household using their services." Application of the Fair Labor Standards Act to Domestic Service, 40 Fed. Reg. 7,407 (Feb. 20, 1975) (formerly codified at 29 C.F.R. § 552.109). The other defined "companionship services" to mean those that "provide fellowship, care, and protection for a person who, because of advanced age or physical or mental infirmity, cannot care for his or her own needs," which "may include household work related to the care of the aged or infirm person." *Id.* at 7,405 (formerly codified at 29 C.F.R. § 552.6).

In the 1990's and early 2000's, the Department began considering changes to these regulations, "citing dramatic changes in the provision of home care services." *Home Care Ass'n of Am. v. Weil*, 799 F.3d 1084, 1088 (D.C. Cir. 2015) [hereinafter, "*Home Care Association*"] (citing a series of proposed amendments in 1993, 1995, and 2001). Also in this period, the Supreme Court heard a challenge by a third-party employee in *Long Island Care at Home, Ltd. v. Coke*, in which Coke contended the regulation that (then) permitted third-party employers to avail themselves of the Companionship Services Exemption was invalid. 551 U.S. 158, 161–64 (2007). The Court held unanimously that "the text of the FLSA does not expressly answer the third-party-employment question," that Congress "expressly instruct[ed] the agency to work out the details" of the Companionship Services Exemption, and that the Department's regulation including third-party employers was reasonable. *Id.* at 167–68.

In 2013, the Department changed course on third-party employers, explaining that the home care industry had transformed in the decades since the 1974 Amendments—a time when "many individuals with significant care needs were served in institutional settings rather than in their homes." Application of the Fair Labor Standards Act to Domestic Service, 78 Fed. Reg. 60,454, 60,455 (Oct. 1, 2013). "Since that time," the Department stated, "there has been a growing demand for long-term home care," such that "[a]s more individuals receive services at home rather than in nursing homes or other institutions, workers who provide home care services . . . perform increasingly skilled duties." *Id.* The new regulation (the "2013 Third-Party Regulation"), which went into effect in 2015, provides in relevant parts that "[t]hird-party employers of employees engaged in companionship services . . . may not avail themselves of the

minimum wage and overtime exemption provided by section 13(a)(15)" and that "[t]hird-party employers of employees engaged in live-in domestic service employment . . . may not avail themselves of the overtime exemption provided by section 13(b)(21)."  29 C.F.R. § 552.109(a), (c).  The Department also narrowed its definition of "companionship services," providing that the term "includes the provision of care . . . provided attendant to and in conjunction with the provision of fellowship and protection" only if "it does not exceed 20 percent of the total hours worked per person and per workweek" (the "Companionship Services Definition").  29 C.F.R. § 552.6.  The Department referred to the Companionship Services Exemption, the Live-In Exemption, and the general grant of rulemaking authority in Section 29(B) of the Fair Labor Standards Act Amendments of 1974 as authorities for these changes.  78 Fed. Reg. 60,557.

**B.     The Present Dispute**

This is an enforcement proceeding brought by the Department against Americare and Adhikari, its owner.  Adhikari initially founded his own home care agency, Intra-National Home Care, LLC, and later purchased Americare in 2016.  Americare operates exclusively in Ohio, where it provides its services to elderly or disabled clients through the state's Medicaid waiver programs.  These waiver programs allow individuals needing care, or their families, to initiate the enrollment process by contacting a relevant state agency or organization and then choosing a provider, such as Americare.

All of Americare's home care workers are live-in workers, and between 95 and 99.9 percent of those workers are employed by Americare to provide care to their own family members.  This business model works because, as Americare represents, it serves a specific population of Nepali Ohioans who, based on cultural and religious beliefs, are unlikely to accept home care services from anyone other than a close family member.  "In the rare case that a consumer does not come with, or have a family member to serve as, their care giver," Americare explains, it "has occasionally matched a consumer with a care giver"; this accounts for the very small percentage of Americare workers who are not family members.  R. 113-3, at PageID 48604.  Because Americare hires nearly all of its workers to serve their family members in their family homes, it contends that it "could not unilaterally cut weekly hours below forty."

The district court held that Americare and Adhikari violated the FLSA's overtime requirements in part because, from October 2018 to September 2019, Americare paid its workers a consistent hourly rate but did not pay them overtime. The record indicates that at least one attorney had advised Adhikari in early 2018 that he should pay overtime to Americare workers and that, as of July 2018, Adhikari was paying overtime to his other employees at Intra-National Home Care. In September 2019, Americare began paying overtime to workers by varying their hourly rates individually based on the number of hours they worked in a given week, then paying overtime according to the lower hourly rate; the result was that each worker's average hourly compensation remained the same, regardless of the number of hours each worked.

The Department filed this enforcement suit in October 2021. Americare and Adhikari moved for partial summary judgment, contesting the validity of the 2013 Third-Party Regulation and the Companionship Services Definition. The Department moved for summary judgment on all claims. While these cross-motions were pending, the Supreme Court decided *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), and the district court allowed both parties to amend their motions accordingly. The district court ultimately granted summary judgment to the Department, holding (a) that Americare and Adhikari were liable for violations of the FLSA, including willful overtime violations; (b) that the 2013 Third-Party Regulation is valid and enforceable; and (c) that Americare and Adhikari lack standing to challenge the Companionship Services Definition. Americare and Adhikari appeal only the district court's holdings that (1) the 2013 Third-Party Regulation is valid and (2) they lack standing to challenge the Companionship Services Definition.

## II. STANDARD OF REVIEW

Under the Administrative Procedure Act (APA), courts must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . [or] in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C). In so doing, "the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." *Id.* § 706.

Applying the APA, courts "must exercise their independent judgment in deciding whether an agency has acted within its statutory authority," *Loper Bright*, 603 U.S. at 412, relying on "traditional tools of statutory construction" to determine a statute's "single, best meaning," *id.* at 400–01. The inquiry begins with the "statutory text," relying on "the language itself" and "the specific context in which that language is used." *United States ex rel. Felten v. William Beaumont Hosp.*, 993 F.3d 428, 431 (6th Cir. 2021) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340–41 (1997)). And courts should interpret that text in accordance with binding judicial precedent. *Freeman v. Wainwright*, 959 F.3d 226, 232 (6th Cir. 2020). At times, a "statute's meaning may well be that the agency is authorized to exercise a degree of discretion" in interpreting or implementing its provisions, in which case "the role of the reviewing court under the APA is, as always, to independently interpret the statute and effectuate the will of Congress subject to constitutional limits." *Loper Bright*, 603 U.S. at 394–95 (citing *Batterton v. Francis*, 432 U.S. 416, 425 (1977)).

## III. ANALYSIS

When the Supreme Court overruled *Chevron* in *Loper Bright*, it held that the "presumption" "that statutory ambiguities are implicit delegations [of authority to interpret statutes] to agencies" "cannot be reconciled with the APA." 603 U.S. at 399–400. But *Loper Bright* did not disturb the principle that an agency is "authorized to exercise a degree of discretion" when the best meaning of the statute is that Congress has expressly delegated to the agency "authority to give meaning to a particular statutory term." *Id.* at 394–95 (citing *Batterton*, 432 U.S. at 425). When a statute does convey such discretion to an agency, *Loper Bright* directs courts to engage in a three-step inquiry to determine whether an agency's action pursuant to its expressly delegated discretion is valid: we must (1) ensure the delegation is constitutional, (2) "fix[] the boundaries of [the] delegated authority," and (3) "ensur[e] the agency has engaged in reasoned decisionmaking within those boundaries." *Id.* at 395 (citations omitted).

We recently applied this three-step framework for express delegations in *Pickens*. *See* 133 F.4th at 588–90. That case concerned Section 13(a)(1) of the FLSA, which exempts from minimum wage and overtime requirements "any employee employed in a bona fide executive,

administrative, or professional capacity . . . (*as such terms are defined and delimited from time to time by regulations of the Secretary*)." 29 U.S.C. § 213(a)(1) (emphasis added). Under regulations promulgated pursuant to Section 13(a)(1), the Department defines an employee as falling within the exemption in Section 13(a)(1) if, among other criteria, she is paid on a salaried, rather than hourly, basis. *See* 29 C.F.R. § 541.200, § 541.602, § 541.604(b). We upheld these regulations as permissible exercises of the agency's "express delegated authority to define executive, administrative, and professional employees" under Section 13(a)(1). *Pickens*, 133 F.4th at 588–90.

### A.      The Statutory Exemptions

The 2013 Third-Party Regulation provides that third-party employers may not avail themselves of two exemptions: the Companionship Services Exemption and the Live-In Exemption. Before applying the *Loper Bright* analysis, we first describe the statutory exemptions at issue. The Companionship Services Exemption provides that the FLSA's minimum wage and overtime requirements do not apply to "any employee employed in domestic service employment to provide companionship services for individuals who (because of age or infirmity) are unable to care for themselves (as such terms are defined and delimited by regulations of the Secretary)." 29 U.S.C. § 213(a)(15). The "Live-In Exemption" provides that the FLSA's overtime requirements do not apply to "any employee who is employed in domestic service in a household and who resides in such household." 29 U.S.C. § 213(b)(21).

Americare and Adhikari concede that the Companionship Services Exemption contains an express delegation of authority to the Secretary, and relevant precedent clearly compels that conclusion. In *Coke*, a unanimous Supreme Court concluded the following about the Companionship Services Exemption: "The statutory language refers broadly to 'domestic service employment' and to 'companionship services.' It *expressly instructs the agency* to work out the details of those broad definitions." 551 U.S. at 167 (emphasis added). The *Coke* Court interpreted the same statutory text that guides and binds the agency today. *See id.* at 163.

*Loper Bright*, having identified the category of express delegation as one where a statute's meaning confers discretion to an agency, then includes a footnote with two examples

of such express delegations—the first of which is the Companionship Services Exemption. 603 U.S. at 394–95 n.5 (citing 29 U.S.C. § 213(a)(15); 42 U.S.C. § 5846(a)(2)).  When citing the exemption, the Court italicized for emphasis the language "as such terms are defined and delimited by regulations of the Secretary."  *Id.*  In sum, the Court acknowledged the long-standing rule of express delegation, declined to disturb it in overruling *Chevron*, and cited the Companionship Services Exemption as a representative example (apparently the first to come to mind).  *See id.*  Thus, the *Loper Bright* majority recognized the Companionship Services Exemption as an express delegation of authority to the Secretary.  Finally, the Supreme Court's treatment of the exemption is consistent with our decision in *Pickens*, as the express delegation language in Section 13(a)(1), "as such terms are defined and delimited from time to time by regulations of the Secretary," 29 U.S.C. § 213(a)(1), is nearly identical to the language *Loper Bright* emphasized in the Companionship Services Exemption, "as such terms are defined and delimited by regulations of the Secretary," § 213(a)(15).  *See Pickens*, 133 F.4th at 588–90; *Loper Bright*, 603 U.S. at 394–95 n.5.

There is significant overlap between the Companionship Services Exemption and the Live-In Exemption.  Both exemptions regulate domestic service employment: the former regulates "any employee employed in domestic service employment to provide companionship services," and the latter regulates "any employee who is employed in domestic service in a household and who resides in such household."  29 U.S.C. §§ 213(a)(15), (b)(21).  The category of "companionship services" is a subset of "domestic service."  *See* 29 C.F.R. § 552.3 (defining "domestic service employment" to include "services performed by employees such as companions").  The text of the Companionship Services Exemption reflects this overlap, as the language "employed in domestic service employment to provide companionship services" necessarily indicates that being employed "to provide companionship services" is a manner of being employed to provide "domestic service[s]."  29 U.S.C. § 213(a)(15).  To be sure, the exemptions do not overlap entirely.  The Companionship Services Exemption, but not the Live-In Exemption, would apply to companionship workers who do not reside in the homes of their patients; while the Live-In Exemption, but not the Companionship Services Exemption, would apply, for instance, to a live-in butler or nanny.  *Compare* 29 U.S.C. § 213(a)(15), *with*

§ 213(b)(21).  Still, both exemptions apply to live-in companionship workers, which includes all the workers employed by Americare.

This overlap in scope impacts the agency's ability to regulate the labor of companionship service workers under the FLSA.  If the Department were to promulgate a regulation limiting the scope of the Companionship Services Exemption *only*, that regulation would have no practical effect on overtime payment for the substantial portion of companionship workers who are also live-in workers, because their employers could simply claim the Live-In Exemption instead.  Thus, to regulate the overtime rights of live-in companionship workers effectively, the Department must address both exemptions.  It has done so each time.  When the Department regulated the application of the FLSA to companionship workers employed by third parties in 1974 and in 2013, it promulgated parallel regulations for the Companionship Services and Live-In Exemptions.  *See* 29 C.F.R. § 552.109.

Americare and Adhikari, while acknowledging the express delegation in the Companionship Services Exemption and the overlap between the exemptions, contend we should treat the Live-In Exemption as if it affords the agency no discretion.  But there is no reason to treat these exemptions differently.

Rather, the FLSA's text makes clear that the express delegation in the Companionship Services Exemption extends to the Live-In Exemption insofar as they overlap in their regulatory coverage.  The Companionship Services Exemption is the first of the two exemptions to appear in the statute, and its references to "domestic service employment" and "companionship services" are the first appearances of either term in Section 13.  *See* 29 U.S.C. § 213(a).  In the Companionship Services Exemption, Congress "expressly instructs the agency to work out the details of [its] broad definitions," including by supplying the definition of "domestic service employment."  *Coke*, 551 U.S. at 167.  Congress "instructs the agency to work out [those] details," *id.*, furthermore, without limiting that instruction to the Companionship Services Exemption (the exemption does not say, for instance, "as such terms are defined and delimited by regulations of the Secretary *for purposes of this provision*").  *See* 29 U.S.C. § 213(a)(15).  Then, the statute makes use of the *same term*, "domestic service," in the Live-In Exemption, which Congress enacted contemporaneously with the Companionship Services Exemption in the

1974 Amendments.  *See id.* § 213(b)(21).  These features form a clear textual link between the exemptions, extending the discretion afforded to the agency in the Companionship Services Exemption to the Live-In Exemption insofar as they cover the overtime pay of the same employees: live-in companionship service workers.[2]

This interpretation of the statute accounts for the overlap between the Companionship Services and Live-In exemptions in a manner consistent with the logic of *Loper Bright*. Principles of statutory construction counsel that courts should "give effect to the text Congress enacted," *Ali v. Federal Bureau of Prisons*, 552 U.S. 214, 228 (2008), and "give effect to each word 'if possible,'" *Chickasaw Nation v. U.S.*, 534 U.S. 84, 94 (2001) (citing K. Llewellyn, *The Common Law Tradition* 525 (1960)).  Reading the express delegation in the Companionship Services Exemption as extending to the Live-In Exemption in a limited capacity gives meaning to Congress's choice to include in the former the language "as such terms are defined and delimited by regulations of the secretary."  29 U.S.C. § 213(a)(15).  Yet reading that express delegation language as applying to the Live-In Exemption *only insofar* as it regulates companionship workers gives meaning to Congress's decision not to include similar express delegation language in that exemption.

## B.          The 2013 Third-Party Regulation

We now apply the three-step framework articulated in *Loper Bright* to the 2013 Third-Party Regulation, which means (1) ensuring the delegation is constitutional, (2) determining "the boundaries of [the] delegated authority," and (3) "ensuring the agency has engaged in reasoned decisionmaking within those boundaries."  603 U.S. at 395 (citation modified).  Our decision in *Pickens* guides this analysis—not only because *Pickens* is binding authority, but because the express delegation language of the FLSA provision we examined in that case, Section 13(a)(1), closely resembles that of the Companionship Services Exemption.  *See* 133 F.4th at 579, 588.

A reviewing court's obligation to ensure a statutory delegation to an agency is constitutional, we explained in *Pickens*, means that the statute must contain an "intelligible

---

[2]In holding that the express delegation in the Companionship Services Exemption extends as specified to the Live-In Exemption, we do not reach the parties' arguments regarding whether the general grant of rulemaking authority in the 1974 Amendments, Section 29(B), confers any additional or independent discretion to the Secretary.

principle" and not be "an impermissible delegation of legislative power to an executive branch agency."  133 F.4th at 587–88 (citing *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472 (2001)).  In *Pickens*, there was no dispute between the parties regarding the constitutionality of the delegation in Section 13(a)(1).  *See id.* at 588.  Here, the express delegation language in the Companionship Services Exemption contains an intelligible principle to guide regulatory actions under both exemptions because it provides that the Secretary must "define[] and delimit[]" the application of certain terms.  29 U.S.C. § 213(a)(15).  As we instructed in *Pickens*, the obligation to define and delimit gave the secretary two distinct powers: to "state precisely" what key terms in the statute mean, and to "fix or mark [the] boundaries or limits" of the statute's application.  133 F.4th at 588.  These specific directives provide an intelligible principle; Americare and Adhikari provide no authority or reason that would suggest otherwise. The express delegation here is constitutional.

In the second step, a reviewing court should "determine the scope of the agency's discretion under the statute by setting out the task that the agency must perform."  *Id.* at 587–88 (citing 5 U.S.C. § 706(2)(C)).  Here, too, our analysis in *Pickens* of the boundaries of the delegation set by the language "as such terms are defined and delimited . . . by regulations of the Secretary" is instructive.  *See id.*  The key verbs "define" and "delimit" are used in multiple provisions of the same "Exemptions" section of the statute (both Section 13(a)(1), which *Pickens* construed, and the Companionship Services Exemption), which typically indicates they have "a consistent meaning" in both iterations.  *Zai v. Nat'l Credit Union Admin. Bd.*, 149 F.4th 837, 846 (6th Cir. 2025) (citing *Nat'l Credit Union Admin. v. First Nat'l Bank & Tr. Co.*, 522 U.S. 479, 501 (1998)); *see* 29 U.S.C. § 213(a)(15), (b)(21).  We specified in *Pickens* what those meanings are: "'Define' means to state precisely what something means. . . . 'delimit' means something else—to fix or mark boundaries or limits."  133 F.4th at 588 (citations omitted).

Americare and Adhikari contend the scope of the Secretary's discretion under the statute is limited to classifying based on employees, not employers, such that she lacks authority to decide whether third-party employers can avail themselves of either the Live-In Exemption or the Companionship Services Exemption.  But the Supreme Court's decision in *Coke* forecloses this interpretation.  *See* 551 U.S. at 167.  *Coke*'s reading of the scope of the delegation is

unmistakable: "The statutory language refers broadly to 'domestic service employment' and to 'companionship services.' It expressly instructs the agency to work out the details of those broad definitions. And *whether to include workers paid by third parties within the scope of the definitions is one of those details.*" *Id.* (emphasis added). Or as the Third Circuit put it recently in *Walsh v. WiCare Home Care Agency, LLC*, the Secretary's decision to "delimit the scope of the companionship services exemption by excluding third-party employers from its reach . . . was a lawful exercise of its expressly delegated authority under the FLSA." 2026 WL 36153, at *2 (3d Cir. Jan. 6 2026). (citation modified).

There is no doubt that *Coke* controls this case. Americare and Adhikari attempt to evade this conclusion by arguing that *Coke*'s "*Chevron*-based" construction of the FLSA has been abrogated by *Loper Bright* and, later, citing an amicus brief from *Coke* to suggest the Department's 1975 approach was correct in the first instance. These arguments misapprehend both *Coke* and *Loper Bright*. The Supreme Court stated clearly in *Loper Bright* that, by overruling *Chevron*, it "[did] not call into question prior cases that relied on the *Chevron* framework." 603 U.S. at 412. As the Court explained,

> The holdings of those cases that specific agency actions are lawful—including the Clean Air Act holding of *Chevron* itself—are still subject to statutory *stare decisis* despite our change in interpretive methodology. Mere reliance on *Chevron* cannot constitute a "special justification" for overruling such a holding, because to say a precedent relied on *Chevron* is, at best, "just an argument that the precedent was wrongly decided." That is not enough to justify overruling a statutory precedent.

603 U.S. at 412 (citing *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 266 (2014)). This statement guides a court's analysis of *Chevron*-era caselaw in at least two ways: (1) it makes clear that cases relying on *Chevron* remain binding as insofar as they interpret the statutes at issue; and (2) it cautions that the Court's ruling in *Loper Bright* is not a sufficient basis for courts or litigants to second-guess agency actions that have already been upheld as lawful (because reasoning that a case "was wrongly decided . . . is not enough to justify overruling a statutory precedent"). *See id.*

Americare and Adhikari's contention that *Coke* has been "abrogated" is wrong for two reasons. First, even cases that rely on *Chevron* are not abrogated by *Loper Bright*. *See id.*

Second, and moreover, *Coke* is not a *Chevron* case: its statutory holding is based on a finding of express delegation, rather than the implied delegation framework *Loper Bright* overturned.  *See* 551 U.S. at 167.  This grounding in express delegation distinguishes *Coke* from the decisions *Loper Bright* contemplates as being at risk of hasty overruling for the insufficient reason that they were "wrongly decided."  603 U.S. at 412.  Thus, *Coke*'s holding regarding the Secretary's expressly delegated powers is still good law, even though the 1975 Third-Party Regulation is no longer in effect—a change that was *pursuant to* that expressly delegated discretion.  In other words, *Coke* remains binding precedent insofar as it interprets the statutory language of the FLSA, but nothing in *Loper Bright* suggests the 1975 agency action *Coke* upheld was to be preserved in amber.  *See id.* at 412.

What remains is whether the Department's promulgation of the 2013 Third-Party Regulation was "reasonable and reasonably explained."  *Pickens*, 133 F.4th at 588 (citing *F.C.C. v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)).  Under the *Chevron* regime, agencies were not subject to a heightened standard of review when the challenged action involved a change in course.  *See F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 514–15 (2009).  After *Loper Bright*, agencies without some delegation of authority from Congress may lack discretion to change course, because the lack of such a delegation generally means an agency is bound by the "single, best meaning" of the statute even if circumstances change.  *See* 603 U.S. at 400–02.  But this case is not in that category because the best meaning of the exemptions *is* "that the agency is authorized to exercise a degree of discretion."  *Id.* at 394.  The prior rules for changes in course therefore remain applicable.  As the Supreme Court explained in *Fox Television Stations*,

> We find no basis in the Administrative Procedure Act or in our opinions for a requirement that all agency change be subjected to more searching review.  The Act mentions no such heightened standard. . . .  To be sure, the requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it *is* changing position. . . .  But it need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates.

556 U.S. at 514–15.  As the text of the APA is unchanged, this reasoning should apply to the three-step express delegation framework identified in *Loper Bright*, *see* 603 U.S. at 395, just as it did for express delegations in the *Chevron* era.

Here, the Department explained its change in course thoroughly and by reference to a decades-long, "dramatic transformation" in the home care industry.  *See* 78 Fed. Reg. 60,467.  In the 1970's, most individuals needing elder care turned to nursing home facilities, such that the vast majority of professional care givers worked in nursing homes.  *See id.* at 60,455.  When the Department promulgated the 1975 Third-Party Regulation, then, it would have understood its inclusion of third-party employers in the scope of the exemptions as having a negligible impact on the application of the FLSA to the industry overall.  By the 1990's, however, the industry had begun a steady shift toward professional home care, as more and more seniors began opting to secure companionship services rather than live in nursing homes—a trend that continued in the ensuing years leading up to the 2013 change in course.  *See Home Care Ass'n*, 799 F.3d at 1088.  As the Department pointed out, this transformation was "in part a result of the rising cost of traditional institutional care, and [it was] made possible in significant part by the availability of government funding assistance for home care under Medicare and Medicaid."  78 Fed. Reg. 60,458.  Americare and Adhikari do not contest these facts.  It is therefore reasonable that the Department would choose to update its regulation of third-party employers of home care workers to ensure that this growing population of workers is protected by the FLSA's overtime requirements.  The 1974 Amendments were generally "intended to expand coverage to include more workers," *id.* at 60,507, and as a result, the Department reasoned, "the exemptions excluding employees from coverage must . . . be defined narrowly in the regulations to achieve the law's purpose of extending coverage broadly," *id.* at 60,482.  This context, as well as the Department's explanation of it, indicates that the 2013 Third-Party Regulation is a reasoned and reasonably explained exercise of the agency's expressly delegated authority to regulate pursuant to the Companionship Services and Live-In exemptions.

The D.C. Circuit reached the same conclusion in *Home Care Association*, finding the Department's promulgation of the 2013 Third-Party Regulation was "entirely reasonable" given these changes in the industry.  799 F.3d at 1093.  That case was decided in 2015 when *Chevron*

was still binding authority. *Id.* at 1090. Nonetheless, as *Loper Bright* confirms by citing *Chevron*-era cases to elucidate the three-step express delegation framework, the reasonableness inquiry for express delegations is analogous to the standard previously applicable to implied delegations at "step two" of a *Chevron* analysis. *See* 603. U.S. at 395 (citing *Michigan v. EPA*, 576 U.S. 743, 750 (2015); *Allentown Mack Sales & Service, Inc. v. NLRB*, 522 U.S. 359, 374 (1998); *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29 (1983)). Thus, having determined that Congress delegated authority to the Department as to the Companionship Services Exemption and the Live-In Exemption (even though it did so by different reasoning), the *Home Care Association* court applied a reasonableness standard that was substantively similar, if not identical, to the "reasonable and reasonably explained" standard that applies under *Loper Bright* now. *Pickens*, 133 F.4th at 588 (citing *Prometheus Radio Project*, 592 U.S. at 423).

For all these reasons, the 2013 Third-Party Regulation is a valid exercise of the Department's expressly delegated authority under the Companionship Services Exemption, including the limited application of that authority to the Live-In Exemption.

### C. Standing to Challenge the Companionship Services Definition

Americare and Adhikari also appeal the district court's holding that they lack standing to challenge the Companionship Services Definition, 29 C.F.R. § 552.6. Article III of the United States Constitution limits federal courts' jurisdiction to certain "cases" and "controversies," U.S. Const. art. III, § 2, and "[t]he doctrine of standing gives meaning to these constitutional limits by 'identif[ying] those disputes which are appropriately resolved through the judicial process,'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 (2014) (second alteration in original) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). To have standing, a plaintiff must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Daunt v. Benson*, 956 F.3d 396, 417 (6th Cir. 2020) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)).

The D.C. Circuit ruled on an analogous issue in *Home Care Association*, in which the plaintiffs were associations of third-party home care agencies that (like Americare and Adhikari) challenged the validity of the 2013 Third-Party Regulation and the Companionship Services Definition. *See* 799 F.3d at 1087. The D.C. Circuit first held, as we have here, that the 2013 Third-Party Regulation was valid, rendering the FLSA's overtime requirements enforceable against the employers. *See id.* at 1096. *Home Care Association* then determined the employers lacked standing to challenge the definition because, given that they could not avail themselves of the Companionship Services Exemption, they were not injured by an application (or lack thereof) of the Companionship Services Definition. *See id.* at 1096–97. Or as the court explained, "[i]n light of our disposition with respect to the third-party-employer regulation, . . . appellees cannot make use of the companionship-services exemption, and their members thus suffer no direct injury as a result of the Department's narrowed definition of companionship services." *Id.* We find the same reasoning persuasive here, because Americare and Adhikari's overtime obligations are traceable to the 2013 Third-Party Regulation (which prevents them from availing themselves of the exemption), not to the Companionship Services Definition. *See Home Care Ass'n*, 799 F.3d at 1096–97. Thus, Americare and Adhikari lack standing to challenge the Companionship Services Definition.

## IV.  CONCLUSION

The district court's judgment is hereby **AFFIRMED.**

————————————

## CONCURRENCE

————————————

JOHN K. BUSH, Circuit Judge, concurring.  I agree with my colleagues that *Long Island Care at Home, Ltd v. Coke*, 551 U.S. 158 (2007) decides this case.  I write separately to express one point of disagreement regarding the path the majority takes to reach this conclusion, as well as two other concerns I have, relating to *Coke* and the Department's arguments concerning § 29(b).

### I.

First, I address my disagreement with one aspect of the court's opinion.  In Section III.A, the majority explains why the live-in exemption and the companionship-services exemption should be treated the same despite the live-in exemption containing no express delegation to define and delimit any terms in the exemption.  The majority interprets the express delegation in the companionship-services exemption to "extend[] to the Live-In Exemption insofar as they overlap in their regulatory coverage." Maj. Op. at 12.

I am hard pressed to see how the text of these exemptions supports the majority's interpretation.  The majority holds that because both the companionship-services exemption and live-in exemption cover domestic-service employment, the Department's regulatory authority extends to the live-in exemption when it is regulating the same employees covered by the companionship-services exemption.  Maj. Op. at 12.  But the delegation to define and delimit does not give the Department the authority to regulate all employees who fall under the exemption; it gives the Department a limited authority over specific terms within the exemptions. I will touch on this more later, but it also compels me not to join the majority on this point.

I agree that companionship services is a subset of domestic service employment, but the live-in exemption does not use the term describing the subset; it uses the broader term.  No textual hook shows that Congress meant for the live-in exemption to provide overlapping coverage only for a subset when it used the broader term.

We could have (and should have) rested our conclusion on much simpler grounds. Congress gave the Department the authority to define and delimit the phrase "domestic service employment . . . ." 29 U.S.C. § 213(a)(15). The Department exercised its authority and defined this term, and, at least under *Coke*, could delimit the term to exclude third-party employers. We then apply that definition and its delimitations to the rest of the statute, including the live-in exemption. *See In re Jackson Masonry, LLC*, 906 F.3d 494, 501 (6th Cir. 2018) ("Courts presume that the same words in the same statute mean the same thing."); Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* § 25 (2012) (discussing the presumption of consistent usage). So now the live-in exemption, after taking on the Department-supplied definition of domestic service employment, includes a third-party exclusion. End of analysis.

My preferred approach relies on traditional methods of statutory interpretation. The majority takes a contrary approach and instead looks to the scope of the Department's regulatory power combined with implications to determine that Congress gave the Department the authority to regulate "live-in companionship service workers," and not the broader category of live-in domestic service workers. Maj. Op. at 12. This approach simultaneously expands and contracts the Department's authority. It expands its authority by implying that the companionship-services exemption gives the Department the power to regulate live-in companionship service workers as a group, rather than the smaller power to regulate the terms that appear in the companionship-service exemption. But it also contracts the Department's power by limiting the definition of "employed in domestic service" to only the subset of domestic-service workers who are engaged in companionship services. I see no textual basis for either the expansion or the contraction.

In sum, I think the majority has moved away from the textual power to define and delimit a specific term and instead granted the power to more broadly regulate the workers themselves. Then, instead of recognizing that the text does not compel this conclusion, it artificially limits the text to apply only to a subset of domestic-service workers. This expands the power to regulate but narrows the class of workers to be regulated. Because I do not see how the text compels either conclusion, I cannot join this portion of the opinion.

It is true that my approach would also lead to an expansion of the Department's authority because it would expand *Coke*'s application to the live-in exemption. But I think this is the only consistent way to apply that case. *Coke* instructs that the Department has the authority under its power to define and delimit to answer whether third parties fit under the definitions. *Coke*, 551 U.S. at 167. This means that the inclusion or exclusion of third-party employers occurs through a definition or delimitation. Definitions and delimitations act on specific terms, and those terms carry their definitions and delimitations throughout the statute wherever they appear—including in the live-in exemption. As I explain in the next section, I believe that *Coke* was wrongly decided, but my approach applies it in the way that I think best harmonizes the case law and the statute's text.

In all other respects I agree with the majority opinion. So I now turn to my two other concerns that have come up in the case.

## II.

This case raises the issue of how *Coke* fits in our post-*Loper Bright* world. Eighteen years before *Loper Bright*, the Supreme Court decided *Coke* by seeming to apply a truncated version of the three-part test that would be announced in *Loper Bright*. The *Coke* Court considered the scope of the delegation to the agency and concluded that the Department of Labor's authority to define and delimit the terms "domestic service employment" and "companionship services" included the authority to determine "whether to include workers paid by third parties within the scope of the definitions . . . ." *Coke*, 551 U.S. at 167. While *Coke* answered *Loper Bright*'s question about the scope of the delegation, it did not engage in a thorough consideration of it. Of course, that was understandable, considering *Loper Bright* was yet to come.

With the benefit of *Loper Bright*, I want to address this gap in the *Coke* analysis by looking more closely at the scope of the delegation here and whether the Department went beyond it. Congress delegated to the Department the authority to "define[] and delimit[]" key phrases, including "domestic service employment" and "companionship services . . . ." 29 U.S.C. § 213(a)(15). The Department exercised its authority to define these phrases, and it

did not include the third-party exclusion in its definitions.  *See* 29 C.F.R. §§ 552.3, 552.6.  The regulation defines domestic service employment to mean "services of a household nature performed by an employee in or about a private home (permanent or temporary)."  *Id.* § 552.3. This definition makes no distinction based on the identity of the employer.  Likewise, the Department defined companionship services to mean "the provision of fellowship and protection for an elderly person or person with an illness, injury, or disability who requires assistance in caring for himself or herself."  *Id.* § 552.6(a).  The Department issued its third-party employment exclusion in a separate section from these definitions.  See 29 C.F.R. § 552.109.  This separate section does not purport to define or delimit any terms; it simply excludes third-party employers from availing themselves of the exemption, even when the employer meets the Department's definition.  Yet the Department claims that the third-party exclusion is an exercise of its authority to delimit the exemptions.

In my view, if not for *Coke*, the third-party exclusion would exceed the Department's delegation.  The statute only permits the Department to define and delimit specified terms in the exemptions, not to delimit the scope of the exemptions themselves.  *See* 29 U.S.C. § 213(a)(15) ("[A]s such *terms* are defined and delimited by regulations of the Secretary." (emphasis added)). The Third Circuit recently glossed over this distinction and held that the Department could delimit "the scope of the companionship services exemption by excluding third-party employers from its reach."  *Walsh v. WiCare Home Care Agency,* 2026 WL 36153, at *2 (3d Cir. Jan. 6, 2026).  But this reading gives short shrift to the exemption's text.  The Department's authority to delimit means that it can "fix or mark boundaries or limits" of the terms, but not of the exemption itself.  *Pickens v. Hamilton-Ryker IT Sols., LLC*, 133 F.4th 575, 588 (6th Cir. 2025). This is a subtle but important difference.  In delimiting the delegated term, the Department cannot change the scope of the other elements where the definitional power was not delegated. So this leaves us with a question regarding the third-party exclusion: was the Department delimiting a term or delimiting the exemption?

In *Pickens*, we said that the power to delimit meant the power to "establish a workable and reasonable method for applying the exemption in practice."  *Id.*  This delimiting power sufficed to let the Department use salary as a factor in drawing lines about who qualified as a

"bona fide executive, administrative, or professional capacity" employee under 29 U.S.C. § 213(a)(1). *Pickens*, 133 F.4th at 589. Using salary "made good sense" because it was "an objective metric, readily understood, easily applied (usually), and perhaps the best single indicator of the degree of importance involved in a particular employee's job." *Id.* (cleaned up). The salary delimitation served as a corollary to the definitions of executive, administrative, and professional employment. It did not serve as a scope limitation divorced from the definitions. The delimitation provided a method for determining whether the definition is met, thus delimiting the terms, not the exemption itself.

The third-party employment exclusion does not share this feature—it serves as a substantive exclusion of a particular type of employer, rather than as a corollary to the already-provided definitions. It delimits the exemption rather than the terms. By supplying the definition, the Department filled the statutory gap left in 29 U.S.C. § 213(a)(15), and without a remaining gap in the statute, the third-party employment exclusion serves as a substantive limit on the exemption's scope—a limit the Department lacks the authority to impose. *See Gonzales v. Oregon*, 546 U.S. 243, 261 (2006). In *Gonzales*, the Attorney General issued a regulation excluding assisted suicide from the definition of "legitimate medical purpose," and stated that assisting suicide using controlled substances violates the Controlled Substances Act (CSA). *Id.* The Supreme Court held that the CSA did not grant the Attorney General this substantive authority when it granted him a narrower authority to register and deregister physicians. *Id.* at 262. The Court reasoned that narrow delegations of authority do not imply the authority to change the scope of the statute and "declare an entire class of activity" to be a violation of the statute. *Id.*; *see also MCI Telecomm. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 231 (1994) (holding that the agency's authority to "modify" did not include the power for the agency to fundamentally change the scope of the statute).

*Coke* blessed a similar expansion of the Department's statutory role. Congress delegated a narrow definitional power to the Department, which it now uses to change the substantive scope of multiple exemptions. And it changes the scope of terms that the Department did not have authority over. The third-party employment exclusion changes the live-in exemption to require that the domestic service worker be an *employee* of the head of household, even though

the statute contains no such requirement.  *See* 29 U.S.C. § 213(b)(21).  This changes the scope of the exemption by changing the meaning of the other elements of the exemption.  The Department does the same thing to the companionship-services exemption.  Instead of just requiring that the companionship services be provided to old or infirm "individuals," the exclusion changes individuals to mean employers.  *Id.* § 213(a)(15).  This is a rewrite of the exemption that goes beyond delimiting the type of work that falls under the delegated terms.

Narrow delegations should be treated narrowly.  *See Gonzales*, 546 U.S. at 262; *Adams Fruit Co. v. Barrett*, 494 U.S. 638, 649–50 (1990) (declining to treat the narrow delegation to the Department of Labor as broad enough to let the agency change the scope of the remedy).  Unlike in *Pickens*, where the Department issued a single rule defining the delegated terms and setting the boundaries for those definitions, 133 F.4th at 580 (citing 29 C.F.R. § 541.602), the Department here established the definitions and boundaries of the terms, and then—in a separate regulation—issued a substantive exclusion that set aside the definition and its boundaries.  It would be like if the regulations at issue in *Pickens* concluded that people who work for real estate companies could never be exempt even if they are salaried employees.  That would not be a method for determining whether someone is an executive, it would be a substantive bar based on a criterion disconnected from the definition.

We also know that this is a substantive change rather than a boundary to the definition because the texts of §§ 213(a)(15) and 213(b)(21) never reference the employer.  They are both framed broadly to apply to any employee and are determined based on criteria separate from the identity of the employer.  The exemptions do not mention who the employer is, so any extra requirement identifying the employer delimits the exemption rather than the delegated terms.  The Department cannot rework the exemption to make it depend on the employer rather than the employee.  *See Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 325 (2014) (holding that the EPA could not rewrite "the statutory thresholds" to achieve its "bureaucratic policy goals").

The third-party exclusion does not on its face purport to be defining or delimiting any term.  *See* 29 C.F.R. § 552.109.  It instead relies on definitions provided by other regulations, notes that the third-party employers meet those definitions, and then places a substantive condition on who can qualify for the exemption.  *Id.*  The third-party employment exclusion does

not add or take away anything from the term.  Instead, it says that even if a particular group of employers meets the definition, that group cannot claim the exemption.  That goes beyond the power to "establish a workable and reasonable method for applying the exemption in practice." *Pickens*, 133 F.4th at 588.  In other words, the Department went beyond its authority to delimit.

Scrutinizing the scope of the delegation is a command that we as federal judges must take seriously.  That command has added force where, as here, the Department flip-flops from its longstanding position.  For almost forty years, the Department allowed third-party employers to benefit from these exemptions.  During that time, the Department was free to change its definitions and delimitations of the delegated terms.  It did not do so.  Employers and employees alike began to rely on the scope of the exemptions being what Congress said they were.  Then *Coke* expanded the Department's authority to cover not just the delegated terms, but the scope of the entire exemption.  And it did so in two sentences.  The Department then took advantage of the change.  Companies like Americare were at one moment exempt and the next moment precluded from seeking the exemption.  Agency flip-flopping can undermine the rule of law in even the best of circumstances.  It is more troubling still when the agency flip-flops on a question that Congress never gave it the authority to answer.

### III.

Now to the final point—the scope of delegation under § 29(d).  In my view, not all grants of rulemaking authority include a grant of *legislative* rulemaking authority.  As part of our duty to consider the scope of the delegation, I believe we must seriously consider whether the delegation included a grant of legislative rulemaking authority in the first place.  The Department asserted here that, regardless of the specific delegation, it has the authority to exclude third-party employers from qualifying for the live-in exemption because of the general rulemaking delegation that the 1974 amendments gave to the Department.  This general grant allowed the Secretary of Labor the authority "to prescribe necessary rules, regulations, and orders with regard to the amendments made by this Act."  Pub. L. No. 93-259 § 29(b), 88 Stat. 76.  The Department would have us conclude that this deputization is the type of delegation described in *Loper Bright* that empowers the agency "to fill up the details of a statutory scheme, or to regulate

subject to the limits imposed by a term or phrase that leaves agencies with flexibility, such as 'appropriate' or 'reasonable.'" 603 U.S. at 395 (cleaned up).

I would take almost the opposite tack from the Department. As an initial matter, the Department makes the exact argument that this court rejected in *Moctezuma-Reyes v. Garland*, 124 F.4th 416, 420 (6th Cir. 2024). Broad grants of rulemaking authority like § 29(b) do not require deference to the agency. *Id.* But more than just not warranting deference, broad grants of rulemaking authority, like the one in § 29(b), do not result in the power to promulgate legislative rules at all. This was the understanding in the early years of the Administrative Procedure Act, but it began to fall away in the 1960s and 1970s. *See* Thomas W. Merrill & Kathryn Tongue Watts, *Agency Rules with the Force of Law: The Original Convention*, 116 Harv. L. Rev. 467, 481 & n.54 (2002); *see also* Ronald A. Cass, *Rulemaking Then and Now: From Management to Lawmaking*, 28 Geo. Mason L. Rev. 683, 698–99 (2021) (describing the increase in legislative rulemaking in the 1970s).

But before we get to the reason for the shift, I offer a brief response to the Department's contention that § 29(b) is the type of specific delegation contemplated by *Loper Bright*. Generally, Congress delegates rulemaking authority to agencies in three ways: (1) specific delegations, (2) general delegations, and (3) hybrid delegations. *See* Kristin E. Hickman & Amy J. Wildermuth, *Harmonizing Delegation and Deference after* Loper Bright, 100 N.Y.U. L. Rev. 1924, 1930–31 (2025). Specific delegations of authority are those that identify "a particular statutory term, requirement, or limitation that needs elaboration and instructs" the administering agency to carry out that directive through rules and regulations. *Id.* at 1934; *see Loper Bright*, 603 U.S. at 394. When an agency acts pursuant to a specific delegation, it is performing the function that Congress entrusted to it, and we review the agency's actions in light of its delegated authority. *Loper Bright*, 603 U.S. at 394. The delegations cited in *Loper Bright* are of this type. 603 U.S. at 395. The Court did not cite to any general delegations when discussing agencies filling up the details of a statute. 603 U.S. at 395; *see also* Hickman & Wildermuth, *supra*, at 1972 ("Citations to general authority/housekeeping delegations are noticeably absent from the examples offered by the *Loper Bright* Court as delegations warranting reasoned decisionmaking review.").

The delegation in § 29(b) that gives the Department the ability to make "necessary rules, regulations, and orders with regard to the amendments made by this Act" is a general delegation. Pub. L. No. 93-259 § 29(b), 88 Stat. 76. This type of delegation is also sometimes referred to as a grant of "housekeeping authority." Merrill & Watts, *supra*, at 481 n.54. The delegation in § 29(b) uses broad language like "necessary" without connecting such language to a specific term or provision of the statute. Hickman & Wildermuth, *supra*, at 1936. And it does not appear alongside any of the substantive provisions of the statute; its only companion is § 29(a), which provides an effective date for the FLSA 1974 Amendments. Pub. L. No. 93–259, § 29(a), 88 Stat. 76.

As a general or housekeeping delegation, § 29(b) gives broad rulemaking authority entrusting the agency with adopting rules and regulations that the agency finds necessary to accomplish the goals of the statute. Historically, this type of grant would provide the agency with only the limited "authority to promulgate nonlegislative substantive rules (interpretive rules and policy statements) and procedural rules." Merrill & Watts, *supra*, at 481 n.54. But the Department does not wrestle with this history because agencies have become accustomed to courts affirming agency rulemaking authority in nearly every instance.

So what changed from the early days of the APA to now? One answer is that the Supreme Court stopped policing the lines for what type of power Congress delegated to the agency.[1] And once agencies realized that the Supreme Court was not going to police the line between legislative and housekeeping authority, agencies that never thought they had legislative rulemaking authority suddenly realized that they "in fact had enjoyed such power from their inception." Merrill & Watts, *supra*, at 545. Because the Supreme Court stopped enforcing the scope of the delegation when it came to legislative versus housekeeping authority, we have been operating in a world where "ambiguous grants of rulemaking authority are presumed to confer

---

[1]*See, e.g.*, *Nat. Broad. Co. v. United States*, 319 U.S. 190 (1943); *Am. Trucking Ass'ns v. United States*, 344 U.S. 298, 311 (1953); *United States v. Storer Broad. Co.*, 351 U.S. 192 (1956); *Fed. Power Comm'n v. Texaco Inc.*, 377 U.S. 33 (1964); *Thorpe v. Hous. Auth.*, 393 U.S. 268, 277 (1969); *Mourning v. Fam. Publ'ns Serv., Inc.*, 411 U.S. 356 (1973). In some of these cases the agency likely did have legislative rulemaking authority, but the Supreme Court ignored the question of what kind of power Congress gave to the agency and instead made assumptions about the scope of the delegation. *See* Merrill & Watts, *supra*, at 475.

legislative rulemaking power unless Congress expressly indicates that the grant is limited to procedural or interpretive rules." *Id.* at 545–46.

In my view, *Loper Bright* eliminated this presumption. Courts now have the obligation to police the lines that the Supreme Court so long ignored. As part of determining the scope of the delegation under the *Loper Bright* framework, we must also determine whether that delegation included the authority to promulgate legislative rules or only the power to promulgate housekeeping rules. Using the historical distinction, this case is easy as it relates to § 29(b)—it is a housekeeping delegation, so it carries with it the limited authority to promulgate interpretive and procedural rules and issue statements of policy. The Department could not have issued the third-party employment exclusion pursuant to § 29(b) because this section does not allow the Department to engage in legislative rulemaking.

Not only is this the more faithful reading of *Loper Bright*, but also my understanding as a matter of happy coincidence has the beneficial effect of diminishing the damage of the flip-flopping that I described earlier. When narrow delegations are treated narrowly, the agency needs some express congressional authority before it sets out on a path of flipping back and forth in its regulation of an industry. Interpreting every grant of rulemaking power as a grant of legislative rulemaking power gives the agencies a power that Congress never intended and lets them regulate industry in ways that lack the consistency we expect from rules that carry the force of legislation.

Contrary to the Department's reading of *Loper Bright* that would expand deference to agencies based on general delegations, my reading gives *Loper Bright* its teeth. Rather than treating any delegation as a command for deference, we should do exactly what *Loper Bright* said and determine the scope of the delegation and whether the agency acted under that delegation. If Congress did not give the agency legislative rulemaking authority, then we ought not to read it in.

But, as it is, *Coke* decides this case, so we need not reach any issues touching § 29(b). While I may not agree with *Coke*, I must follow it until the Supreme Court says otherwise. *See Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 484 (1989) ("If a precedent of

[the Supreme] Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to [the Supreme] Court the prerogative of overruling its own decisions.").